JOSEPH C. RUST (2835)
SCOTT S. BRIDGE (12039)
KESLER & RUST
68 South Main Street, 2nd Floor
Salt Lake City, Utah  84101
Telephone:  (801) 532-8000
jcrust@keslerrust.com
sbridge@keslerrust.com
*Attorneys for Plaintiff*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| KEITH JONSSON, an individual; MICHAEL JONSSON, an individual; CEDAR VALLEY FUR FARM, LLC, a Utah limited liability company; KENT GRIFFETH, an individual, MOUNT SMART ENTERPRISES, LLC, an Idaho limited liability company and ROGER GRIFFETH, an individual; | **COMPLAINT** |
| Plaintiffs, | Civil No. _____ |
| v. | Judge _____ |
| NATIONAL FEEDS, INC., an Ohio corporation; | **JURY DEMANDED** |
| Defendant. | |

Plaintiffs Keith Jonsson, Michael Jonsson, Cedar Valley Fur Farm, LLC (collectively "Jonssons"), Kent Griffeth, Mount Smart Enterprises, LLC and Roger Griffeth (collectively "Griffeths") (Jonssons and Griffeths collectively "Plaintiffs") complain of defendant National Feeds, Inc. (hereinafter "National Feeds"), and for cause of action allege as follows:

## JURISDICTION AND VENUE

1.      Keith Jonsson is an individual residing in Utah County, State of Utah.

2.      Michael Jonsson is an individual residing in Utah County, State of Utah.

3.      Cedar Valley Fur Farm, LLC is a Utah limited liability owned by Keith and Michael Jonsson, with its principal place of business in the State of Utah.

4.      Kent Griffeth is an individual residing in Franklin County, State of Idaho.

5.      Mount Smart Enterprises, LLC is an Idaho limited liability company owned by Kent Griffeth, with its principal place of business in the State of Idaho.

6.      Roger Griffeth is an individual residing in Franklin County, State of Idaho.

7.      National Feeds is an Ohio corporation with its principal place of business in the State of Ohio.

8.      The claims at issue in this action exceed $75,000, exclusive of interest and costs.

9.      The subject matter of this action falls within the jurisdiction of this court by virtue of 28 U.S.C. § 1332(a)(2).

10.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to the claims occurred in the State of Utah and a substantial part of the property that is the subject of this action is located in the State of Utah.

## GENERAL ALLEGATIONS

11.     Plaintiffs operate mink ranches and have been in the mink business for many years.

2

12.   National Feeds is a supplier of animal feed, including supplying animal feed, nutrients, and supplements to the mink ranching industry.

13.   For many years the Plaintiffs have purchased and utilized feed from National Feeds for their mink.

14.   For the last ten or more years, Griffeths have annually fed their mink with lactation crumblets acquired from National Feeds.

15.   For some eight years prior to 2010, the Jonssons fed their mink no lactation crumblets at all or otherwise put any additives into their mink feed.

16.   In February 2010 at a trade show in Seattle, Washington, Kent Griffeth was shown some literature concerning a feed supplement produced by National Feeds called Immu Max which has as its main ingredient oregano.

17.   Kent Griffeth talked with Ed Buschur, the president of National Feeds, as well as with Al Newman, the area representative of National Feeds, at the trade show regarding the use of Immu Max in conjunction with lactation crumblets.

18.   Kent Griffeth was convinced by Newman and Buschur that Plaintiffs should have Immu Max mixed in with the lactation crumblets to feed their mink during the whelping season.

19.   While still at the trade show in Seattle, Griffeth affirmed to Ed Buschur and Al Newman he would order Immu Max to be mixed in the lactation crumblets he would be ordering for the Plaintiffs for 2010 and would give that order as soon as the Plaintiffs knew how much total feed they would be acquiring from National Feeds for 2010.

3

20.   Shortly thereafter Kent Griffeth on behalf of the Plaintiffs ordered six pallets of lactation crumblets for himself and his company, four pallets for Roger Griffeth, six pallets for the Jonssons, and four pallets of Grow Fur for himself and his company.

21.   All the lactation crumblets ordered by Plaintiffs were to include Immu Max.

22.   The order placed with National Feeds by Kent Griffeth on behalf of the Plaintiffs was sufficient to fill a semi truck.

23.   The lactation crumblets for 2010 were shipped by National Feeds and the Rangen mixing plant in Buhl, Idaho mixed the order.

24.   The payment by Plaintiffs for the semi truckload of feed from National Feeds included payment for the extra charge for the Immu Max which Plaintiffs had ordered.

25.   After the semi truckload of product ordered by Plaintiffs from National Feeds had been mixed at the Rangen plant at the direction of National Feeds, Kent Griffeth had the load delivered to his ranch in Preston, Idaho.

26.   The Jonssons and Roger Griffeth each picked up their purchased amounts of National Feeds product at the Kent Griffeth ranch.

27.   The arrangement on collectively using the semi truck was for the Plaintiffs to save trucking costs.

28.   Upon information and belief, the lactation crumblets mixed at the Rangen plant and sold to the Plaintiffs had the following problems:

4

a.  Although ordered and paid for by Plaintiffs, there is a question whether any Immu Max at all was mixed into the lactation crumblets sold to Plaintiffs.

b.  The lactation crumblets were mixed at the Rangen plant approximate thirty days prior to delivery to the Plaintiffs, even though feed industry standards, specifically including the poultry industry standards, require that most feeds, particularly those which have blood meal as did the lactation crumblets, not be mixed for delivery more than two to three weeks prior to delivery, according to moisture content.

c.  The lactation crumblets mixed at the Rangen plant had no expiration dates noted.

d.  Apparently no Immu Max was shipped by National Feeds to the Rangen mixing plant until after the lactation crumblets sold to Plaintiffs had already been mixed.

29.   Griffeth took possession of the semi truckload of feed from the Rangen plant on or about April 21, 2010, with each of the Plaintiffs taking their respective ordered amounts of feed.

30.   Upon opening some sacks of the lactation crumblets purchased from National Feeds, the Jonssons noticed a strong smell, but were not particularly alerted to any problems because they had not used National Feeds lactation crumblets for many years before that time.

31.   As of April 24, 2010, almost two-thirds of the mother mink on the Jonsson ranch in Lehi had finished the whelping process.

32.   None of the Jonsson mink on their ranch in Cedar Valley were fed any of the lactation crumblets purchased from National Feeds in 2010.

5

33. The Jonssons fed their mink with the lactation crumblet feed purchased from National Feeds starting about April 24, 2010.

34. When Kent Griffeth opened some sacks of lactation crumblets from the first pallet he had purchased from National Feeds, he noticed that the feed had a much different color than he was used to and had a very strong smell.

35. Kent Griffeth immediately called National Feeds to complain about the lactation crumblets on the first pallet and was told that someone from National Feeds would come to check on the problem and if necessary replace the product.

36. When Griffeth opened the sacks on the second pallet, he determined that they did not seem to have as strong a bad smell as he had experienced with the sacks on the first pallet, although he noted they did have the same questionable coloration as those previously opened.

37. Although Kent Griffeth was informed that a representative of National Feeds would come and check all of the lactation crumblets and if necessary, provide replacement, at no time did any representative of National Feeds ever come to check the feed or to otherwise arrange to replace the same for several months.

38. Around September 2010, Kent Griffeth was able to replace the first pallet of lactation crumblets for a pallet of another product from National Feeds called Grow Fur.

39. Kent Griffeth put the first pallet of lactation crumblets aside and fed the other five pallets of lactation crumblets to his mink in the ordinary course of his business, believing that only the first pallet had any problems, particularly after not having heard back from anyone from

National Feeds to verify one way or another the condition of the feed, and needing to keep his mink fed.

40.   Starting in late April 2010 and continuing through mid May 2010, all the Plaintiffs started to experience serious losses in newborn mink as well as losses and weaknesses in mother mink as to those mink which had been fed the lactation crumblets during the whelping process, primarily those which had later litters, according to how they had been bred.

41.   After Plaintiffs started to experience significant animal losses among the newborn and mother mink which had been fed the lactation crumblets during the whelping period, they started to check a number of different sources as to the possible causes, including checking with veterinarians and making multiple calls to National Feeds and to the National Feeds area representative, Al Newman.

42.   At no time were Plaintiffs ever told by National Feeds not to feed the National Feeds lactation crumblets to their mink during the whelping period.

43.   Although both Plaintiffs disclosed their respective problems to National Feeds soon after they experienced unusual losses, the problems the Jonssons were experiencing were not disclosed to the Griffeths and the problems the Griffeths were experiencing were not disclosed to the Jonssons until Keith Jonsson and Kent Griffeth met together in August of 2010 and began to compare notes about mink losses.

44.   Upon information and belief, a number of mink ranchers in the Midwest who had purchased feed from National Feeds were having unusually high rates of deaths among newborn and mother mink during the Spring of 2010.

45.   Upon information and belief, many if not all of the Midwest mink ranchers had disclosed their mortality problems to National Feeds prior to July of 2010.

46.   Sometime in July 2010 Ed Buschur, the President of National Feeds, personally visited Preston Idaho and invited Kent Griffeth to meet him in downtown Preston for dinner.

47.   During that dinner Mr. Buschur disclosed he was there visiting other Idaho mink ranchers.

48.   Although Mr. Buschur discussed the Griffeths' mink losses with Kent Griffeth, he declined to visit the Griffeths' ranches nor ask to take any samples of any National Feeds feed at the Griffeths' ranches or otherwise give any direction to Kent Griffeth as to what could be causing the significant losses of mother and newborn mink.

49.   At no time during his meeting in Preston Idaho with Kent Griffeth did Mr. Buschur disclose that there might be some problems with the National Feeds lactation crumblets, although he did say that there were some issues with a vitamin pack additive and as a consequence National Feeds had doubled the vitamins in their feed.

50.   In August 2010, Ed Buschur along with Al Newman visited several ranches in the Preston Idaho area, including the ranches of Kent Griffeth, for a very short visit, and with Roger Griffeth for a longer visit.

51.   While meeting with Roger Griffeth, Ed Buschur and Al Newman were informed that Roger Griffeth had one remaining pallet of lactation crumblets he had purchased from National Feeds, which he intended on feeding his mink later that year.

52.   Although both Buschur and Newman seemed a little troubled by the information given them by Roger Griffeth, they both affirmed that it was okay for him to feed the lactation crumblets to his mink.

53.   At no time until November 2010 did National Feeds ever disclose to Plaintiffs that other mink ranchers, including a number of ranchers in the Midwest, were also having problems with feed obtained from National Feeds.

54.   In November 2010, Ed Buschur, on National Feed's letterhead, issued a letter to many of National Feeds' customers stating that ranchers who had experienced losses attributed to feed supplied in the Spring of 2010 would be contacted by National Feeds' insurance carrier, who would be working with National Feeds in resolving the matter.

55.   None of the Plaintiffs received a copy of Buschur's letter directly from National Feeds.

56.   Upon information and belief, National Feeds failed to do any of the following:

   a.   Immediately recall its lactation crumblets as soon as it learned there was a significant mortality problem at more than one mink ranch or as soon as it received complaints about National Feeds product from more than one rancher.

b.  Inform all mink ranchers who had received the National Feeds lactation crumblets about similar problems other mink ranchers were experiencing.

c.  Attempt to immediately pinpoint the exact problems with the National Feeds products.

d.  Advise the mink ranchers to cease feeding the National Feeds lactation crumblets until the problems concerning the same could be isolated.

e.  Undertake appropriate testing to determine the exact cause for the problems being experienced by the various mink ranchers.

f.  Preserve for later investigation appropriate samples of feed and feed additives from its own sources and from all the mixing plants where National Feeds had sent its products.

g.  Share laboratory results on the lactation crumblets with all ranchers who had purchased the lactation crumblets from National Feeds.

57.   On information and belief, National Feeds failed to test its products prior to having them mixed in order to determine, among other things, rancidity and moisture content.

58.   On information and belief, National Feeds failed to make certain that its mink feeds did not become unstable over time, which will happen if the mixed product has a moisture content over 6% and even over 4% in some situations.

59.   National Feeds advertised to the public that its lactation crumblets had a moisture content of between 9 and 10 percent but did not notify the mink ranchers that the shelf life of the same was very short.

60.   The National Feeds lactation crumblets sold to Plaintiffs had a mix date but not shelf life or expiration date.

61.   Upon information and belief, National Feeds knew or should have known that its lactation crumblets once mixed did not smell right, had bad coloration, and that some or all of the lactation crumblets were rancid before being sent to the Rangen plant for mixing before being sold to Plaintiffs.

62.   Upon information and belief, the lactation crumblets sold to Plaintiffs out of the Rangen plant were mixed a full month before being sold to Plaintiffs, which is improper and contrary to good practices.

63.   National Feeds did not disclose to Plaintiffs until late 2010 that the lactation crumblets sold to Plaintiffs may not have had any Immu Max mixed in with the lactation crumblets.

64.   Upon information and belief, the main ingredient in Immu Max is oregano which, according to Plaintiffs' current understanding, should not be fed to pregnant mink.

65.   The specific recommendation of National Feeds was that Immu Max should be fed to pregnant mink and particularly during the whelping period.

66.   At no time were Plaintiffs informed Immu Max should not be given to pregnant mink, particularly during the whelping period.

67.   Upon information and belief, National Feeds intentionally sought to prevent Plaintiffs from learning that the lactation crumblets had been mixed a month before being sold to Plaintiffs.

68.   Upon information and belief, Plaintiffs allege that the reason the lactation crumblet mixing took place a month before sale to Plaintiffs was to try to hide high moisture content and/or rancidity of the products supplied by National Feeds for mixing, which act of mixing early was deliberate, intentional, willful, and wanton and with complete disregard for Plaintiffs and their mink.

69.   Upon information and belief, shortly after National Feeds began to learn that there were problems with its feeds, it imposed a gag order on all of its employees not to talk to anyone about such problems or to share information from those ranchers who were having problems stemming from the feed with other ranchers and otherwise took such actions as would cover up National Feeds' problems and to prevent Plaintiffs and other ranchers similarly situated from learning the truth about the feed that they had acquired from National Feeds, all of which actions were willful, wanton, and with complete disregard for the interests of their customers and specifically Plaintiffs.

70.   Upon information and belief, National Feeds' lactation crumblets had problems which caused the kidneys and the livers of pregnant mink during the whelping process to not

process Vitamin E, causing a Vitamin E deficiency both in the mother mink and in their offspring, thereby causing serious health problems and death for the mother mink and their offspring.

71.   After October 1, 2010 all the mink were blood tested for AD.  The adults basically showed normal results, but the kits showed significantly higher positive levels for AD.

72.   Upon information and belief, the damage to the kidneys and livers of the mother mink and their offspring from being fed the lactation crumblets during the whelping period causes a false positive in blood tests for AD, particularly in the blood tests of the kits.

73.   Based on the information which Plaintiffs now possess by reason of their own investigations and not from any assistance from National Feeds, Plaintiffs have been able to determine that a majority of the blood test positives, particularly with regard to the kits whose mothers were fed lactation crumblets during the whelping process, were false.

74.   The reason for the false positives is that the liver and kidney damage from the lactation crumblets caused the blood tests to show positives with AD.

75.   During the late April / early May whelping period, those female mink which were unable to clean out after the births or were too weak to give birth usually died from peritonitis, whereas the females which gave live birth to their kits during that same time and which were back on their feet within 30 days after giving birth were generally okay thereafter.

13

76.   However, Plaintiffs are still uncertain of the long term effects and damage to those mother mink which were fed lactation crumblets during their pregnancy and which have survived to today.

77.   Based on the poor offspring of those mother mink which were fed the lactation crumblets during the whelping period, Plaintiffs decided to cease using those mother mink as breeder females but rather caused that they would be harvested for their pelts in 2010.

78.   In the Spring and Summer of 2010, and without understanding the effects of feeding the mother mink with the lactation crumblets during the whelping period, Plaintiffs determined to use those kits which survived as breeder mink rather than using the mother mink which bore them, which decision was made in light of the information available to Plaintiffs in May and June of 2010, and without the knowledge they now have as to the problems with the lactation crumblets.

79.   Had Plaintiffs been given more information from National Feeds about the problems with the lactation crumblets in May and June 2010, Plaintiffs would have been in a better position to make correct decisions concerning which mink to retain as breeders.

80.   Because of the current uncertainty about the health of the mink in question, Plaintiffs are being damaged in their ability to pick quality breeders in sufficient quantities for the long term sustainability of their mink ranches.

81.   Color, size and quality not only affects the breeders but also the pelts which are sold for revenue.

82.   Based on information and belief, Plaintiffs allege that in 2010 the mink ranches operated by National Feeds also experienced many of the same problems of inconsistent sizes, quality, and health of their mink which Plaintiffs experienced in 2010.

83.   As a direct result of National Feeds' conduct and its product which was sold to Plaintiffs, Plaintiffs have not only been damaged but also will be damaged in the future as to the long term profitability of their ranches and in their reputations for producing quality mink.

84.   Upon information and belief, in all respects National Feeds acted willfully, wantonly, and with complete disregard for Plaintiffs and their mink.

<u>**FIRST CAUSE OF ACTION:**</u>

<u>**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**</u>

85.   Plaintiffs reincorporate the preceding paragraphs as though set forth verbatim herein.

86.   Plaintiffs purchased product from National Feeds for feeding Plaintiffs' mink.

87.   At the time of purchase, National Feeds was in the business of manufacturing and selling feed to buyers.

88.   Upon information and belief, the product sold to Plaintiffs:

  a.   Was not reasonably fit for the ordinary purposes for which such products are used;

  b.   Was not of the same kind and quality as other products with which it was sold;

c.   Was not of the same kind and quality as other similar products which National Feeds sold to Plaintiffs in previous years; and

d.   Would not pass without objection in the mink feed industry.

89.   Upon information and belief, these conditions rendered the product defective and unreasonably dangerous to pregnant females and their offspring.

90.   Upon information and belief, Plaintiffs were harmed by the National Feeds product in that subsequent to feeding the product to its mink, Plaintiffs suffered significant amounts of mink deaths and injury.

91.   Upon information and belief, the defective condition of National Feeds' product was a cause of Plaintiffs' mink deaths and injury.

92.   Plaintiffs could have reasonably expected to use or be affected by the mink feed product.

93.   As a result, Plaintiffs have suffered damages in an amount to be proven at trial.

94.   Plaintiffs are entitled to punitive damages against National Feeds for its willful and wanton conduct in an amount to be determined at trial.

## SECOND CAUSE OF ACTION:

## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

95.   Plaintiffs reincorporate the preceding paragraphs as though set forth verbatim herein.

96.   Upon information and belief, National Feeds had reason to know that Plaintiffs were buying the product for the particular purpose of feeding pregnant mink.

97.   Upon information and belief, National Feeds knew or had reason to know that Plaintiffs were relying on National Feeds skill or judgment to select or furnish a suitable product.

98.   Upon information and belief, the product was defective, unreasonably dangerous, and unfit for the particular purpose Plaintiffs bought it for.

99.   Upon information and belief, Plaintiffs were harmed by the product in the injury and death of mink.

100. Upon information and belief, the defective condition was a cause of Plaintiffs' harm.

101. As a result, Plaintiffs have suffered damages in an amount to be proven at trial.

102. Plaintiffs are entitled to punitive damages against National Feeds for its willful and wanton conduct in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### NEGLIGENCE

103. Plaintiffs reincorporate the preceding paragraphs as though set forth verbatim herein.

104. Upon information and belief, the product sold by National Feeds to Plaintiffs had a manufacturing defect which made the product unreasonably dangerous.

105. Upon information and belief, the product's defect was the result of National Feeds' failure to use reasonable care.

106. Upon information and belief, the defect in the product was a cause of Plaintiffs' mink deaths and injury.

107. As a result, Plaintiffs have suffered damages in an amount to be proven at trial.

108. Plaintiffs are entitled to punitive damages against National Feeds for its willful and wanton conduct in an amount to be determined at trial.

<u>FOURTH CAUSE OF ACTION:</u>

<u>STRICT LIABILITY</u>

109. Plaintiffs reincorporate the preceding paragraphs as though set forth verbatim herein.

110. National Feeds was engaged in the business of selling the product.

111. Upon information and belief, the product sold by National Feeds to Plaintiffs had a manufacturing defect which made the product unreasonably dangerous.

112. Upon information and belief, the manufacturing defect was present at the time National Feeds sold/distributed the product.

113. Upon information and belief, the manufacturing defect in the product was a cause of the Plaintiffs' injuries to their mink.

114. As a result, Plaintiffs have suffered damages in an amount to be proven at trial.

115. Plaintiffs are entitled to punitive damages against National Feeds for its willful and wanton conduct in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

## STRICT LIABILITY – FAILURE TO ADEQUATELY WARN

116. Plaintiffs reincorporate the preceding paragraphs as though set forth verbatim herein.

117. Upon information and belief, National Feeds was required to warn about a danger from the product's foreseeable use of which it knew or reasonably should have known and that a reasonable user would not expect.

118. Upon information and belief, National Feeds failed to provide an adequate warning at the time the product was manufactured, distributed, and/or sold.

119. Upon information and belief, the lack of an adequate warning made the product defective and unreasonably dangerous.

120. Upon information and belief, the lack of an adequate warning was a cause of Plaintiffs' injuries.

121. As a result, Plaintiffs have suffered damages in an amount to be proven at trial.

122. Plaintiffs are entitled to punitive damages against National Feeds for its willful and wanton conduct in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

## NEGLIGENCE – FAILURE TO ADEQUATELY WARN

123. Plaintiffs reincorporate the preceding paragraphs as though set forth verbatim herein.

124. Upon information and belief, National Feeds was required to warn about a danger from the product's foreseeable use of which it knew or reasonably should have known and that a reasonable user would not expect.

125. Upon information and belief, National Feeds failed to exercise reasonable care because it did not provide an adequate warning.

126. Upon information and belief, the lack of an adequate warning made the product defective and unreasonably dangerous.

127. The lack of an adequate warning was a cause of Plaintiffs' injuries.

128. As a result, Plaintiffs have suffered damages in an amount to be proven at trial.

129. Plaintiffs are entitled to punitive damages against National Feeds for its willful and wanton conduct in an amount to be determined at trial.

## JURY DEMAND

Plaintiffs request that this matter be tried by jury.

WHEREFORE Plaintiffs pray for judgment against National Feeds, Inc. as follows:

1.     Based on the FIRST CAUSE OF ACTION, Plaintiffs are entitled to judgment against National Feeds for such damages as are reasonable in the premises, including punitive damages;

2.     Based on the SECOND CAUSE OF ACTION, Plaintiffs are entitled to judgment against National Feeds for such damages as are reasonable in the premises, including punitive damages;

3.     Based on the THIRD CAUSE OF ACTION, Plaintiffs are entitled to judgment against National Feeds for such damages as are reasonable in the premises, including punitive damages;

4.     Based on the FOURTH CAUSE OF ACTION, Plaintiffs are entitled to judgment against National Feeds for such damages as are reasonable in the premises, including punitive damages; and

5.     Based on the FIFTH CAUSE OF ACTION, Plaintiffs are entitled to judgment against National Feeds for such damages as are reasonable in the premises, including punitive damages;

6.     Based on the SIXTH CAUSE OF ACTION, Plaintiffs are entitled to judgment against National Feeds for such damages as are reasonable in the premises, including punitive damages; and

7.    For pre and post judgment interest, attorneys fees and such other relief as the court

deems proper.

**DATED** this  _4th_  day of February 2011.

**KESLER & RUST**


 _/s/  Joseph C. Rust_
Joseph C. Rust
Scott S. Bridge
Attorneys for Plaintiff


Plaintiffs' addresses:

Keith Jonsson
9250 West 8170 North
Lehi, Utah 84043

Michael Jonsson
9250 West 8170 North
Lehi, Utah 84043

Cedar Valley Fur Farm, LLC
9250 West 8170 North
Lehi, Utah 84043

Kent Griffeth
2214 South 1600 East
Preston, Idaho 83263

Mount Smart Enterprises, LLC
2214 South 1600 East
Preston, Idaho 83263

Roger Griffeth
38 West Main
Franklin, Idaho 83237