CONFIDENTIAL- ATTORNEYS' EYES ONLY



# EXPERT WITNESS

# REPORT

---

## KEITH JONSSON et al.

## vs.

## NATIONAL FEEDS, INC.

---

*Submitted by:*

**Richard S. Hoffman, CPA/ABV**

Principal/Shareholder

*Date of Report:*

January 31, 2013

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   **I.   INTRODUCTION**

2   I have been engaged to review and respond to the report of Wade C. Roberts, Ph.D. dated

3   November 7, 2012.  Professor Roberts' report contains his opinions regarding the alleged

4   damages incurred by Cedar Valley Fur Farms ("the Jonssons" or "Plaintiffs"), as a result of their

5   claims made against National Feeds, Inc. ("National Feeds, Inc." or the "Defendant").  This

6   engagement, as with all of LonePeak's engagements, has been completed through the efforts of

7   multiple individuals.  Since I intend to testify regarding the opinions described in this report, I

8   have typically used singular pronouns such as "me", "I", etc. to describe the basis for my

9   opinions.  This is not meant to suggest that this report is a result of only my own efforts.

10  The opinions and findings expressed herein are based upon my work to date and upon the

11  pattern of facts that were observed in the review of the documents produced in this case,

12  publicly available documents, and my past professional experience. The information we have

13  reviewed is itemized in Schedule 1 of this report.  This report has been prepared solely in

14  connection with the litigation referenced herein and is intended for no other use.  Below, I have

15  described the bases for the opinions.

16  I may supplement, update or otherwise modify this report at a later date if I receive additional

17  relevant information produced to me during the proceedings of this matter.

18  This report is based on an assumption of liability.  I have not done work to determine liability

19  and do not expect to do any such work.  It is my understanding that National Feeds, Inc.

20  disputes the Jonssons' claims and asserts that it has not acted wrongfully.

21  **II.   QUALIFICATIONS**

22  I am a Co-Founding Shareholder and Principal of Lone Peak Valuation Group.  Prior to Lone Peak,

23  I was a Managing Director in the international professional services firm of LECG.  I have over

24  eighteen years of experience in public accounting and am a Certified Public Accountant.  I am

25  also accredited in business valuations through the American Institute of Certified Public

26  Accountants.  I have taught many times on the proper methodology of calculating damages on

27  behalf of the National Association of Certified Valuation Analysts.  I have also taught about the

28  process of valuing businesses and calculating damages at the University of Utah, as an adjunct

29 professor. I have co-authored a book on performing damage calculations. Additionally,

30 numerous articles of mine have been published in a variety of magazines and trade publications

31 regarding the proper methods of determining value and calculating damages. I have also taught

32 on such topics via presentations given at the national conferences of the American Institute of

33 Certified Public Accountants and the National Association of Certified Valuation Analysts.

34 Schedule 2 contains a copy of my Curriculum Vitae detailing my qualifications, publications and

35 speeches in the last ten years and trial and deposition testimony offered within the last four

36 years.

## III.    BACKGROUND AND ALLEGATIONS

38 In the calculation of certain damage remedies (i.e. lost profits), the damage expert's task is

39 conventionally viewed by damage experts as being to ascertain the amount of money that will

40 make the damaged party whole or put the damaged party in the same position it would have

41 been if not for the other party's allegedly wrongful actions.[1] In order to make such a calculation,

42 it is usually necessary to focus on just how the alleged wrongful conduct impacted the plaintiff's

43 business.

44 As part of my work, I analyzed the mink breeding industry. Through my research, I obtained a

45 basic level of understanding of certain aspects of the business. Specifically, I gained some

46 understanding of the mink breeding, kit (baby mink) raising, and harvesting processes. The

47 following brief description summarizes the most pertinent parts of how I understand the

48 plaintiffs operate their business.

49 The Jonssons operated two mink ranches; one in Lehi, Utah, and one in Cedar Valley, Utah.

50 Keith Jonsson is the father of Michael Jonsson and together they raise mink at both the Lehi and

51 Cedar Valley locations. It is my understanding that the Jonssons breed all the mink at the Lehi

52 ranch and then the mink are separated to the two separate farms. The black mink are raised on

53 the Lehi ranch and Mahogany mink on both the Lehi and Cedar Valley ranches.[2]

---

[1] Weil, Roman L., Michael J. Wagner, and Peter B. Frank, eds., Litigation Services Handbook: The Role of the Financial Expert, Third Edition, John Wiley & Sons, Inc., 2001, Chapter 5, page 4-5.

[2] Keith Jonsson Deposition, July 6, 2011, page 18.

3

CONFIDENTIAL - ATTORNEYS' EYES ONLY

54   Crop Year

55   The Jonssons begin each calendar year with a certain number of male and female mink that are

56   used for breeding ("Breeders").  Generally, the female to male ratio for Breeder mink is

57   between 4 to 1 and 5 to 1.[3]  During the first six months of the year, the female Breeder mink are

58   bred and the gestational period ("Whelping") is completed.  During the next six months the

59   offspring ("kits") go through a growing period and the mink are then harvested and the furs

60   ("pelts") prepared to be sold. The mink that are not pelted are kept as Breeders for the next

61   year.  This is referred to as the Crop Year.

62   The Jonssons sell their pelts either to or through the American Legend Cooperative ("ALC") in

63   auctions held twice a year; the first is generally in the spring ("1st Auction") and the second is in

64   May ("2nd Auction").[4]

65   The following chart depicts the Jonsson's business processes:



66

67   Therefore, the pelts produced in each Crop Year are generally sold in the following calendar

68   year. For purposes of our analysis, when the term Sales Year is used, the sales represent the

69   sales in the stated year; and the Breeders in the stated year represent the breeders from the

70   previous calendar year breeding cycle.  This is to more accurately match revenues and expenses.

71   The Plaintiffs allege that the Defendants' provided them with contaminated feed in the early

72   part of 2010 that seriously impacted their breeder mink herd at the Lehi location.[5] The Plaintiffs

73   testified the mink being raised at the same time at Cedar Valley location were not fed the

---

[3] Keith Jonsson Deposition, July 6, 2011, page 53.
[4] Keith Jonsson Deposition, July 6, 2011, page 65.

[5] Complaint page 5 line 29-33; Deposition of Keith Jonsson dated July 6, 2011, page 39.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

74  alleged contaminated feed.[6]  The feed allegedly impacted the mortality rates of the mink in

75  2010 and the breeder minks' ability to reproduce in 2011 and future years ("Alleged Wrongful

76  Conduct").

77  According to the Complaint filed in this matter, "...Plaintiffs have not only been damaged but will

78  also be damaged in the future as to the long term profitability of their ranches and in their

79  reputation for producing quality mink "[7] (emphasis added).  The Complaint does not further

80  discuss damages other than to say that the "...National Feed's product was a cause of Plaintiffs'

81  mink death and injury."[8] Damage experts would typically measure damages resulting from

82  these types of claims as Lost Profits.

83  The Plaintiffs' damage expert, Dr. Roberts, was asked "to provide a professional opinion in

84  regards to the economic impact experienced by the Cedar Valley Fur Farms following the

85  feeding of lactation crumlets in 2010."[9]  Dr. Roberts summarized his calculations into the

86  following three categories ("Damage Categories"):[10]

87      A.  Loss of sales revenue on pelts sold in 2011 due to substandard quality of pelt
88          produced from the 2010 Crop Year ("Pelts Taken to Market $62,627");

89      B.  Loss of pelt sales revenue in 2010, 2011, 2012, and 2013 due to high kit mortality
90          rates and low Reproduction Rates ("Pelts Not Taken to Market $1,380,771"); and

91      C.  Loss of breeder mink that would have been retained for the 2011 and future
92          breeding seasons and the cost of replacing breeder minks ("Breeder Mink
93          $1,142,500").

94  Dr. Roberts summarizes his work on page 6 of his report where he states, "In reviewing all facts

95  pertaining to this case, it is my professional opinion that the minimum monetary figure required

96  to compensate the Jonssons for losses experienced consequent to the advent of lactation

97  crumlets is $2,667,905 (current as of October 2012)."

---

[6] Complaint page 5 line 32.

[7] Paragraph 83 of Complaint filed 2/4/2011

[8] For example, see Paragraph 91, 106, 113, etc.

[9] Expert report of Wade C. Roberts; page 2

[10] Expert report of Wade C. Roberts; page 47.

98   **IV.   OPINIONS**

99        **A.  Dr. Roberts Has Not Measured Lost Profits or Any Other Conventional Measurement**
100           **of Damages. Instead, He Has Measured Lost Revenues, from Which Costs and Risk**
101           **Must Be Accounted For In Order to Measure Lost Profits**

102   The amounts measured by Dr. Roberts are in no way "...the minimum monetary figure required

103   to compensate the Jonssons..."[11] because Dr. Roberts has not measured Lost Profits. Instead he

104   has measured **Lost Revenues** as not deducted one single dollar's worth of expenses from his

105   calculation of Lost Revenue. This is an extremely significant error in that he has not accounted

106   for any of the incremental costs necessary to breed, feed, raise, and harvest the additional mink

107   that Dr. Roberts claims his client would have otherwise raised and sold. This error is especially

108   material given the large increase in the number of mink his calculations suggest would have

109   been raised by Cedar Valley Fur Farms. Further, this apparent oversight can't be remedied from

110   the data and analysis that was produced in his report. Finally, this approach is contrary to Dr.

111   Roberts own report. For example, his report states (emphasis added):

112        1.  Mink ranchers, in conjunction with profit maximizing principles, are concerned with
113           both total revenue *and total cost functions*.

114        2.  *Total costs are also targeted* - with efforts to become more efficient and reduce
115           costs subtracted from revenue received.

116        3.  While *considering both total revenue and total cost* in my process of analysis,...

117        4.  *We now turn our attention to the total cost side of the equation*.

118   Despite acknowledging the necessity of considering costs when estimating lost profits, Dr.

119   Roberts never did turn his attention to the total cost side of the equation and therefore hasn't

120   measured any conventional remedy of damages.

121        **B.  Dr. Roberts Calculations of Revenue Do Not Pass the Most Basic of Reasonableness**
122           **Tests**

123   Further, Dr. Roberts has greatly overstated any revenues that may have been lost by the

124   Jonssons. The reasons for his overstatement are described in detail below. In sum, he has not

---

[11] Expert report of Wade C. Roberts; page 6.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

125   tested assumptions that he made for reasonableness, reliability, or for consistency with the

126   factual accounting data. Further, the assumptions he used are often contrary to the accounting

127   data. He has not supported the methods that he has claimed to have used with any details of

128   his analysis. Finally, he has omitted steps in measuring damages that are conventionally applied

129   by the community of damage experts. The following illustrates the Plaintiffs' expected results

130   based on historical performance and the unreasonableness of the amounts ultimately

131   determined by Dr. Robert's (See Schedule 3):

Expected Results Assuming Average Historical Kits and Market Prices

| | Quantity | | | Market Prices | | | Actual/Expected | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | Black Pelt Sales | Mahogany Pelt Sales | Total Pelt Sales | Average Black Pelt Price | Averge Mahogany Pelt Price | | Total Sales | Actual Sales | Estimated Lost Sales |
| 2008 | 11,618 | 17,598 | 29,216 | $ 58.05 | $ 54.13 | | $1,627,051 | | |
| 2009 | 9,994 | 14,349 | 24,343 | $ 40.16 | $ 37.82 | | $ 944,068 | | |
| 2010 | 11,787 | 18,020 | 29,807 | $ 59.04 | $ 57.76 | | $1,736,724 | | |
| 2011 | 11,133 | 16,656 | 27,789 | $ 74.62 | $ 76.95 | | $2,112,325 | $ 2,133,968 | $ (21,643) |
| 2012 | 11,133 | 16,656 | 27,789 | $ 85.02 | $ 86.51 | | $2,387,494 | $ 2,754,476 | $ (366,981) |
| 2013 | 11,133 | 16,656 | 27,789 | $ 98.66 | $ 105.08 | | $2,848,559 | | |

No Loss

Expected Results Assuming Highest Historical Volume and Market Prices

| | Quantity | | | Market Prices | | | Actual/Expected | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | Black Pelt Sales | Mahogany Pelt Sales | Total Pelt Sales | Average Black Pelt Price | Averge Mahogany Pelt Price | | Total Sales | Actual Sales | Alleged Lost Sales |
| 2008 | 11,618 | 17,598 | 29,216 | $ 58.05 | $ 54.13 | | $1,627,051 | $ - | $ - |
| 2009 | 9,994 | 14,349 | 24,343 | $ 40.16 | $ 37.82 | | $ 944,068 | $ - | $ - |
| 2010 | 11,787 | 18,020 | 29,807 | $ 59.04 | $ 57.76 | | $1,736,724 | $ - | $ - |
| 2011 | 11,787 | 18,020 | 29,807 | $ 74.62 | $ 76.95 | | $2,266,106 | $ 2,133,968 | $ 132,138 |
| 2012 | 11,787 | 18,020 | 29,807 | $ 85.02 | $ 86.51 | | $2,561,132 | $ 2,754,476 | $ (193,344) |
| 2013 | 11,787 | 18,020 | 29,807 | $ 98.66 | $ 105.08 | | $3,056,447 | | |

132

No Loss

133   **C. Dr. Roberts Has Not Performed Statistical Analysis Usually Performed by a Statistician**
134   **When Measuring Damages. He Has Also Made Assumptions that Defy the Accounting**
135   **Evidence That Has Been Produced.**

136

137   As discussed in the American Institute of Certified Public Accountants' ("AICPA") Practice Aid 06-

138   4, "Calculating Lost Profits" it is generally understood by damage experts that:

139   The plaintiff must prove that their loss is related to the breach or wrongful act. The fact that the

CONFIDENTIAL - ATTORNEYS' EYES ONLY

140    defendant breached a contract or performed a wrongful act does not alone support damages.[12]

141    The practitioner should also be aware of the distinction between the legal requirement of
142    causation and the proof of the amount of damages. **In order to recover damages for lost**
143    **profits, it is necessary to show that the damages were proximately caused by the wrongful**
144    **conduct of the defendant.[13]** [Emphasis added.]

145    In many cases, damage experts are required to make assumptions regarding the link between
146    the actions of the defendant and how those actions are linked to the lost profit damages being
147    sought by the plaintiff.  Damage experts are trained that to "the extent that assumptions are
148    required, they should be backed by strong factual support."[14]  Many times the link between the
149    alleged harmful conduct and the damage measure is based on disputed facts. In such instances,
150    it is not uncommon for the damage expert to assume a factual interpretation consistent with his
151    client's interpretation.  In such instances, the damage expert does not typically opine on the
152    propriety of the assumption, since it is considered by damage experts to be a question of fact
153    that will be determined by the Finder of Fact.

154    However, even in such instances, forensic accountants conventionally review any relevant
155    financial data to determine if the business records are consistent with the factual assumptions
156    the damage expert has been asked to make.

157    When there is relevant financial information, the forensic accountant's analysis may help the
158    Finder of Fact make a factual determination.

159    Likewise, other assumptions may be based on expert testimony of an expertise that lies *outside*
160    a financial expert's particular area of specialized knowledge.  For such assumptions, the damage
161    expert conventionally relies on the testimony of the other expert and is again incapable of
162    testing the reliability of the assumption.

163    Finally, other assumptions in damage calculations lie *within* the damage expert's area of
164    expertise.  In these cases, an expert typically applies their specialized knowledge to assess the

---

[12] American Institute of Certified Public Accountants Practice Aid 06-4, "Calculating Lost Profits," p. 19.

[13] American Institute of Certified Public Accountants Practice Aid 06-4, "Calculating Lost Profits," p. 19.

[14] Fannon, Nancy J., Ed., The Comprehensive Guide to Lost Profits Damages, 2009 Edition, Business Valuation
Resources, LLC, 2009, Chapter 6, page 6-1.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

165    reasonableness of the assumptions they have been asked to make. Damage experts do not

166    conventionally assume something that is contrary to the methods and general beliefs of the

167    financial community.

168    In this case, the damages, as measured by Dr. Roberts, are dependent on assumptions that

169    could have been tested by Dr. Roberts through the type of conventional analysis utilized by

170    damage experts.  Dr. Roberts did not disclose in his report evidence of testing the assumptions

171    that a statistician would normally be used to support through statistical tests.[15]  Further, Dr.

172    Roberts has seemingly ignored the relevant accounting, financial, or economic evidence[16] that is

173    contrary to his assumptions.  By doing so, he has overstated all three of his calculations of Lost

174    Revenue.

175    **Pelts Taken to Market $62,627:**

176    Professor Roberts assumed the Alleged Wrongful Conduct caused low pelt quality of mink kits

177    raised during the 2010 Crop Year.  As part of this assumption, he also assumed:

178          a.    The Jonssons' experienced a loss of $62,627 in 2011 as a result of the
179                reduced quality of the pelts taken to market.

180          b.    The Plaintiffs' actual pelt quality is outside of the normal variance in pelt
181                quality experienced by the Plaintiffs

182          c.    That pelts sold during 2011 would have been sold at market averages.

183          d.    The variance that does exist in the pelt quality is attributed only to the
184                Alleged Wrongful Conduct.

185    In support of his opinion that the Plaintiffs experienced a loss of $62,627 in sales on the pelts

186    taken to market in 2011, Dr. Roberts prepared a chart that seems to provide 100% of the basis

187    for this damage number.  I have added a yellow box to the chart from where his damage

188    number has come.  The chart is a historical comparison of the actual prices received by the

---

[15] If Dr. Roberts produces any statistical analysis subsequent to the issuance of my report, I intend to have a statistician review such testing and update my report accordingly.

[16] Based my review of the deposition testimony of the Plaintiffs, the Plaintiffs have not maintained the historical documentation normally kept by businesses that is needed to most reliably examine many of the assumptions used by Dr. Roberts

CONFIDENTIAL - ATTORNEYS' EYES ONLY

189 Plaintiffs for its pelts taken to market. The Plaintiffs' actual historical sales were compared to

190 the amount that the sales would have been had the Plaintiffs' pelts been sold exactly at market

191 average prices. Dr. Roberts provided the following information:[17]

### CHART 14: JONSSON PRICE PERFORMANCE RELATIVE TO MARKET PERFORMANCE (WEIGHTED AVERAGE CALCULATIONS)

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| JONSSONS | 1,350,958 | 1,752,254 | 928,994 | 1,733,710 | 2,133,968 | 2,764,603 |
| MARKET AVERAGE | 1,338,719 | 1,733,509 | 944,068 | 1,736,812 | 2,196,595 | 2,701,516 |
| DIFFERENCE | 12,239 | 18,744 | (15,074) | (3,102) | (62,627) | 63,087 |
| DIFF (%) | 0.009 | 0.011 | −0.016 | −0.002 | −0.029 | 0.023 |

192

193 Based on the information in the above Chart, Dr. Roberts concludes that the Jonssons' price

194 performance is very near the price performance of the market averages for the industry. He

195 further concludes that the Jonssons pelts taken to market underperformed the market in 2011

196 by $62,627 and this underperformance is entirely due to the reduced pelt quality caused by

197 Alleged Wrongful Conduct.

198 Dr. Roberts' conclusion is not consistent with or supported by his analysis. The chart above

199 demonstrates that variation exists between the average prices received for the Jonssons' pelts

200 and the average prices received by other pelts sold by the American Legend Cooperative. Dr.

201 Roberts does not calculate an expected variance. Nor has he explained what caused the

202 variation from year to year, specifically, in 2012 when the Jonssons' outperformed the average

203 market prices by $63,087.

204 For damages calculated in a conventional manner measure only variance that falls outside of the

205 normal expected variance. The calculation of expected variance, and the determination of

206 whether or not the aforementioned variance is statistically significant, is a test statisticians

207 usually perform for this type of measurement. Dr. Roberts did not do so. Further, if the

208 crumlets cause such a variance, any beneficial variance must be offset against any detrimental

209 impact.

---

[17] Expert report of Wade C. Roberts; page 13, Chart 1

CONFIDENTIAL - ATTORNEYS' EYES ONLY

210  Thus, if this approach were the correct way to measure damages, which it is not, then the

211  Plaintiff has benefitted by the use of crumlets in the amount of $460 (-62,627+63,087). This

212  amount considers the difference in price received as compared to the market averages over all

213  the years the Plaintiff claims it was damaged.

### CHART 14: JONSSON PRICE PERFORMANCE RELATIVE TO MARKET PERFORMANCE (WEIGHTED AVERAGE CALCULATIONS)

|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|
| JONSSONS | 1,350,958 | 1,752,254 | 928,994 | 1,733,710 | 2,133,968 | 2,764,603 |
| MARKET AVERAGE | 1,338,719 | 1,733,509 | 944,068 | 1,736,812 | 2,196,595 | 2,701,516 |
| DIFFERENCE | 12,239 | 18,744 | (15,074) | (3,102) | (62,627) | 63,087 |
| DIFF (%) | 0.009 | 0.011 | -0.016 | -0.002 | -0.029 | 0.023 |

214

215  **Pelts Not Taken to Market - Low Reproduction and High Mortality Rates $1,380,771:**

216  Dr. Roberts opined the Alleged Wrongful Conduct caused the loss of 4,400 black mink and 1,100

217  mahogany mink during the 2010 Crop Year.[18] In order to make this determination, Dr. Roberts

218  assumed:

219  　　　　a.  An unreasonably high ratio of female breeders to pelts sold,

220  　　　　b.  No minks ever die before being large enough to be sold for pelting,

221  　　　　c.  The Alleged Wrongful Conduct caused low reproduction rates of the
222  　　　　　　 black breeder females,

223  　　　　d.  There is no normal reproduction rates from year to year,

224  　　　　e.  The black breeder mink purchased after the Alleged Wrongful Conduct
225  　　　　　　 also experienced reduced Reproduction Rates.

---

[18] Expert report of Wade C. Roberts; page 13, Chart 1.

11

CONFIDENTIAL - ATTORNEYS' EYES ONLY

226    **An Unreasonably High Ratio of Female Breeders to Kits**

227    Dr. Roberts did not seem to test the reliability of his calculations because he skipped

228    preparation of a conventional accounting step used to test measurements like the one he put

229    forth - an inventory roll-forward.

230    An inventory roll-forward recognizes that inventory can be analyzed over time by starting with

231    beginning inventory, adding any purchase or kits, subtracting deaths, sold kits, which results in

232    the time periods' ending inventory.  Of course, the ending inventory is equal to next year's

233    beginning inventory and so the inventory can be "rolled-forward" over time.  I have used Dr.

234    Roberts' assumptions regarding kits, death rates, etc to prepare an inventory roll forward based

235    upon his assumptions and it demonstrates that the assumptions used by Dr. Roberts are not

236    reliable.  For example, combining the Plaintiff actual results with Dr. Roberts' alleged lost pelts,

237    the 2011 Black Female Breeder Reproduction Rate is 6.08, when the actual rate for the previous

238    three year was 3.11, 2.62, and 2.78 (See Schedule 5 for more details).

239    The Graphs below compare the historical Kit/Breeder production to the production projected by

240    Dr. Roberts for Black and Mahogany female breeder:



241

242    See Schedule 5.1 for more details.

CONFIDENTIAL - ATTORNEYS' EYES ONLY



243

244    See Schedule 5.1 for details.

245    The Graphs illustrates the fact that the production during the damage years was within the
246    historical range experienced by the Plaintiff (with the exception of Mohagony in 2011 which I
247    discuss further below).  The Graphs also illustrate that Dr. Roberts' projections are much greater
248    than what was historically generated by the Plaintiff.  Finally, the Graphs show that even if his
249    projections of kit production were true, the production is within the historical range without
250    crumlet feeding.  In other words, his own projections indicate there are no damages for what Dr.
251    Roberts refers to as "Pelts not Taken to Market".

252    In sum, giving the Plaintiff every single benefit of the doubt and ignoring many of the
253    aforementioned problems in the analysis of Dr. Roberts, the number of lost mink is no more
254    than 1,508, (for the shortfall from the lower end of the historical average in Mohagony in 2011).
255    In 2011, the average sales price for Mohagony was $73.10 indicating the maximum Lost
256    Revenue for mink was no more than $110,235.[19]  This number is not damage since the costs
257    must still be subtracted to measure Lost Profits.  Nevertheless, this analysis demonstrates that
258    Dr. Robert's calculation of Lost Revenue is exaggerated greatly.

---

[19] If the shortfall were calculated based on the Reproduction Rate resulting from Dr. Robert's assumptions (Schedule 5.1), the Lost Revenue would be $165,352.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

259        **No Minks Ever Die before being Large Enough to be Sold for Pelting**

260    Dr. Roberts assumes that every single premature death loss experience by the Plaintiffs was due

261    to the Alleged Wrongful conduct. He did not consider that fact that the Plaintiffs experience

262    some level of loss due to death each year.[20] This is another assumption that a statistician would

263    be expected to test. Yet, Dr. Roberts has not provided any analysis of the Plaintiffs' historical

264    losses due to death. Instead, he has simply assumed that for some reason, the Jonsson's mink

265    never die - unless they eat crumlets.

266        **There is No Normal Variance in Reproduction Rates from Year to Year.**

267    Dr. Roberts analysis acts as if there is not any fluctuation in the annual reproduction rate.

268    Reproduction Rates naturally vary from year to year even when there is no Alleged Wrongful

269    Conduct. Damage experts commonly utilize a statistician or otherwise obtain statistical analysis

270    to determine whether or not the variance being analyzed is outside of the normal expected

271    range of variance. Dr. Roberts did not do this analysis.

272    Based on my review of the accounting evidence that is available, the actual Reproduction Rates

273    experienced by the Plaintiffs varied each year.[21] In the three years prior to any claimed

274    wrongdoing, the Plaintiffs experienced Reproduction Rates that ranged from 2.62 to 5.11.[22] The

275    following table demonstrates the actual variation in Reproduction Rates experience by the

276    Plaintiffs:

---

[20] For example, see bates numbers PL000243, PL000241, and PL000244, which identify Freezer Mink of varying amounts. Freezer Mink contain mink casualties throughout the year that are waiting to be pelted (See Michael Jonsson Deposition page 42 and Keith Jonsson Deposition page 62-63).

[21] See Schedules 4, 5, & 5.1.

[22] The Reproduction Rates I used have been adjusted to account for any change in the size of the Plaintiffs' breeder herd. See Schedules 4 for more detail.

14

CONFIDENTIAL - ATTORNEYS' EYES ONLY



277

278   Dr. Roberts ignored the fact that there is a normal range of variance in which the Reproduction
279   Rate fluctuates from year to year.  The flaw in his methodology can be further revealed by
280   applying his methodology to the female breeders in years 2008 to 2010, years in which no
281   wrongdoing is alleged.  Dr. Roberts' approach leads to a substantial overstatement of revenue in
282   every year of between 35% and 70%, before they ever fed the crumlets to their mink.  In other
283   words, the most basic testing demonstrates that Dr. Roberts' approach is one that the damage
284   expert community would not accept as reliable.  See Schedule 6 for more detail.


285            **No Intervening Factors Affected the Reproduction Rate**

286   There are several factors that would likely impact the Reproduction Rate, such as weather
287   conditions, age of the female breeders, the number of kits produced, the number of mink lost to
288   disease, the decision to change the herd size based on market conditions, etc.  Dr. Roberts did
289   not consider any other reasons the Reproduction Rate varied throughout his damage period.  He
290   does acknowledge that such factors may exist and even acknowledges that one must normally
291   consider such factors.[23]  However, his report indicates that by relying on the experience at Cedar
292   Valley, he has effectively accounted for all such risk.

---

[23] Expert report of Wade C. Roberts; page 11.

15

CONFIDENTIAL - ATTORNEYS' EYES ONLY

293   Once again, Dr. Roberts made an assumption (that the kit production at one location would be

294   the exact same as at the other) without ever testing this assumption.  Nowhere in his report, has

295   Dr. Roberts demonstrated the basis for expecting the two farms to produce at the exact same

296   rate.

297   The following is a list of reasons to expect the two ranches would not be exactly the same:

298   • Only Mahogany Mink are raised at Cedar Valley, where as Lehi has both black and
299     mahogany.[24]

300   • Weather conditions are not exactly the same.[25]

301   • Water source is different at each location.

302   • Lehi is adjacent to a lighted sports arena and closer to a more populated area than
303     Cedar Valley.[26]

304   • Age of the female breeders moved to each location is not exactly the same.[27]

305   **The Black Breeder Mink Purchased after the Alleged Wrongful Conduct Experienced**
306   **Reduced Reproduction Rates.**

307   Dr. Roberts calculations are based on an assumption that the black female breeder mink that

308   were purchased by the Plaintiffs subsequent to the Alleged Wrongful Conduct were also

309   somehow affected by the crumlets. This can't be accurate. Dr. Roberts' report says:[28]

310   At the start of 2012, The Jonsson ranchers held 4,630 mahogany, 3,127 black, and 975 additional black breeder females that were purchased to bridge the gap in female breeders from the previous season

[24] Keith Jonsson Deposition, pages 18-22.

[25] Keith Jonsson Deposition, pages 69.

[26] Keith Jonsson Deposition, page 21-22.

[27] Keith Jonsson Deposition, page 21-22.

[28] Expert report of Wade C. Roberts; page 22.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

311    Next, he adds the purchased breeders to the 3,127 as shown in the following chart, to get 4,102

312    allegedly affected mink as demenostrated here:

| Female Breeder per Roberts | 2012 |
|---|---|
| Black Female Breeders Held | 3,127 |
| Black Female Breeders Purchased | 975 |
| Female Count (Chart 5) | 4,102 |

313

314    Next, he uses 4,102 mink to calculate the lost kits shown here on a copy of his Chart 6:

# CHART 6: QUANTITATIVE DISTINCTION IN KIT COUNT, ACCOUNTING FOR KIT PER LITTER DISTINCTIONS (2012)

| BLACK MINK | | | |
|---|---|---|---|
| | FEMALE COUNT | KITS PER LITTER | TOTAL KITS |
| w/lactation crumlets | 4102 | 3.730 | 15,300 |
| w/out lactation crumlets | 4102 | 4.826 | 19,796 |
| DIFFERENCE | | | 4,496 |

| MAHOGANY FEMALES | | | |
|---|---|---|---|
| | FEMALE COUNT | KITS PER LITTER | TOTAL KITS |
| w/lactation crumlets | 773 | 5.184 | 4,007 |
| w/out lactation crumlets | 773 | 5.909 | 4,568 |
| DIFFERENCE | | | 560 |

315

316    Including the purchased Black Female Breeders in his analysis, Dr. Roberts assumes the newly

317    purchased female breeders would have experienced the same alleged reduced Reproduction

318    Rates as the black female breeders that were fed the cumlets.

319    **The Alleged Wrongful Conduct Caused the Plaintiffs to Replace Damaged Black and Mahogany**

320    **Breeders that Would not have Otherwise Needed Replacement ($1,142,500).**

321    Dr. Roberts's calculated the value of the female breeders that he claims would have comprised

322    the herd absent the Alleged Wrongful Conduct. The following is the Chart used by Dr. Roberts:[29]

---

[29] Expert report of Wade C. Roberts; page 46.

| CHART 18: BREEDER MINK, PURCHASE PRICE & REPLACEMENT VALUE (2010 - 2013) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ITEM | | 2010 | | 2011 | | 2012 | | 2013 |
| Breeders Quantified | | 1,560 | | 300 | | 975 | | 380 |
| Replacement Value | $ | 250 | $ | 250 | $ | 500 | $ | 500 |
| YEARLY TOTAL | $ | 390,000 | $ | 75,000 | $ | 487,500 | $ | 190,000 |
| COMBINED TOTAL | | | | | | | | $ 1,142,500 |

323

324    In order to make this determination, Dr. Roberts assumed:

325         a.   It cost between $250 and $500 to buy a breeder mink.

326         b.   The Plaintiffs are entitled to double counted damages.

327    It cost between $250 and $500 to buy a breeder mink.

328    Dr. Roberts uses a replacement cost of $250 in 2010 and 2011, and $500 in 2012 and 2013. Dr.

329    Roberts explains that the costs to purchase the breeders at these two points in time come from

330    a quote received from Patrick Fur Farm.[30] According to Dr. Roberts, mink farms are often not

331    capable of providing mink ranchers with hundreds of breeders.[31]

332    The breeder replacement costs used by Dr. Roberts are unreasonable as they on are

333    inconsistent with the other evidence produced. Dr. Roberts should have used the actual

334    purchase price of the breeder minks purchased. According to the Keith Jonsson, the breeders

335    were purchased for between $100 and $110 per mink.[32] Mr. Jonsson stated in his deposition:

336         Q. ...Between December of 2010 and now, how many mink have
337         you purchased from other sources? ... did you purchase any this last year?

338         A. I did.

339         Q. How many did you purchase this last year?

340         A. I had an order of 500 from Lyle Groves and I had an order of 500 from some kid out in
341         Riverton. And then I got, I think, it's 115 from Gordy again.

---

[30] Expert report of Wade C. Roberts; page 46, and PL0001794 and PL0001795.

[31] Expert report of Wade C. Roberts; page 46.

[32] As with many areas of the damage calculation, accounting evidence normally expected to be produced
by a business (copies of invoices, purchase documents) was not produced. If additional accounting
evidence is produced, I intend to update my calculations accordingly.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

342     Q. Okay. And do you know how much you paid for all of those?

343     A. I paid **$100** at the time from the one guy. I paid Lyle Groves $10 over his top average,
344     which was mine because he sells with me. And so he got, I believe, **$110** on those. And
345     then Gordy was – I believe it was **$110** on his also.

346     Dr. Robert provides no explanation for why the actual purchase price of the breeder mink

347     purchased by the Plaintiffs was not used in his analysis. Furthermore, the documentation

348     produced by the Plaintiffs indicates that in 2010, the Plaintiffs sold 5,500 live mink. Dr. Roberts

349     could have used this as another point of reference for the market price of a breeder mink.

350     This error is compounded by the fact that Dr. Roberts chose not to consider any salvage value

351     for the breeder pelts he claims died as a result of the crumlets nor has he considered any

352     additional costs of maintaining the additional mink. Since Dr. Roberts has not accounted for his

353     inventory in a traditional manner it is impossible to determine at this point whether or not he

354     has double counted these pelts in his damage figure.


355     **Other Factors Ignored by Dr. Roberts**

356     The AICPA's Practice Aid discussed above also outlines the steps required in the "Before and

357     After" method employed by Dr. Roberts in calculating lost profits. The Practice Aid states:

358     This method compares the plaintiff's performance before the event or action causing lost profits

359     to the plaintiff's performance after that event or action. The underlying theory is that, "but for"

360     the defendant's action, the plaintiff would have experienced the same level of revenues and

361     profits after the event or action as the plaintiff did before that event or action.[33]

362     The practitioner, however, should consider other factors that could have affected the plaintiff's

363     level of revenues and demonstrate how those factors have been taken into consideration.[34]

364     [Emphasis added.]

365     Dr. Roberts has also ignored the conventional method of accounting for all of the potential

366     business and economic risks that are associated with financial projections such as his related to

367     the alleged future damages (assumed to occur from 2010 to 2013).

---

[33] American Institute of Certified Public Accountants, Practice Guide 06-4, "Calculating Lost Profits," p. 25.

[34] American Institute of Certified Public Accountants, Practice Guide 06-4, "Calculating Lost Profits," p. 25.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

368    Another conventional method of making sure that a damage calculation is reasonably certain

369    and avoids over-stating damages, is to account for the "Time Value of Money" and "Business

370    Risks" that are inherent in any future damage measure.  Dr. Roberts has skipped this step

371    entirely again causing his damage measure to be overstated and in contradiction to

372    conventional methods used by damage experts.


373    *Accounting for the Time Value of Money*

374    It is universally understood that a dollar is worth more today than a dollar at some later point of

375    time in the future.  This is due to the holder's ability to earn interest on the money if it's held

376    today.  Thus, if a Finder of Fact were to award damages that include amounts the Plaintiff would

377    not have otherwise earned until sometime in the future, it is necessary that the future amounts

378    be reduced to account for the fact that the Plaintiffs can invest such funds until they would have

379    otherwise been earned.

380    This step is referred to as converting future amounts into their "Present Value" equivalent.  Any

381    forecast of lost profits into the future is therefore discounted to account for the Time Value of

382    Money allowing damages to be shown at their "Present Value."

383    The method used to convert future amounts into their present value equivalent involves the

384    application of a universally agreed upon mathematical model.  The mathematical model relies

385    on three main inputs:

386    1.  **The amount of the expected future economic benefits.**  This is the amount of the projected

387        future lost profits, which Dr. Roberts has not calculated.  Dr. Roberts projected losses that

388        he claims the Plaintiffs will incur between 2010-2013.

389    2.  **The timing for receiving those benefits.**  In order to properly apply the mathematical

390        formula, the analyst must estimate the date during which the projected amounts would

391        have been (will be) generated.  The further into the future, the more the amount is reduced

392        to account for Business Risks.  Thus, in order to properly account for the Time Value of

393        Money, the date of which the present value is determined must be known.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

394     In this case, damages should have been measured as of the date of the Alleged Wrongful

395     Conduct, which I understand to have been in the early part of 2010, because this is when

396     the Plaintiffs fed their respective breeder herds the Defendant's product that allegedly

397     impacted their breeder mink herds and the breeder minks' ability to reproduce.

398   3.  **The Discount Rate.**  A discount rate is a factor, often expressed as a percentage, by which a

399     future amount is reduced to a present value.[35]  An appropriate discount rate used in

400     litigation is generated through the same conventional procedures and applying the same

401     theories that are used in conducting business valuations.  The discount rate is comprised of

402     two large components: 1) A component to account for the *Time Value of Money* and 2) a

403     component to account for the *Business Risks* that are inherent within the financial

404     projections at issue.

405   In calculations involving projections of future earnings, future profits, or future cash flows, the

406   projections must be discounted to account for the Time Value of Money in the conventional

407   manner that is used by financial experts.   Most projections of lost future profits must also be

408   reduced to account for Business Risks Inherent in Projections.

409   **Business Risks Inherent in Projections**

410   It is also conventional for damage experts to reduce the damage calculation to account for the

411   uncertainties that are inherent within any financial forecast[36] due to the many type of risks that

412   all businesses face ("Business Risks").

413

414   A forecast of lost profits must also be discounted to account for the Business Risks that are part

415   of any projection of profits. In Shannon Pratt's "Valuing a Business," the concept embodied by

416   Business Risk is defined as:

417               *"the degree of uncertainty as to the realization of the expected future returns."*[37]

---

[35] Fannon, Nancy J., Ed., The Comprehensive Guide to Lost Profits Damages, 2011 Edition, Business Valuation Resources, LLC, 2011, page 466.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

418                    Capital market theory divides this risk into two components: *systematic risk* and
419                    *unsystematic risk.*[38]

420        •   *Systematic Risk*

421      Systematic Risk is "the uncertainty of future returns resulting from the sensitivity of the
422      return on the subject investment to movements in the return on the investment market
423      as a whole."[39]  In other words, this type of Business Risk represents the risks businesses
424      face related to changes in the overall economy.  For example, a downturn in the
425      economy, increase in fuel costs, interest rate fluctuations, etc.

426        •   *Unsystematic Risk*

427      Unsystematic risk is based on specific factors affecting the operations of the specific
428      company that is being forecast.   Business Risks that are specific to the company include
429      things like the amount of snowfall for a ski rental company, the amount of debt for an
430      overly leveraged firm, an inexperienced level of management, etc.[40]

431  In this case, specific risks include factors such as the age of the female breeding herd, variance in
432  mink reproduction rates, weather conditions, disease among the mink herd, moving operations
433  from one location to another, etc.

434  The business valuation community has long applied conventional methods to account for such
435  Business Risks and my analysis is consistent with those methods.  There are two main ways that
436  are conventionally used by damage experts and/or the business valuation community: the
437  *Expected Cash Flow Approach* or the *Capital Markets Approach.*

[37] Pratt, Shannon, P., Valuing a Business: The Analysis and Appraisal of Closely Held Companies, Fifth Edition, McGraw Hill, 2008, page 184.

[38] Pratt, Shannon, P., Valuing a Business: The Analysis and Appraisal of Closely Held Companies, Fifth Edition, McGraw Hill, 2008, page  185.

[39] Pratt, Shannon, P., Valuing a Business: The Analysis and Appraisal of Closely Held Companies, Fifth Edition, McGraw Hill, 2008, page 185.

[40] See for example, AICPA Practice Aid 06-4, "Calculating Lost Profits," Chapter 13, Financial Discounting of Future Lost Profits to Present Value, pg. 39.

438 _Expected Cash Flow Approach_:

439 In the first method, Business Risks are accounted for directly within the projection of lost profits.

440 This method can be implemented in a couple of ways. One way an analyst can account for

441 Business Risks inherent in the projections is to adjust the projections so that they reflect

442 information that is now known but would not have been known as of the date the projection is

443 being made.

444 Specifically, the analyst uses data generated between the date of the damage calculation

445 (usually the date of the alleged bad act) and the present date. For instance, drastic changes in

446 the general economy that have occurred since the date of injury can be reflected and factored

447 directly into the projections of lost profits. The use of hindsight information in this manner

448 generally reduces the level of uncertainty that is inherent in the projection of lost profits.

449 The analyst might also use estimates known to be "conservative" when deciding on inputs that

450 are used in making the projections. Using conservative estimates can directly reduce the

451 riskiness of the projections being forecasted and therefore increase the reliability of such

452 projections.

453 Dr. Roberts did not account for Business Risks in this manner. In fact, Dr. Roberts

454 inappropriately assumes constantly optimistic conditions for three years. Consider:

455     1) He assumed the Reproduction Rates of Black and Mahogany breeders to be 4.826
456        and 5.909, respectively, which is higher than the Plaintiffs' actual Reproduction
457        Rates in the previous three years.

458     2) He assumed, without any supporting evidence, that the Lehi and Cedar Valley
459        ranches were historically indistinguishable as it relates to kit-count averages,
460        production, and whelping.

461     3) He used a single historical reproduction rate for all years of his damage period.

462     4) He assumed the Plaintiffs would have received a market average price per pelt in
463        2011, 2012, and 2013.

464     5) He assumed the Plaintiffs would have grown their ranch to capacity in 2011.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

465   *Capital Markets Approach:*

466   In the second method used to account for Business Risk inherent within a projection, a

467   "discount rate" is applied to the projections via the same standard mathematical formula

468   described above regarding the Time Value of Money.  Most often, the risk free rate of interest

469   described above is increased by a risk premium that accounts for Business Risks.  Then the

470   projections are reduced for Business Risk and the Time Value of Money at the same time by

471   applying the mathematical formula referred to in the above.  Again, Dr. Roberts did not account

472   for Business Risks in this manner.


473   In sum, Dr. Roberts has not performed his calculations in the conventional manner that is used

474   to account for the inherent uncertainties of projecting profits.  Dr. Roberts has also not

475   accounted for the Time Value of Money in preparing his loss estimate.  These errors have

476   caused Dr. Roberts to overstate damages with respect to his calculation of the alleged lost

477   profits.


## V.   CONCLUSION

478   I tested Dr. Roberts's calculations by comparing the Lost Revenues by Sale Year to the Plaintiffs'

479   historical operating results.  This test effectively recreates the financial statements that would

480   have presumably been generated by the Plaintiff, if it had not lost any Revenues.  In this case,

481   the profits that the Plaintiffs' allege would have been generated in 2011 through 2013 only

482   include lost Revenues.  The following is a graphical depiction of the Plaintiffs' historical revenues

483   compared to the alleged lost revenues during the damage period (See Schedule 9 for more

484   detail):

24

CONFIDENTIAL - ATTORNEYS' EYES ONLY



485

486     The above analysis indicates that Plaintiffs' allegation of Lost Revenue is not reasonable
487     compared to its own historical results. This is not surprising since Dr. Roberts's calculations are
488     based on a variety of assumptions that are contrary to the accounting evidence, contrary to the
489     normal conventions used by financial experts, and without the typical support normally
490     expected for such claims, and without the completion of many steps normally performed by
491     damage experts in determining lost profits with a reasonable degree of certainty.

492     Furthermore, the data illustrates the Plaintiffs generated an amount of revenue that is very
493     close to what is expected based on historical numbers of minks and reflecting the then market
494     price for mink. In other words, the accounting evidence indicates that the Plaintiffs' have not
495     suffered an economic harm from the Alleged Wrongful Conduct.

496     My opinions and calculations included in this report are based on information available as of the
497     date of the report. I may amend, supplement, update, or modify this report at a later date if
498     additional relevant information becomes available. This report has been prepared solely in
499     connection with the litigation referenced herein and is intended for no other use.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

500 **VI.   COMPENSATION**

501  Lone Peak Valuation is presently being compensated for my work in the matter at my current

502  billing rate of $375 per hour.  Other Lone Peak consultants are assisting me in this matter and

503  are being compensated at rates less than $375 per hour.  No part of my compensation depends

504  on the outcome of this litigation.


Respectfully Submitted,


Rick Hoffman – CPA/ ABV
Principal/Shareholder

**LonePeak Valuation Group**
**Jonsson vs. National Feeds**
**Documents Relied Upon**                                                                     Schedule 1

**Documents Relied Upon**

    1 Keith Jonsson et al. v National Feeds, Inc  Complaint
    2 Expert Report of Wade C. Roberts, Ph.D dated November 07, 2012.
    3 Summary of Mink Inventory, Operating Expenses, and Pelt Income (2001 - 2010)
    4 Jonsson Stats Letter
    5 Plaintiff Mink Production Report Letter, June 14, 2011
    6 Keith Jonsson Deposition & Exhibits
    7 Patrick Fur Farm Quote
    8 American Legend Cooperative: 3 Year Quantity Percent Reports
    9 American Legend Cooperative: Sales Analysis Reports
   10 2007 Income Tax Return of Keith Jonsson
   11 Cedar Valley Fur Farm LLC Tax Returns: 2008 - 2010
   12 Vaccination Report
   13 Deposition of Michael Jonsson
   14 American Legend Cooperative Stockholder Statement
   15 Various mink inventory documents to/from Chris Mershon
   16 Letters to Co-op Regarding Breeding Stock

**LonePeak Valuation Group**
**Jonsson vs. National Feeds**
**Rick S. Hoffman, CV**

**Schedule 2**

See Following Pages

# RICK S. HOFFMAN, CPA/ABV

Lone Peak Valuation Group
36 South State Street, Suite 500
Salt Lake City, Utah 84111
Tel. (801) 321-6334
Fax. (801) 708-7701
Email: Rhoffman@lpvgroup.com

Mr. Hoffman has over eighteen years of experience in public accounting and consulting.
He has been primarily involved with calculating damages related to commercial
Litigation and has spent considerable time performing business valuations inside and outside
of the litigation arena, with particular emphasis in the valuation of intellectual property.
Mr. Hoffman is a Certified Public Accountant, Accredited in Business Valuation and has
hundreds of hours of additional training in the areas of valuation, litigation, and lost profit
calculations. He has taught on the subject of damages and has testified in State Court, Federal
Court, Arbitrations, and acted as Special Master.

## EMPLOYMENT HISTORY

| | |
|---|---|
| April 2008 to Present | Co-Founding Shareholder and Principal<br>Lone Peak Valuation Group<br>Salt Lake City, Utah<br>Litigation/Consulting Services |
| December 2000 to April 2008 | Managing Director<br>LECG, LLC<br>Salt Lake City, Utah<br>Litigation/Consulting Services |
| September 1992 to November 2000 | Director<br>PricewaterhouseCoopers LLP<br>Salt Lake City, Utah<br>Litigation/Consulting Services |
| September 1989 to August 1992 | Sr. Associate<br>Arthur Andersen & CO |



## EDUCATION & CREDENTIALS

Certified Public Accountant, Accredited in Business Valuations
Adjunct Professor – University of Utah (2002)
Co-Instructor NACVA – Valuation of Intellectual Property Damages
Southwest Texas State University, San Marcos, Texas
BA Accounting, 1989 (Magna Cum Laude)

## PROFESSIONAL MEMBERSHIPS

American Institute of Certified Public Accountants
American Society of Appraisers (1999-2000)
Association of Investment Management Research (1998-2000)
Games Development Association – Patent Committee (2000-2001)
National Association of Certified Valuation Analysts (1999 - 2008)
National Litigation Certification Board – NACVA (2001-2001)
National Litigation Review Board (2005-2006)
Board Member of NACVA (2005-2006)
Management Advisory Council of LECG, LLC 2005
Editorial Advisory Board for National Litigation Consultants 2005-2006
Board Member of Journal of Business Valuation (2006-2010)
Board Member of Utah Clean Energy Association (2011 – Present)

## SPEECHES, ARTICLES, AND BOOKS

*"Earn Outs – Snake Oil or Cure-All?"*, Speech Presented at the Utah State Bar Convention, Sun Valley, Utah, July 2012

*"Valuing Multi-Level Marketing Companies"*, Grant Thornton's Direct Sellers Conference, October 2011

*"Lost Profits in Trademark and Copyright Cases"*, a chapter in *"The Comprehensive Guide to Lost Profits Damages"*, Business Valuation Resources, LLC June 2009

*"Financial Discovery"*, Utah Bar Association, August 2006

*"Improving the Rigor of Your Market Approach"*, National Litigation Consultants Review, Feature Article, February 2006


LONEPEAK
VALUATION GROUP

*"Keeping Track of Your Experience"*, National Litigation Consultants Review, Feature Article, November 2005

*"Valuing Intellectual Property and Other Intangible Assets"*, Business Valuation Resources, LLC, Telephone Conference, June 2005

*"Value of Intellectual Property Damage Calculation"*, National Association of Certified Valuation Analysts, Las Vegas, Nevada, November 2004

*"Intellectual Property Damages: Guideline and Analysis, 2004 Supplement"*, Wiley Publications, November 2004

*"Valuation in Context of a Merger"*, Kennesaw State University, February 2004

*"Valuing Start Up Technology Companies"*, National Internal Revenue Service, September 2003

*"Corporate Analysis of Intellectual Property"*, Executive MBA Program, University of Utah, June 2003

*"Value of Intellectual Property"*, National Association of Certified Valuation Analysts, New York, New York, June 2003

*"Intellectual Property Damages: Guidelines and Analysis"*, Wiley Publications, November 2002

*"Valuing Patents that are Not Generating Sales"*, The RMA Journal, May 2002

*"An Introduction to Valuing Intellectual Property"*, The RMA Journal, May 2002

*"How Intellectual Property Influences Your Existing Loans"*, The RMA Journal, April 2002

*"Intellectual Property Valuation"*, American Institute of Certified Public Accountants, National Valuation Conference, December 2001

*"Calculating Intellectual Property Damages"*, National Association of Certified Valuation Analysts, Chicago, Illinois, December 2001

*"Calculating Intellectual Property Damages"*, Nation Association of Certified Valuation Analysts, Washington D.C., November 2001



*"Reasonable Royalty Calculation"*, Valuation Examiner, Summer 2001

*"Calculating Damages in Intellectual Property Cases"*, National Association of Certified Valuation Analysts, November 2001

*"Intellectual Property Section"*, Utah State Bar, September 2000

*"Calculating Intellectual Property Damages"*, National Association of Certified Valuation Analysts, Dallas, Texas, May 2000

*"Valuing Intellectual Property"*, Guest Lecturer, University of Utah, February 2000

*"Patent Damages"*, Utah Bar Association, April 1999

*"Performing Business Valuations"*, Guest Lecturer, University of Utah, October 1998 & February 1999

*"Maximizing the Value of Intellectual Property"*, Law and Economic Society, January 1999

*"Business Valuations"*, Utah Bar Association, July 1998

*"Calculating Personal Injury Damages"*, Young Lawyers Association, November 1997

*"Calculating Personal Injury Damages"*, Utah Bar Association, July 1997

## PRIOR TESTIMONY EXPERIENCE

**Clearone Communication, Inc. vs. Andrew Chaing and WideBand Solutions, Inc.**
Trial
Federal Court of Utah

**Wardell vs. Clyde**
Deposition
3rd District Court of Utah

**Praise Kutchera vs. USANA**
Arbitration
Salt Lake City, Utah

**1-800-Contacts, Inc. vs. Lens.Com**
Deposition
Federal Court of Utah



East Jordan School District vs.
West Jordan School District
Arbitration

Salt Lake City, Utah
Tim Schmanski and Maria Schmanski
vs. Nielson, Desert Irrigation Company,
and Millard County
Deposition and Trial
4th District Court of Utah

Kim K. Marquardt vs. Robert S. Marquardt
Trial
3rd District Court of Utah

Basic Research Testimony Regarding
Nutritional Products
Testimony
District of Columbia

Sai Food Sensations vs. TCBY
Systems, LLC
Deposition
State of New York

Patricia Dahl vs. James C. Pinegree, M.D.
And Utah Orthopedic Associates, P.C.
Deposition
3rd District Court of Utah

Robert Stillwell, Futurelink Corp., SDP
Electronics, Inc., Electronic Marketing
Corporation vs. Radioshack Corporation
Deposition
Southern District of California

Donald and Tamaron Cole vs. Lynn
Hines and Swift Transportation Co. Inc.
Deposition

3rd District Court of Utah
Turner Gas Company vs. Mark A.
Harris and Kamps Company
Deposition
3rd District Court of Utah

Ipalani Lewis
Deposition
3rd District Court of Utah

Nagraj Narasimhan, Total Renal Care,
Inc. and Gate City Dialysis Center vs.
vs. Rahim and Kidney Institute, LLP
Deposition
District of Hawai'i

Liberty Dialysis, Hawai'i LLC and St.
Francis Medical Center vs. Fresenius
Medical Holding and Bio-Medical
Application of California
Deposition
District of Hawai'i

ASC Utah, Inc., d/b/a The Canyons vs.
Wolf Mountain Resorts, L.C.
Deposition
3rd District Court of Utah

Hansen Beverage Company, d/b/a
Monster Beverage Company vs.
Cytosport, Inc.
Deposition
Central District of California



**Mark Haug vs. La Caille Restaurant Corporation, et al.**
Trial
3rd District Court of Utah

**Sara Lee Corporation vs. Sycamore Family Bakery, Inc., and Leland Sycamore**
Deposition
District Court of Utah, Central Division

**Cutrubus Motors, Inc., Rocky Mountain Chrysler Jeep vs. Chrysler Group, LLC**
Arbitration
Salt Lake City, Utah

**Shari J. Jackson and Michael L. Jackson vs. Glen R. Fuller, M.D.**
Deposition
3rd District Court of Utah

**Kevin R. Griffith vs. Douglas Deny, M.D.**
Deposition
3rd District Court of Utah

**Zulema McLean and the Estate of Christopher Lee McLain vs. Tooele Hospital Corporation, d/b/a Mountain West Medical Center**
Deposition
3rd District Court of Utah

**Unishippers Global Logistics, LLC vs. DHL Express (USA), Inc.**
Deposition
3rd District Court of Utah

**Unishippers Global Logistics, LLC vs. DHL Express (USA), Inc.**
Deposition
District Court of Utah, Central Division

**Quality Jeep Chrysler, Inc., n/k/a Quality Automotive Sales and Service, Inc. vs. Chrysler Group, LLC**
Arbitration
Salt Lake City, Utah

**B. Scott Berry and Lind Berry vs. Davis Hospital and Medical Center, L.P.**
Arbitration
Salt Lake City, Utah

**Samuel Harrison and Ashley Harrison vs. CNL Income Properties, Inc.**
Deposition
3rd District Court of Utah

**Connor Sport Court International, Inc. vs. Snap Court, LLC d/b/a Snap Sports Company**
Deposition
3rd District Court of Utah

**First Line Security Bankruptcy Hearing**
Trial
Federal Court of Utah

**Eleutian Technology, LLC vs. Pearson Education, Inc., and NCS Pearson, Inc.**
Arbitration
Salt Lake City, Utah



**USS Logistics, LLC, et al. vs. DHL Express (USA), Inc.**
Deposition and Trial
Federal Court of Utah

**Fatu Matagi and Shellise Matagi vs. Pacificorp d/b/a Rocky Mountain Power**
Deposition
3rd District Court of Utah

**American Ski vs. Wolf Mountain**
Deposition and Trial
Federal Court of Utah

**ASC Utah, Inc. d/b/a The Canyons vs. Wolf Mountain Resorts, L.C.**
Trial
3rd District Court of Utah

**Daniel Updike vs. Yamaha Motor Corporation, U.S.A., et al.**
Deposition
Utah State Court

**Zip Ship, Inc. vs. Unishippers Global Logistics, LLC**
Trial
3rd District Court of Utah

**Debbie Herrera vs. Maria Oneida, M.D.**
Deposition
3rd District Court of Utah

**Premier Technology, Inc. vs. Chad Orr, et al.**
Deposition
3rd District Court of Utah

**Tri-Valley Distributing vs. Western Life Assurance Company**
Deposition
3rd District Court of Utah

**Tahitian Noni International, Inc. vs. Robert L. Dean, Jr., and Top Gun International**
Trial
Federal Court of Utah

**Holly L. Johnston**
Deposition
Utah State Court

**Mud Buddy, LLC vs. Gator Tail, LLC**
Deposition
3rd District Court of Utah

**Sammy Boutot vs. Kevin D. Hiatt and Flint Energy**
Deposition
3rd District Court of Utah

**Glen Jensen and Itsumo Family Investment Co., LLC vs. Agel Enterprises LLC and James Savas**
Deposition
4rd District Court of Utah

**LONEPEAK**
VALUATION GROUP

**Gulf Coast Shippers, LP, et al vs. DHL Express (USA), Inc.**
Deposition and Trial
Federal Court of Utah

**Brigham Young University and Dr. Daniel L. Simmons vs. Pfizer, Inc. G.D. Searle and Company, Monsanto Company, And Pharmacia Corporation**
Deposition
3rd District Court of Utah

**Kristy Szeles and Rick Szeles vs. The Kroger Company**
Deposition
3rd District Court of Utah

**Legacy Resources, Inc. vs. Liberty Pioneer Energy Source, Inc.**
Testimony
Salt Lake City, Utah

**Thomas Zenger vs. Javier Becerra-Macias and Dynatec Corporation**
Deposition
Salt Lake City, Utah

**Suzanne Caruso vs. Viridian Network, LLC**
Arbitration
New York, New York

**Verlyn Linford vs. Tri City Medical Clinic, P.C.**
Deposition
Salt Lake City, Utah

**Glen Jensen and Itsumo Family Investment Co., LLC vs. Agel Enterprises LLC and James Savas**
Trial
4th District Court of Utah

**David Day and Shanna Day vs. Brooke Horan and Justin Williams**
Deposition
3rd District Court of Utah

**Education Opportunities in America, Inc. vs. Stevens-Henager College**
Deposition and Trial
3rd District Court of Utah

**Arla Jean Cochran and Loren Cochran vs. Intermountain Health Care, a Utah Corporation and Scott Smith, M.D.**
Trial
5th District Court of Utah

**Patricia Dahl vs. James C. Pingree, M.D., and Utah Orthopedic Associates**
Arbitration
3rd District Court of Utah

**Roy Santo vs. Lithonia Lighting**
Deposition
Salt Lake City, Utah

**Cindy Schaugaard vs. State Farm Insurance and Lee Ann Wight**
Trial
3rd District Court of Utah



**Sara Lee Corporation vs. Sycamore Family Bakery, Inc. and Leland Sycamore**
Trial
Federal Court of Utah

**Alexis Flores and Jennifer Flores vs. University of Utah Health Sciences Center**
Deposition
Salt Lake City, Utah

**Debrah Orr Watts and Todd Watts vs. University of Utah Hospital, et al.**
Deposition
Idaho

**Cytosport, Inc. vs. Vital Pharmaceuticals, Inc.**
Deposition
Irvine, California

**Ifreedom Direct Corporation vs. First Tennessee Bank National Association**
Trial
3rd District Court of Utah

**Wendy McDaniel vs. Marc C. Bingham**
Deposition
3rd District Court of Utah

**USS Logistics, LLC, et al. vs. DHL Express (USA), Inc.**
Deposition
Supreme Court of the State of New York
County of New York

**iFreedom Direct Corporation vs. First Tennessee Bank National Association**
Deposition
Salt Lake City, Utah

**Stone Flood and Fire Restoration, Inc. vs. Safeco Insurance Company of America**
Trial
Federal Court, Utah

**MP Nexlevel, LLC vs. Codale Electric Supply, Inc., et al.**
Deposition
Salt Lake City, Utah

**Karen Christoffersen vs. United Parcel Service, Inc.**
Deposition
United States District Court, District of Utah, Central Division

**Hornady Manufacturing Company vs. Double Tap Ammunition, Inc.**
Deposition
United States District Court of Utah

**Lonnie Jill Wootten and Salih Wooten vs. Anthony R. Butler**
Deposition
United States District Court for the Northern District of Alabama Southern Division

**Verilyn Linford vs. Tri City Medical Clinic, P.C.**
Trial
Fourth Judicial District Court of Utah

LonePeak Valuation Group
Jonsson vs. National Feeds
Analysis of 2011 - 2013 Expected Results based on Historical Operating Results

Schedule 3

Expected Results Assuming Average Historical Kits and Market Prices

| Year | Quantity | | | Market Prices | | Actual/Expected | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Black Pelt Sales | Mahogany Pelt Sales | Total Pelt Sales | Averge Black Pelt Price | Averge Mahogany Pelt Price | Total Sales | Actual Sales | Estimated Lost Sales |
| 2008 | 11,618 | 17,598 | 29,216 | $ 58.05 | $ 54.13 | $ 1,627,051 | | |
| 2009 | 9,994 | 14,349 | 24,343 | $ 40.16 | $ 37.82 | $ 944,068 | | |
| 2010 | 11,787 | 18,020 | 29,807 | $ 59.04 | $ 57.76 | $ 1,736,724 | | |
| 2011 | 11,133 | 16,656 | 27,789 | $ 74.62 | $ 76.95 | $ 2,112,325 | $ 2,133,968 | $ (21,643) |
| 2012 | 11,133 | 16,656 | 27,789 | $ 85.02 | $ 86.51 | $ 2,387,494 | $ 2,754,476 | $ (366,981) |
| 2013 | 11,133 | 16,656 | 27,789 | $ 98.66 | $ 105.08 | $ 2,848,559 | | |

*No Loss*

Expected Results Assuming Highest Historical Volume and Market Prices

| Year | Quantity | | | Market Prices | | Actual/Expected | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Black Pelt Sales | Mahogany Pelt Sales | Total Pelt Sales | Averge Black Pelt Price | Averge Mahogany Pelt Price | Total Sales | Actual Sales | Alleged Lost Sales |
| 2008 | 11,618 | 17,598 | 29,216 | $ 58.05 | $ 54.13 | $ 1,627,051 | $ - | $ - |
| 2009 | 9,994 | 14,349 | 24,343 | $ 40.16 | $ 37.82 | $ 944,068 | $ - | $ - |
| 2010 | 11,787 | 18,020 | 29,807 | $ 59.04 | $ 57.76 | $ 1,736,724 | $ - | $ - |
| 2011 | 11,787 | 18,020 | 29,807 | $ 74.62 | $ 76.95 | $ 2,266,106 | $ 2,133,968 | $ 132,138 |
| 2012 | 11,787 | 18,020 | 29,807 | $ 85.02 | $ 86.51 | $ 2,561,132 | $ 2,754,476 | $ (193,344) |
| 2013 | 11,787 | 18,020 | 29,807 | $ 98.66 | $ 105.08 | $ 3,056,447 | | |

*No Loss*

*LonePeak Valuation Group*
Jonsson vs. National Feeds

Plaintiffs Actual Results - Quantity

Schedule 4

| Activity Recored in Year of Pelt Sales (Sales Year) | | Source | 2008 Pre-Damage | 2009 Pre-Damage | 2010 Pre-Damage | 2011 Damage | 2012 Damage |
|---|---|---|---|---|---|---|---|
| | | | | | | | Note <1> |
| **Female Breeder Mink:** | | | | | | | |
| Black Females | (a) | PLO00256 | 3,750 | 3,780 | 3,700 | 2,100 | 4,102 |
| Mahogany Females | (b) | PLO00256 | 3,750 | 3,900 | 3,900 | 5,800 | 4,630 |
| Total Females | (c) | PLO00256 | 7,500 | 7,680 | 7,600 | 7,900 | 8,732 |
| | | | | | | | |
| **Breeders Purchased for Following Year:** | | | | | | | |
| Black Breeders Purchased | (d) | Note <2> | 0 | 0 | 0 | 975 | 0 |
| Mahogany Breeders Purchased | (e) | Note <2> | 0 | 0 | 0 | 0 | 380 |
| | | | | | | | |
| **Must Have Been Withheld from Kits or Pelts Sold from Breeders** | | | | | | | |
| Black Females | (f) | | 30 | (80) | (1,600) | 1,027 | (716) Note <3> |
| Mahogany Females | (g) | | 150 | 0 | 1,900 | (1,170) | 781 |
| Total Withheld from Kits or Pelts Sold from Breeders | (h) | | 180 | (80) | 300 | (143) | 65 |
| | | | | | | | |
| **Change in Female Breeders** | | | | | | | |
| Black Females | (c) + (f) = (i) | Schedule 7 | 30 | (80) | (1,600) | 2,002 | (716) |
| Mahogany Females | (e) + (g) = (j) | Schedule 7 | 150 | 0 | 1,900 | (1,170) | 1,161 |
| Total Change in Female Breeders | | | 180 | (80) | 300 | 832 | 445 |
| | | | | | | | |
| **Pelts Sold:** | | | | | | | |
| Actual Black Pelts Sold | (k) | Schedule 7 | 11,618 | 9,994 | 11,787 | 7,766 | 12,245 |
| Actual Mahogany Pelts Sold | (l) | Schedule 7 | 17,598 | 14,349 | 18,020 | 21,016 | 19,076 |
| Total Pelts Sold | (m) | | 29,216 | 24,343 | 29,807 | 28,782 | 31,321 |
| Growth | | | | -16.7% | 22.4% | -3.4% | 8.8% |
| | | | | | | | |
| **Reproduction Rates** | | | | | | | |
| Black | ((f) + (k))/(a) | | 3.11 | 2.62 | 2.75 | 4.19 | 2.81 |
| Mahogany | ((g) + (l))/(b) | | 4.73 | 3.68 | 5.11 | 3.42 | 4.29 |
| Weighted Average Rate | ((h) + (m))/(c) | | 3.92 | 3.16 | 3.96 | 3.63 | 3.59 |

Notes:

<1> Per Dr. Roberts' Report pg 22, the Jonssons started the 2012 season with 4102 Black female breeders which included 975 Black female breeders that were purchased, 4630 Mahogany female breeders, and 8732 total female breeders.

<2> Dr. Roberts' Report pages 22 and 24 state that the Jonssons purchased 975 Black female mink and 380 mahogany female mink. Dr. Roberts states in the text of his report the 380 mink purchased in 2012 were Mahogany females (page 24), but Chart 10 (page 26) indicates that these were Black females.

<3> PLO00256 shows the Jonssons started the 2011 season with 2100 Black female breeder mink. Per Dr. Roberts' Report page 22, the Jonssons started the 2012 season with 4102 Black female breeder mink which includes 975 Black female breeder mink purchased. Therefore, 1027 Black female breeder mink must have been withheld from the kits produced in 2011.



LONEPEAK
VALUATION GROUP

*LonePeak Valuation Group*
Jonsson vs. National Feeds

Plaintiffs Actual Pelt Sales - Price/Sales

Schedule 4.1

| Activity Recored in Year of Pelt Sales (Sales Year) | | Source | 2008 Pre-Damage | 2009 Pre-Damage | 2010 Pre-Damage | 2011 Damage | 2012 Damage |
|---|---|---|---|---|---|---|---|
| **Price** | | | | | | | |
| Avg Black Price | (a) | Schedule 7 | 61.19 | 39.10 | 60.22 | 76.96 | 89.88 |
| Avg Mahogany Price | (b) | Schedule 7 | 53.10 | 37.51 | 56.82 | 73.10 | 86.70 |
| Wt Avg Price | (c) | Schedule 7 | 56.31 | 38.16 | 58.16 | 74.14 | 87.94 |
| *Growth* | | | | *-32.2%* | *52.4%* | *27.5%* | *18.6%* |
| | | | | | | | |
| **Pelts Sold:** | | | | | | | |
| Actual Black Pelts Sold | (d) | Schedule 7 | 11,618 | 9,994 | 11,787 | 7,766 | 12,245 |
| Actual Mahogany Pelts Sold | (e) | Schedule 7 | 17,598 | 14,349 | 18,020 | 21,016 | 19,076 |
| Total Actual Pelts Sold | (f) | Schedule 7 | 29,216 | 24,343 | 29,807 | 28,782 | 31,321 |
| *Growth* | | | | *-16.7%* | *22.4%* | *-3.4%* | *8.8%* |
| | | | | | | | |
| **Total Pelt Income:** | | | | | | | |
| Black | (a) * (d) | | $ 710,856 | $ 390,726 | $ 709,849 | $ 597,702 | $ 1,100,619 |
| Mahogany | (b) * (e) | | $ 934,394 | $ 538,268 | $ 1,023,861 | $ 1,536,266 | $ 1,653,857 |
| Pelt Gross Income | (c) * (f) | Schedule 7 | $ 1,645,251 | $ 928,994 | $ 1,733,710 | $ 2,133,968 | $ 2,754,476 |

**LONEPEAK**
VALUATION GROUP

**LonePeak Valuation Group**
Jonsson vs. National Feeds

Plaintiffs Actual Results with Alleged Damages Added - Quantity

Schedule 5

| | | | 2008 Pre-Damage | 2009 Pre-Damage | 2010 Pre-Damage | 2011 Damage | 2012 Damage | 2013 Damage | |
|---|---|---|---|---|---|---|---|---|---|
| | | Source | | | | | | Note <1> | |
| **Female Breeder Mink:** | | | | | | | | | |
| Black Females | (a) | PL000256 | 3,750 | 3,780 | 3,700 | 2,190 | 4,102 | 3,386 | |
| Mahogany Females | (b) | PL000256 | 3,750 | 3,900 | 3,900 | 5,800 | 4,630 | 5,791 | |
| Total Females | (c) | PL000256 | 7,500 | 7,680 | 7,600 | 7,990 | 8,732 | 9,177 | |
| | | | | | | | | | |
| **Breeders Purchased for the Following Year:** | | | | | | | | | |
| Black Breeders Purchased | (d) | Note <4> | 0 | 0 | 0 | 975 | 0 | | |
| Mahogany Breeders Purchased | (e) | Note <4> | 0 | 0 | 0 | 0 | 380 | | |
| | | | | | | | | | |
| **Must Have Been Withheld from Kits or Pelts Sold from Breeders** | | | | | | | | | |
| Black Females | (f) | | 30 | (80) | (1,510) | 0 | 0 | | |
| Mahogany Females | (g) | | 150 | 0 | 1,900 | 0 | 0 | | |
| Total Withheld from Kits or Pelts Sold from Breeders | (h) | | 180 | (80) | 390 | - | - | | |
| | | | | | | | | | |
| **Change in Female Breeders** | | | | | | | | | |
| Black Females | (i) | | 30 | (80) | (1,510) | 1,912 | (716) | | |
| Mahogany Females | (j) | | 150 | 0 | 1,900 | (1,170) | 1,161 | | |
| Total Change in Female Breeders | (k) | | 180 | (80) | 390 | 742 | 445 | | |
| | | | | | | | | | |
| **UNRECONCILED DIFFERENCE** | | Note <6> | | | | | | | |
| Black Females | (i) - (f) - (d) = (l) | | 0 | 0 | 0 | 937 | (716) | | |
| Mahogany Females | (j) - (g) - (e) = (m) | | 0 | 0 | 0 | (1,170) | 781 | | |
| | | | | | | | | | |
| **Pelts Sold:** | | | | | | | | | |
| Actual Black Pelts Sold | (n) | Schedule 7 | 11,618 | 9,994 | 11,787 | 7,766 | 12,245 | 12,630 | Note <3> |
| Actual Mahogany Pelts Sold | (o) | Schedule 7 | 17,598 | 14,349 | 18,020 | 21,016 | 19,076 | 33,661 | Note <3> |
| Total Pelts Sold | (p) | Schedule 7 | 29,216 | 24,343 | 29,807 | 28,782 | 31,321 | 46,291 | |
| | | | | | | | | | |
| Lost Pelts - Black Pelts Not Taken to Market | (q) | Note <2> | | | | 5,552 | 4,496 | 3,711 | |
| Lost Pelts - Mahogany Pelts Not Taken to Market | (r) | Note <2> | | | | 2,277 | 560 | 558 | |
| | | | | | | | | | |
| Total Pelts Per Dr. Roberts | (p) + (q) + (r) = (s) | | 29,216 | 24,343 | 29,807 | 36,611 | 36,377 | 50,560 | |
| Growth | | | | -16.7% | 22.4% | 22.8% | -0.6% | 39.0% | |
| | | | | | | | | | |
| **Reproduction Rates** | | Note <5> | | | | | | | |
| Black | ((f) + (n) + (q))/(a) | | 3.11 | 2.62 | 2.78 | 6.08 | 4.08 | 4.83 | |
| Mahogany | ((g) + (o) + (r))/(b) | | 4.73 | 3.68 | 5.11 | 4.02 | 4.24 | 5.91 | |
| Weighted Average Rate | (s)/(c) | | 3.92 | 3.16 | 3.97 | 4.58 | 4.17 | 5.51 | |

Notes

<1> The 2013 figures are based on assumptions taken from Dr. Roberts' Report.

<2> Lost Pelts come from Dr. Roberts' Report Chart 15 and 17. Due to the timing of the Plaintiffs' breeding and harvesting cycles, Dr. Roberts' 2010 and 2011 Pelts Taken to Market would have been sold in 2011.

<3> 2013 Actual Pelts Sold have be calculated using Dr. Roberts' reproduction ratios of 4.826 and 5.909 for black and mahogany mink, respectively, less the number of Lost Pelts Dr. Roberts calculated in his analysis.

<4> Dr. Roberts' Report pages 22 and 24 state that the Jonssons purchased 975 black female mink and 380 mahogany female mink.  Dr. Roberts states in the text of his report that the 380 mink purchased in 2012 were Mahogany females (page 24), but Chart 10 (page 26) indicates that these were Black females.

<5> These amounts don't include any pelts sold directly to another mink rancher, mink sold live, or other sales not reported through the ALC sales records.  Including those sales would further demonstrate the unreasonableness of these amounts.

<6> A positive amount indicates mink appear in the Breeder herd for the following year without basis;  A negative amounts indicates mink disappear from the Breeder without basis.

*LonePeak Valuation Group*
Jonsson vs. National Feeds

Plaintiffs Actual Results with Alleged Damages Added - Quantity

Schedule 5.1

| | | | 2008 Pre-Damage | 2009 Pre-Damage | 2010 Pre-Damage | 2011 Damage | 2012 Damage | 2013 Damage | |
|---|---|---|---|---|---|---|---|---|---|
| | | Source | | | | | | | |
| **Female Breeder Mink:** | | | | | | | | | |
| | | | | | | | | | Note <1> |
| Black Females | (a) | PL000256 | 3,750 | 3,780 | 3,700 | 2,190 | 4,102 | 3,386 | |
| Mahogany Females | (b) | PL000256 | 3,750 | 3,900 | 3,900 | 5,800 | 4,630 | 5,791 | |
| Total Females | (c) | PL000256 | 7,500 | 7,680 | 7,600 | 7,990 | 8,732 | 9,177 | |
| | | | | | | | | | |
| **Breeders Purchased for the Following Year:** | | | | | | | | | |
| Black Breeders Purchased | (d) | Note <4> | 0 | 0 | 0 | 975 | 0 | | |
| Mahogany Breeders Purchased | (e) | Note <4> | 0 | 0 | 0 | 0 | 380 | | |
| | | | | | | | | | |
| **Must Have Been Withheld from Kits or Pelts Sold from Breeders** | | | | | | | | | |
| Black Females | (f) | | 30 | (80) | (1,510) | 937 | (716) | | |
| Mahogany Females | (g) | | 150 | 0 | 1,900 | (1,170) | 781 | | |
| Total Withheld from Kits or Pelts Sold from Breeders | (h) | | 180 | (80) | 390 | (233) | 65 | | |
| | | | | | | | | | |
| **Change in Female Breeders** | | | | | | | | | |
| Black Females | (i) | | 30 | (80) | (1,510) | 1,912 | (716) | | |
| Mahogany Females | (j) | | 150 | 0 | 1,900 | (1,170) | 1,161 | | |
| Total Change in Female Breeders | (k) | | 180 | (80) | 390 | 742 | 445 | | |
| | | | | | | | | | |
| **UNRECONCILED DIFFERENCE** | | Note <6> | | | | | | | |
| Black Females | (l) - (f) - (d) = (l) | | 0 | 0 | 0 | 0 | 0 | | |
| Mahogany Females | (j) - (g) - (e) = (m) | | 0 | 0 | 0 | 0 | 0 | | |
| | | | | | | | | | |
| **Pelts Sold:** | | | | | | | | | |
| Actual Black Pelts Sold | (n) | Schedule 7 | 11,618 | 9,994 | 11,787 | 7,766 | 12,245 | 12,630 | Note <3> |
| Actual Mahogany Pelts Sold | (o) | Schedule 7 | 17,598 | 14,349 | 18,020 | 21,016 | 19,076 | 33,661 | Note <3> |
| Total Pelts Sold | (p) | | 29,216 | 24,343 | 29,807 | 28,782 | 31,321 | 46,291 | |
| | | | | | | | | | |
| Lost Pelts - Black Pelts Not Taken to Market | (q) | Note <2> | | | | 5,552 | 4,496 | 3,711 | |
| Lost Pelts - Mahogany Pelts Not Taken to Market | (r) | Note <2> | | | | 2,277 | 560 | 558 | |
| | | | | | | | | | |
| Total Pelts Per Dr. Roberts | (p) + (q) + (r) = (s) | | 29,216 | 24,343 | 29,807 | 36,611 | 36,377 | 50,560 | |
| Growth | | | | -16.7% | 22.4% | 22.8% | -0.6% | 39.0% | |
| | | | | | | | | | |
| **Reproduction Rates** | | Note <5> | | | | | | | |
| Black | ((f) + (n) + (q))/(a) | | 3.11 | 2.62 | 2.78 | 6.51 | 3.91 | 4.83 | |
| Mahogany | ((g) + (o) + (r))/(b) | | 4.73 | 3.68 | 5.11 | 3.81 | 4.41 | 5.91 | |
| Weighted Average Rate | (s)/(c) | | 3.92 | 3.16 | 3.97 | 4.55 | 4.17 | 5.51 | |

<u>Notes:</u>

<1> The 2013 figures are based on assumptions taken from Dr. Roberts' Report.

<2> Lost Pelts come from Dr. Roberts' Report Chart 13 and 17. Due to the timing of the Plaintiffs' breeding and harvesting cycles, Dr. Roberts' 2010 and 2011 Pelts Taken to Market would have been sold in 2011.

<3> 2013 Actual Pelts Sold have be calculated using Dr. Roberts' reproduction ratios of 4.826 and 5.909 for black and mahogany mink, respectively, less the number of Lost Pelts Dr. Roberts calculated in his analysis.

<4> Dr. Roberts' Report pages 22 and 24 state that the Jonssons purchased 975 black female mink and 380 mahogany female mink. Dr. Roberts states in the text of his report that the 380 mink purchased in 2012 were Mahogany females [page 24], but Chart 10 (page 26) indicates that these were Black females.

<5> These amounts don't include any pelts sold directly to another mink rancher, mink sold live, or other sales not reported through the ALC sales records. Including those sales would further demonstrate the unreasonableness of these amounts.

<6> A positive amount indicates mink appear in the Breeder herd for the following year without basis; A negative amounts indicates mink disappear from the Breeder without basis.

**LonePeak Valuation Group**
Jonsson vs. National Feeds

Plaintiffs' Actual Results with Alleged Damages Added - Price/Sales

Schedule 5.2

| | Source | 2008 Pre-Damage | 2009 Pre-Damage | 2010 Pre-Damage | 2011 Damage | 2012 Damage | 2013 Damage Note <1> |
|---|---|---|---|---|---|---|---|
| *Price* | | | | | | | |
| Avg Black Price | Schedule 7 | 61.19 | 39.10 | 60.22 | 76.96 | 89.88 | 98.66 |
| Avg Mahogany Price | Schedule 7 | 53.10 | 37.51 | 56.82 | 73.10 | 86.70 | 105.08 |
| Wt Avg Price | Schedule 7 | 56.31 | 38.16 | 58.16 | 74.14 | 87.94 | 103.33 |
| *Growth* | | | -32.2% | 52.4% | 27.5% | 18.6% | |
| **Pelts Sold:** | | | | | | | |
| Actual Black Pelts Sold | Schedule 7 | 11,618 | 9,994 | 11,787 | 7,766 | 12,245 | 12,630 |
| Actual Mahogany Pelts Sold | Schedule 7 | 17,598 | 14,349 | 18,020 | 21,016 | 19,076 | 33,661 |
| Total Actual Pelts Sold | Schedule 7 | 29,216 | 24,343 | 29,807 | 28,782 | 31,321 | 46,291 |
| Lost Pelts - Black Pelts Not Taken to Market | Note <2> | | | | 5,552 | 4,496 | 3,711 |
| Lost Pelts - Mahogany Pelts Not Taken to Market | Note <2> | | | | 2,277 | 560 | 558 |
| Total "But For" Pelts Sold | | 29,216 | 24,343 | 29,807 | 36,611 | 36,377 | 50,560 |
| *Growth* | | | -16.7% | 22.4% | 22.8% | -0.6% | 39.0% |
| *Income* | | | | | | | |
| Pelt Gross Income | Schedule 7 | $ 1,645,251 | $ 928,994 | $ 1,733,710 | $ 2,133,968 | $ 2,754,476 | $ 4,783,159 |
| Lost Sales - Pelts Taken to Market (Low Quality) | Note <2> | | | | 62,627 | | |
| Lost Sales - Pelts Not Taken to Market (Morality Rate/Death) | Note <2> | | | | $ 231,588 | | |
| Lost Sales - Pelts Not Taken to Market (Low Reproduction) | Note <2> | | | | $ 293,658 | $ 430,756 | $ 424,769 |
| Total "But For" Pelt Gross Income | | $ 1,645,251 | $ 928,994 | $ 1,733,710 | $ 2,721,841 | $ 3,185,232 | $ 5,207,928 |

| | Source | | | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| **Breeder Replacement Cost** | Note <3> | | | | | | |
| Breeder Mink Lost | | | | 1,560 | 300 | 975 | 380 |
| Replacement Cost | | | | 250 | 250 | 500 | 500 |
| Breeder Mink Purchased/Lost | | | | $ 390,000 | $ 75,000 | $ 487,500 | $ 190,000 |

Notes:
<1>  The 2013 figures are based on assumptions taken from Dr. Roberts' Report.
<2>  Numbers come from Dr. Roberts' Report Chart 13, 17, & 19. Due to the timing of the Plaintiffs' breeding and harvesting cycles, Dr. Roberts' 2010 and 2011 Pelts Taken to Market have been combined in 2011, which is when those pelts would have been sold.
<3>  From Chart 18 in Dr. Roberts Report, page 46.



LONEPEAK
VALUATION GROUP

*Lone Peak Valuation Group*
*Jonsson vs. National Feeds*

Testing of Dr. Roberts' Assumptions

Schedule 6

| | | Source | Historical 2008 Pre-Damage | Historical 2009 Pre-Damage | Historical 2010 Pre-Damage |
|---|---|---|---|---|---|
| Black Females | (a) | Schedule 4 | 3,750 | 3,780 | 3,700 |
| *Alleged Average Reproduction Ratio* | | Note <1> | 4.826 | 4.826 | 4.826 |
| Implied Kit Production | (b) | | 18,098 | 18,242 | 17,856 |
| | | | | | |
| Mahogany Females | (c) | Schedule 4 | 3,750 | 3,900 | 3,900 |
| *Alleged Reproduction Ratio* | | Note <1> | 5.909 | 5.909 | 5.909 |
| Implied Kit Production | (d) | | 22,159 | 23,045 | 23,045 |
| | | | | | |
| Total Implied Kit Production | (b) + (d) =(e) | | 40,256 | 41,287 | 40,901 |
| Total Available for Pelting | (a) + (c) + (e) = (f) | | 47,756 | 48,967 | 48,501 |
| Female Breeder Held for Next Years Breeding | (g) | | (7,680) | (7,600) | (7,900) |
| Male Breeder Held for Next Years Breeding | (h) | | (586) | (60) | (124) |
| Total Pelts for Sale | (f) + (g) + (h) | | 39,490 | 41,307 | 40,477 |
| Average Sales Price per Pelt | | | $ 56.31 | $ 38.16 | $ 58.16 |
| Sales if Dr. Roberts' Assumptions Were True | | | $ 2,223,828 | $ 1,576,400 | $ 2,354,343 |
| Actual Sales | | Schedule 4.1 | $ 1,645,251 | $ 928,994 | $ 1,733,710 |
| Error Caused by Dr. Roberts' Assumptions | | | $ 578,577 | $ 647,406 | $ 620,633 |
| | | | | | |
| Overstatement - as % | | | 35% | 70% | 36% |

Notes:

<1> Reproduction Rates of 4.826 and 5.909 are used by Dr. Roberts. See Dr. Roberts' Report pg 20.


LONEPEAK
VALUATION GROUP

**LonePeak Valuation Group**
**Jonsson vs. National Feeds**
**Recalculation of Historical Sales from ALC Documents**

Schedule 7
(1 of 2)

| VARIETY | 2008 | | | 2009 | | | 2010 | | |
|---|---|---|---|---|---|---|---|---|---|
| | QTY | Avg | Revenue | QTY | Avg | Revenue | QTY | Avg | Revenue |
| **JONSSON MINK PRODUCTION** | | | | | | | | | |
| FEMALE Breeder Std Rch | 0 | $0.00 | $0 | 59 | $21.78 | $1,285 | 0 | $0.00 | $0 |
| FEMALE Breeder Mahogany | 0 | $0.00 | $0 | 78 | $22.31 | $1,740 | 0 | $0.00 | $0 |
| MALE Section III Dark | 59 | $18.98 | $1,120 | 7 | $24.71 | $173 | 200 | $30.81 | $6,162 |
| MALE Section III Mahogany | 84 | $13.11 | $1,101 | 318 | $18.80 | $5,978 | 202 | $23.02 | $4,650 |
| MALE Section III Dark Brown | 0 | $0.00 | $0 | 1 | $7.00 | $7 | 0 | $0.00 | $0 |
| FEMALE Section III Dark | 98 | $14.42 | $1,413 | 98 | $16.36 | $1,440 | 326 | $14.95 | $4,874 |
| FEMALE Section III Mahogany | 75 | $13.11 | $983 | 486 | $12.59 | $6,119 | 196 | $11.30 | $2,215 |
| FEMALE Section III Dk Brown | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| FEMALE Section III Silverblue | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 1 | $14.00 | $14 |
| FEMALE Section III Misc Mink | 0 | $0.00 | $0 | 0 | $1.00 | $0 | 1 | $4.00 | $4 |
| MALE Blackglama | 2824 | $96.75 | $273,222 | 2468 | $49.76 | $122,808 | 2908 | $61.53 | $188,171 |
| MALE Glma | 1013 | $88.47 | $89,620 | 962 | $45.63 | $43,896 | 1110 | $76.30 | $84,693 |
| MALE Std Rch Dark | 687 | $81.63 | $56,080 | 507 | $43.68 | $22,146 | 549 | $74.02 | $40,637 |
| FEMALE Blackglama | 1786 | $57.75 | $103,142 | 2353 | $36.21 | $85,202 | 2076 | $62.74 | $130,248 |
| FEMALE Glma | 1357 | $46.62 | $63,263 | 760 | $29.98 | $22,785 | 1877 | $51.67 | $96,985 |
| FEMALE Std Rch Dark | 767 | $44.92 | $34,454 | 542 | $28.01 | $15,181 | 994 | $49.51 | $49,213 |
| MALE Am Legend Mahogany | 3777 | $82.62 | $312,056 | 2697 | $48.42 | $130,589 | 3450 | $71.81 | $247,745 |
| MALE Mahogany | 1757 | $68.29 | $119,986 | 1895 | $42.61 | $80,746 | 2062 | $66.64 | $137,412 |
| MALE Unlab Mahogany | 1462 | $68.60 | $100,293 | 1176 | $45.64 | $53,673 | 1718 | $68.56 | $117,786 |
| FEMALE Am Legend Mahogany | 3737 | $50.58 | $190,512 | 2196 | $35.72 | $78,441 | 2562 | $52.20 | $133,736 |
| FEMALE Mahogany | 1556 | $42.59 | $66,270 | 1801 | $30.61 | $55,129 | 1958 | $48.83 | $95,609 |
| FEMALE Unlab Mahogany | 1338 | $43.03 | $57,574 | 1070 | $30.13 | $32,239 | 1667 | $47.35 | $78,932 |
| MALE Blackglama. | 43 | $0.00 | $0 | 29 | $50.69 | $1,470 | 47 | $69.60 | $3,271 |
| MALE Breeder Std Rch | 416 | $0.00 | $0 | 786 | $46.01 | $36,164 | 638 | $66.69 | $42,548 |
| MALE Breeder Mahogany | 1025 | $0.00 | $0 | 1247 | $46.08 | $57,462 | 1114 | $66.93 | $74,560 |
| MALE Breeder Wild Type | 4 | $0.00 | $0 | 3 | $33.00 | $99 | 0 | $0.00 | $0 |
| MALE Breeder Silverblue | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Breeder Pastel | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 2 | $65.00 | $130 |
| MALE Breeder Palomino | 0 | $0.00 | $0 | 2 | $40.00 | $80 | 0 | $0.00 | $0 |
| MALE Breeder White | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Breeder Sapphire | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| FEMALE Blackglama. | 7 | $0.00 | $0 | 35 | $31.17 | $1,091 | 5 | $42.60 | $213 |
| FEMALE Breeder Std Rch | 25 | $0.00 | $0 | 352 | $27.29 | $9,606 | 62 | $39.53 | $2,451 |
| FEMALE Breeder Mahogany | 102 | $0.00 | $0 | 256 | $28.55 | $7,309 | 179 | $39.13 | $7,004 |
| FEMALE Breeder Dark Brown | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| FEMALE Breeder Wild Type | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 2 | $27.00 | $54 |
| MALE Section III Dark | 627 | $53.83 | $33,751 | 373 | $35.66 | $13,301 | 314 | $51.45 | $16,155 |
| MALE Section III Mahogany | 758 | $42.28 | $32,048 | 458 | $32.93 | $15,082 | 1158 | $54.75 | $63,401 |
| MALE Section III Dk Brown | 6 | $39.50 | $237 | 12 | $19.33 | $232 | 0 | $0.00 | $0 |
| MALE Section III Iris | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 1 | $10.00 | $10 |
| MALE Section III Pastel | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Section III Silverblue | 2 | $49.00 | $98 | 1 | $28.00 | $28 | 0 | $0.00 | $0 |
| MALE Section III Misc Mink | 0 | $0.00 | $0 | 6 | $2.00 | $12 | 18 | $4.00 | $72 |
| FEMALE Section III Dark | 1876 | $28.72 | $53,879 | 645 | $21.18 | $13,661 | 1255 | $34.99 | $43,912 |
| FEMALE Section III Mahogany | 1927 | $27.80 | $53,571 | 671 | $20.51 | $13,762 | 1754 | $34.67 | $60,811 |
| FEMALE Section III Dk Brown | 21 | $27.52 | $578 | 2 | $19.50 | $39 | 0 | $0.00 | $0 |
| FEMALE Section III Pastel | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| FEMALE Section III Silverblue | 0 | $0.00 | $0 | 1 | $20.00 | $20 | 1 | $31.00 | $31 |
| FEMALE Section III Misc Mink | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE AM Legend Dark Brown | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Dark Brown | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE UNLAB Dark Brown | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| **TOTAL** | 29,216 | | 1,945,251 | 24,343 | | 928,994 | 29,807 | | 1,733,710 |
| | QTY | Average | Weighted Avg. | QTY | Average | Weighted Avg. | QTY | Average | Weighted Avg. |
| Total Black | 11,618 | 16.62 | 61.19 | 9,994 | 17.38 | 39.10 | 11,787 | 23.11 | 60.22 |
| Total Mahogany | 17,598 | 34.80 | 53.10 | 14,349 | 31.92 | 37.51 | 18,020 | 45.01 | 56.82 |

Note <1> This schedule does not agree with Dr. Roberts' summary of ALC statements due to minor differences between his schedules and actual source documents.

LonePeak Valuation Group
Jonsson vs. National Feeds
Recalculation of Historical Sales frc

Schedule 7
(2 of 2)

JONSSON MINK PRODUCTION

| VARIETY | 2011 | | | 2012 | | |
|---|---|---|---|---|---|---|
| | QTY | Avg | Revenue | QTY | Avg | Revenue |
| FEMALE Breeder Std Rch | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| FEMALE Breeder Mahogany | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Section III Dark | 43 | $36.56 | $1,572 | 54 | $66.69 | $3,601 |
| MALE Section III Mahogany | 90 | $54.62 | $4,916 | 121 | $63.14 | $7,640 |
| MALE Section III Dark Brown | 1 | $49.00 | $49 | 0 | $0.00 | $0 |
| FEMALE Section III Dark | 44 | $17.39 | $765 | 214 | $42.21 | $9,033 |
| FEMALE Section III Mahogany | 58 | $22.52 | $1,306 | 157 | $39.97 | $6,275 |
| FEMALE Section III Dk Brown | 0 | $0.00 | $0 | 1 | $42.00 | $42 |
| FEMALE Section III Silverblue | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| FEMALE Section III Misc Mink | 1 | $1.00 | $1 | 0 | $0.00 | $0 |
| MALE Blackglama | 1291 | $99.97 | $129,061 | 1237 | $124.72 | $154,279 |
| MALE Glma | 889 | $91.85 | $81,655 | 1768 | $112.87 | $199,554 |
| MALE Std Rch Dark | 711 | $91.47 | $65,035 | 1013 | $110.15 | $111,582 |
| FEMALE Blackglama | 1017 | $74.07 | $75,329 | 1530 | $92.42 | $141,403 |
| FEMALE Glma | 925 | $63.57 | $58,802 | 1974 | $72.50 | $143,115 |
| FEMALE Std Rch Dark | 705 | $57.91 | $40,827 | 1388 | $70.67 | $98,090 |
| MALE Am Legend Mahogany | 5641 | $86.42 | $487,495 | 9065 | $108.63 | $982,951 |
| MALE Mahogany | 1902 | $79.08 | $150,410 | 2707 | $102.23 | $276,797 |
| MALE Unlab Mahogany | 2331 | $82.50 | $192,308 | 2620 | $101.27 | $265,327 |
| FEMALE Am Legend Mahogany | 3647 | $63.15 | $230,308 | 3168 | $73.22 | $231,961 |
| FEMALE Mahogany | 1802 | $56.08 | $101,056 | 2248 | $70.16 | $157,369 |
| FEMALE Unlab Mahogany | 2219 | $57.95 | $128,591 | 1797 | $66.80 | $120,040 |
| MALE Blackglama. | 14 | $105.43 | $1,476 | 10 | $108.60 | $1,086 |
| MALE Breeder Std Rch | 500 | $96.71 | $48,355 | 769 | $93.94 | $72,240 |
| MALE Breeder Mahogany | 1085 | $94.19 | $102,196 | 1192 | $92.29 | $110,010 |
| MALE Breeder Wild Type | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Breeder Silverblue | 3 | $85.33 | $256 | 0 | $0.00 | $0 |
| MALE Breeder Pastel | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Breeder Palomino | 2 | $89.00 | $178 | 0 | $0.00 | $0 |
| MALE Breeder White | 2 | $75.50 | $151 | 1 | $90.00 | $90 |
| MALE Breeder Sapphire | 0 | $0.00 | $0 | 1 | $94.00 | $94 |
| FEMALE Blackglama. | 4 | $65.75 | $263 | 5 | $76.20 | $381 |
| FEMALE Breeder Std Rch | 43 | $58.49 | $2,515 | 111 | $58.71 | $6,517 |
| FEMALE Breeder Mahogany | 151 | $57.19 | $8,636 | 138 | $61.81 | $8,530 |
| FEMALE Breeder Dark Brown | 2 | $67.00 | $134 | 0 | $0.00 | $0 |
| FEMALE Breeder Wild Type | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Section III Dark | 606 | $79.97 | $48,462 | 869 | $90.23 | $78,410 |
| MALE Section III Mahogany | 951 | $74.97 | $71,295 | 1022 | $87.48 | $89,405 |
| MALE Section III Dk Brown | 6 | $76.50 | $459 | 26 | $88.96 | $2,313 |
| MALE Section III Iris | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Section III Pastel | 0 | $0.00 | $0 | 1 | $126.00 | $126 |
| MALE Section III Silverblue | 4 | $61.75 | $247 | 0 | $0.00 | $0 |
| MALE Section III Misc Mink | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| FEMALE Section III Dark | 921 | $44.38 | $40,874 | 1103 | $55.12 | $60,797 |
| FEMALE Section III Mahogany | 1139 | $50.70 | $57,747 | 846 | $56.28 | $47,613 |
| FEMALE Section III Dk Brown | 19 | $51.79 | $984 | 3 | $40.00 | $120 |
| FEMALE Section III Pastel | 1 | $49.00 | $49 | 0 | $0.00 | $0 |
| FEMALE Section III Silverblue | 4 | $48.75 | $195 | 0 | $0.00 | $0 |
| FEMALE Section III Misc Mink | 8 | $1.00 | $8 | 0 | $0.00 | $0 |
| MALE AM Legend Dark Brown | 0 | $0.00 | $0 | 45 | $105.62 | $4,753 |
| MALE Dark Brown | 0 | $0.00 | $0 | 25 | $104.72 | $2,618 |
| MALE UNLAB Dark Brown | 0 | $0.00 | $0 | 97 | $106.97 | $10,376 |
| TOTAL | 28,782 | | 2,133,968 | 31,321 | | 2,754,476 |
| | QTY | Average | Weighted Avg. | QTY | Average | Weighted Avg. |
| Total Black | 7,766 | 42.03 | 76.96 | 12,245 | 50.60 | 89.88 |
| Total Mahogany | 21,016 | 59.95 | 73.10 | 19,076 | 71.02 | 86.70 |

**LonePeak Valuation Group**
**Jonsson vs. National Feeds**
**Recalculation of Historical Market Revenue from ALC Documents**

Schedule 8
(1 of 2)

JONSSON MINK QUANTITY AT ALC AVERAGE PRICE

| VARIETY | 2008 | | | 2009 | | | 2010 | | |
|---|---|---|---|---|---|---|---|---|---|
| | QTY | Mkt | Mkt REV | QTY | Mkt | Mkt REV | QTY | Mkt | Mkt REV |
| FEMALE Breeder Std Rch | 0 | $0.00 | $0 | 59 | $25.61 | $1,511 | 0 | $0.00 | $0 |
| FEMALE Breeder Mahogany | 0 | $0.00 | $0 | 78 | $29.05 | $2,266 | 0 | $0.00 | $0 |
| MALE Section III Dark | 59 | $49.29 | $2,908 | 7 | $30.27 | $212 | 200 | $46.17 | $9,234 |
| MALE Section III Mahogany | 84 | $42.39 | $3,561 | 318 | $29.86 | $9,495 | 202 | $23.02 | $4,650 |
| MALE Section III Dark Brown | 0 | $0.00 | $0 | 1 | $24.27 | $24 | 0 | $0.00 | $0 |
| FEMALE Section III Dark | 98 | $24.44 | $2,395 | 88 | $17.62 | $1,551 | 326 | $27.82 | $9,069 |
| FEMALE Section III Mahogany | 75 | $23.09 | $1,732 | 486 | $16.03 | $7,791 | 196 | $27.14 | $5,319 |
| FEMALE Section III Dk Brown | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| FEMALE Section III Silverblue | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 1 | $21.50 | $22 |
| FEMALE Section III Misc Mink | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 1 | $4.12 | $4 |
| MALE Blackglama | 2824 | $94.39 | $266,557 | 2468 | $54.49 | $134,481 | 2308 | $83.70 | $193,180 |
| MALE Glma | 1013 | $84.70 | $85,801 | 962 | $48.28 | $46,445 | 1110 | $77.41 | $85,925 |
| MALE Std Rch Dark | 687 | $77.88 | $53,504 | 507 | $45.78 | $23,210 | 549 | $74.57 | $40,939 |
| FEMALE Blackglama | 1786 | $54.09 | $96,605 | 2353 | $36.13 | $85,014 | 2076 | $58.56 | $121,571 |
| FEMALE Glma | 1357 | $43.00 | $58,351 | 760 | $30.97 | $23,537 | 1877 | $48.62 | $91,260 |
| FEMALE Std Rch Dark | 767 | $39.98 | $30,665 | 542 | $28.65 | $15,528 | 994 | $46.28 | $46,002 |
| MALE Am Legend Mahogany | 3777 | $84.62 | $319,610 | 2697 | $50.17 | $135,308 | 3450 | $76.86 | $265,167 |
| MALE Mahogany | 1757 | $74.04 | $130,088 | 1895 | $44.61 | $84,536 | 2062 | $72.36 | $149,206 |
| MALE Unlab Mahogany | 1462 | $69.55 | $101,682 | 1176 | $43.81 | $51,521 | 1718 | $71.23 | $122,373 |
| FEMALE Am Legend Mahogany | 3737 | $52.25 | $195,258 | 2196 | $35.50 | $77,958 | 2562 | $54.16 | $138,758 |
| FEMALE Mahogany | 1556 | $43.10 | $67,064 | 1801 | $30.66 | $55,219 | 1958 | $49.72 | $97,352 |
| FEMALE Unlab Mahogany | 1338 | $42.59 | $56,985 | 1070 | $30.27 | $32,389 | 1667 | $47.75 | $79,599 |
| MALE Blackglama. | 43 | $0.00 | $0 | 29 | $50.54 | $1,466 | 47 | $71.47 | $3,359 |
| MALE Breeder Std Rch | 416 | $0.00 | $0 | 786 | $44.57 | $35,032 | 638 | $67.18 | $42,861 |
| MALE Breeder Mahogany | 1025 | $0.00 | $0 | 1247 | $43.60 | $54,369 | 1114 | $61.51 | $68,522 |
| MALE Breeder Wild Type | 4 | $0.00 | $0 | 3 | $31.36 | $94 | 0 | $0.00 | $0 |
| MALE Breeder Silverblue | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Breeder Pastel | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 2 | $57.07 | $114 |
| MALE Breeder Palomino | 0 | $0.00 | $0 | 2 | $31.73 | $63 | 0 | $0.00 | $0 |
| MALE Breeder White | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Breeder Sapphire | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| FEMALE Blackglama. | 7 | $0.00 | $0 | 35 | $31.13 | $1,090 | 5 | $47.36 | $237 |
| FEMALE Breeder Std Rch | 25 | $0.00 | $0 | 352 | $25.61 | $9,015 | 62 | $39.57 | $2,453 |
| FEMALE Breeder Mahogany | 102 | $0.00 | $0 | 256 | $29.05 | $7,437 | 179 | $42.93 | $7,684 |
| FEMALE Breeder Dark Brown | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| FEMALE Breeder Wild Type | 0 | $0.00 | $0 | 0 | $35.10 | $0 | 2 | $35.10 | $70 |
| MALE Section III Dark | 627 | $49.29 | $30,905 | 373 | $30.27 | $11,291 | 314 | $46.12 | $14,482 |
| MALE Section III Mahogany | 758 | $42.39 | $32,132 | 458 | $29.86 | $13,676 | 1158 | $47.20 | $54,658 |
| MALE Section III Dk Brown | 6 | $41.73 | $250 | 12 | $24.27 | $291 | 0 | $0.00 | $0 |
| MALE Section III Iris | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 1 | $40.38 | $40 |
| MALE Section III Pastel | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Section III Silverblue | 2 | $37.01 | $74 | 1 | $19.25 | $19 | 0 | $0.00 | $0 |
| MALE Section III Misc Mink | 0 | $0.00 | $0 | 6 | $10.62 | $64 | 18 | $5.78 | $104 |
| FEMALE Section III Dark | 1876 | $24.44 | $45,849 | 645 | $17.62 | $11,365 | 1255 | $27.81 | $34,902 |
| FEMALE Section III Mahogany | 1927 | $23.09 | $44,494 | 671 | $16.03 | $10,756 | 1754 | $27.13 | $47,586 |
| FEMALE Section III Dk Brown | 21 | $27.64 | $580 | 2 | $16.32 | $33 | 0 | $0.00 | $0 |
| FEMALE Section III Pastel | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| FEMALE Section III Silverblue | 0 | $0.00 | $0 | 1 | $11.05 | $11 | 1 | $21.51 | $22 |
| FEMALE Section III Misc Mink | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE AM Legend Dark Brown | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Dark Brown | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE UNLAB Dark Brown | 0 | $0.00 | $0 | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| TOTAL | 29,216 | | 1,627,051 | 24,343 | | 944,068 | 29,807 | | 1,736,724 |

| | QTY | Average | Weighted Avg | QTY | Average | Weighted Avg | QTY | Average | Weighted Avg |
|---|---|---|---|---|---|---|---|---|---|
| Total Black | 11,618 | 16.51 | 58.05 | 9,994 | 18.50 | 40.16 | 11,787 | 24.31 | 59.04 |
| Total Mahogany | 17,598 | 38.24 | 54.13 | 14,349 | 32.96 | 37.82 | 18,020 | 46.23 | 57.76 |

Note <1> This schedule does not agree with Dr. Roberts' summary of ALC statements due to minor differences between his schedules and actual source documents.

LonePeak Valuation Group
Jonsson vs. National Feeds
Recalculation of Historical Market I

JONSSON MINK QUANTITY AT ALC AVERAGE PRICE

| VARIETY | 2011 | | | 2012 | | |
|---|---|---|---|---|---|---|
| | QTY | Mkt | Mkt REV | QTY | Mkt | Mkt REV |
| FEMALE Breeder Std Rch | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| FEMALE Breeder Mahogany | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Section III Dark | 43 | $68.04 | $2,926 | 54 | $79.80 | $4,309 |
| MALE Section III Mahogany | 90 | $71.33 | $6,420 | 121 | $81.30 | $9,837 |
| MALE Section III Dark Brown | 1 | $69.00 | $69 | 0 | $0.00 | $0 |
| FEMALE Section III Dark | 44 | $38.33 | $1,687 | 214 | $47.50 | $10,165 |
| FEMALE Section III Mahogany | 58 | $40.33 | $2,339 | 157 | $50.27 | $7,892 |
| FEMALE Section III Dk Brown | 0 | $0.00 | $0 | 1 | $43.71 | $44 |
| FEMALE Section III Silverblue | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| FEMALE Section III Misc Mink | 1 | $1.38 | $1 | 0 | $0.00 | $0 |
| MALE Blackglama | 1291 | $102.07 | $131,772 | 1237 | $122.67 | $151,743 |
| MALE Glma | 889 | $93.71 | $83,308 | 1768 | $109.65 | $193,863 |
| MALE Std Rch Dark | 711 | $89.26 | $63,464 | 1013 | $104.15 | $105,504 |
| FEMALE Blackglama | 1017 | $72.89 | $74,129 | 1530 | $87.37 | $133,676 |
| FEMALE Glma | 925 | $59.63 | $55,158 | 1974 | $67.52 | $133,284 |
| FEMALE Std Rch Dark | 705 | $55.30 | $38,987 | 1388 | $62.93 | $87,347 |
| MALE Am Legend Mahogany | 5641 | $97.35 | $549,151 | 3065 | $111.48 | $341,686 |
| MALE Mahogany | 1902 | $88.42 | $168,175 | 2707 | $101.95 | $275,979 |
| MALE Unlab Mahogany | 2331 | $90.00 | $209,790 | 2620 | $100.86 | $264,253 |
| FEMALE Am Legend Mahogany | 3647 | $64.53 | $235,341 | 3168 | $75.41 | $238,899 |
| FEMALE Mahogany | 1802 | $57.38 | $103,399 | 2243 | $68.04 | $152,614 |
| FEMALE Unlab Mahogany | 2219 | $58.24 | $129,235 | 1797 | $67.11 | $120,597 |
| MALE Blackglama. | 14 | $96.96 | $1,357 | 10 | $117.14 | $1,171 |
| MALE Breeder Std Rch | 500 | $90.93 | $45,465 | 769 | $94.42 | $72,609 |
| MALE Breeder Mahogany | 1085 | $84.49 | $91,672 | 1192 | $87.78 | $104,634 |
| MALE Breeder Wild Type | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Breeder Silverblue | 3 | $88.15 | $264 | 0 | $0.00 | $0 |
| MALE Breeder Pastel | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Breeder Palomino | 2 | $95.16 | $190 | 0 | $0.00 | $0 |
| MALE Breeder White | 2 | $90.47 | $181 | 1 | $126.28 | $126 |
| MALE Breeder Sapphire | 0 | $0.00 | $0 | 1 | $91.60 | $92 |
| FEMALE Blackglama. | 4 | $66.14 | $265 | 5 | $74.47 | $372 |
| FEMALE Breeder Std Rch | 43 | $53.74 | $2,311 | 111 | $56.14 | $6,232 |
| FEMALE Breeder Mahogany | 151 | $51.75 | $7,814 | 138 | $60.19 | $8,306 |
| FEMALE Breeder Dark Brown | 2 | $59.52 | $119 | 0 | $0.00 | $0 |
| FEMALE Breeder Wild Type | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Section III Dark | 606 | $68.04 | $41,232 | 869 | $79.80 | $69,346 |
| MALE Section III Mahogany | 951 | $71.33 | $67,835 | 1022 | $81.30 | $83,089 |
| MALE Section III Dk Brown | 6 | $69.00 | $414 | 26 | $69.51 | $1,807 |
| MALE Section III Iris | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| MALE Section III Pastel | 0 | $0.00 | $0 | 1 | $85.60 | $86 |
| MALE Section III Silverblue | 4 | $38.95 | $156 | 0 | $0.00 | $0 |
| MALE Section III Misc Mink | 0 | $0.00 | $0 | 0 | $0.00 | $0 |
| FEMALE Section III Dark | 921 | $38.33 | $35,302 | 1103 | $47.50 | $52,399 |
| FEMALE Section III Mahogany | 1139 | $40.33 | $45,936 | 846 | $50.27 | $42,528 |
| FEMALE Section III Dk Brown | 19 | $32.80 | $623 | 3 | $43.71 | $131 |
| FEMALE Section III Pastel | 1 | $39.21 | $39 | 0 | $0.00 | $0 |
| FEMALE Section III Silverblue | 4 | $14.75 | $59 | 0 | $0.00 | $0 |
| FEMALE Section III Misc Mink | 8 | $1.38 | $11 | 0 | $0.00 | $0 |
| MALE AM Legend Dark Brown | 0 | $0.00 | $0 | 45 | $107.00 | $4,815 |
| MALE Dark Brown | 0 | $0.00 | $0 | 25 | $99.96 | $2,499 |
| MALE UNLAB Dark Brown | 0 | $0.00 | $0 | 97 | $97.98 | $9,504 |
| TOTAL | 28,782 | | 2,196,595 | 31,321 | | 2,691,430 |

| | QTY | Average | Weighted Avg | QTY | Average | Weighted Avg |
|---|---|---|---|---|---|---|
| Total Black | 7,766 | 40.85 | 74.62 | 12,245 | 49.14 | 85.02 |
| Total Mahogany | 21,016 | 62.73 | 76.95 | 19,076 | 72.00 | 86.51 |

LonePeak Valuation Group
Jonsson vs. National Feeds
Analysis of 2011 - 2013 Expected Results based on Historical Operating Results

Schedule 9

*Results per Dr. Roberts' Loss Calculation:*

| | | Quantity | | | Actual Prices | | | Actual/Expected | |
| Year | Black Pelt Sales | Mahogany Pelt Sales | Total Pelt Sales | Averge Black Pelt Price | Averge Mahogany Pelt Price | Actual Revenue | Lost Revenue | Expected Revenue |
|---|---|---|---|---|---|---|---|---|
| 2008 | 11,618 | 17,598 | 29,216 | $ 61.19 | $ 53.10 | $ 1,645,251 | | $ 1,645,251 |
| 2009 | 9,994 | 14,349 | 24,343 | $ 39.10 | $ 37.51 | $ 928,994 | | $ 928,994 |
| 2010 | 11,787 | 18,020 | 29,807 | $ 60.22 | $ 56.82 | $ 1,733,710 | | $ 1,733,710 |
| 2011 | 5,552 | 2,277 | 7,829 | | | $ 2,133,968 | $ 587,874 | $ 2,721,842 |
| 2012 | 4,496 | 560 | 5,056 | | | $ 2,754,476 | $ 430,756 | $ 3,185,232 |
| 2013 | 3,711 | 558 | 4,269 | | | | $ 424,769 | $ 424,769 |

Note <1> applies to 2011 row.

| | | Quantity | | | Market Prices / Premium (Discount) | | |
| Year | Black Pelt Sales | Mahogany Pelt Sales | Total Pelt Sales | Averge Black Pelt Price | Averge Mahogany Pelt Price | Lost Revenue |
|---|---|---|---|---|---|---|

*Dr. Roberts' Pelts Taken to Market (Quality Loss):*

| 2011 | 7,766 | 21,016 | 28,782 | $ (2.35) | $ 3.85 | $ 62,627 |
|---|---|---|---|---|---|---|

*Dr. Roberts' Pelts Not Taken to Market (Quantity Loss):*

| Year | Black Pelt Sales | Mahogany Pelt Sales | Total Pelt Sales | Averge Black Pelt Price | Averge Mahogany Pelt Price | Lost Revenue |
|---|---|---|---|---|---|---|
| 2010 | 3,152 | 788 | 3,940 | $ 59.03 | $ 57.76 | $ 231,588 |
| 2011 | 2,400 | 1,489 | 3,889 | $ 74.62 | $ 76.95 | $ 293,658 |
| 2012 | 4,496 | 560 | 5,056 | $ 85.02 | $ 86.59 | $ 430,756 |
| 2013 | 3,711 | 558 | 4,269 | $ 98.66 | $ 105.08 | $ 424,769 |

**Notes:**

Note <1>   Due to the timing of the Plaintiffs' breeding and harvesting cycles, Dr. Roberts' 2010 and 2011 Pelts Taken to Market would have been sold in 2011.

# RICK S. HOFFMAN, CPA/ABV

Lone Peak Valuation Group
36 South State Street, Suite 500
Salt Lake City, Utah 84111
Tel. (801) 321-6334
Fax. (801) 708-7701
Email: Rhoffman@lpvgroup.com

Mr. Hoffman has over eighteen years of experience in public accounting and consulting. He has been primarily involved with calculating damages related to commercial Litigation and has spent considerable time performing business valuations inside and outside of the litigation arena, with particular emphasis in the valuation of intellectual property. Mr. Hoffman is a Certified Public Accountant, Accredited in Business Valuation and has hundreds of hours of additional training in the areas of valuation, litigation, and lost profit calculations. He has taught on the subject of damages and has testified in State Court, Federal Court, Arbitrations, and acted as Special Master.

## EMPLOYMENT HISTORY

| | |
|---|---|
| April 2008 to Present | Co-Founding Shareholder and Principal Lone Peak Valuation Group Salt Lake City, Utah Litigation/Consulting Services |
| December 2000 to April 2008 | Managing Director LECG, LLC Salt Lake City, Utah Litigation/Consulting Services |
| September 1992 to November 2000 | Director PricewaterhouseCoopers LLP Salt Lake City, Utah Litigation/Consulting Services |
| September 1989 to August 1992 | Sr. Associate Arthur Andersen & CO |

**LONEPEAK**

VALUATION GROUP

## EDUCATION & CREDENTIALS

Certified Public Accountant, Accredited in Business Valuations
Adjunct Professor – University of Utah (2002)
Co-Instructor NACVA – Valuation of Intellectual Property Damages
Southwest Texas State University, San Marcos, Texas
BA Accounting, 1989 (Magna Cum Laude)

## PROFESSIONAL MEMBERSHIPS

American Institute of Certified Public Accountants
American Society of Appraisers (1999-2000)
Association of Investment Management Research (1998-2000)
Games Development Association – Patent Committee (2000-2001)
National Association of Certified Valuation Analysts (1999 - 2008)
National Litigation Certification Board – NACVA (2001-2001)
National Litigation Review Board (2005-2006)
Board Member of NACVA (2005-2006)
Management Advisory Council of LECG, LLC 2005
Editorial Advisory Board for National Litigation Consultants 2005-2006
Board Member of Journal of Business Valuation (2006-2010)
Board Member of Utah Clean Energy Association (2011 – Present)

## SPEECHES, ARTICLES, AND BOOKS

*"Earn Outs – Snake Oil or Cure-All?"*, Speech Presented at the Utah State Bar Convention, Sun Valley, Utah, July 2012

*"Valuing Multi-Level Marketing Companies"*, Grant Thornton's Direct Sellers Conference, October 2011

*"Lost Profits in Trademark and Copyright Cases"*, a chapter in *"The Comprehensive Guide to Lost Profits Damages"*, Business Valuation Resources, LLC June 2009

*"Financial Discovery"*, Utah Bar Association, August 2006

*"Improving the Rigor of Your Market Approach"*, National Litigation Consultants Review, Feature Article, February 2006



*"Keeping Track of Your Experience",* National Litigation Consultants Review, Feature Article, November 2005

*"Valuing Intellectual Property and Other Intangible Assets",* Business Valuation Resources, LLC, Telephone Conference, June 2005

*"Value of Intellectual Property Damage Calculation",* National Association of Certified Valuation Analysts, Las Vegas, Nevada, November 2004

*"Intellectual Property Damages: Guideline and Analysis, 2004 Supplement*", Wiley Publications, November 2004

*"Valuation in Context of a Merger",* Kennesaw State University, February 2004

*"Valuing Start Up Technology Companies",* National Internal Revenue Service, September 2003

*"Corporate Analysis of Intellectual Property",* Executive MBA Program, University of Utah, June 2003

*"Value of Intellectual Property",* National Association of Certified Valuation Analysts, New York, New York, June 2003

*"Intellectual Property Damages: Guidelines and Analysis",* Wiley Publications, November 2002

*"Valuing Patents that are Not Generating Sales",* The RMA Journal, May 2002

*"An Introduction to Valuing Intellectual Property",* The RMA Journal, May 2002

*"How Intellectual Property Influences Your Existing Loans",* The RMA Journal, April 2002

*"Intellectual Property Valuation",* American Institute of Certified Public Accountants, National Valuation Conference, December 2001

*"Calculating Intellectual Property Damages",* National Association of Certified Valuation Analysts, Chicago, Illinois, December 2001

*"Calculating Intellectual Property Damages",* Nation Association of Certified Valuation Analysts, Washington D.C., November 2001

**LONEPEAK**
VALUATION GROUP

*"Reasonable Royalty Calculation"*, Valuation Examiner, Summer 2001

*"Calculating Damages in Intellectual Property Cases"*, National Association of Certified Valuation Analysts, November 2001

*"Intellectual Property Section"*, Utah State Bar, September 2000

*"Calculating Intellectual Property Damages"*, National Association of Certified Valuation Analysts, Dallas, Texas, May 2000

*"Valuing Intellectual Property"*, Guest Lecturer, University of Utah, February 2000

*"Patent Damages"*, Utah Bar Association, April 1999

*"Performing Business Valuations"*, Guest Lecturer, University of Utah, October 1998 & February 1999

*"Maximizing the Value of Intellectual Property"*, Law and Economic Society, January 1999

*"Business Valuations"*, Utah Bar Association, July 1998

*"Calculating Personal Injury Damages"*, Young Lawyers Association, November 1997

*"Calculating Personal Injury Damages"*, Utah Bar Association, July 1997

## PRIOR TESTIMONY EXPERIENCE

**Clearone Communication, Inc. vs. Andrew Chaing and WideBand Solutions, Inc.**
Trial
Federal Court of Utah

**Wardell vs. Clyde**
Deposition
3rd District Court of Utah

**Praise Kutchera vs. USANA**
Arbitration
Salt Lake City, Utah

**1-800-Contacts, Inc. vs. Lens.Com**
Deposition
Federal Court of Utah



Page 4

East Jordan School District vs.
West Jordan School District
Arbitration

Salt Lake City, Utah
Tim Schmanski and Maria Schmanski
vs. Nielson, Desert Irrigation Company,
and Millard County
Deposition and Trial
4th District Court of Utah

Kim K. Marquardt vs. Robert S. Marquardt
Trial
3rd District Court of Utah

Basic Research Testimony Regarding
Nutritional Products
Testimony
District of Columbia

Sai Food Sensations vs. TCBY
Systems, LLC
Deposition
State of New York

Patricia Dahl vs. James C. Pinegree, M.D.
And Utah Orthopedic Associates, P.C.
Deposition
3rd District Court of Utah

Robert Stillwell, Futurelink Corp., SDP
Electronics, Inc., Electronic Marketing
Corporation vs. Radioshack Corporation
Deposition
Southern District of California

Donald and Tamaron Cole vs. Lynn
Hines and Swift Transportation Co. Inc.
Deposition

3rd District Court of Utah
Turner Gas Company vs. Mark A.
Harris and Kamps Company
Deposition
3rd District Court of Utah

Ipalani Lewis
Deposition
3rd District Court of Utah

Nagraj Narasimhan, Total Renal Care,
Inc. and Gate City Dialysis Center vs.
vs. Rahim and Kidney Institute, LLP
Deposition
District of Hawai'i

Liberty Dialysis, Hawai'i LLC and St.
Francis Medical Center vs. Fresenius
Medical Holding and Bio-Medical
Application of California
Deposition
District of Hawai'i

ASC Utah, Inc., d/b/a The Canyons vs.
Wolf Mountain Resorts, L.C.
Deposition
3rd District Court of Utah

Hansen Beverage Company, d/b/a
Monster Beverage Company vs.
Cytosport, Inc.
Deposition
Central District of California



**Mark Haug vs. La Caille Restaurant
Corporation, et al.**
Trial
3rd District Court of Utah

**Sara Lee Corporation vs. Sycamore Family
Bakery, Inc., and Leland Sycamore**
Deposition
District Court of Utah, Central Division

**Cutrubus Motors, Inc., Rocky Mountain
Chrysler Jeep vs. Chrysler Group, LLC**
Arbitration
Salt Lake City, Utah

**Shari J. Jackson and Michael L. Jackson
vs. Glen R. Fuller, M.D.**
Deposition
3rd District Court of Utah

**Kevin R. Griffith vs. Douglas Deny, M.D.**
Deposition
3rd District Court of Utah

**Zulema McLean and the Estate of Christopher
Lee McLain vs. Tooele Hospital Corporation,
d/b/a Mountain West Medical Center**
Deposition
3rd District Court of Utah

**Unishippers Global Logistics, LLC vs.
DHL Express (USA), Inc.**
Deposition
3rd District Court of Utah

**Unishippers Global Logistics, LLC
vs. DHL Express (USA), Inc.**
Deposition
District Court of Utah, Central Division

**Quality Jeep Chrysler, Inc., n/k/a
Quality Automotive Sales and Service,
Inc. vs. Chrysler Group, LLC**
Arbitration
Salt Lake City, Utah

**B. Scott Berry and Lind Berry vs. Davis
Hospital and Medical Center, L.P.**
Arbitration
Salt Lake City, Utah

**Samuel Harrison and Ashley Harrison
vs. CNL Income Properties, Inc.**
Deposition
3rd District Court of Utah

**Connor Sport Court International, Inc.
vs. Snap Court, LLC d/b/a Snap Sports
Company**
Deposition
3rd District Court of Utah

**First Line Security Bankruptcy
Hearing**
Trial
Federal Court of Utah

**Eleutian Technology, LLC vs. Pearson
Education, Inc., and NCS Pearson, Inc.**
Arbitration
Salt Lake City, Utah



**USS Logistics, LLC, et al. vs. DHL Express (USA), Inc.**
Deposition and Trial
Federal Court of Utah

**Fatu Matagi and Shellise Matagi vs. Pacificorp d/b/a Rocky Mountain Power**
Deposition
3rd District Court of Utah

**American Ski vs. Wolf Mountain**
Deposition and Trial
Federal Court of Utah

**ASC Utah, Inc. d/b/a The Canyons vs. Wolf Mountain Resorts, L.C.**
Trial
3rd District Court of Utah

**Daniel Updike vs. Yamaha Motor Corporation, U.S.A., et al.**
Deposition
Utah State Court

**Zip Ship, Inc. vs. Unishippers Global Logistics, LLC**
Trial
3rd District Court of Utah

**Debbie Herrera vs. Maria Oneida, M.D.**
Deposition
3rd District Court of Utah

**Premier Technology, Inc. vs. Chad Orr, et al.**
Deposition
3rd District Court of Utah

**Tri-Valley Distributing vs. Western Life Assurance Company**
Deposition
3rd District Court of Utah

**Tahitian Noni International, Inc. vs. Robert L. Dean, Jr., and Top Gun International**
Trial
Federal Court of Utah

**Holly L. Johnston**
Deposition
Utah State Court

**Mud Buddy, LLC vs. Gator Tail, LLC**
Deposition
3rd District Court of Utah

**Sammy Boutot vs. Kevin D. Hiatt and Flint Energy**
Deposition
3rd District Court of Utah

**Glen Jensen and Itsumo Family Investment Co., LLC vs. Agel Enterprises LLC and James Savas**
Deposition
4rd District Court of Utah



**Gulf Coast Shippers, LP, et al vs. DHL
Express (USA), Inc.**
Deposition and Trial
Federal Court of Utah


**Brigham Young University and Dr.
Daniel L. Simmons vs. Pfizer, Inc. G.D.
Searle and Company, Monsanto Company,
And Pharmacia Corporation**
Deposition
3rd District Court of Utah


**Kristy Szeles and Rick Szeles vs. The
Kroger Company**
Deposition
3rd District Court of Utah


**Legacy Resources, Inc. vs. Liberty Pioneer
Energy Source, Inc.**
Testimony
Salt Lake City, Utah


**Thomas Zenger vs. Javier Becerra-Macias
and Dynatec Corporation**
Deposition
Salt Lake City, Utah


**Suzanne Caruso vs. Viridian Network, LLC**
Arbitration
New York, New York


**Verlyn Linford vs. Tri City Medical Clinic, P.C.**
Deposition
Salt Lake City, Utah


**Glen Jensen and Itsumo Family
Investment Co., LLC vs. Agel
Enterprises LLC and James Savas**
Trial
4th District Court of Utah


**David Day and Shanna Day vs. Brooke
Horan and Justin Williams**
Deposition
3rd District Court of Utah


**Education Opportunities in America,
Inc. vs. Stevens-Henager College**
Deposition and Trial
3rd District Court of Utah


**Arla Jean Cochran and Loren Cochran
vs. Intermountain Health Care, a Utah
Corporation and Scott Smith, M.D.**
Trial
5th District Court of Utah


**Patricia Dahl vs. James C. Pingree,
M.D., and Utah Orthopedic Associates**
Arbitration
3rd District Court of Utah


**Roy Santo vs. Lithonia Lighting**
Deposition
Salt Lake City, Utah


**Cindy Schaugaard vs. State Farm
Insurance and Lee Ann Wight**
Trial
3rd District Court of Utah




**Sara Lee Corporation vs. Sycamore Family Bakery, Inc. and Leland Sycamore**
Trial
Federal Court of Utah

**Alexis Flores and Jennifer Flores vs. University of Utah Health Sciences Center**
Deposition
Salt Lake City, Utah

**Debrah Orr Watts and Todd Watts vs. University of Utah Hospital, et al.**
Deposition
Idaho

**Cytosport, Inc. vs. Vital Pharmaceuticals, Inc.**
Deposition
Irvine, California

**Ifreedom Direct Corporation vs. First Tennessee Bank National Association**
Trial
3rd District Court of Utah

**Wendy McDaniel vs. Marc C. Bingham**
Deposition
3rd District Court of Utah

**USS Logistics, LLC, et al. vs. DHL Express (USA), Inc.**
Deposition
Supreme Court of the State of New York
County of New York

**iFreedom Direct Corporation vs. First Tennessee Bank National Association**
Deposition
Salt Lake City, Utah

**Stone Flood and Fire Restoration, Inc. vs. Safeco Insurance Company of America**
Trial
Federal Court, Utah

**MP Nexlevel, LLC vs. Codale Electric Supply, Inc., et al.**
Deposition
Salt Lake City, Utah

**Karen Christoffersen vs. United Parcel Service, Inc.**
Deposition
United States District Court, District of Utah, Central Division

**Hornady Manufacturing Company vs. Double Tap Ammunition, Inc.**
Deposition
United States District Court of Utah

**Lonnie Jill Wootten and Salih Wooten vs. Anthony R. Butler**
Deposition
United States District Court for the Northern District of Alabama Southern Division

**Verilyn Linford vs. Tri City Medical Clinic, P.C.**
Trial
Fourth Judicial District Court of Utah

**LONEPEAK**
VALUATION GROUP

## Lone Peak Valuation Group Rates

### Partners

Rick Hoffman: $350 per hour
Kent Goates:  $275 per hour
Roger Smith: $275 per hour
Cory Kennedy: $230 per hour

### Managers

Burk Reynolds: $225 per hour
Laura McNichols: $220 per hour
John Pilkinton: $220 per hour
Gavin Harris: $215 per hour
Jeff Pickett: $200 per hour
Jeremy Sharpe: $195 per hour
Matt Germane: $185 per hour

### Senior Associates

Dave Cook: $160 per hour
Ying Zhang: $155 per hour
Yongsheng Wang: $155 per hour

### Associates

Rhett Mason:  $140 per hour
Kristin Nicks: $120 per hour
Laura Ewald: $90 per hour

### Administrative

Krystina McLain: $85 per hour

