1                IN THE UNITED STATES DISTRICT COURT

2                DISTRICT OF UTAH, CENTRAL DIVISION

3

4   KEITH JONSSON, an individual; MICHAEL    )

5   JONSSON, an individual; CEDAR VALLEY     )

6   FUR FARM, LLC, a Utah limited liability  )

7   company,                                 )

8           Plaintiffs,                      )

9     vs.                                    )    Case No.

10  NATIONAL FEEDS, INC., an Ohio            )  2:11-CV-140-BSJ

11  corporation, RANGEN, INC., an Idaho      )

12  corporation,                             )

13          Defendants.                      )

14  _____)

15

16             BEFORE THE HONORABLE BRUCE S. JENKINS

17          -------------------------------------

18                    January 21, 2014

19                     Jury Trial

20

21

22

23

24  REPORTED BY: Patti Walker, CSR, RPR, CP

25  350 South Main Street, #146, Salt Lake City, Utah  84101

```
 1                    A P P E A R A N C E S

 2

 3

 4   For Plaintiff:              Ryan B. Hancey
                                 Scott O. Mercer
 5                               Joseph C. Rust
                                 KESLER & RUST
 6                               68 S. Main Street, 2nd Fl
                                 Salt Lake City, Utah  84101
 7

 8   For National Feeds:         Joseph E. Minnock
                                 Allison S. Fletcher
 9                               MORGAN MINNOCK RICE & JAMES
                                 136 S. Main Street, #800
10                               Salt Lake City, Utah  84101

11

12   For Rangen:                 Hans A. Mitchell
                                 CAREY PERKINS LLP
13                               300 N. 6th Street, #200
                                 Boise, Idaho  83701
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   SALT LAKE CITY, UTAH; TUESDAY, JANUARY 21, 2014; 11:00 A.M.
 2                          PROCEEDINGS
 3           THE COURT:  Good morning.  Why don't we turn to
 4   Jonsson and others vs. National Feeds and others.  It's
 5   11-C-140.  We'll note the absence of the jury and note the
 6   presence of counsel and, just for the heck of it, why not
 7   tell us again who you are and whom you represent.
 8           MR. HANCEY:  Ryan Hancey and Scott Mercer here for
 9   the plaintiffs, Keith and Michael Jonsson, Cedar Valley Fur
10   Farm.  Joseph Rust is back in the pews.
11           MR. MINNOCK:  Joseph Minnock and Allison Fletcher
12   for National Feeds.
13           MR. MITCHELL:  Hans Mitchell for Rangen.
14           THE COURT:  Let's look first at the pending motion
15   for partial directed verdict.  I received the transcript and
16   have read those pages and, counsel, want an opportunity to
17   respond?
18           MR. HANCEY:  Yes.
19           Your Honor, I appreciate the opportunity.  I want
20   to just start by talking a little bit about the standard
21   here.  A party that moves for directed verdict has a very
22   difficult burden of showing that no evidence exists that
23   raises a question of material fact, and a court should deny
24   the motion when any evidence exists raising such a question
25   no matter how improbable the evidence may appear.  That's
```

1   Gross vs. DeWitt, Utah appellate 1989.

2            I also looked at Benson and Mangrum on Utah

3   Evidence, and they talk about reasonable degree of

4   scientific certainty, which is a lot of what defendants are

5   saying here.  They say that's higher than what is needed in

6   a civil case where the standard is always a preponderance of

7   the evidence.

8            So whether or not Dr. Hall was able to say a

9   particular thing with a reasonable degree of scientific

10  certainty does not mean plaintiffs haven't at least

11  established a preponderance of the evidence or that that

12  issue is to go to the jury.

13           And the third resource, Your Honor, is a case

14  called Alder vs. Bayer Corp., and that's Utah Supreme Court

15  2002.  In that case, the court held that legally when you've

16  got a situation, an observable sequence of an event --

17  sorry, of a condition followed by an event followed by an

18  altered condition, that's sufficient to establish causation

19  even if the exact mechanism is unknown, and a temporal

20  relationship specifically between a chemical exposure -- in

21  that case -- and injury could help support proof of

22  causation.

23           That's what we have here.  We have mink on three

24  ranches that died just a few days after eating the same

25  batch of lactation crumlets.  There's clearly a temporal

1  relationship.

2           In addition, I want to talk a little bit about

3  what Dr. Hall said.  On redirect, I asked Dr. Hall to

4  clarify concerning the 1500 mink the Jonssons stated died

5  between June and November, and my exact question was, the

6  Jonssons testified that in 2010, 1500 of their kits died

7  between June and November.  In your opinion, what role did

8  the lactation crumlets play in the deaths of those mink.  I

9  don't have a copy of the transcript because the court

10  reporter has been out of town that was doing it that day,

11  but I can tell you my recollection of his response, and that

12  was that the later bred and whelping mink whose kits were

13  still young during that period of time could have been

14  impacted by the lactation crumlets the same as the ones that

15  died earlier.  That was his testimony.

16           On page 57 of the transcript that we do have,

17  Dr. Hall explains why the 400 mothers could also be affected

18  by the lactation crumlets in the sense that if they had

19  stillborns, babies trapped inside their bodies they couldn't

20  expel, other pregnancy related complications, they could

21  die.  And the testimony by Keith Jonsson is that those

22  mothers died during or right after the whelping period.

23           Dr. Hall also talked about the Koppang Study, and

24  one of the findings in that study, Your Honor -- I mean we

25  all interpret it differently, but the study involved mice

 1    and it involved testing those mice over two or three

 2    generations of time.  And those mink received nitrosamine

 3    exposure and -- sorry, it involved mink, and those mink were

 4    administered nitrosamine.  And Dr. Hall said that the study

 5    shows two things, that nitrosamine exposure can be tied to

 6    reduced kits per litter and it can also be tied to reduced

 7    survivability among the kits that do survive.

 8          He also talked about how, in that particular

 9    study, these 14 mothers produced the 44 kits, 30 survived a

10    couple of months through weaning, and by the end of the

11    year, only 23 were left.  He also talked about in the first

12    and second generations of those animals, there was only one

13    mother that had any babies and it had three, and of those

14    only one survived.

15          So clearly there is some evidence in the record

16    about the effects that nitrosamines have on future

17    generations and defendants are free to argue their

18    interpretation of that study to the jury, but it doesn't

19    mean there's not evidence that supports the jury's ability

20    to look into that issue.

21          And, finally, Your Honor -- well, two more things.

22    Dr. Wustenberg, the defendants' own expert, testified that

23    nitrosamine exposure can have both short-term and long-term

24    clinical effects on mink.

25          And, finally, Dr. Roberts said, I've looked at all

1    the data and in my expert opinion, there are statistically

2    anomalies in the years postdating 2010 that cannot be

3    explained by anything in their known history.  And that's

4    expert evidence given with a reasonable degree of

5    probability and it ties in to the causation that Dr. Hall

6    found in 2010 at the time of the feeding.

7            So, Your Honor, Dr. Hall -- or Dr. Roberts also

8    talked about the domino effect that these damages had from

9    2010 spilling over into other years.  We've got the historic

10   growth that they were striving for, that they had achieved

11   eight percent on an annual basis over time.  For the last

12   three years before 2010, they saved up their capital.  So

13   what could they do?  So they could go out and build some

14   mink sheds to house new mink.  They were trying to grow, and

15   they were not able to do that because of what happened in

16   2010.

17           That caused complications in future years.  They

18   had to sell off breeders they wanted to keep and they had to

19   go out and buy breeders that they otherwise didn't want to

20   have.  Those are all damages that go well beyond this very

21   narrow window of time the defendants are trying to limit the

22   jury's deliberations to.

23           For those reasons, Your Honor, we think that there

24   is clearly a preponderance of the evidence.  We think the

25   issues should go to the jury on all of the damages, it's the

1    jury's call on causation, and we would ask the Court to deny

2    the motion.

3           MR. MITCHELL:  I think it's worth looking at

4    exactly what Dr. Hall had to say because he said it two

5    times.  He said it the first day of his testimony and he

6    said it when he came back the second day.  We find it on

7    page 57 in particular.  I believe he talks about what

8    about -- Mr. Hancey asked, what about the mink that died on

9    the Jonsson ranch later in the year.  So we're outside of

10   any temporal relationship between feeding of the feed and

11   any of the losses that occurred or any signs or symptoms

12   that one might expect to see.  So we're outside of that

13   range.  So you have to have that causative opinion coming in

14   and tying those two things together.

15          And what we see is that Dr. Hall says, is it

16   possible that some of those animals had tumors and died and

17   they weren't identified?  Yes, it's possible, but to what

18   degree I cannot, with a reasonable degree of scientific

19   certainty, say.

20          So what we find is that he has limited the

21   causative effect of the feeding of the crumlets to a defined

22   period that starts with whelping and ends with weaning.

23          THE COURT:  Of course, counsel argues that he's

24   not the only person that gave evidence.

25          MR. MITCHELL:  The problem with that argument is,

1    Your Honor, that Dr. Roberts himself testified that he isn't

2    qualified to render an opinion as to causation, and he

3    wasn't rendering an opinion as to causation.  All he did is

4    look to see if there were anomalies.  He didn't look back

5    and tie anything backwards to the feeding of the feed.

6           Indeed, it would be kind of difficult for him to

7    do so given the fact that in certain categories, for

8    example, the black mink, plaintiffs actually improved on a

9    year-to-year basis.  So you have a break in a chain that's

10   going on there.  That coupled with Dr. Roberts' own

11   admission that he's not qualified to render an opinion as to

12   causation means that for purposes of the causation element,

13   his testimony doesn't factor into the equation.

14          So we're left with either a temporal component

15   under the Bayer case, which beyond the weaning period we

16   don't have.  We're far out.  The crumlets aren't being fed

17   anymore.  You don't have that temporal association with the

18   exposure, anything that ties it back that might allow a jury

19   to make that link together.  Or you've got to have expert

20   testimony that ties those two things together.  And what we

21   find is plaintiffs' case comes up far short in that regard.

22          THE COURT:  Thank you.

23          I think under the circumstances, I will deny the

24   motion.  I think that the evidence as a whole in the case

25   justifies that at this point.  So the motion is denied.

1    Send me an order on that.

2           In my own mind, I have been trying to simplify

3    this case to make it understandable to the jury and to do so

4    in a fashion that makes sense, at least makes sense to me.

5    In looking at the causes of action which at this point

6    remain, implied is gone, negligence is gone.  We end up with

7    two, namely, strict liability or express warranty.

8           Now each of those is a way of describing, or

9    characterizing I should say, factual events.  History is

10   what it is.  The manner in which you describe it may differ.

11   But if you try to get behind the words to see what common

12   elements exist and what remains, you focus really on the

13   question of causation, bad food, sick and dead mink,

14   economic damage.

15          Now if we're dealing with causation, that's really

16   the focal point on the remaining causes of action.  They're

17   concurrent.  And then you get to the question, well, if we

18   deal with strict liability and there is a finding of

19   causation and a subsequent damage, then we don't have to

20   worry about warranty, promises, contractual provisions.  But

21   then if you find causation lacking in the strict liability

22   section, that's the same causation lacking which is

23   concurrent in the warranty, promises, contractual

24   provisions.

25          So in an effort to simplify, because of the nature

1   of the question of causation, it seems to me to make sense

2   to confine the remaining cause of action to strict liability

3   because the element there that's critical is the same as the

4   element that's critical in the so-called contractual

5   provision.  If you succeed on your causation of strict

6   liability, warranty walks out the door.  If you don't

7   succeed on your causation under strict liability, warranty

8   is an academic exercise.

9        I think the key here is for these folks on the

10  jury to decide the question as to whether or not the product

11  was appropriately defective, in effect dangerously so, that

12  caused damage as a practical matter to the mink, and then as

13  a practical matter the monetary damage to plaintiffs, and

14  lets people get away from all of these strange contractual

15  provisions on the basis that the causation question has to

16  be running along the same track.  It's the same element.

17       So I've determined to, in effect, say folks have a

18  choice, strict liability, warranty.  But from the

19  conversations we've previously had, I think that strict

20  liability is the matter that we ought to concern ourselves

21  with.  And, thus, because of the redundant nature of the

22  same element in the warranty cause of action, I have

23  determined only to submit the strict liability question to

24  the jury.

25       It's one thing to say you've broken your promise,

1    you've breached your contract, you've breached your

2    warranty.  You still have in there the causation question,

3    which is dealt with in the strict liability cause of action.

4          I have prepared a package, which I hope strips the

5    cause down to its essentials.  I have substituted some of

6    our stock instructions for stocks that you requested but

7    which cover the same subjects and which, I believe, deal

8    with the requests that you've made that remain.

9          The question always is whether the instruction

10   accurately states the law.  It may not state it as you would

11   like it stated.  That is a matter of style, but that isn't

12   the question.  The question is does it accurately state the

13   law.

14         So what I've done is had a package prepared for

15   each one of you along with a special verdict form.  I'll

16   have the clerk pass those out to you.  And what I will do is

17   I will give you some time to look at them.  Then I will come

18   back, after you've had an adequate time to look at those,

19   and we'll walk through each of the instructions.  The

20   question is does it accurately state the law.  We'll work

21   our way through.

22         If there are requests that relate to the remaining

23   cause of action that you don't feel like we've covered in an

24   effective sort of way, I will be happy to have you call that

25   to my attention and we'll be happy to deal with appropriate

1    changes or amendments.

2              The effort, of course, is to let the fact finders

3    have a genuine opportunity to deal with the information that

4    they have received and to provide an appropriate outcome as

5    they may determine.

6              We'll just be in recess and I'll give you a chance

7    to look at that, and we'll be back in a few minutes.

8              (Recess)

9              THE COURT:  Let's turn to Jonsson and others vs.

10   National Feeds and others, here today with a continuation of

11   our instruction conference, and we'll note the presence of

12   counsel.

13             Procedurally, why don't we just begin with number

14   one and see if there are any problems.

15             MR. MINNOCK:  Your Honor, the parties actually

16   spoke prior to Your Honor coming in, and based on -- I

17   believe the parties are ready to stipulate to the charge as

18   you prepared it without exception.

19             THE COURT:  That's correct?

20             MR. HANCEY:  Yes, it is, Your Honor.

21             THE COURT:  Are there any requests other than what

22   we've done that we need to worry about?

23             MR. MINNOCK:  There may be a problem.

24             MR. MITCHELL:  The packet as prepared, Your Honor,

25   we don't have a problem with.  The only thing that we would

1   ask is that this Court submit a mitigation of damages

2   instruction.

3               THE COURT:  Well, let's talk about mitigation for

4   a moment.  Tell me again what they should have done that

5   they didn't do.

6               MR. MITCHELL:  There are a number of things, Your

7   Honor.  There was no vet visit.

8               THE COURT:  Okay.  There wasn't a vet visit.  I

9   guess defendants had no vet visit either?

10              MR. MITCHELL:  Defendants didn't know a vet needed

11  to get out there.  We weren't informed of it until months

12  after the fact.  There was no vet visit that occurred while

13  the situation was ongoing.  None of the animals themselves

14  were tested.

15              THE COURT:  There was no testing on the part of

16  defendants.

17              MR. MITCHELL:  Sorry?

18              THE COURT:  The defendants didn't test either.

19              MR. MITCHELL:  We didn't know about it, Your

20  Honor.  We weren't given any notice of it.  The fact of the

21  matter is these are things that are within the plaintiffs'

22  control that they failed to undertake to mitigate their

23  damages.

24              THE COURT:  I thought somebody had called you up

25  and told you about it.  They told National about it.

 1          MR. MITCHELL:  Not until months after the fact,

 2   Your Honor.  There was no notice while the problem was

 3   ongoing.

 4          THE COURT:  As a matter of fact you didn't test?

 5          MR. MITCHELL:  That's correct.

 6          THE COURT:  They should have tested.  Should you

 7   have tested?

 8          MR. MITCHELL:  Tested what?

 9          THE COURT:  The sample that you had in your

10   possession.

11          MR. MITCHELL:  No.

12          THE COURT:  They had a duty to test, but you

13   didn't have a duty to test?

14          MR. MITCHELL:  No.  I'm not talking about the

15   feed, Your Honor.  I'm talking about the mink.

16          THE COURT:  I'm sorry?

17          MR. MITCHELL:  I'm not talking about testing the

18   feed.  I'm talking about the mink.

19          THE COURT:  Oh, okay.  What else?

20          MR. MITCHELL:  To the extent that breeders had to

21   be replaced, it should have been done so in a much more

22   timely fashion to cut off any damages that were ongoing and

23   occurring during that period of time.  There are a number of

24   steps.  There's evidence that has come in about things that

25   could or should have been done by the plaintiffs to lessen

 1   their losses, and we ask that an instruction as to that be

 2   given.

 3          THE COURT:  Should we give the same kind of

 4   instruction in reference to the defendants as to what they

 5   should have done?

 6          One of the things that I considered when we dealt

 7   with the question of punitives was the nature of the

 8   activities or inactivity on the part of the defendants.  And

 9   I felt that under those circumstances it made sense to say,

10   well, okay, lots of things they should have done but didn't

11   do.  I thought that was kind of a trade-off for your

12   requested instruction on mitigation.  And counsel complained

13   about what you folks didn't do when you finally got the

14   information that you say that you got.

15          Should we give a mitigation instruction involving

16   the failure to act on the part of defendants as well as the

17   plaintiffs?

18          MR. MITCHELL:  Well, I think the duty to act or

19   not act is covered by the instruction -- on the part of the

20   defendants has been adequately covered within the set of

21   instructions that Your Honor has already prepared.  And then

22   once we turn from that to the question of the avoidance of

23   damages on the part of the plaintiffs --

24          THE COURT:  My question is should I give an

25   instruction regarding mitigation directed to both parties?

1   It's not done very often.  It's rather unusual.  But if I

2   remember, counselor the other day was complaining about all

3   that stuff that you fellows were supposed to do and didn't

4   do.  They called you up and you stonewalled them.  That's

5   the impression that I got.

6           MR. MITCHELL:  You know, what I can say, Your

7   Honor, is I understand the perspective that you're coming

8   from.  I have to make a record and I think that record is --

9           THE COURT:  I appreciate the fact that you need to

10  make a record, but I'm trying to indicate to you the thought

11  processes that went into the question as to whether they did

12  what they should have done to mitigate or you did what you

13  should have done to mitigate.  And I'm perfectly willing to

14  give a mitigation instruction that affects both parties, but

15  I won't give one that affects only one, particularly in

16  light of the fact that I dealt with the question of

17  punitives, even though there was great complaint about what

18  you should have done and didn't do.

19          MR. MITCHELL:  I understand, and all I will say --

20  the only other thing I will say on the point, Your Honor, is

21  in all the years I've been doing this, I have never heard of

22  a duty to mitigate on the part of defendants.

23          THE COURT:  In all the years I've been doing this,

24  this is the first case, in my experience, where it appears

25  appropriate.

1          MR. MITCHELL:  I don't think it's an appropriate

2     statement of the law, and with that I'll just --

3          THE COURT:  Oh, it depends.

4          MR. MITCHELL:  With that, I will just let it go.

5          MR. MINNOCK:  So now I believe with that dealt

6     with, I think the instructions and the special verdict are

7     stipulated to.

8          THE COURT:  Everybody agrees on the verdict form?

9          MR. MINNOCK:  Correct.

10          MR. HANCEY:  We agree on both documents, the

11     instructions the Court proposed and the verdict form.

12          THE COURT:  And the verdict form.

13          MR. MINNOCK:  As does National Feeds.

14          THE COURT:  Well, let's let you go to lunch.  The

15     jury is coming back at ten to 1:00.  Forty-five minutes.

16     Forty-five minutes split.  Reserve what you reserve.  We'll

17     go from there.

18          MR. MINNOCK:  Thank you, Your Honor.

19          THE COURT:  I think it's an interesting case.

20          MR. MINNOCK:  It is that.  That it is.

21          THE COURT:  Thanks a lot.  We'll see you back here

22     at 1:00.

23          (Recess)

24          THE COURT:  Looks like we're all here.  Any reason

25     we shouldn't bring them in?

1          Why don't you bring in your jury.

2          They're pretty conscientious.

3          (Jury present)

4          THE COURT:  Good afternoon, folks.  Sit down,

5     relax.  We appreciate your conscientious nature.  Thank you

6     very much.

7          As I indicated the last time we met, now that

8     we've heard all of the evidence, we have the opportunity of

9     hearing what's called final argument.  We get to hear from

10    plaintiff through counsel, the defendants through counsel,

11    and after that plaintiff has a chance to speak in rebuttal

12    if they so desire.  Then the Court will have a chance to

13    instruct you as to the law that applies to this case, and

14    you will have a chance to retire and deliberate.

15         So, counselor, you go ahead.

16         MR. HANCEY:  Thank you, Your Honor.

17         Good afternoon.  I know it's been a long week and

18    a half for you and I hope you found the trial interesting.

19    I know it means a lot to the Jonssons.  We've all put a lot

20    of time and effort into this trial.

21         I wanted to first of all thank you for your

22    attentiveness.  The Jonssons have noticed it, I've noticed

23    it throughout the trial, and it certainly means a lot to all

24    of us that are involved in this process.

25         As I said in my opening, you heard from the

1    plaintiffs first.  We put on our witnesses, and that took a

2    few days last week.  Then you heard from the defendants

3    concerning their defense to the plaintiffs' allegations.  I

4    want to just spend a few minutes talking to you about both

5    aspects of the case.

6            So the plaintiffs' case is pretty simple.  In the

7    spring of 2010, the plaintiffs obtained some lactation

8    crumlets from the defendants.  They were manufactured by

9    Rangen and they were sold by National.  They mixed them

10   together with some co-op feed and they fed them to their

11   mink at the Lehi ranch.

12           Just a few days later, the mink started dying, and

13   the pregnant ones were hit the worst, you heard.  Mothers

14   that were expected to have five kits had one kit, as one

15   example.  Some others died.  A lot of babies died.  And

16   problems persisted all the way that year into November.

17           The Jonssons tried to figure out what the problem

18   was, and in August they had their suspicions and contacted

19   the defendants about that, and you heard what became of

20   those efforts.

21           You heard from Dr. Hall, and Dr. Hall talked about

22   the lab tests and the poisons that were found in the

23   crumlets.  But what's interesting about the Cedar Valley and

24   the Lehi ranch dichotomy is this.  Just 15 miles to the

25   west, plaintiffs had their Cedar Valley ranch.  They fed

1    co-op feed -- the same co-op feed to those mink, and they

2    were healthy.   In fact, that ranch had an absolute banner

3    year.   The mink did phenomenal.

4           What was the one thing that was different between

5    the two ranches?   The ranching practices were the same.

6    They were even bred at the same ranch.   They all came from

7    Lehi originally.   They had the same parents.   So they were

8    the same mink, same ranching practices, same co-op feed.

9    The only difference was the crumlets.

10          And in science we have something called a control,

11   and Dr. Hall talked a little bit about what a control is.

12   But basically when scientists want to do an experiment, they

13   set up two experiments.   When they want to determine

14   something and they want to find out the effect something

15   has, they set up two experiments.   They make everything the

16   same in both experiments, and they change one variable

17   because what they want to see at the end of the experiment

18   is whether or not there is a change in the outcome.   In

19   science, if they do it properly, set up the control properly

20   and at the end the result is different, they can point their

21   finger at that one variable as being the culprit.

22          All of the evidence in this case points to one

23   culprit, and that's the crumlets.   The Jonssons,

24   unwittingly, unexpectedly, set up the perfect control

25   scenario with the Cedar Valley and the Lehi ranch, and that

1     was a very, very significant fact for our scientist,

2     Dr. Hall.  I think that would be enough alone.  But in this

3     case, we actually have three controls.

4             Remember the Griffeths' testimony.  You heard from

5     Kent Griffeth and his father Roger.  They both purchased

6     lactation crumlets, and they mixed them with the co-op feed,

7     and they fed them to their mink on their two ranches up in

8     Idaho, 150 miles away.  A few days later, same problems,

9     same mink dying, same symptoms, same mortality rate, same

10    co-op feed.  What was the difference there?  The lactation

11    crumlets.  The lactation crumlets were the common factor

12    among the three ranches that had the problems.

13            In addition to the three controls that we have in

14    this case, we have the lab tests.  The Jonssons were able to

15    take samples of the very crumlets that were fed to the mink

16    and send them in to lots of different laboratories.  You

17    heard their testimony.  They didn't know what they were

18    testing for at first because they weren't getting any

19    information from the defendants.  So they were trying to

20    figure out what the problem was.

21            The lab tests tell us, unequivocally, that there

22    were four different poisons in them.  We have the histamines

23    and we had three different kinds of nitrosamines.  We've got

24    the three controls and we have the lab tests.

25            Dr. Hall explained how nitrosamines and histamines

1    are harmful to minks' reproductive systems.  He talked to

2    you about one particular study where nitrosamine exposure

3    had a huge impact on the minks' offspring, on their kits per

4    litter count, on the survivability of the mink that didn't

5    die at birth.  If you remember, there were 40 mink babies

6    that were born.  Just a couple of weeks later, a few weeks

7    later, there were only 30.  By the end of the year, there

8    were only 23.

9         Then there were also problems in the first and

10   second generations of those mink.  There was only one mink

11   that had any babies two generations down the line, and she

12   had three and only one survived.  So we know there are

13   long-term clinical effects associated with nitrosamines, and

14   the defendants' own expert, Dr. Wustenberg, admitted to

15   that.  He said there's short-term and there's long-term

16   clinical effects.

17        You also heard from Dr. Roberts, the economist,

18   and he talked about the way that these crumlets affected the

19   Jonssons financially.  And he told you how he calculated

20   their damages at $3.4 million and he said several different

21   times why, in his words, that was their bare minimum of

22   loss.

23        I just want to focus on three things that

24   Dr. Roberts emphasized.  First of all, he talked about

25   economics and what it is and the kinds of things that they

 1   rely on.  They rely on things like opportunity costs and

 2   lost opportunities, and expenditures to go out and buy a

 3   mink that you weren't going to buy in the first place.  So

 4   they look at the big picture.  They look at all the

 5   different factors that go into a complex problem like this.

 6          He talked over and over again about how

 7   conservative he was.  He said, for example, I used

 8   95-percent confidence intervals when it was professionally

 9   possible and okay for me to use something that was lower

10   than that.  I wanted to be 95-percent sure of what I'm

11   saying.

12          Another way that he was very conservative is he

13   had ten years of data available to him.  He could have data

14   mined.  He could have selected the years that were going to

15   be most helpful to his evaluation, and he didn't.  He used

16   all ten years of the data because that's what was there, and

17   he wanted to be accurate.

18          The third thing that he did is he -- Dr. Hall

19   considered the masking effect between the two ranches, and

20   he explained that to you.  He said the great year that they

21   had out at Cedar Valley offset the damages that the Jonssons

22   suffered to some extent at the Lehi ranch, so I can't get a

23   good picture of all the damages they suffered.  But I'm not

24   going to give them credit for the damages that I can't see.

25   I'm going to tell you what I can see with the masking effect

1    and all.

2         He also told you, if you remember, that when he

3    obtained new information that he hadn't considered before,

4    he factored that into his analysis, even though the result

5    was that the Jonssons' damages were reduced by more than a

6    half million dollars, because it was the right thing to do.

7    He was ultraconservative and his figure was a minimum of

8    $3.4 million.  That's the plaintiffs' case in a nutshell.

9         Let's look at the defendants' case.  The

10   defendants called three witnesses.  Their first witness was

11   Dr. Wustenberg, their scientist, and his testimony can be

12   summarized, really, in two statements.  The first statement

13   was the lactation crumlets didn't kill one single mink, not

14   one, not on the Jonssons' ranch, not on Ken Griffeth's

15   ranch, not on Roger Griffeth's ranch.  The lactation

16   crumlets didn't kill one single mink.

17        The second statement that he made was take

18   everything that the plaintiffs' case consists of, consider

19   the three ranches, consider the lab tests showing the

20   poisons in the crumlets, consider the similarities between

21   the three ranches, consider all of that and chalk it up to a

22   coincidence.  That's what he said.  He said, just a tidy and

23   very unfortunate coincidence.  I will leave any judgment of

24   his credibility up to you.

25        The defendants last two experts were accountants.

1    And, remember, I said this before, but Dr. Roberts was

2    talking about economics.  He's an economist.  He talks about

3    looking at the big picture, factoring in all of the data,

4    all of the information.  And in light of what he said about

5    the importance of economics, it's interesting that the

6    defendants chose to employ accountants to talk about

7    economic damages.

8         Consider the Federal Reserve.  You're all familiar

9    with that.  That's the central banking system for the entire

10   United States.  All the money, all the policy, the interest

11   rates flows through the Federal Reserve.  Imagine what an

12   enormous job that is and how much goes into it and how many

13   different things have to be considered when you're talking

14   about the entire country.  One person is in charge of that

15   entire operation as the chairman of the Fed -- the

16   chairperson of the Fed.

17        The last three chair people of the Fed are Alan

18   Greenspan, Ben Bernanke, and the very recently appointed

19   Janet Yellen.  What do they have in common?  All three of

20   them have multiple degrees in economics.  They are not

21   accountants.  In other words, the people who are charged

22   with running the finances of the entire country, the people

23   who are charged with looking at the big picture and

24   contemplating all the different factors and aspects of what

25   goes into that, they use economic principles.

1                When you listen to the defendants' accountant and

2      look at their spreadsheets and their balance sheets and

3      their calculations, you can see why hiring an accountant to

4      review an economist's measure of damages is sort of like

5      hiring a plumber to look at the wiring work of an

6      electrician.  Accounting and economics are two completely

7      different disciplines.

8                And what did those accountants tell you?  They sat

9      there on that witness stand and they told you that the

10     Jonssons didn't lose one single dollar.  They said it over

11     and over.  It doesn't matter that they lost 6,000 mink.  It

12     doesn't matter that they couldn't achieve the eight-percent

13     growth they had achieved for ten years prior to that.  It

14     doesn't matter they couldn't use the four mink sheds they

15     had saved up for three years to buy and fill with mink, and

16     they couldn't keep breeders that they wanted to keep.  It

17     doesn't matter they had to go outside and buy breeders that

18     they hadn't historically bought.  Even if they did all of

19     those things, not a single dollar of losses.  That's what

20     they told you.

21               So that's the defendants' case in a nutshell, not

22     a single mink death attributable to the crumlets, not a

23     single dollar of damages.

24               Now a fascinating and I think puzzling aspect of

25     this case is the defendants' conduct both before and after

1   learning that the crumlets might be responsible for killing

2   thousands of mink.  Let's take before first.

3          You've got National Feeds that's in the business

4   of selling mink products, mink feed, and specifically

5   crumlets to pregnant mink.  What policies does it have in

6   place to prevent this from happening?  Nothing.

7          It has a nutritionist, Dre Sanders, who has no

8   formal education in nutrition.  It gives no supervision or

9   guidance to Rangen who's going out and purchasing

10  ingredients to put into these crumlets.  It doesn't even

11  know where the crumlets come from.  And National isn't

12  telling Rangen, well, we don't care where you get your

13  ingredients from as long as you make sure that nitrites

14  aren't in them, or as long as you check for histamines.

15  That conversation didn't happen either.  National didn't

16  require Rangen to test for those things.

17          So National is sitting over there saying, you make

18  our product for us, but you do it however you want to do it,

19  and we're not going to give you any guidelines.  In fact,

20  David Brock, the Rangen nutritionist, testified that

21  National did give them -- did give Rangen one quality

22  specification.  Remember what that was?  Make sure the

23  pellets are small enough.  That was the quality

24  specification.  Nothing about nitrites, nothing about

25  preservatives, nothing about quality control.

1          Let's take Rangen.  Rangen is in the business of

2    making the mink feed.  Its nutritionist, David Brock,

3    doesn't know anything about mink nutrition, and it was hard

4    for me to get that out of him, but he eventually admitted

5    that in 2010 he had absolutely no idea about mink nutrition.

6    So if he had a question what would he do?  He'd call Dre

7    Sanders, National's nutritionist, and because he didn't have

8    any answers, he would look at books.  He would read books or

9    call a friend.  That's what was going on.

10         Rangen didn't do any independent testing either.

11   It didn't test for nitrites.  It didn't know what

12   preservatives were in the crumlets.  David Brock says, don't

13   worry about that because we have such a sophisticated

14   quality assurance program in place over here at Rangen.

15         But when he was asked about that, what was the

16   quality assurance program, I heard two things.  One was we

17   had a guy standing there out at the warehouse, so when our

18   suppliers deliver the ingredients that are being dumped into

19   these big metal containers, he's looking at it to make sure

20   it looks right.  The second thing is we make sure the

21   crumlets don't fall apart when they're manufactured.  That's

22   the quality assurance program that Rangen had in place.

23         We read countless articles online, in newspapers,

24   whatever, about product recalls, don't we?  Something's

25   defective.  Chicken has been found to have salmonella in it.

1    We always read the same thing, the same company response.

2    At great expense and effort -- I can't imagine how great --

3    those companies re-call the products.  The vast majority,

4    I'm sure, of which are uncontaminated.  But they do that and

5    we expect responsible companies to do that because we expect

6    companies to take accountability and we expect them to put

7    safety first.

8            Contrast that with what we saw here.  The Jonssons

9    had no idea what was affecting their mink.  But by August of

10   2010, they started having some suspicions about the

11   lactation crumlets connection.  So they get on the phone and

12   they contact National and tell them about their suspicions.

13   And then they call Rangen and tell them about their

14   suspicions.  And what is the response?

15           The response is that they do nothing.  They didn't

16   conduct their own tests, they didn't give any advice to the

17   Jonssons, and the Jonssons were left with, luckily, being in

18   the position of having their own crumlet pallet saved, and

19   they could send tests in on it.  They didn't know what they

20   were testing for.  They were completely in the dark.

21           Imagine a chicken company telling its salmonella

22   infected customer, go do your own tests if you want.  That's

23   not what we expect responsible companies to do.  That's what

24   the Jonssons had to do.

25           Now in the law there is something called direct

1   evidence and there's something called circumstantial

2   evidence.  I'm sure you're familiar with both terms.  You

3   are going to get an instruction on the difference between

4   the two.  But let me just give you an example.

5          In state court there's a jury instruction that's

6   commonly read about the difference between the two, and it

7   says, imagine that you're missing a cherry pie.  If you saw

8   Johnny pick up the pie and eat it, that's direct evidence.

9   If you see Johnny with cherry smeared all over his face

10   holding an empty pie tin, that's circumstantial evidence.

11   In the law, one type of evidence isn't better than the

12   other.  They are equal.  You can rely on both.  They are

13   both useful.  Many, many cases hinge completely on

14   circumstantial evidence.

15          In this case, we have both.  We've got dead mink

16   bodies.  We have lab reports that show poisons.  That's the

17   direct stuff.  But let's consider the circumstantial

18   evidence for a minute.  I just want to talk about two

19   things.

20          The defendants have taken the position that

21   nitrites were not in the ingredients that were used in the

22   crumlets.  It seems to me that if you're going to take that

23   position, you would prove it one of two ways.  You would

24   either put your supplier up on the witness stand under oath

25   and ask that person what was in the shipment that was used

1    in the crumlets, and that didn't happen.  If I couldn't get

2    that person, I would at least produce the shipping documents

3    for those ingredients that show the preservatives that were

4    in the ingredients, and I didn't see that either.  If those

5    things were helpful to the defendants, I think we would have

6    seen them.

7              The other thing the defendants are saying is that

8    the crumlets weren't poisonous.  They didn't cause any mink

9    deaths.  They have spent a lot of time and effort during the

10   trial criticizing the way that the Jonssons went about doing

11   their lab tests.  But the evidence is that Rangen kept a

12   sample of the crumlets, the very batch that was fed to their

13   mink.  What did they do?  They split it in half.  They kept

14   half and they gave the other half to National Feeds.  So

15   both defendants had in their possession a sample of the

16   problematic crumlets.

17             What would you expect a company to do when they

18   get a phone call from the Jonssons and the Griffeths saying

19   we've got mink dying on three ranches?  You would expect

20   them to conduct some tests on those crumlets and find out

21   what the problem was.  No lab tests.  The only lab tests we

22   see are the ones that the Jonssons did.

23             Why is that?  I can only think of two reasons.

24   One, the defendants were afraid of what those results would

25   show and it was just better off for them to not test them,

1    because that's abnormal behavior to have the problematic

2    sample and not test it.  And the only other explanation I

3    can think of is that they did do the tests.  And believe me,

4    if they were helpful, we would have heard about it.

5              I misspoke earlier when I told you that the

6    defendants didn't do anything in response to the Jonssons'

7    phone call in August of 2010.  They did do something.  They

8    started their campaign of deny, deny, deny that continued

9    all the way throughout this trial.

10             You heard Ed Buschur, the National Feeds

11   president, on the stand under oath saying -- or insinuating

12   at least, that the Jonssons misused the crumlets when they

13   fed them to their pregnant mink.  Really?  When National

14   Feeds own promotional and advertising materials say feed

15   them exactly how the Jonssons fed them.  No.  Denials.  Not

16   one single mink died because of the crumlets, not one single

17   dollar of damages.  Deny, deny, deny.

18             In this case we have a product, lactation

19   crumlets, that had one purpose, to be fed to pregnant mink.

20   The Jonssons did that.  The Jonssons' operations got

21   hammered.  They suffered losses.  They had one obligation,

22   make sure the crumlets are safe, and they didn't do

23   anything -- anything to make sure that happened.

24             Based on all of that, we're asking you to consider

25   the evidence and to return a verdict in favor of the

1   plaintiffs against National and Rangen in at least the bare

2   minimum figure that Dr. Roberts talked about of

3   $3.4 million, or more if you consider the masking effect

4   that happened between the Lehi and the Cedar Valley ranches.

5           Thank you for your time.  And I may get the last

6   word in here after you've heard from the defendants.

7           MR. MITCHELL:  When we got going in this case last

8   week, you might remember that what I said this case is about

9   is plaintiffs' claims versus reality.  There were a few

10  things that struck me as interesting in the initial portion

11  of closing that we've started down, and one of the things

12  that was said is that we've heard from witnesses, and that's

13  true.  And for a large part, for the plaintiffs' case,

14  that's all there's been, stuff that we've heard.  And I

15  think if we're going to compare the claims to reality, we

16  ought to be looking at not only what is heard but what

17  actually exists.

18          And so I put together a little timeline running

19  from April through December of 2010 with the events that are

20  either undisputed or for which there's a document that's out

21  there that we can actually look at and say, okay, this is

22  what was going on.  Regardless of what it is that anybody

23  says, we know that this is going on because it's here in a

24  document that we can see and was created at a time when

25  there wasn't a real interest in trying to skew things one

1    way or the other.

2           So if we start off back in 2010, we've heard one

3    of the things that plaintiffs have said is -- or at least

4    suggested, because I don't think I ever actually heard

5    Michael Jonsson say that he did this, was that they

6    called -- they have all of these problems going on.  It's a

7    train wreck.  They are having sleepless nights.  Never seen

8    anything like this before.  So one of the first questions

9    that pops to mind is, well, did you call a vet.  And as it

10   turns out, well, at least no vet ever made it out to their

11   farm.

12          But what they do say is -- well, you can look at

13   the exhibits, and in particular Exhibit No. 39.  What you

14   see on Exhibit No. 39 is that we bought some Baytril, an

15   antibiotic in May.  I believe it was May 26th, but we'll see

16   it here shortly.  So this stuff is going on in either late

17   April or very early May, and the first time that we see

18   anything being done, at least according to the plaintiffs,

19   is buying Baytril in late May.

20          Well, guess what?  They are buying Baytril

21   April 5th.  When you look at Exhibit No. 39, if you look at

22   page number FBAC0057 -- let's do this.  We see that on

23   April 5th, 2010, they buy Baytril, 20 days before they ever

24   fed the crumlets.

25          Next thing that shows up on the timeline,

 1   April 12th, another purchase of Baytril.  That's also in

 2   Exhibit 39 on page 53.  April 12th, Baytril.  Twice in the

 3   month of April, before they ever started feeding crumlets,

 4   two purchases of Baytril.

 5           Now this one becomes a bit interesting because

 6   they begin feeding the crumlets in late April, and you've

 7   heard the testimony.  In his deposition, Keith Jonsson said

 8   April 28th.  So did Michael Jonsson.  Here they've told you

 9   April 25th.  Not necessarily a big deal, but it's at least

10   interesting to note.

11           Somewhere around the 1st of May, they start to

12   notice -- or claim that they notice, anyway, lethargy in

13   stillborn kits and the very next day they knew they had a

14   problem -- knew they had a problem.  And so one would expect

15   that you would call the vet, have them come out, take a look

16   at what's going on, try to help you fix the problem, cut it

17   off at the pass if you can do it.  Do we see a vet visit the

18   very next item?  No.

19           The very next thing that we see, more Baytril.

20   But not May 3rd, May 4th.  No, May 26th, three weeks later,

21   we see more Baytril.  This is the entry that plaintiffs have

22   talked about in their testimony, May 26th, Baytril.  Page 58

23   of Exhibit 39.

24           So what do we see then?  Not a whole heck of a

25   lot.  Sleepless nights, disaster happening.  This is their

1  livelihood and, according to them, it's going down the

2  tubes.  The very next event that we have is they stop

3  feeding the crumlets somewhere around June 7th or June 10th.

4  Nobody is quite sure exactly what date that was, but that's

5  what we see.

6         The important thing to note, we start feeding the

7  crumlets somewhere in the April 25th to 28th time range, and

8  less than a week later, we're seeing signs and symptoms.

9  That's acute.  It's not chronic, not sub chronic.  It's

10  acute.

11        The next thing for which we have any kind of a

12  record or a document is August 20th.  It shows up in Exhibit

13  No. 2 that you will be getting when this is all done.  And

14  interestingly enough, it's a report to the Jonssons' bank.

15  What's interesting about that particular report is that they

16  have 500 mixed pelts in their freezer already.  We've heard

17  that it was maybe 1500, somewhere along those lines, in the

18  testimony, but what we've got in the record to their bank is

19  500.  It's important for the number, but it's also important

20  for what it shows.

21        What it shows, folks, is that even with everything

22  that's going on, even though they are saving pelts, what we

23  don't have is a necropsy.  We don't have a postmortem

24  examination of any of these animals they have saved.  500

25  mixed mink in their freezer as of August 20th, 2010, and not

1   one of them has been sent for a necropsy.  Not one.  Not

2   one.

3          The next interesting thing that we have was what

4   Keith Jonsson talked about and that was the first time that

5   we actually see something going on with a vet in this case.

6   That shows up in Exhibit No. 32, where Dr. Austin Larsen,

7   the vet for the Fur Breeders co-op, who comes at no charge

8   to co-op members.  It's part of the membership.

9          On August 27th, Dr. Larsen drove to the Utah State

10  Lab, where the Jonssons had sent mink.  Interestingly

11  though, they hadn't sent mink from Lehi.  These were mink

12  that they sent from Cedar Valley.

13         Two important things about that.  One is not a

14  week earlier -- or exactly a week earlier I believe, they

15  had just told their bank that they had 500 minks sitting in

16  their freezer.  We've heard testimony that they were

17  gathering up the mink as they died, that they could, to save

18  them and pelt them later from the Lehi ranch.  The only mink

19  that gets set in the for necropsy are mink on the Cedar

20  Valley ranch that have a bad case of diarrhea.  That's what

21  viral enteritis is.  The only mink that gets sent in by the

22  Jonssons is mink from Cedar Valley, not Lehi where this

23  disaster has happened.

24         The next event for which we have a record is a

25  letter that the Jonssons send to National, Exhibit 15 in the

1    exhibit book that's going to go back with you.  In that --

2    we'll see it here in just a second.  In fact, we've got it

3    right here where it will be just a little bit easier,

4    hopefully, for folks to see.

5              Everybody see okay?

6              In this letter, November 5th, two things

7    important.  November 5th, so we're before pelting, which

8    happens late November and early December.  And the other

9    thing that's really important is on November 5th, no

10   necropsy.  Not one feed test.  No herd investigation had

11   ever been done by the plaintiffs.  As of November 5th,

12   without anything to back up their claim, they are willing to

13   point the finger at the feed.  Haven't tested it, haven't

14   necropsied, haven't done a herd investigation to figure out

15   what actually happened on their farm.

16             In spite of all of that, they write this letter

17   where they ask for compensation for 4,000 kits lost during

18   whelping, another 1500 kits lost in June to November, and

19   400 old females that died during whelping.  No necropsy, no

20   feed tests, no herd investigation, and they are asking for

21   compensation at a minimum of 5900 mink.  That's important.

22             The next thing that's important and the final

23   thing that shows up on this timeline is December 13th, the

24   very first feed test gets performed.  That's important for

25   two reasons.  One is the date on which it's performed,

1   because it is the first feed test.  As we see here, it's

2   dated December 13th of 2010.  The second thing that's

3   important about this is we have no histamines detected in

4   the feed sample on that date.

5          So that's it for the timeline and things that

6   actually show up on a record, or that at least aren't

7   disputed.

8          Apparently this at least hasn't been clear to

9   plaintiffs, I hope it's clear to you folks, Rangen isn't

10  contesting -- I can't speak for National, but at least

11  Rangen isn't contesting, at least in the tests that have

12  been done, except for this last one we just looked at,

13  histamines and nitrosamines were present in the feed.  I

14  thought that was fairly clear that hasn't been an issue.

15  But maybe it has.  I hope it's clear now.

16         But what we don't see on the timeline is --

17  frankly, probably it's at least as important as the things

18  that do show up if not more important.  The number one

19  thing, not once did a vet visit the Lehi ranch.  Not once.

20  Sleepless nights, train wreck, disaster, never seen this

21  kind of loss in kits before.  That doesn't seem logically

22  consistent with not getting a vet out to your place.  We

23  know that they knew how to send animals in for necropsy when

24  they had diarrhea, because they did out in Cedar Valley.

25  But where you have animals actually dying and you don't send

1   it in for necropsy to figure out what's going on, there's a

2   bit of a disconnect there.

3           The next thing we don't have is a record of a call

4   to a vet.  It was suggested that Michael was told to call

5   the vet, but I don't recall him actually saying that he

6   called the vet.  Maybe that's just me, but I don't recall

7   him saying that.  Two, there is no record of a call to the

8   vet.  And three, the one thing that they try to point to as

9   a record of a call didn't happen for a month -- until a

10  month after all of this supposedly started.

11          The next thing that doesn't show up, any necropsy.

12  We talked about that.  You have animals dying.  You've got

13  to figure out what's going on.  The way you figure out

14  what's going on is why did they die.  You have a necropsy

15  done.  That was never done.

16          The other thing that doesn't show up is a decline

17  in feed consumption, and it has been suggested that the mink

18  went off their feed.  The interesting thing is the

19  plaintiffs didn't actually plot out their feed consumption

20  during that time period.  We did.

21          This is a diagram of the plaintiffs' feed

22  consumption at Lehi for the years 2008, 2009 and 2010, red

23  being the 2010, blue being the 2009, and green being the

24  2008.  The interesting thing, when you start in April and

25  look in May -- and go all the way to May, you have 2008,

1    2009, 2010 being almost in lockstep with each other, almost

2    identical.  2010 looks to be just a whisker above the other

3    two but almost identical, for all intents and purposes.

4         The other interesting thing, this is only the

5    co-op feed.  It does not include the additional 12,000

6    pounds of crumlets that these mink consumed.  If you

7    incorporate that, what you're going to see is actually a bit

8    of a separation here between 2010 and the other years.

9         The other thing that we don't see is we don't see

10   any kind of a decline.  There is no decline in feed

11   consumption the April to May month.

12        We've also heard testimony about how it is typical

13   for ranchers to track the deaths that occur on specific

14   dates.  Maybe it's a tally sheet on a calendar, something

15   else, but when they have an event going on where they are

16   losing a bunch of animals, they will track to see if it's a

17   curve, to see if it's a random event and try and get a grasp

18   on what actually is going on.  We don't have anything like

19   that in this case, nothing.

20        Then we've talked about number six.  They had 500

21   mink in their freezer in August -- as of August 20th, and

22   not one of them was sent in for necropsy from the Lehi

23   ranch.

24        So here's the claim.  They lost 4,000 kits during

25   the 2010 whelping, 1500 mink from June to November, and 400

1    breeders during whelping.

2           The reality, they sold more mink from the 2010

3    crop than they ever had before.  Exhibit 34, 2011 sales,

4    36,520 sales generated from the 2010 crop.  This is the

5    record that was put together by Michael Jonsson and sent to

6    Dr. Roberts.  Nowhere else did they generate that many sales

7    ever -- ever.

8           The interesting thing about this exhibit,

9    Dr. Roberts doesn't believe it, doesn't believe what Michael

10   Jonsson tells him, doesn't believe they had 36,520 sales

11   when you combine pelts and live animals.  In fact, the

12   interesting thing is back when -- you might recall

13   Dr. Roberts testified that when he was deposed, when we took

14   his deposition, he didn't even know that live sales were in

15   play.  He didn't know a thing about them until we brought

16   them up.  And then he had to go back and revise his numbers.

17   And does he use this?  No.  He uses something else that, as

18   far as I can tell, he has never explained how he got that

19   number.

20          Exhibit No. 50, keep in mind, one portion of

21   plaintiffs' claim is that they had to -- is that they lost a

22   bunch of black mink and had to buy breeders to replace them.

23   I realize that Exhibit No. 50 right here is not particularly

24   legible.  In fact, I need to get to the right page of

25   Exhibit No. 50.  But this is what Michael Jonsson told

1    Dr. Roberts, that after the sale in the spring of 2010, the

2    market for black mink and mahogany mink were comparable.  So

3    we decided to fine breed our black females since we had

4    extra females anyways and by doing this we increased in

5    blacks and showed an increase in mahoganies.  They had extra

6    blacks.  Check that exhibit.  I messed up.

7            Plaintiffs also sold more black mink per litter in

8    2011 from the 2010 crop than they had in 2010 from the 2009

9    crop.  These, again, are Dr. Roberts' calculations.  But as

10   we look here at the blacks in 2010 that came from the 2009

11   crop, they were at a 2.75 black kits per litter.

12           When we get out here to 2011 from the 2010 crop,

13   we see that they went almost a full kit per litter to a

14   3.72, by Dr. Roberts' own calculations.

15           And the final reality for this slide is that the

16   plaintiffs produced more mahogany in 2011 than they did in

17   2010.  So 2011, 21,000.  You have 18,000 in 2010.

18           Plaintiffs claim that they needed breeders

19   replaced at $500 a head.  The reality is plaintiffs -- and

20   they claim that it should be this $500 per head mink because

21   it is something akin to a $50,000 Mercedes, if you recall

22   the analogy.  You might also recall that Dr. Roberts said

23   that the price of something is frequently a good indicator

24   of the quality of something.  So let's take a look at the

25   reality.

1         One, plaintiffs had extra black breeders in 2010.

2    That's what they told Dr. Roberts.  We've seen that letter.

3         Two, when you look at the number of mink that they

4    sold as pelts, as Dr. Roberts tallied up, 28,782 pelts sold,

5    and subtract that from the number of live sales, 36,520,

6    they sold 7,738 live animals in 2011 as breeders -- as

7    breeders.  And yet they are asking for breeders to be

8    purchased for them.  A bit of a disconnect there for me.  If

9    you need breeders, don't sell your breeders.

10        Same thing happens in 2012.  We get -- if we look

11   at the actual number that Michael Jonsson came up with in

12   Exhibit 34 and subtract from that the pelts that Dr. Roberts

13   totaled up in his report, we find just a whisker over 2900

14   live sales in 2012.

15        The final interesting fact -- and this came from

16   Dr. Roberts -- the plaintiffs, who want $50,000 Mercedes

17   mink, were selling their mink for a Chevy price.  For those

18   live sales in 2011, because those were the only numbers that

19   Dr. Roberts had, they got 79 to $132 per head live sales, a

20   Chevy price, and they want a Mercedes.

21        The fact of the matter is they were selling their

22   mink and buying equivalent mink creating a little bit of

23   genetic diversity to help alleviate a lot of the inbreeding

24   that goes on in a mink herd.

25        So as we walk through all of that stuff getting an

1    overall impression, as we turn from that to the science,

2    we've had Dr. Hall say one thing, Dr. Wustenberg say

3    another.  I think it's helpful to look at what do the --

4    which way do the objective facts point, which side of the

5    science do the objective facts point to.

6            So let's start with the science, the Koppang

7    article, the only article that's been discussed here that

8    actually talks about mink.  What we see in the Koppang

9    article is that there are a number of animals that undergo

10   testing for NDMA.  And their doses range from four

11   one-hundredths of a milligram per kilogram of body weight

12   per day all the way up to 17 one-hundredths of a milligram

13   per kilogram of body weight per day.

14           The Jonssons -- assuming the worst case scenario,

15   like Dr. Hall did, the dose that the Jonssons' mink received

16   is ten times less, four one-thousandths of a milligram per

17   kilogram of body weight per day.  It's ten times less than

18   the lowest dose in the Koppang article.  No effects were

19   seen at that level in the Koppang mink.  And it ends up

20   being about 30 times less than the lowest dose at which any

21   harm was seen in the mink in the Koppang Study.

22           It's interesting because the plaintiffs have

23   touched upon this issue of a control and how these other

24   ranches act as a control in this case.

25           Two things to talk about there.  One, the Koppang

1   article also had a control.  And in the later studies that

2   were done that they are pointing to to talk about

3   reproductive effects, or the potential for reproductive

4   effects, the problems existed both in the control and in the

5   animals that were studied.  They did.  So what that means is

6   there was something else going on throughout that herd, and

7   you can't tell one way or the other whether there was any

8   impact or not.  The only thing that we can tell from the

9   Koppang Study is that these doses from eight one-hundredths

10  of a milligram per kilogram of body weight per day down to

11  four one-hundredths don't cause any anatomical changes in

12  mink.  They don't.

13          The other interesting thing about a control, and

14  it's more applicable to what's going on in this case, is you

15  have to start from the standpoint that the same thing

16  happened on all three ranches in order for the fourth ranch

17  to act as a control.  The interesting thing -- as far as I

18  can tell, the only thing that's the same between those three

19  ranches is the fact that none of them have any necropsies,

20  none of them have had their mink looked at, none of them did

21  a herd investigation, none of them have actually been

22  diagnosed with poisoning from either histamines or

23  nitrosamines.  It's the only thing they have in common.

24          Trying to move through this now, the highest level

25  of histamine concentration Dr. Hall conceded would be 58

1   parts per million, wouldn't have caused any mortality in the

2   mink.  In fact, if it caused any changes, they would be

3   subtle, you wouldn't see it.

4           The other thing that we don't see is we don't see

5   vomiting, diarrhea, cannibalism, nothing that you would

6   expect to see if, in fact, you had histamine or nitrosamine

7   poisoning going on, no tumors.  There hasn't been one sign

8   of cancer pointed to in any of these mink, no liver damage

9   in any of these mink.

10          And, finally, if you have a problem with your feed

11  that is causing problems in your herd, it will cause

12  problems throughout the entire herd that is eating the diet,

13  that's eating the feed.  It doesn't limit itself to one

14  select group.

15          The fact is that the only documented problem in

16  the plaintiffs' herd was that it was in the Cedar Valley

17  herd.  They didn't do any investigation before pointing the

18  finger at the feed, no necropsies, no feed tests, no herd

19  investigation.  The reality is that neither the science nor

20  the facts support plaintiffs' -- nor their past performance

21  support their claim.  You can see a nice progression in

22  their profits.  Start from losses before the feed, have nice

23  profits afterwards.  Neither the facts nor their performance

24  support any conclusion that the feed caused them any

25  problems.

1           And so on behalf of Rangen, I will ask you to

2    return a no cause for the defendants.

3           And now Mr. Minnock will take over and finish up

4    on the damages side of things.

5           MR. MINNOCK:  Good afternoon, folks.  I hope you

6    all had a nice holiday weekend.

7           I'm going to be really brief today because I think

8    Mr. Mitchell has pretty well laid out for you the way we see

9    the case, and I agree with everything that Mr. Mitchell has

10   to say.

11          There's a couple of things I want to say before I

12   start.  Mr. Hancey represented to you that the defendants

13   didn't do any testing when they found out about that.  Now

14   you know that's not true.  You heard from Dre Sanders that

15   when the Jonssons initially made their claim that National

16   Feeds, in fact, did do testing, they did so much testing

17   that they ran out of sample.  They ran out of sample.  And

18   the undisputed evidence is all of those tests came back

19   entirely normal.

20          The problem that was discovered with nitrosamines

21   came about, as you heard from these folks, about two years

22   afterwards.  You've heard all the science and all the

23   evidence and everything about that.  I'm not going to go

24   into the levels and things like that.  But the notion that

25   somehow National Feeds didn't take this seriously is gross

1    mischaracterization of the facts.  National Feeds took it

2    very seriously, consumed its entire sample trying to find

3    out the problem.

4           Let me tell you, I've spent a lot of time with

5    this case, and I think when you get back to the jury room

6    what you're going to find is that this is not a war between

7    the Jonssons and National Feeds and Rangen.  This is not a

8    conflict between them.  The conflict is between the Jonssons

9    and their own experts, the Jonssons and their own experts.

10   Let me tell you why I say that.

11          Mr. Hancey came up here and one of the facts that

12   Mr. Hancey has focused on throughout the entire trial is

13   this notion of a control -- of a control, that the Jonssons

14   and the Griffeths had these problems on three of their

15   ranches, but the fourth ranch, which didn't serve the

16   crumlets, had no problems.

17          There is no evidence that you have seen in this

18   case regarding productivity at Cedar Valley or the

19   Griffeths' ranch.  The only data you have ever seen is from

20   the Lehi ranch.  And the Lehi ranch, again, we don't know

21   which of these mahoganies ate the crumlets and which didn't.

22   We don't know.  There is only one group in this entire case

23   that you have data for.  That is the black mink.  They are

24   the only mink in this case you know ate the crumlets.  You

25   know it because they were all at Lehi.  It's undisputed by

1   the plaintiffs.

2        What did it show?  Do you remember when I asked

3   Dr. Hall and he was talking about the control, I said,

4   Dr. Hall, you've talked about this control.  Have you seen

5   the data on the control, have you seen what the production

6   was.  No, I haven't.  Would it concern you if the production

7   of the black minks actually went up.  He said, yeah, that

8   would concern me.

9        Look at what we know.  We know that when it comes

10  to the black mink, that from 2010 to 2011, the mink that ate

11  the crumlet went up a kit, a kit per litter.  In fact, and

12  I'm going to show you this in a minute, this is the only

13  above average year they have amongst their blacks in five

14  years.  The only data you have beyond the Jonssons' word and

15  the Griffeths' word about this control is their own.  And

16  this isn't my data.  This is Dr. Roberts' data.  The control

17  argument actually supports the defendants.

18       What Mr. Hancey wants to do is say, well, we don't

19  have any documentation, but if you take what people say, we

20  have a control.  Folks, you've got to take the data.

21       Now let me take a minute here and talk to you

22  about the second conflict between the plaintiffs and their

23  experts.  This was the letter that Mr. Mitchell referred to,

24  November 5th of 2010.  This letter is done about, what,

25  eight months after they finished eating the lactation

1   crumlets.  In that they say, well, we lost 4,000 kits during

2   whelping, 1500 during and into November, and 432 breeders.

3          Now Dr. Roberts says to you, well, I have to

4   assume this is true because Michael Jonsson told it to me.

5   Well, we know that Michael Jonsson said he saw these dead

6   mink.  You will remember Michael was quite honest about

7   this, he said, these aren't mink I actually saw dead.  What

8   I did is I assumed that we would get a five and instead we

9   only got a one.  So the difference for that thousand mink

10  that we had problems with is 4,000.

11         Well, the first thing Dr. Roberts should have done

12  is he should have told Michael, well, Michael, I appreciate

13  that you have high expectations for your mink, a five per

14  litter, but it's inconsistent with what you've done

15  historically.  Historically you have, over the ten years of

16  data, averaged 3.57.  So you shouldn't have expected 5,000

17  dead mink.  What you should have expected is about 2500

18  mink, or 3500 mink.  So if you generally only had a

19  thousand, you would have about 2500 mink that you lost.

20         Assume that, as they said, they put them in the

21  freezers, they have about 500 here.  Assume that they've got

22  their 400 breeders.  We're talking here about 3500 mink --

23  about 3500 mink that were lost, which, using Dr. Roberts'

24  own numbers of about 50 bucks in profit per mink, is about a

25  150 to a $200,000 claim.

1           How do we go from $200,000, is what Michael

2    Jonsson thought they were entitled to in November of 2010,

3    to the 3.4 million?  Here's what you're going to see from

4    the record.

5           Dr. Roberts believes the Jonssons are lying, and

6    that is the only way he can reach his numbers.  Because the

7    Jonssons told you and they told me in a deposition that they

8    lost those mink in black kit breeders.  Dr. Roberts

9    calculated it and said, I didn't see the loss.  Remember the

10   whole 95-percent confidence interval discussion?  It's not

11   only in the 95 percent, it's above average.  It's above

12   average.  So what he should have done is he should have

13   said, guys, you may have suffered a loss, but we can't

14   detect it.  It can't be detected.

15          Now Mr. Hancey came up and said the defendants are

16   going to deny, deny, deny.  We're not saying deny, deny,

17   deny.  We're saying no one can detect this loss on the

18   plaintiffs' own financial data.  It can't be detected.

19          But here's where the Jonssons and Dr. Roberts

20   again come to blows.  You remember that Dr. Roberts, the

21   foundation of his conclusion is that these two years fell

22   outside the 95-percent confidence interval -- or actually

23   this year did, the 3.42 for mahoganies.

24          Now the first thing he says is when the Jonssons

25   said they didn't have any mahogany losses and it was a

1   thousand kit breeders that were the problem, they're wrong.

2   They're wrong, that's what Dr. Roberts is perceiving from

3   the assumption.  I've concluded they only got 3.42 kits,

4   therefore they are outside the confidence interval.  They

5   are outside this confidence interval, therefore they

6   suffered a loss.

7          But remember -- actually it's this one -- this

8   whole discussion about the number of actual mink being sold,

9   about the 36,520.  Now Dr. Roberts said it didn't account

10  for about 2,000 of those.  He said, according to my numbers,

11  they only sold 5500 mink, and therefore they only sold

12  34,000 mink.  They only sold 5500 live sale mahoganies.

13         Folks, you all sat there last Tuesday morning,

14  Michael Jonsson told you, no, I sold 7738 of them.  I sold

15  7738.

16         Now why -- and Dr. Roberts, when I examined him,

17  he was quite -- and when Mr. Mitchell examined him, he was

18  quite acrimonious about that.  He would never admit that the

19  Jonssons were right and that they sold 7638 live mahoganies.

20  Why?

21         I'll tell you why, because if they sold 7600, and

22  Mr. Mitchell went through the math with Dr. Roberts, this

23  goes up to 4.74, this one goes up to 4.84, when you add in

24  those 2,900 minks from 2012.  They fall within the

25  confidence interval.  They fall within the confidence

1    interval.

2            So Dr. Roberts, what he says is the Jonssons don't

3    know what they're talking about.  They didn't sell 7600 live

4    mink.  They only sold 5500.  If you believe the Jonssons,

5    what they said on this stand, they had no loss in the

6    mahoganies.  And, in fact, according to Dr. Roberts, he

7    found no losses in the blacks in any year.  And if you

8    believe the Jonssons about live sales, they suffered no

9    losses in any other year.  But Dr. Roberts is like the

10   Jonssons are wrong, and that's how you get to the $3.5

11   million from $200,000 that Michael thought it was worth.

12           You saw this chart and I thought I would blow it

13   up because you didn't get to see the numbers clearly.  When

14   we talked about pelts taken to market, you will remember, I

15   asked Dr. Roberts about this very analysis.  He said, that

16   would be too much work.  That's too much work.  When the

17   Jonssons are changing from blacks to mahoganies, in order to

18   determine whether it's caused by that or caused by some

19   crumlets, you have to look at the data.  You can't data

20   mine.  He said, oh, it's data mining.  I'm so conservative.

21   He's the one data mining.  He's ignoring this data.

22           As you see here, the problem here is that they are

23   selling more mink of the kind that they've always been bad

24   at and not as many of the kind that they've always been good

25   at.  I haven't heard any witness if this case say that these

1   lactation crumlets could turn a male mahogany into a black

2   female.  Nobody has said that.  The sex is what it is, and

3   that year they just happened to have more of the poor ones.

4          But the other problem Dr. Roberts did is he

5   totally ignored the mink that were sold live.  Mr. Mitchell

6   showed you that analysis during his examination of

7   Dr. Roberts.  They took out all of the blacks -- I mean all

8   of the breeders and sold them for between 79 and $108.

9   Dr. Roberts only accounted -- or left them out of his

10  analysis.

11         THE COURT:  You've got five minutes.

12         MR. MINNOCK:  Thank you.  I will be easily within

13  time.

14         So, you know, Mr. Hancey talked about the

15  difference between an economist and accountants.  And I

16  can't speak to the Fed chairs.  I don't know any of the Fed

17  chairs.  I'm not a financial guy.  I can tell you this.  The

18  two accountants we produced to you have done hundreds of

19  these -- hundreds of these analyses over the years.

20  Dr. Roberts has done five.

21         Dr. Roberts told you that the whole 95-percent

22  confidence interval concept wasn't his at all.  He was

23  relying upon our expert.  He told you that he never even

24  knew about the live sales until I told him about them in the

25  deposition.  And yet they are trying to portray him as being

1   very conservative.  That's how you go from a 200 or $300,000

2   claim to a $3.5 million claim, you ignore the live sales and

3   what that does and you claim that the clients aren't correct

4   when they give you the data.  That's simply not the way to

5   do it.  If there is a claim and mink die, this is where the

6   claim is.

7           Again, Dr. Roberts couldn't detect it in black

8   mink.  But if it's there, it's this.  But, again, looking at

9   the totality of the information, if it's this and the

10  Jonssons didn't understand that they were suffering a loss

11  enough to call a veterinarian, and that I understand, but I

12  simply can't believe that these two experienced ranchers

13  would allow themselves to suffer three and a half million

14  dollars worth of damage and never call a veterinarian.  I

15  simply can't accept it.

16          Now just one final thing I want to talk about.  We

17  started this case talking about the period 2010, 2011 and

18  2012, but you heard what Dr. Hall had to say.  He said the

19  only thing that I can account for is weaning to whelping of

20  2010.  Weaning to whelping.  So we're talking about the

21  period of April 25th through June 30th, that 60 days.  That

22  60 days.  And he talked about how a lot of these mink, the

23  1500, may very well have died during that period.  That's

24  what we're talking about.  All the rest of these losses to

25  get to 3.5 million simply aren't consistent with either the

1   causation evidence, and they are not even consistent with

2   what the Jonssons told Dr. Roberts.

3            Again, I don't believe they suffered any loss

4   because it could not be detected in the documents.  It's

5   fine to come into federal court and say I suffered a loss,

6   but their own economist couldn't find it in the blacks,

7   which is where they said they had it.  But if they did have

8   the loss, it should be limited to the two or $300,000 that

9   Michael was able to identify in 2010.  Thank you.

10           MR. HANCEY:  Well, I get the last word, and I will

11   try to be very brief.

12           That's the perfect example of why we don't have

13   accountants running the Fed.  They look at things in a

14   vacuum.  They look at things in a narrow context.  Let me

15   just give you a couple of examples.

16           You didn't hear any discussion right there about

17   the inability to grow at historic rates or the damages

18   associated with lack of growth.  Their own experts

19   testified, admitted that would have to be calculated for in

20   a damages calculation.

21           Why are you selling mahoganies and buying blacks?

22   That's the Honda versus Toyota thing.  Selling one asset

23   doesn't mean you can't go out and buy a different asset.

24   They are different assets, and businesses have to operate

25   how they want to operate.

1          You remember their very last expert witness, John

2    Karraker.  He admitted on cross-examination that when you

3    just look at the charts in a narrow context and you see

4    sales and revenues go up in particular years, those are

5    artificially inflated if you're not considering the whole

6    picture.  If you're not considering, for example, that the

7    Jonssons sold some of their very best breeders that they

8    wanted to keep -- that were big and furry and superior

9    characteristics, that they wanted to keep to make more baby

10   mink but they couldn't because of production, so they sold

11   them and that elevated the prices at market.  Those are the

12   kind of things that the accountants aren't looking for.

13         And the fourth thing you didn't hear one word

14   about is the domino effect that you can see happens when

15   something like this impacts a business.  Whether the mink

16   died at the beginning of 2010, throughout 2010 or into

17   future years, you've heard the evidence on that.  But nobody

18   believes that dead mink in 2010 aren't going to carry over

19   and their damages affect the future years.  Of course they

20   are.  Of course they are, especially when they have to go

21   out and buy replacement mink, especially when they are not

22   able to perform with a market like they had in the past.

23         On the science, there was a lot of talk about the

24   Koppang Study.  There was another study that Dr. Hall talked

25   about that involved mice.  He said it's perfectly normal in

 1   the scientific world to extrapolate between species.  That's

 2   how we do tests of drugs for humans.  We don't want to test

 3   on humans.  We test on animals, and we extrapolate the

 4   results.  In the mice study that he talked about, a

 5   minuscule, microscopic amount of nitrosamines decimated

 6   those mice's litters.

 7          There were four poisons found in the lactation

 8   crumlets, undisputed.  Just because nobody on this planet

 9   has ever done a study of the effects of four combined

10   poisons on mink doesn't mean there isn't damage, doesn't

11   mean it doesn't have a harmful effect.  We know that all

12   four of them do in their individual capacities.

13          Finally, this talk about the controls, the

14   controls benefiting the defendants.  Really?  So we're

15   supposed to ignore what happened up in Idaho because nothing

16   that happened on the Griffeth ranches, who fed the same

17   crumlets to their mink, has any bearing on this case.  Of

18   course it does.

19          Just a couple of words about the experts.

20   Dr. Roberts is a scientist, he is a professor and he does

21   research.  If Dr. Roberts is presented with a scenario where

22   he has to choose between a letter from Michael Jonsson

23   estimating sales for the year or the actual auction results

24   that he got from the auction house that show the sales for

25   the year, what is a scientist going to rely on?  He's going

1    to rely on the actual data, and that's what he did.

2           That chart that you saw over and over again during

3    this trial with all those columns and rows, that's

4    Dr. Roberts' chart.  Those are Dr. Roberts' numbers.  So

5    they can talk about kits per litter going up and down and

6    sales going up and down.  Dr. Roberts calculated his opinion

7    on his own numbers.  Those are his numbers.  And the

8    95-percent confidence interval, whoever's idea it was, he

9    implemented it, and there's no dispute about that.  He's

10   95-percent confident.

11          And I think it's very interesting that in that

12   entire 50 plus minutes of closing argument, not one word

13   about Dr. Wustenberg, not one word about Richard Hoffman,

14   not one word about John Karraker.  They've abandoned their

15   experts.  And what's the tactic?  Deny, deny, deny, attack

16   the plaintiffs' evidence, we don't have any of our own.

17   That's exactly what you just heard for almost an hour.

18          What the evidence does show is the Jonssons have

19   been consistent from the very beginning about what their

20   losses are.  In November of 2010, they wrote that letter to

21   Ed Buschur saying here's our losses.  We lost 4,000 kits,

22   1500 more kits, 400 mothers.  They have never varied from

23   that story.  They've never varied from what they said in

24   that letter.

25          And if you look at the letter, the other question

1   that they ask, it was a legitimate concern of the Jonssons,

2   is please let us know if there are going to be any carryover

3   effects in future years.  Are we going to have continuing

4   health effects in 2011 and 2012 and on into the future.  No

5   response.  No response.  And there were future impacts.

6   Maybe that's why there's not a response.

7              In just one second, when I sit down, the Judge is

8   going to read you some jury instructions.  He's going to

9   instruct you on what the law is in this case.  I just want

10  to highlight a couple of those.

11             Jury Instruction No. 6 is going to talk about the

12  importance of circumstantial evidence, like the controls,

13  like the things I talked about before, the lack of any test

14  results from the defendants.

15             Jury Instruction No. 7 says you've got to consider

16  all the evidence, but one of the things you can do as a jury

17  is use common sense.  Use common sense in your

18  deliberations.  Why would there be problems on three

19  different ranches 150 miles apart within days of eating

20  those crumlets?  There is no other explanation, and none was

21  offered by the defendants during the entire trial.

22             There are a couple of instructions on damages and

23  how those are calculated.  The only evidence that you've

24  heard on damages calculations is by Dr. Roberts and by the

25  accountants who say zero.  The law doesn't require the

1   plaintiffs to establish their damages with mathematical

2   certainty.  That's what Instruction No. 19 says.  It doesn't

3   have to be mathematically precise.  Dr. Roberts took the

4   data that he had and he gave you his best calculation based

5   on that evidence.

6           And anything that the lawyers have said in

7   arguments, this is Jury Instruction No. 20, if you've heard

8   any other formula argued by the lawyers to you, that's not

9   evidence and that's not how you calculate damages.  That's a

10  suggestion and the evidence is what the expert witnesses

11  said.

12          The last point I want to leave you with is this.

13  $3.4 million, Dr. Roberts said over and over again, is not

14  going to make the Jonssons rich.  It's not going to put an

15  extra dollar in their pocket.  That is only going to make

16  them whole.  He said over and over, it's going to put them

17  back in the same position they were in in the spring of 2010

18  had the crumlets not been fed to their mink, and nothing

19  more.  It's a bare minimum of loss.

20          We ask you again to find liability on the part of

21  the defendants and award a verdict in favor of the

22  plaintiffs for at least the $3.4 million.  Thank you very

23  much for your time.

24          (Proceedings not transcribed)

25

1                    C E R T I F I C A T E

2

3

4          I hereby certify that the foregoing matter is

5   transcribed from the stenographic notes taken by me and is a

6   true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP      DATED: 2-20-14
     Official Court Reporter
17   350 South Main Street, #146
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25