IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re:                 ) | |
|                 ) | |

In re:                    )
                          )
KEITH JONSSON, an         )
individual; MICHAEL       )
JONSSON, an individual;   )
CEDAR VALLEY FUR FARM,     )
LLC, a Utah limited       )
liability company,        )
                          )
        Plaintiffs,       )
                          )
vs.                       )   Case No. 2:11-CV-140BSJ
                          )
NATIONAL FEEDS, INC., an  )
Ohio corporation,         )
RANGEN, INC., an Idaho    )
corporation,              )
                          )
        Defendants.       )
_____   )


BEFORE THE HONORABLE BRUCE S. JENKINS

January 15, 2014


Jury Trial


Laura W. Robinson, RPR, FCRR, CSR, CP
144 U.S. Courthouse
350 South Main Street
Salt Lake City, Utah 84101-2180
(801)328-4800

**Appearances of Counsel:**

For the Plaintiffs:           Ryan B. Hancey
                              Scott O. Mercer
                              Attorneys at Law
                              KESLER & RUST
                              68 South Main Street
                              Second Floor
                              Salt Lake City, Utah 84101

For Defendant National        Joseph E. Minnock
Feeds:                        Attorney at Law
                              Morgan Minnock Rice & James
                              136 S. Main Street
                              Suite 800
                              Salt Lake City, Utah  84101

For Defendant Rangen:         Hans A. Mitchell
                              Attorney at Law
                              Carey Perkins LLP
                              P.O. Box 519
                              Suite 200
                              Boise, Idaho 83701

I N D E X

Examinations                                                          Page

**DR. HALL**
RECROSS-EXAMINATION                                                    388
BY MR. MINNOCK
RECROSS-EXAMINATION                                                    394
BY MR. MITCHELL
FURTHER DIRECT EXAMINATION                                             413
BY MR. HANCEY
**JOY KINYON**                                                        414
DIRECT EXAMINATION                                                    414
BY MR. MERCER
VOIR DIRE EXAMINATION                                                 421
BY MR. MITCHELL
DIRECT EXAMINATION                                                    435
BY MR. MITCHELL
CROSS-EXAMINATION                                                     439
BY MR. MINNOCK
REDIRECT EXAMINATION                                                  440
BY MR. MERCER
**DAVID LORING BROCK**                                               441
DIRECT EXAMINATION                                                   441
BY MR. MERCER
CROSS-EXAMINATION                                                    450
BY MR. MITCHELL
REDIRECT EXAMINATION                                                 492
BY MR. MERCER
**WADE ROBERTS**                                                     504
DIRECT EXAMINATION                                                   505
BY MR. HANCEY
CROSS-EXAMINATION                                                    548
BY MR. MINNOCK

1              **Salt Lake City, Utah, January 15, 2014**

2                          **\* \* \* \* \***

3          THE COURT:  Good morning, and it looks like we're all

4     here and Dr. Hall.  Should we bring in the jury?

5          MR. MITCHELL:  Before we do that, Your Honor, today I

6     expect we're going to have to take up the issue that we

7     raised yesterday about Exhibit 14, not necessarily right now

8     but with a later witness, and I have got a brief I would

9     like to submit to the court at this point.

10         THE COURT:  That would be fine.

11         MR. HANCEY:  We're ready to proceed with Dr. Hall,

12    Your Honor.

13         THE COURT:  Okay, fine.  Bring in your jury.

14         (Whereupon, the jury returned to the courtroom.)

15         THE COURT:  Good morning again, ladies and gentlemen.

16    Sit down and relax.  And we'll note for the record that the

17    jury is present and counsel and the parties.  And counselor,

18    you may proceed.

19         MR. HANCEY:  Thank you, Your Honor.

20         Q.   (By Mr. Hancey) Dr. Hall, I just have a few

21    questions for you this morning.  Now you're aware of the

22    fact that the Jonssons did not observe any of their mink in

23    2010 vomiting, having diarrhea, or distended stomachs; is

24    that correct?

25         A.   That is correct.

1          Q.   Does that alter your scientific opinions in this

2     case in any way?

3          A.   No, it does not.

4          Q.   Why not?

5          A.   The amount of histamines that one would expect to

6     produce severe vomiting or diarrhea were not present in this

7     case.  There were enough histamines present at least with

8     worst-case scenario to where you would expect to see very

9     mild effects of a slightly decreased feed intake and

10     potentially a slight loosening of the stool that in some

11     cases wouldn't even be noticeable.

12          Q.   Now yesterday, Dr. Hall, you indicated that it is

13     important to calculate the nitrosamine exposure to the

14     Jonssons' mink on a dry-matter basis.  Do you remember that

15     testimony?

16          A.   Yes, sir.

17          Q.   Mr. Mitchell was insisting on asking you

18     questions that had you calculating exposure on a wet feed

19     basis despite what you were telling him.  Why do you believe

20     it is important to calculate nitrosamine exposure on a

21     dry-matter basis?

22          A.   In this particular case when you're comparing

23     between studies you need to compare in equal terms.  The

24     predominate effects that was observed in the mink eating

25     nitrosamine contaminated feed in this case -- in this

1    case the predominate clinical effects that we observed, that

2    were observed in the Jonssons' mink associated with the

3    nitrosamine contaminated feed was associated with

4    reproductive effects, loss of kits due to stillborn fetuses

5    and deaths in the kits at a young age.  And in the studies

6    that were comparable, one needed to be able to calculate the

7    exposure rate to do a direct comparison on a dry-matter

8    basis.

9         Q.   Have you calculated what the nitrosamine exposure

10   was to the Jonssons' mink on a dry-matter basis?

11        A.   Yes, sir, I have.

12        Q.   And what is your calculation, sir?

13        A.   The calculation was that the concentration of the

14   feed being fed at the time using the 0.22 parts per million

15   nitrosamine in the crumlets would have been 0.07 milligrams

16   per kilogram.

17        Q.   How does that exposure, Dr. Hall, compare to the

18   study you referenced yesterday concerning nitrosamine

19   exposure to pregnant mice?

20        A.   Um, in one of the studies the exposure in

21   pregnant mice was 0.01 which means it was seven times

22   higher.

23        Q.   In this case?

24        A.   In this case.

25        Q.   You testified yesterday that the lactation

1    crumlets contained three different types of nitrosamines; is

2    that correct?

3         A.   That is correct.

4         Q.   As well as histamines; is that correct?

5         A.   That is correct.

6         Q.   Okay.  What significance, in your mind, does the

7    presence of those four substances in the lactation crumlets

8    collectively have to the case?

9         A.   Well, in most scientific studies the way that

10   researchers look at compounds is they look at individual

11   compounds.  It is very rare that you see them look at

12   multiple compounds unless there is specific interactions

13   that are thought to occur.  When each of the nitrosamines

14   are metabolized, or all of them that have been studied that

15   I'm aware of are metabolized by the same enzymes so any time

16   you dose multiple nitrosamines, then you have multiple

17   compounds competing for the same enzymes of metabolism.

18   When that happens, you can see additive effects or

19   synergistic effects to where having multiple nitrosamines in

20   the system at the same time may make one or all of them

21   slightly more toxic just because it decreases the animal's

22   ability to get them out of the system.

23        Q.   Dr. Hall, you were asked yesterday by opposing

24   counsel how you would feel if you learned that the Jonssons

25   had a good production year in 2010.  Do you remember that

1      testimony?

2           A.   Yes, sir.

3           Q.   Okay.  If you learned that the Jonssons actually

4      expected to produce 45,000 kits in 2010 and only produced

5      36,000 kits, what bearing would that have on your scientific

6      opinion in this case?

7           A.   Actually, that fits with my scientific opinion in

8      that the nitrosamines would expect to result in an increased

9      number of stillbirth, increased number of neonatal

10     mortalities, to where you would actually wean less kits per

11     mother than you would have expected otherwise.

12          Q.   Now, Mr. Mitchell asked you some questions

13     yesterday about something he referenced as the Koppang

14     Study.  That was the study that was in the book that he kept

15     handing you and then taking back so you couldn't read it.

16     Do you remember that article?

17          A.   Yes, sir.

18          Q.   Okay.  Have you had a chance to read that article

19     in its entirety?

20          A.   Yes, sir.

21          Q.   Okay.  Can you briefly explain for the jury what

22     that article says that you think is relevant to this case?

23          A.   Okay.  A little bit of background on the article.

24     The researcher for that article actually was doing research

25     specifically aimed at cancer.  So they designed the studies

1    with specific aims to actually look at the potential for

2    cancer.  It was a three-fold study, a three-year study.  The

3    first year they just looked at exposure rate and various

4    concentrations for a period of, I believe, 122 days, and

5    then a portion of the mink were sacrificed at this time and

6    they looked for effects.  A small number of animals, 20 to

7    be exact, were kept out of that initial group, 6 males, 14

8    females.  Those animals were then bred.  They were continued

9    on the nitrosamines through the breeding cycle, through

10   gestation, and then as the mothers had the kits and raised

11   the kits.

12        In this particular study, although the goal and the

13   aim was not designed to look at reproduction so there were

14   many factors that were not accounted for in the study, they

15   did note that the mothers, those 14 mothers or females that

16   were bred, only had 44 kits total.

17        Q.   What does that average kit per litter?

18        A.   That is 3.1 kits per litter.

19        Q.   How does that compare to industry standards?

20        A.   Um, between 50 and 60 percent of what one would

21   expect.

22        Q.   Okay.  Continue.

23        A.   Um, but the thing that they also noted was that

24   they had an extremely high perinatal mortality in the kits

25   and they ended up only weaning, I'm trying to remember the

1      exact number, 30, I believe it was 30 kits total out of 16

2      mothers which actually works out to be a 2.1 kit per mother

3      average.  Which means a third of the animals that were born

4      died before weaning.

5           Q.   Were there any further studies done on the

6      offspring that did survive?

7           A.   Actually, yes.  They continued that into the

8      third year.  And they took the females that were born to

9      that first generation and they subsequently bred those

10     females.  They only had one of all of the females that they

11     retained actually bred and that one that bred only had three

12     kits.  And of those three kits, only one of them lived.  So

13     they ended up with only one surviving kit out of all of that

14     first generation group.

15          Q.   Do you believe that the findings in the Koppang

16     Study support or detract from your scientific opinions in

17     this case?

18          A.   Even though the study was not specifically

19     designed to look at reproduction, I believe that it highly

20     supports what has been shown with the mice study.  That

21     where you see increased perinatal mortality, increased

22     number of stillbirths in mice, and it also supports the fact

23     that in the nitrosamines, as has been shown with other

24     species, you would expect to see the same thing in mink.

25          Q.   Does the study allow you to opine that the

1     nitrosamines contribute to a high death rate or sorry a high

2     or a low kit per litter count at birth?

3          A.   It would allow you to suggest a lower kit per

4     birth at birth and also a significantly lower number of

5     weaned kits per litter.

6          Q.   In other words, low survivability of the kits

7     that did survive, that were actually born?

8          A.   That were actually born alive, yes, sir.

9          Q.   Now you're aware that there are no necropsy

10    reports for the Jonssons' mink that died during the time of

11    neonatal mortality in 2010; correct?

12         A.   That is correct.

13         Q.   Okay.  Say for purposes of argument that the

14    Jonssons did send some of their mink from that time period

15    in for necropsies and there were reports available, would

16    those reports tell you anything about nitrosamines or

17    histamines?

18         MR. MITCHELL:  Objection, calls for speculation.

19         THE COURT:  Sustained.

20         Q.   (By Mr. Hancey)  Would a necropsy done

21    immediately after exposure to nitrosamines allow one to

22    determine the cause of death?

23         MR. MITCHELL:  Objection.  Lacks foundation and calls

24    for speculation.

25         THE COURT:  Well, he may answer.  You're asking him

1        what a necropsy would show.

2                Q.   (By Mr. Hancey)  Correct.  Tell us that?

3                A.   And with nitrosamines it would depend upon the

4        dose.  At really high doses, you can see some liver changes

5        fairly soon after the dose.  At lower doses, you often see

6        no changes immediately after the dose.

7                Q.   Like the doses that were administered in this

8        particular case?

9                A.   In this particular case, the concentration that

10       was identified in the feed I would not expect to see liver

11       necrosis from those doses.

12               Q.   The Jonssons testified that in 2010 about 1,500

13       of their kits that had survived birth died between June and

14       November.  In your opinion, what role did the lactation

15       crumlets play in the deaths of those animals?

16               A.   In the studies that have been done, there have

17       been associations with increased, what are referred to as,

18       neonatal or perinatal mortalities.  In the Koppang study,

19       for example, the time from birth to weaning they saw a

20       significant number of animals die.  Part of those 1,500 from

21       the time point of June 1st through November would be some of

22       the later animals that had their babies later in May, that

23       were still in that perinatal time period.  And there again,

24       if you look at the Koppang study, they talk about weaning

25       their animals at three months of age, so they didn't

1    delineate in that study exactly when, during that

2    three-month time period, that the deaths occurred.

3         In mice studies and rat studies, they also describe an

4    increase in perinatal mortality during the time period from

5    birth to weaning.  That increase can explain a significant

6    number of that 1,500.

7         Q.   Mr. Mitchell asked you a lot of questions

8    yesterday, Dr. Hall, about calculating toxic substances on a

9    milligram per pound of body weight basis.  Do you remember

10   that?

11        A.   Yes, sir.

12        Q.   And did I understand your testimony to be that

13   the most scientifically accurate way to measure toxic

14   substances is, in fact, to use milligrams per kilogram of

15   body weight?

16        A.   That is correct.

17        Q.   Why is that true?

18        A.   That is the way that all of the studies are

19   published.  And so in order to be able to compare apples to

20   apples you need the same units.  And the units in the

21   publications are milligram per kilogram.

22        Q.   If Mr. Mitchell had done his calculations on the

23   white board yesterday using a milligrams per kilogram method

24   of calculation, would the results have been different?

25        A.   Yes, sir.

1    Q.   In what way?

2    A.   They would have been 2.2 times higher.  And so by

3    calculating them on a milligrams per pound basis, it

4    artificially makes the number look smaller.

5    Q.   As a toxicologist having investigated

6    contamination issues in the past, how would you advise a

7    company wanting to avoid nitrite contaminated ingredients in

8    a finished product?

9    A.   The primary recommendation would be that

10   ingredients coming into the facility should be tested prior

11   to their inclusion into a final ration.

12   Q.   In your opinion, would that be part of a normal

13   quality assurance program?

14   A.   If the intent is to produce a feed known to be

15   not contaminated, yes, that would definitely be part of a

16   normal quality control protocol.

17   Q.   Mr. Mitchell asked you a few questions yesterday

18   about a study that involved animals that had been exposed to

19   nitrosamines over a period of 500 days, and then asked you

20   sort of to compare that to the 45 days that the animals in

21   this case were exposed to nitrosamines.  Do you remember

22   that line of questioning?

23   A.   Yes, sir.

24   Q.   Okay.  How would you evaluate the exposure of

25   nitrosamines over time to the Jonssons' mink in this case?

1        A.   Okay.  The exposure across time actually needs to

2   be evaluated based on what parameters that you're looking

3   at.  If you were looking at damage to the liver, for

4   example, dose plays a critical role and cumulative effects

5   become important.  And so even at lower doses for longer

6   periods of time you can see some liver damage.  At high

7   doses for very short periods of time you can see liver

8   damage because there is more of a cumulative effect.

9        Q.   What if you are looking for say cancer which I

10   think you said yesterday is one effect of nitrosamine

11   exposure?

12        A.   I'll refer back to the Koppang Study again.  In

13   the 70's, early 70's, which is when that study was actually

14   done, a lot of the cancer research looked at cumulative

15   effects as potential causes of cancer.  That is actually not

16   done any more because it is not considered 100 percent

17   scientifically valid.  There is what is commonly referred to

18   as a one hit theory which means that you need to have a

19   compound that has the potential to damage the DNA of an

20   animal that can result in cells proliferating or growing

21   without control.  That is the definition of cancer.  And so

22   it does -- it is not technically a cumulative effect.  You

23   can have animals on a low dose that happen to get that one

24   hit that damages the DNA that potentially can cause cancer.

25   That is one of the reasons very large numbers of animals

1    have to be used for cancer studies.  And you can see cancers

2    from short time exposures, and you can also see cancers from

3    long time exposures.  One of the reasons they look at long

4    time exposures is because on each individual day you may get

5    that one hit and that one animal that damages the DNA and it

6    just increases your probability of seeing cancer in the

7    group.

8         Q.   Now in this case we're not really talking about

9    liver damage or cancer, are we?

10        A.   No, sir.

11        Q.   We're talking about reproductive effects,

12   correct?

13        A.   That is correct.

14        Q.   Okay.  So explain your opinion then on how the

15   duration of exposure to nitrosamines in this case has a

16   bearing on reproductive effects?

17        A.   The duration of exposure when you look at either

18   teratogenic effect or the effect on fetal survival, is more

19   of a relationship to the exposure amount at an individual

20   point in time during that animal's gestation or growth in

21   the uterus, because you can have specific organ systems

22   damaged that may be damaged only on a single day of

23   gestation.  And so the feeding of the nitrosamine

24   contaminated feed at that later point of gestation prior to

25   them having the kits it doesn't really matter that we're not

1    feeding them for 100 days, it matters that the exposure was

2    occurring at that time when the animals were sensitive.

3        Q.   Yesterday you were asked to refer to your

4    deposition on about two occasions and the question that was

5    posed at that time was read to you as followed by your

6    answer.  Do you remember those lines of questioning?

7        A.   Yes, sir.

8        Q.   Okay.  Can you explain to the jury why you

9    answered the way that you did on those two occasions in your

10   deposition?

11       A.   Can you refer to the page of the deposition,

12   please?

13       Q.   Yes, I can.  Okay.  The first one is on Page 52,

14   the bottom of Page 52 and top of page 53?

15       A.   Okay.  That question line was asking me about the

16   nitrosamines and determining an exact amount of nitrosamines

17   that occurred at the time of the exposure in comparison to

18   the time that the analysis was done.  And the way that the

19   questions were worded, I cannot say with a hundred percent

20   certainty what the concentrations were because we don't have

21   tests that were done on the feed at the time it was fed.

22       However, I can, based on science, and based on what is

23   known about the formulation and the breakdown of

24   nitrosamines, say within a reasonable degree of scientific

25   certainty that the concentrations should have been similar

1   at the time of testing as they were at the time the feed was

2   delivered and fed.

3        Q.   Very good.  Okay.  And the other -- the other

4   time you were questioned about something you said in your

5   deposition referred to Page 110.  Can you just turn there

6   real fast.  Specifically, let's see, line -- lines 10

7   through 14.  Can you just read that for a minute and then

8   explain your answer?  You were being asked about histamines

9   here, correct?

10       A.   That is correct.

11       Q.   The question was, are you able to tell us with

12  any certainty what the level of histamines would have been

13  in the feed at the time it was fed to the Jonsson mink.

14  Your answer was no, sir.  Why did you answer that way?

15       A.   Because in the way I mentally interpret that

16  question is no, I cannot provide a hundred percent

17  certainty.  However --

18       Q.   What can you provide?

19       A.   Based on the science of histamine production,

20  based on science of histamine breakdown, based on the

21  scientific articles that had been described with reference

22  to histamine production and breakdown, I can with a

23  reasonable degree of scientific certainty say that the

24  concentrations should have been higher at the time of

25  feeding than they were at the time of testing.

1          Q.   Now you were cross-examined, Dr. Hall, at length

2     yesterday by both counsel.  Did any of the answers that you

3     provided during that cross-examination change or alter your

4     scientific opinions in this case?

5          A.   No, sir, they did not.

6          Q.   And what is your scientific opinions in this

7     case?

8          A.   The scientific opinions in this case is based on

9     the facts that have been presented to me and my evaluation

10    of the overall case and the data are that the crumlets

11    contained toxins that were present, that one of these toxin

12    or a combination of these toxins resulted in adverse health

13    effects in the Jonssons' mink that resulted in increased

14    numbers of neonatal mortalities and health effects in the

15    mink which caused mink deaths.

16         MR. HANCEY:  Thank you very much, sir.  That is all

17    that I have.

18         THE COURT:  Counsel?

19                         **RECROSS-EXAMINATION**

20    BY MR. MINNOCK:

21         Q.   All right.  Good morning, Dr. Hall.

22         A.   Good morning.

23         Q.   So yesterday we finished with our

24    cross-examination of you at approximately 5:00, right?

25         A.   That is correct.

1          Q.   And then after the completion of the

2     cross-examination, you spent several hours with Mr. Hancey

3     and Mr. Mercer reviewing your testimony, correct?

4          A.   Yes, sir.

5          Q.   At his office?

6          A.   No, sir.

7          Q.   Well or somewhere?

8          A.   Yes, sir.

9          Q.   Okay.  And so the three of you sat down for a few

10     hours to prepare your testimony for this morning, correct?

11          A.   Actually not to prepare my testimony for this

12     morning, no, sir.  We sat down and discussed some of the

13     things that were stated in the courtroom.

14          Q.   All right.  So let's talk about a few of those

15     things.  First of all, let's talk about the Koppang article.

16     Now, the Koppang article was actually an article you relied

17     upon in your original report, right?

18          A.   It was one that was referenced in a number of the

19     scientific summary articles that I used, yes, sir.

20          Q.   And you had the abstract?

21          A.   Yes, sir.

22          Q.   But you never actually pulled the complete

23     article?

24          A.   The article was unavailable to pull completely.

25     It is no longer in print.

1          Q.   All right.  Well, Mr. Mitchell was able to get a

2     copy, correct?

3          A.   He managed to get a copy of the book.  I tried

4     and was not able to.

5          Q.   All right.  So you said that one of the things

6     that you learned yesterday was that the Jonssons expected to

7     have 45,000 mink and they only got 36,000 mink, right?

8          A.   That was stated yesterday.

9          Q.   But there was no documentation shown to you as to

10    why they had that expectation, right?

11         A.   No, sir.

12         Q.   That was simply a representation made to you?

13         A.   That is correct.

14         Q.   Now you remember yesterday I asked you the

15    question of when we were talking about your control that the

16    only mink that we know definitively that ate the lactation

17    crumlets were the black mink, right?

18         A.   The mink at the Lehi Ranch.

19         Q.   Yes.  Well, let me state it to you this way.  If

20    you have a particular mahogany mink, you don't know whether

21    that particular mink ate the lactation crumlets because half

22    were at Lehi and half were at Cedar Valley, right?

23         A.   Well you know the ones at Lehi did and the ones

24    at Cedar Valley didn't.

25         Q.   But the ones at -- the mahoganies you can't break

1    out amongst mahoganies which ones ate the crumlets and which

2    ones did not because you don't know which ranch they were

3    at, right?

4         A.   As far as production no, you can't.

5         Q.   So the only production numbers that we know ate

6    the lactation crumlets would be the production numbers for

7    the blacks because we know for a fact they all ate the

8    lactation crumlets, right?

9         A.   That can be assumed, yes, sir.

10        Q.   Okay.  Now, you never reviewed the report of

11   Dr. Wade Roberts?

12        A.   I do not believe I have ever seen a report of

13   Dr. Roberts, no, sir.

14        Q.   Okay.  Could I impose on you to come down for a

15   minute.  Your Honor, may he come down?

16        THE COURT:  Oh, sure.

17        MR. MINNOCK:  May I impose on you --

18        THE COURT:  He says he hasn't seen the Roberts report

19   so --

20        MR. MINNOCK:  Well, I'm going to ask him based on this

21   data whether it affects his opinion.

22        THE COURT:  Well, I suppose you can talk to

23   Dr. Roberts about that data, but if you're assuming

24   different data than what he has used, you know --

25        Q.   (By Mr. Minnock)  You haven't made any

1       assumptions with respect to the production of blacks, right?

2           A.   No, sir.

3           Q.   Okay.  Well, here is my question.  If you look at

4       the data that Dr. Roberts concluded, okay, which is that for

5       the past seven years they had 4.79 mink, 3.9 mink, 4.9 and

6       this is blacks, so kits per litter for blacks, all right?

7       4.79, 3.9, 4.5, 3.2, 3.21, 2.62, and 2.75 that is the seven

8       years prior to this -- to this -- to eating lactation

9       crumlets, right?

10          MR. HANCEY:  Objection foundation and speculation.  He

11      is not familiar with this data.

12          THE COURT:  I'm going to sustain the objection.

13          Q.   (By Mr. Minnock)  All right.  Well let me ask you

14      this question.  You would expect that the lactation crumlets

15      -- after the lactation crumlets, you would expect the black

16      mink that you know ate the lactation crumlets to have a

17      reduced kits per liter compared to prior years?

18          A.   Yes, sir.

19          Q.   Okay.  And so if they in fact had an increase,

20      then that would call into question whether or not these

21      neonatal losses actually took place?

22          A.   You would have to factor in a few other factors

23      on the age of the blacks in previous years versus current

24      years because age does affect the number of kits per litter.

25      Other factors that come into play but yes, that that is a

1      factor that would need to be evaluated.

2           Q.   Right.  And neither you or -- you can resume your

3      seat.  Neither you nor Dr. Roberts -- well not -- I

4      shouldn't ask you about Dr. Roberts.  You have not evaluated

5      that?

6           A.   That is correct, sir.

7           Q.   You have not evaluated and compared their actual

8      production to determine whether or not it was consistent

9      with the opinions that you were rendering?

10          A.   That is correct.

11          Q.   Okay.  Finally, as I understand it yesterday when

12     we talked about this your testimony as I recall was that you

13     believe that the neonatal losses could have been caused by

14     this toxin?

15          A.   Yes, sir.

16          Q.   Okay.  But that anything after that time period

17     you cannot say would be caused by this?

18          A.   The neonatal and time up to weaning is what most

19     of the reports that refer to the neonatal so you have to be

20     careful in what you refer to as neonatal.  What I'm talking

21     about is the time from birth to weaning.

22          Q.   Birth to weaning you believe that the toxins had

23     an effect on them?

24          A.   Yes, sir.

25          Q.   After that, the levels are too low to have an

1     effect at least based on the data?

2          A.   We do not have any indication.  At low doses you

3     can occasionally still see cancers but we don't have any

4     data to say one way or the other for that.

5          Q.   From your opinion we're only talking about birth

6     to whelping -- birth to weaning?

7          A.   That is correct.

8          MR. MINNOCK:  All right.  Thank you, sir.  That is all

9     of the questions I have for you.

10                        **RECROSS-EXAMINATION**

11    BY MR. MITCHELL:

12         Q.   Dr. Hall, as I understand your testimony today,

13    you have calculated the dry-matter basis of the I assume it

14    is the NDMA or is it the total nitrosamines in the feed?

15         A.   It is just the NDMA.

16         Q.   Okay.  So the nitroso dimethyl amine you have

17    calculated on a dry-matter basis at a concentration of

18    .07 milligrams per kilogram of feed?

19         A.   Of dry-matter feed, correct.

20         Q.   Okay.  So that doesn't tell us what the exposure

21    rate for the mink were, does it?

22         A.   No, it does not.

23         Q.   Okay.  Have you calculated the exposure rate for

24    the mink assuming that the concentration of .07 milligrams

25    per kilogram?

1          A.    I did not because I was comparing directly back

2    to articles where I was comparing directly to exposure

3    rates.  So when you calculated it I calculated exposure rate

4    so I could do a direct comparison exposure rate to exposure

5    rate.

6          Q.    Except you just told me you haven't calculated

7    exposure rate, you calculated concentration?

8          A.    Exposure rate is the concentration in the feed.

9    I didn't -- I didn't calculate dose.  You're asking me a

10   question about something -- exposure rate is the amount in

11   the feed being fed to the animals.  Dose is a different

12   calculation.

13         Q.    Okay.  So but if we're really going to compare

14   apples to apples, because say for example a mouse consumes a

15   whole lot less than a mink does, we really want to compare

16   milligrams per kilogram of body weight consumed or the dose

17   consumed, correct?

18         A.    Not necessarily.

19         Q.    Have you actually gone through and done that

20   calculation?

21         A.    No, I did not.

22         Q.    Okay.  Now, if we go through -- how would we go

23   through and do the calculation to calculate the dose that

24   these mink would have consumed at .07 milligrams per

25   kilogram of concentration levels?

1          A.   You would take the concentration in the feed at

2     0.07, you would then multiply that by the amount of feed fed

3     to the animals based on body weight.  And typically you're

4     going to get about 8 to 9 percent of their body weight per

5     day ingested in dry-matter intake.  Then you would take that

6     number of milligrams and divide it by the animal's body

7     weight and give you milligrams per kilogram per day.

8          Q.   Okay.  You have had a chance to look at the

9     Koppang article now for a second time because you read

10    through it as you were sitting up there yesterday, correct?

11         A.   I read through a paragraph or two on the specific

12    questions you were asking me.

13         Q.   Okay.  And you have actually had a chance to look

14    through the whole article now?

15         A.   That is correct.

16         Q.   Okay.  Did you happen to bring a copy of it with

17    you today?

18         A.   I did not.

19         Q.   Okay.  So I have got the same one that we used

20    yesterday so we can use it at your convenience.  Any time

21    you want to look at it, feel free.

22         A.   Okay.

23         Q.   Okay.  So let's start by looking back at table

24    two that we were looking at yesterday.

25         A.   Okay.

1          Q.   As I recall, in table two they have two figures

2     that we're looking at.  One is the concentration levels in

3     the fish meal that were fed -- that was fed to the mink, is

4     that how you read this?

5          A.   Yes, sir.

6          Q.   Okay.  And then we have the dose, the daily dose

7     that the mink consumed per day?

8          A.   That is correct.

9          Q.   Okay.  Now, the concentration in the fish meal is

10    not going to provide us with a direct correlation to the

11    concentration in the feed in this case, will it?  In other

12    words, we can't compare the concentration levels in that

13    study in the fish meal to the concentration levels in the

14    feed in this case because each one gets diluted, it gets

15    mixed into additional feed?

16         A.   Right, it is diluted at different rates.

17         Q.   We don't know -- we don't know what those rates

18    are in the study so we can't do an apples to apples

19    comparison?

20         A.   Actually, in the study they said they

21    incorporated it at 10 percent.  That is actually written in

22    the study.

23         Q.   They incorporated it in at 10 percent but we

24    don't know if things --

25         THE COURT:  Slow down.  Laura is a very quiet person

1    but I have seen her on occasion stare down attorneys.  So

2    relax, take your time, put your question.

3         MR. MITCHELL:  I would tell you to kick me under the

4    table if you could but --

5         THE COURT:  Ask your question.

6         Q.   (By Mr. Mitchell)  My legs might reach but -- so

7    my question is, we can't do -- we don't have all of the

8    information that we would need to do an apples to apples

9    comparison of the concentrations in the finished ration that

10   was fed to each of the animals, we need a little more

11   information?

12        A.   That is correct.

13        Q.   Okay.  But what we can do is an apples to apples

14   comparison of the -- of the doses that these animals were

15   exposed to?

16        A.   That is correct.

17        Q.   Okay.  Because we can go through and do that

18   dry-matter calculation.  So let's do that.  Walk me through

19   how you would do the math for the dry-matter calculation in

20   this case assuming a .07 milligrams per kilogram

21   concentration.

22        A.   Okay.  The first thing you would do is multiply

23   that by the amount of feed being fed.

24        Q.   Okay.

25        A.   And I was told that the mink in that late

1    gestation, early lactation, were fed approximately half a

2    pound of feed per animal.

3         Q.   So we're going to multiply that --

4         A.   Okay.  You have to take that 0.5 pounds, divided

5    by 2.2 to put it into kilograms.

6         Q.   Let me grab my handy calculator.  So if you would

7    divide .5 by 2.2, what does that give us?

8         A.   0.23.

9         Q.   .23?

10        A.   Correct.

11        Q.   So we have .23 kilograms of feed?

12        A.   No, it -- that is correct.

13        Q.   Okay.  So what is the next calculation that we

14   have to do?

15        A.   Then you multiply that .23 kilograms of feed

16   times 0.7 milligrams per kilogram of feed.

17        Q.   What does that give us?

18        A.   0.16.

19        Q.   .16?

20        A.   0.16.  Scientifically you always put a zero in

21   front of the point that way you maintain accuracy.  0.0 --

22   0.016.

23        Q.   I thought there was a zero missing.  That didn't

24   look quite right to me.  0.016?

25        A.   Milligrams.

1          Q.    Milligrams per kilogram?

2          A.    No, no, no just milligrams.

3          Q.    Just milligrams, okay.

4          A.    The kilograms go away.

5          Q.    Well, milligrams per kilogram of body weight?

6          A.    No, we're not there yet.

7          Q.    We're not there yet.

8          A.    That is the total number of milligrams ingested.

9          Q.    Okay.

10         A.    Then you divide it by the animal's body weight.

11         Q.    So what are we going to assume for the animal's

12    body weight in this case?

13         A.    I was told that those females were approximately

14    one and a half kilograms.

15         Q.    Okay.  So we divide .016 by 1.5?

16         A.    Yes.

17         Q.    What does that give us?

18         A.    0.01 milligrams per kilogram of body weight per

19    day and that is the amount that they received each day.

20         Q.    0.01 milligrams per kilogram of body weight per

21    day?

22         A.    That is correct.

23         Q.    Okay.  Now let's look at -- let's turn back to

24    the Koppang study for a second.

25         A.    Okay.

1          Q.   And you remember there were four groups of --

2     four initial groups of mink that were studied in the Koppang

3     Study?

4          A.   That is correct.

5          Q.   Okay.  And were there groups that had levels of

6     exposure, i.e., and when I say level of exposure I mean

7     dose, that received daily doses in excess of 0.01 milligrams

8     per kilogram of body weight per day?

9          A.   Yes, sir, there were.

10         Q.   And which groups received higher doses than that

11    level?

12         A.   All of them.

13         Q.   Okay.  And as I recall, there were three groups

14    that did not show any pathoanatomical changes after they

15    were pelted at 122 days?

16         A.   That is correct.

17         Q.   Okay.  And of those three groups, what is the

18    highest dose that those animals received or highest rate of

19    nitrosamines NDNA that those animals received for those

20    122 days?

21         A.   Of the -- in all four studies.

22         Q.   Of the three groups that did not show any

23    pathoanatomical changes?

24         A.   Okay, it is actually you were right in the first

25    way you described it, it is the dose not the rate.

1      Q.   Right.

2      A.   So the highest dose where they did not show any

3  pathologic lesions in the liver because on that study the

4  only thing they were looking at was liver lesions was 0.08.

5      Q.   Okay.  And so that we get through that for

6  122 days no changes at least that they were -- of the

7  changes that they were looking for, none were seen in those

8  animals after 122 days at eight times the dose that these

9  animals were receiving?

10     A.   That is correct.

11     Q.   Okay.  And then we have the fourth group where

12 there were some changes seen?

13     A.   That is correct.

14     Q.   Okay.  And what were those changes that were

15 seen?

16     A.   Um, damage to the liver.

17     Q.   What was the damage to the liver?  I believe,

18 correct me if I'm wrong, but I believe it was some partially

19 occluded veins?

20     A.   Right.  There was some damage to the vein

21 drainage in the liver.  Typically that is associated with

22 damage to the liver cells themselves which causes occlusion

23 of the veins.

24     Q.   Okay.  What was the lowest dose at which those

25 changes were seen in this study?

1          A.   In this study 0.13.

2          Q.   So 13 times higher than the dose that the animals

3     in this case received?

4          A.   That is correct.

5          Q.   And none of those animals in any of those four

6     groups died until they were actually killed and pelted out?

7          A.   That is correct.

8          Q.   Okay.  So we get through that looking at that

9     stuff.  And then you started talking about the second

10    generation of and third generations within this study?

11         A.   That is correct.

12         Q.   They reserved a few of the animals from the

13    collective four groups and continued on studying the effects

14    of the NDMA in their system?

15         A.   That is correct.

16         Q.   And as they did that, what was the dose that

17    these animals were receiving as they continued on?

18         A.   It will take me just a moment to find that.

19    Actually, I don't show that they ever calculated that.  The

20    only thing they calculated in that was the total dose over

21    the entire duration of the animals being fed.

22         Q.   Doesn't the study indicate that those animals

23    that continued on continued -- were actually fed at the

24    highest rate from the first group that was studied?

25         A.   It indicates, based on this, that they were dosed

1      or had a feed inclusion rate similar or maybe slightly

2      higher than that initial high dose group.

3          Q.   Okay.  So they were -- they were at least at the

4      dose, the lowest dose where we saw those anatomical changes

5      of .31 milligrams per kilogram of body weight per day?

6          A.   No, sir.  0.13 not three-one.

7          Q.   If I said three-one I meant .13?

8          A.   That is correct.

9          Q.   Yes.  Okay.  So -- and how many -- when did --

10     when in relation to the reproduction process did they begin

11     the second portion of this study?

12         A.   In the second portion of the study they started

13     the second portion of the study at that 122 days after they

14     initiated the first part of the study.

15         Q.   Okay.  So they went straight from concluding the

16     first portion straight into the second portion?

17         A.   That is the way it reads, yes, sir.

18         Q.   Okay.  And can you tell from that study how far

19     into the reproduction cycle those animals were at that 122

20     day mark?

21         A.   Okay.  They started the initial study in July

22     of 1970.  They actually bred the mink in February.

23         Q.   Okay.  So --

24         A.   So you're looking at seven -- between six and

25     seven months from the time they initially started on the

1     first study before they were bred.

2          Q.   Before they were bred.  And if we count roughly

3     four months, 122 days, we go -- we start in July, August,

4     September, October, November, and they were bred in

5     February?

6          A.   Right.

7          Q.   So we have an additional three months where after

8     they have completed the first session where they continued

9     to receive those high doses of NDMA and then they're bred

10    and they continue to receive those high doses all the way

11    through the whelping process?

12         A.   I don't refer to .13 as high doses, but that was

13    the highest dose that they used in the first study.

14         Q.   Well, that was the lowest dose at which we saw

15    any changes.  It wasn't the highest dose that they used?

16         A.   Right.  It was the lowest dose they saw any liver

17    associated pathology, yes, sir.

18         Q.   Right.  And that was the rate that they fed these

19    mink for roughly three-quarters of a year before they

20    actually tried to breed them?

21         A.   That is correct.

22         Q.   And then they continued feeding them at that rate

23    all the way through gestation, all the way through whelping?

24         A.   That is correct.

25         Q.   And as compared to initiate -- in this case,

1    initiating the exposure right in the middle of whelping,

2    correct?

3         A.   That is correct, yes, sir.

4         Q.   Okay.  You mentioned a study in mice that showed

5    some reproductive issues at a -- was it a concentration or

6    was it a dose of .01 milligrams per kilogram?

7         A.   It was a concentration.

8         Q.   Okay.  So a concentration of .01 milligrams per

9    kilogram.  What was the name of that article?

10        A.   That was written by Anderson, Al Anderson.

11        Q.   Was it *The Effects of Imipramine, Nitrite and*

12   *Dimethylnitrosamine on Reproduction in Mice*?

13        A.   No.

14        Q.   It was the other article that was actually a

15   cancer study, wasn't it?

16        A.   That is correct.

17        Q.   Okay.  And as I recall from your testimony

18   yesterday, it was a cancer study kind of actually similar to

19   what they were looking at in Koppang, but also the

20   reproductive effect that you were talking about was lung

21   tumors showing up in -- is it pups, are mice pups?

22        A.   Yes, sir.

23        Q.   In pups after they have been whelped?

24        A.   That is correct.

25        Q.   Okay.  If that is the effect that -- the

1    reproductive effect or what you're calling the reproductive

2    effect, we're not talking about mortality, stillbirths, dead

3    kits, that kind of a thing, we're talking about tumors

4    showing up after these kits are born?

5         A.   Actually, there were two different Anderson

6    studies.  In one of them the exposure rate was at 0.01.

7         Q.   That is cancer study?

8         A.   That is the cancer study and they did see adverse

9    health effects in the kits.  That was associated with

10   cancer.  There was another one where the exposure rate was

11   0.1 and in that study is the study where they saw the

12   increased neonatal mortality in stillbirth in the pups.

13        Q.   Okay.  And so what we were seeing actually in the

14   second study that you just referenced is a higher

15   concentration than what we have in this case, and then there

16   were actually two groups that were studied in that second

17   article in that second Anderson article.  That is the one

18   that I referenced first, the *Effects of Imipramine Nitrite*

19   *and Dimethylnitrosamine on Reproduction in Mice*?

20        A.   That is correct.

21        Q.   And there were two groups that were studied in

22   that study, correct?

23        A.   That is correct.

24        Q.   Okay.  And in the first group, they studied the

25   effects of imipramine?

1          A.   Yes, sir.

2          Q.   And the effects of nitrite?

3          A.   Yes, sir.

4          Q.   And the effects of imipramine plus nitrite?

5          A.   Yes, sir.

6          Q.   And the effects of dimethylnitrosamine?

7          A.   That is correct.

8          Q.   And in that first group, if we're looking at

9     dimethylnitrosamine, there were no reproductive effects?

10          A.   Actually, that can't be stated.  They did not see

11     a significant -- statistically significant effect.  But if

12     you look at the total number of pups, there was a depression

13     in the number of pups born.  The reason they went to the

14     second phase in that study was they increased the number of

15     mothers.  Oftentimes, with reproductive studies when you are

16     looking at a mother that has multiple offspring you have to

17     have a high enough number of animals to where you can show a

18     statistical comparison.  The reason they went to the second

19     phase in that study was because they did see that decreased

20     number in the first study.

21          Q.   And what we're seeing is that -- what they

22     indicated was that in that first group there wasn't a

23     statistical -- statistically significant difference between

24     the NDMA group and the control group that didn't receive

25     NDMA?

1          A.    That is correct.

2          Q.    Okay.  And that can be -- would you say that that

3     is somewhat analogous to the fact that any production entity

4     like a livestock production entity is going to have a normal

5     death rate within its herd?

6          A.    Actually, I would not say that based on that

7     study, no, sir.

8          Q.    No, I'm not saying based on that study.  I'm just

9     saying is that something that is -- would that be a

10    comparable analogy?

11         A.    In any production environment you have what would

12    be considered a normal death rate.  But that -- that does

13    not compare to that study in any way, shape or form.

14         Q.    Okay.  Okay, no I wasn't really trying to compare

15    them to the study, I was just trying to get my arms around

16    it.  Um, okay, so let's look at the -- then the second group

17    and um, in the second study that they looked at they weren't

18    looking solely at stillborn kits, they were looking at a

19    number of factor neonatal criteria, for lack of a better

20    word?

21         A.    They actually designed the study much more

22    stringently to where they actually went in and counted the

23    number of pups born.  They did a much more thorough

24    examination.  I -- to give the jury an understanding, when

25    you have a mouse colony, for example, and I sat on the

1    institutional animal care and use committee for the

2    university so I deal with this issue.  Typically, when pups

3    are born you want to leave them alone because sometimes

4    disturbing the pups can actually cause the mothers to kill

5    the pups.

6         So in that first study, the way they described it,

7    they may not have seen a true incidence of stillbirths, they

8    may not have seen how many pups were born versus how many

9    survived because in mice a dead pup is often cannibalized by

10   the mother likely as a natural instinct to where in the wild

11   they would not want that dead pup to be around to attract

12   predators.

13        Q.   Okay.  Dr. Hall, let me focus you a little bit

14   more about what I'm looking at in this -- in this second

15   portion of the study.  They looked at the number of days

16   from conception to birth?

17        A.   That is correct.

18        Q.   And the NDMA group was -- there was no

19   statistically significant difference in that aspect of the

20   reproductive cycle?

21        A.   That is correct.

22        Q.   They also looked at the number of births after

23   30 days and there was no statistically significant

24   difference between the NDMA group and the control group for

25   that criteria, correct?

1          A.   The number of births after 30 days?

2          Q.   Number of births after 30 days?

3          A.   I have no idea what you're talking about.  I

4     don't recollect that in that paper.

5          Q.   Okay.  I'm happy to show that to you if you would

6     like to see it.

7          A.   I would be glad to see it.

8          Q.   Sure.  And I will come around here so I can kind

9     of lean into your mike.  So this is the second portion of

10    that study.  I'm happy to grab the whole thing if you want

11    to look at it, but just for ease of convenience, would you

12    agree with me that this is the table that summarizes the

13    findings in the second portion of that study, that being the

14    Anderson study on the effects?

15         A.   Yes, sir.

16         Q.   Okay.  And so we see here that they looked at the

17    number of births after 30 days and with no statistical

18    significant difference -- statistically different

19    significance between the NDMA group and the control group?

20         A.   Correct.

21         Q.   Okay.

22         A.   Well, to -- where everybody understands what this

23    -- the number of births after 30 days the reason that

24    parameter was measured was to try to determine how many

25    animals did not breed the first time and it took them longer

1    to breed.

2         Q.   Okay.  The next criteria that they looked at was

3    the total number of pups that were born.  And in the NDMA

4    group, it actually exceeded the control group by three pups

5    185 to 182, correct?

6         A.   Yeah, average 9.5 and 9.1.

7         Q.   Okay.  And then we get down to the total dead and

8    that is where we start to see some statistically significant

9    differences between the NDMA group and the control group and

10   that is what you have already talked about, correct?

11        A.   Correct.

12        Q.   Okay.  And so then we get down to the litters

13   with 100 percent dead and the litters with some dead and do

14   we see a statistically significant difference between the

15   control group and the NDMA group?

16        A.   No, sir, there was 11 verses 8.  So it was

17   55 percent in the NDMA group and 40 percent in the other

18   group had at least one pup that did not survive.

19        Q.   Okay.  So then in the second portion of this

20   study there were five groups of criteria that the study

21   looked at and in only one of those five did we see a

22   statistically significant variance between the NDMA group

23   and the control group?

24        A.   That is correct.  That is in the number of

25   stillbirths and the number that did not survive to weaning.

1           MR. MITCHELL:  Okay.  Those are all of my questions.

2      Thank you.

3           THE COURT:  Are you through with him?

4           MR. HANCEY:  I might have one more question, Your

5      Honor.

6           THE COURT:  Okay.  One.

7                    **FURTHER DIRECT EXAMINATION**

8      BY MR. HANCEY:

9           Q.   I'll even stick to my promise on that.

10          Dr. Hall, you were just crossed at length by

11     Mr. Mitchell and you were asked about a bunch of specific

12     questions that were framed in a particular way.  Is there

13     anything that you felt like could have assisted the jury

14     in --

15          THE COURT:  He is not an expert in what is assisting

16     the jury.  Put your question.

17          Q.   (By Mr. Hancey)  Could you -- can you provide any

18     more explanation that you weren't given an opportunity to

19     provide on cross as to anything that was asked of you?

20          MR. MITCHELL:  Objection.  That is way too broad.

21          THE COURT:  Yeah, he responded to the questions put.

22     I don't know that that is helpful to us.

23          MR. HANCEY:  Then let me ask one more specifically.

24          THE COURT:  I thought we were dealing with one.

25          MR. HANCEY:  That one didn't work out, did it.  No, I

1      don't have any other questions, Your Honor.  I'll stick with

2      my one.

3           THE COURT:  Thank you, sir.  Appreciate your help.

4      And your next witness?

5           MR. MERCER:  Your Honor, plaintiffs call Joy Kinyon.

6           THE COURT:  Sir, if you will come forward and be

7      sworn, please.

8           MR. MITCHELL:  Your Honor, before we get going, I

9      think this might be an appropriate time to bring up that

10     issue that we were going to need to address outside of the

11     presence of the jury.

12          THE COURT:  All right.  Well let's get the witness

13     sworn.

14                              **JOY KINYON,**

15         called as a witness at the request of the Plaintiff,

16              having been first duly sworn, was examined

17                      and testified as follows:

18          THE WITNESS:  Yes, I do.

19          THE CLERK:  Have a seat right over here, please.  And

20     can you state your name and spell it for the record, please.

21          THE WITNESS:  My name is Joy Kinyon, J-O-Y

22     K-I-N-Y-O-N.

23     //

24     //

25                        **DIRECT EXAMINATION**

1    BY MR. MERCER:

2         Q.   Mr. Kinyon, you're employed by Rangen?

3         A.   Yes, I am.

4         Q.   One of the defendants in this case?

5         A.   Yes.

6         Q.   You have a bachelor's degree in business

7    administration from Wartburg College in Waverly, Iowa?

8         A.   Yes, I do.

9         Q.   You began working for Rangen in 1997?

10        A.   Yes.

11        Q.   Rangen has four divisions?

12        A.   Yes.

13        Q.   Aquaculture, general feeds, commodities and

14   logistics?

15        A.   That is correct at that time, correct.

16        Q.   You started as division manager over the

17   aquaculture division when you began working for Rangen?

18        A.   Yes.

19        Q.   And in approximately 2003 you became the division

20   manager over the general feeds division and the aquaculture

21   division?

22        A.   Yes.

23        Q.   And continued in that position until 2010?

24        A.   Yes.

25        Q.   And through 2010?

1          A.   Yes.

2          Q.   So you were the division manager over the two

3     divisions at Rangen that produced feed?

4          A.   Yes.

5          Q.   Feed for fish and feed for terrestrial animals;

6     is that correct?

7          A.   Yes.

8          Q.   In 2010, you reported to Wayne Courtney the

9     executive vice-president at Rangen?

10         A.   Yes.

11         Q.   And in 2010, Wayne Courtney reported to Chris

12    Rangen the president and CEO of Rangen?

13         A.   Yes.

14         Q.   In 2010, was Rangen a Tollmiller?

15         A.   Yes.

16         Q.   And Tollmilling means that Rangen manufactures

17    products for other companies which those companies sell to

18    their customers, correct?

19         A.   Yes.

20         Q.   Rangen was a Tollmiller for National Feeds in

21    2010?

22         A.   Yes.

23         Q.   So Rangen had a contract with National Feeds in

24    2010?

25         A.   Yes, we did.

1          Q.   You're familiar with the basic terms of Rangen's

2     contract with National Feeds?

3          A.   Yes.

4          Q.   One of the terms is that Rangen will quote,

5     "maintain the standard and quality of the goods processed by

6     it," close quote?

7          A.   Yes.

8          Q.   Another term is that Rangen guarantees to

9     National that the goods it makes will not be adulterated; is

10    that correct?

11         A.   Yes.

12         Q.   In 2010, National Feeds would send a feed formula

13    to Rangen and Rangen would then produce the feed according

14    to the formula; is that correct?

15         A.   Yes.

16         Q.   Then Rangen would ship the feed to National

17    Feeds' customer on behalf of National Feeds; is that

18    correct?

19         A.   In some cases, yes.

20         Q.   And that is where Rangen's logistics division

21    comes into play, the shipping; is that right?

22         A.   No.

23         Q.   But did Rangen ship the national lactation -- the

24    National Feeds lactation crumlets to Kent Griffeth in

25    Preston, Idaho in April of 2010?

1          A.   I am not sure if we shipped them ourselves or if

2     they picked them up in that case.

3          Q.   But you don't know?

4          A.   No.

5          Q.   Did Rangen prepare and send the invoices on

6     behalf of National Feeds?

7          A.   No.

8          Q.   Who prepared the invoices?

9          A.   I don't know.

10         Q.   But you're sure Rangen didn't do it?

11         A.   Rangen did not invoice National's customers, no.

12         Q.   So Rangen didn't issue an invoice to Kent

13    Griffeth?

14         A.   No.

15         Q.   Or Keith Jonsson?

16         A.   No.

17         Q.   Or Roger Griffeth?

18         A.   No.

19         Q.   In 2010, were you the ultimate decision maker at

20    Rangen for the purchase of fish meal?

21         A.   I was one of them, yes.

22         Q.   In 2010, did you know whether there were some

23    preservatives that could be put into fish meal that might be

24    dangerous to mink?

25         A.   I don't.

1          Q.   In fact, you had no knowledge about that, did

2     you?

3          A.   I knew that fish meal that we were purchasing was

4     preserved with ethoxyquin.

5          Q.   That is not what I asked you.  In 2010, did you

6     know whether there were some preservatives that could be put

7     into fish meal that might be harmful to mink?

8          A.   No, I did not know that.

9          Q.   In fact, you have no education or training in

10    mink; is that correct?

11         A.   Correct.

12         Q.   There is an exhibit book in front of you.  Could

13    you turn to Exhibit 14, please.

14         MR. MITCHELL:  This would be the time, Your Honor.

15         THE COURT:  Ladies and gentlemen, I'm going to give

16    you your 15 minute break, your morning break.  And remember

17    what I told you.  Don't talk to anybody about this case.

18    You may be excused.

19         (Whereupon, the jury left the courtroom.)

20         THE COURT:  You go ahead.

21         MR. MERCER:  Thank you, Your Honor.  Could you turn to

22    Exhibit 14, please.

23         THE WITNESS:  Okay.

24         Q.   (By Mr. Mercer)  What is that?

25         A.   It is a warning letter issued by the FDA dated

1    February 11th, 2010.

2         Q.   Addressed to whom?

3         A.   Addressed to Christopher T. Rangen, president.

4         Q.   Were you CCed on that letter?

5         A.   Yes, I was.

6         MR. MERCER:  Your Honor, I offer Exhibit 14.  I would

7    like to -- well, I will proceed with my questions.

8         Q.   (By Mr. Mercer) With regard -- the letter states,

9    does it not, that the FDA investigators inspected Rangen's

10   animal feed manufacturing facilities in Buell, Idaho; is

11   that correct?

12        A.   Yes.

13        Q.   And it states that the inspection revealed

14   significant deviations from federal regulatory requirements;

15   is that correct?

16        A.   Yes, it is.

17        Q.   And it also states that that failure resulted in

18   Rangen manufacturing adulterated products; is that correct?

19        A.   Yes.

20        MR. MERCER:  I offer Exhibit 14.

21        MR. MITCHELL:  If I might inquire, Your Honor?

22        THE COURT:  I'm sorry?

23        MR. MITCHELL:  If I might inquire of the witness?

24        THE COURT:  Oh, sure.

25   //

1                            **VOIR DIRE EXAMINATION**

2       BY MR. MITCHELL:

3            Q.   Mr. Kinyon, when did the inspection referenced in

4       this letter take place?

5            A.   June 9th through the 11th, 2009.

6            Q.   And when was the feed in this case made?

7            A.   In March of 2010.

8            Q.   And what were the issues that were raised by the

9       inspection that occurred in June of 2009?

10           A.   The issues raised were that we failed to label,

11      correctly label, some pallets of feed.  That was one of the

12      issues.  The other issue was that we delivered some bulk

13      mink feed in auger trucks.

14           Q.   Now, the bulk mink feed, does that have any

15      relation to the feed that we're talking about in this case?

16           A.   None whatsoever.

17           Q.   Okay.  And so the palletized feed that we're

18      talking about that didn't have a correct label on it, what

19      was incorrect about that label?

20           A.   The label failed to contain the statement do not

21      feed to cattle or other ruminants.

22           Q.   Did the FDA find any other defect associated with

23      that feed?

24           A.   No.

25           Q.   And what is the significance of the statement,

1      "do not feed to cattle or other ruminants"?

2          A.   The significance is that it is designed to keep

3      that feed from being fed to cattle to avoid BSE or chronic

4      wasting disease.

5          Q.   What is the common name for common wasting

6      disease?

7          A.   Mad cow disease.

8          Q.   And did the inspection and the findings within

9      the inspection have anything to do with fish meal

10     preservatives?

11         A.   None whatsoever.

12         Q.   Did the inspection or its findings have anything

13     to do with histamines?

14         A.   No.

15         Q.   Did the inspection or its findings have anything

16     to do with nitrosamines?

17         A.   No.

18         Q.   Did the inspection have anything to do with any

19     alleged cause of harm to the mink in this case?

20         A.   No, not at all.

21         Q.   Thank you.  By the time that the feed was in this

22     case was made, had Rangen changed its processes to address

23     the issues that were raised within Exhibit 14?

24         A.   Yes, we had.

25         Q.   And how did you do that?

1          A.   We, in June of 2009, we immediately stopped

2     purchasing -- the purchase of meat and bone meal and we

3     immediately began to use up our remaining inventory of meat

4     and bone meal which was all used up within 30 days, so it

5     was used up by mid July of 2009.  We also cleaned out the

6     auger trucks and did a complete wash out and inspection of

7     those auger trucks to remove any residual mink feeds that

8     may have been in those trucks.

9          Also, we did a complete blow down, a deep cleaning, if

10     you will, of the entire mill and milling equipment where

11     this product was being manufactured, i.e. the aquaculture

12     feed mill.

13          Q.   Okay.  Would you take a look at Exhibit Number 9

14     in your book.  That is the copy of the label that came off

15     of the feed that was -- that is at issue in this case.  And

16     does this label contain the statement that do not feed to

17     cattle or other ruminants.  If you look right in the middle

18     right above the word caution?

19          A.   Yes it does.

20          Q.   Okay.

21          MR. MITCHELL:  No further questions.

22          MR. MERCER:  Your Honor, I received this morning, at

23     9:15 or 9:20, from Mr. Mitchell this memorandum and I would

24     like to respond to that now if I may.

25          THE COURT:  First of all, tell me what you claim for

1    the notice.

2         MR. MERCER:  Here is what I claim from the notice.

3    Number one, in its opening statement in this case, the

4    defendant Rangen put at issue its -- its careful procedures

5    that it has conducted for decades in cleaning out and having

6    impeccable standards of -- in its processes.

7         THE COURT:  Well, he has told us that he got a notice

8    and they worked hard to correct it prior to the 2010 season.

9         MR. MERCER:  I understand he said that, however,

10   number two, Dr. Hall put at issue that Dr. Hall said the

11   very words cross-contamination can cause the nitrosamine

12   problem.  This letter from an FDA inspection says the words

13   from the -- our investigation determined that adulteration

14   resulted from the failure of your firm to provide for

15   measures to avoid commingling or cross-contamination.

16   Mr. Kinyon says we took measures to fix it, but it is the

17   exact issue in this case that has been presented by

18   Dr. Hall.

19        Finally, Your Honor, oh, and the letter also says on

20   Page 2, at the top of page 2, you conducted no clean-outs or

21   flushes of the equipment to remove proteins derived from, et

22   cetera, et cetera.

23        THE COURT:  Yeah this was for February 2009.

24        MR. MERCER:  I understand that.

25        THE COURT:  Yeah.

1          MR. MERCER:  Finally, Your Honor, in the pretrial

2     order, this document was stipulated to as admissible, and at

3     the pretrial conference, the court, someone, Mr. Hancey

4     raised the issue of motions in limine and the court said

5     this is the day for motions in limine.

6          THE COURT:  Oh.

7          MR. MERCER:  There were no others and today and now

8     this morning in the middle of the jury trial we have a

9     motion in limine on a document that was stipulated to.

10         THE COURT:  Well, the question is whether it is an

11    appropriate exhibit or not and to what extent is it relevant

12    to the issues.  And you have got a causation issue here.

13    You suggest that there may be cross-contamination.

14    Hopefully, you'll provide information from this witness

15    problems of that kind.  But the interesting question and you

16    mean you previously have been put on notice that you need to

17    watch cross-contamination, people should tell you what to

18    do.  I have trouble with this frankly.  Ordinarily, I would

19    indicate that motions in limine often take place during the

20    course of the trial itself.  I don't specifically recall

21    saying now is the day but I could have.  But the question is

22    how is 14 going to help us in this case involving these

23    batches which were produced apparently long after February

24    of 2009.

25         MR. MERCER:  They were.  But again, hasn't the

1    defendant put this issue right squarely in front of the jury

2    when it said Rangen has had these impeccable standards for

3    decades.  Apparently that is not true.

4         THE COURT:  We like to tell jurors that opening

5    statements are not evidence, they're to be concerned with

6    the evidence that they receive.  The attorneys aren't here

7    as witnesses.  They sometimes pretend to be, but they're

8    not.  I think he has got a point.  I think that the letter

9    as a letter, Exhibit 14, is objectionable.  State again your

10   objection.

11        MR. MITCHELL:  Your Honor, we object to its relevance

12   and we object to it on 401 grounds as well.

13        THE COURT:  Which are?

14        MR. MITCHELL:  I'm sorry, 403 prejudicial.  It is --

15   any beneficial effect that it might have is far outweighed

16   by its prejudicial effect.  And in fact what the plaintiff

17   is trying to do is use a letter written by a governmental

18   agency long before the events in this case.

19        THE COURT:  Well, defendants often do that as well.

20        MR. MITCHELL:  Sure.  But talking -- what the -- what

21   they're specifically trying to do in this case falls

22   squarely within the relevance issue.  It doesn't have

23   anything to do with histamines, nitrosamines.

24        THE COURT:  Well, you acknowledge that the

25   cross-contamination can occur?

1          MR. MITCHELL:  Do I acknowledge that

2     cross-contamination can occur?  In the abstract, certainly.

3          THE COURT:  Certainly.  In the concrete, specifically.

4     Okay.  I think the exhibit is objectionable, I will sustain

5     the objection as an exhibit.  I am not suggesting that you

6     can't appropriately cross-examine as to practices.

7          MR. MERCER:  Okay.  And I would like to just make my

8     offer of proof from the evidence I have submitted outside

9     from the jury and make sure that Exhibit 14 is in the record

10    as an offer of proof.

11         THE COURT:  No, no, you made your offer.  He objected.

12    You cross-examined him, well you adversarially examined the

13    witness, I thought that was your proffer.

14         MR. MERCER:  So my proffer is that examination as well

15    as Exhibit 14 which I understand --

16         THE COURT:  Well, it was Exhibit 14 that I have ruled

17    upon.  I haven't ruled upon anything else.

18         MR. MERCER:  Okay.

19         THE COURT:  Okay.  Take 10 minutes and we'll get

20    started again.  Objection sustained as to 14.

21                   (Recess taken at 10:51 a.m.)

22         THE CLERK:  Should I bring the jury in?

23         THE COURT:  It looks like we're all here.  Bring in

24    the jury.

25         THE CLERK:  All rise for the jury.

1          (Whereupon, the jury returned to the courtroom.)

2          THE COURT:  Thanks folks, sit down and relax.

3     Appreciate your patience and your help and you may continue.

4          MR. MERCER:  Thank you, Your Honor.

5          Q.   (By Mr. Mercer)  Mr. Kinyon, in 2010 did Rangen

6     manufacture fish meal?

7          A.   No.

8          Q.   So in 2010, Rangen purchased all of its fish meal

9     from outside sources?

10         A.   Yes.

11         Q.   Does the Food and Drug Administration, the FDA,

12    inspect Rangen's facilities?

13         A.   Yes.

14         Q.   Often?

15         A.   Periodic.

16         Q.   Has Rangen ever been cited by the FDA for failure

17    to follow FDA regulations?

18         MR. MITCHELL:  Objection, judge.

19         THE COURT:  I'll let him respond to that.  And let's

20    talk about practices if they come in and inspect -- let him

21    tell us what they do, and that is what Rangen does.  You can

22    get into Rangen's practices themselves in handling fish meal

23    and other items.

24         Q.   (By Mr. Mercer)  Do you need me to restate the

25    question?

1          A.    Please.

2          Q.    Has Rangen ever been cited by the FDA for failure

3     to follow FDA regulations?

4          A.    Yes, we have.

5          Q.    Has the FDA ever determined that Rangen's failure

6     to follow FDA regulations resulted in products being

7     manufactured and distributed?

8          MR. MITCHELL:  Objection, judge.

9          THE COURT:  Yeah.  Let's focus on the time frame that

10    is involved in this case, counselor.

11         Q.    (By Mr. Mercer)  Okay.  When did the FDA find

12    Rangen in violation of FDA regulations?

13         MR. MITCHELL:  Objection, judge.

14         THE COURT:  When in 2010?  Is that your question?

15         Q.    (By Mr. Mercer)  Were you cited in 2010?

16         A.    No, we were not.

17         THE COURT:  We're interested in his processes.

18         Q.    (By Mr. Mercer)  What kinds of things is the FDA

19    inspecting when it comes in and conducts an inspection?

20         A.    We have had inspections where they have come in

21    and checked our drug records for the use of various drugs we

22    may use in some of our animal feeds.  They check our

23    receiving logs, they check our usage logs of those drugs to

24    make sure that we're following our own procedures.

25         Q.    Okay.  Do they ever check to see -- do they ever

1    review your commingling?  Do they ever -- do they ever

2    inspect your facilities in order to determine whether there

3    is any commingling between the last batch that you mixed and

4    the next batch that you mix?

5         A.   No, not specifically, they don't.

6         Q.   If they ever made a determination that that had

7    happened, how would they make that determination?

8         A.   Um --

9         MR. MITCHELL:  Objection, lacks foundation.

10        THE COURT:  Yeah.  Why don't you have him tell us

11   about his mixing processes and his clean-up processes.

12        Q.   (By Mr. Mercer)  Can you tell me about your

13   clean-up process between the last batch and the next batch?

14        A.   Um, I assume you're asking the question about

15   different types of feeds from one batch to the next.  I

16   guess that makes a little more clarification.

17        Q.   Does that make a difference?

18        A.   Yes, it does.

19        Q.   So if you were changing from a fish meal -- a

20   fish feed, a feed that you are feeding to fish in

21   aquaculture, right, to, for example, a mink feed, tell me

22   about the clean out process in the mixing bowl?

23        A.   In that case, we may do a flush, depends upon the

24   formulation of the two products, because there is so many

25   similarities between the ingredients that are used in the

1    mink feeds and fish feeds so there is -- there is not a lot

2    of cause for concern or contamination between those two

3    feeds.

4         Q.   So you may not do much of a clean out at all?

5         A.   Possibly, yes.

6         Q.   And is that the kind of thing or is that the kind

7    of process that the FDA would investigate during an

8    investigation of Rangen's facilities?

9         A.   No, not -- no.

10        Q.   Never?

11        A.   They come in and inspect our drug records again.

12   They come in and do an occasional inspection for restricted

13   protein use.  Those are the only two instances that I'm

14   aware of them coming in.  But they're both very routine in

15   nature.

16        Q.   So you can't think of any FDA inspection --

17   you're aware of no type of FDA inspection of Rangen's

18   facilities where they might determine that you have not

19   conducted appropriate clean out procedures or flushes of

20   your equipment?

21        MR. MITCHELL:  Objection, judge.

22        THE COURT:  Well, it would be really helpful,

23   counselor, if you would have him describe the process by

24   which they mix feed and the machinery with which they use in

25   the mixing of feed, and the manner in which they clean the

1       machines after the feed has been mixed when another batch is

2       to be mixed.  His processes are interesting, at least to me,

3       in this case as to what they do.  They get an order to mix

4       feed, tell us about your factory, tell us about how you mix

5       it, tell us about your machines.  Tell us about how you

6       comply with the order from National Feeds in order to

7       produce a particular product.  What do you do?  And do you

8       have a regular process for flushing your machines?  How

9       often do you do that?

10          Q.   (By Mr. Mercer)  Thank you, Your Honor.

11      Mr. Kinyon, I understand that you have very large mixing

12      bins at Rangen; is that correct?

13          A.   We have a -- mixers?  Are you talking about the

14      mixer or are you talking about the ingredient bin?

15          Q.   Why don't we talk specifically about the mink

16      feed that you mixed for Rangen on March 30th, 2010.  Are you

17      familiar with that mix?

18          A.   Vaguely.

19          Q.   Vaguely.  Were you not in charge of that division

20      when that mink feed was mixed?

21          A.   Yes, I was.

22          Q.   But you're only vaguely familiar with that

23      particular batch?

24          A.   Well, I'm only vaguely familiar with all of the

25      ingredients that were used at that time.  That was in 2010

1     so --

2          Q.   Do you know anything about the ingredients that

3     were put in that batch?

4          A.   Not without looking at the mix sheet.

5          Q.   Do you know anything about what facility was

6     used?

7          A.   Yes.

8          Q.   Which one?

9          A.   It is in our building warehouse five or

10    manufacturing facility in aquaculture.

11         Q.   And what is aquaculture?

12         A.   Fish feed.

13         Q.   And does that mean that is not fish meal, is it?

14         A.   No, it is not.

15         Q.   So how are the two different?

16         A.   Well, fish meal is an ingredient, it is an

17    ingredient that is used in animal feeds and fish feeds.

18    Fish feed itself is fish that is actually fed to the trout

19    in the stream or the bass in the pond or the catfish in the

20    pond.

21         Q.   So what Rangen does is manufacture, one of its

22    divisions, the aquaculture division, manufactures feed that

23    you throw into the water to feed the trout or the salmon on

24    a fish farm; is that correct?

25         A.   Yes.

1          Q.   And it is in that aquaculture division that you

2     also manufacture mink feed; is that correct?

3          A.   Correct.

4          Q.   Why is the mink feed manufactured in the

5     aquaculture division instead of the general feeds division

6     for terrestrial animals?

7          A.   It is the process that we use to -- we use an

8     extruder to extrude a lot of that mink feed and that is

9     where our mixture is located.

10         THE COURT:  I'm going to have you pull that mike a

11    little closer to you and speak into the mike so that

12    everybody can hear.

13         THE WITNESS:  The extruder is located in the

14    aquaculture facility.  Typically animal feed facilities do

15    not have extruders for their cow feeds or their pig feeds,

16    so it is a more expensive process.

17         Q.   (By Mr. Mercer)  What percentage of business is

18    the mink feed portion of the entire aquaculture division?

19         A.   I don't know the exact percentage, but it is --

20    it would be a small percentage.

21         Q.   Ten percent or so?

22         A.   Maybe, yeah.

23         Q.   Do you know anything about the clean out

24    procedures between the mix of a fish feed in that facility

25    you're telling me about, and the moving over then to the

1    mixing of a mink feed?

2         A.   I know some of the clean out process if it is

3    required.  Again, as I testified earlier, um, it is not

4    always required between the two types of feed because the

5    ingredients are so similar.

6         Q.   Who makes the decision about whether it gets

7    cleaned out or not?

8         A.   That would be between the mill manager and our

9    nutritionist.

10        Q.   You don't have much to do with that?

11        A.   No, they're very competent at what they do.

12        MR. MERCER:  I have no further questions.

13        THE COURT:  Cross-examination.

14                    **DIRECT EXAMINATION**

15   BY MR. MITCHELL:

16        Q.   Mr. Kinyon, where do you live?

17        A.   I live in Buell, Idaho.

18        Q.   Where is Buell located?

19        A.   It is about -- it is in south central Idaho,

20   25 Miles West of Twin Falls in Twin Falls County.

21        Q.   How big a town is Buell?

22        A.   Oh, it is only 4,000 people.

23        Q.   You talked just a little bit about your

24   background at Rangen.  As I recall your testimony, you

25   indicated that you started there in 1997?

1          A.   Yes.

2          Q.   Tell us a little bit -- give us a little bit of a

3     history of Rangen.  How long -- what is it, how long has it

4     been around?

5          A.   Well, Rangen is a family owned business, third

6     generation owners, currently owned by Chris Rangen.  His

7     grandfather started the operation in 1925 so we're at

8     89 years in operation.  They started as a feed and ice

9     company where we supplied ice to a lot of the fish, trout

10    processors in the valley, Magic Valley as it is known there.

11         It has grown into -- in 19 -- approximately 1950 we

12    started the aquaculture division where we started

13    manufacturing some aquaculture feed and it grew from there

14    to 1976 when we added the Rangen Aquaculture Research Center

15    which is the 70 acre parcel that is located along the Snake

16    River where we have spring fed streams to raise trout and to

17    conduct experiments, feeding trials, as well as to help

18    develop some of the feeds that we currently use and

19    manufacture and to work on future diets as well.

20         Q.   What other types of business activities does

21    Rangen have going on?

22         A.   Okay.  Currently we have the aquaculture division

23    as I described, and we also have the general feeds division

24    which is the livestock feed division where we supply a lot

25    of the rolled grains and rolled mixes, mineral pre-mixes,

1    and specialty calf feeds like that to the dairies in the

2    Magic Valley as well as the other animal producers.  We also

3    have a commodities division who deal with the local growers

4    where they receive and process dry edible beans for

5    distribution into the food industry.  And we just -- we also

6    have our own transportation equipment to where we deliver a

7    lot of our fish feeds that we manufacture and most of our

8    animal feeds that we manufacture in the general feeds

9    division.

10        Q.   And what kind of research does Rangen undertake

11   in its research facility?

12        A.   Well, we have done quite a bit of different

13   research over the years.  One of the -- probably the most

14   successful research project that we had is Rangen developed

15   a product that was a stabilized Vitamin C commonly known as

16   Stay-C in conjunction with Kansas State, and it is --

17   currently it is being distributed throughout the world as a

18   very viable Vitamin C source.

19        Q.   I believe that you indicated that as part of your

20   role as the manager of the aquaculture division that you are

21   involved in some of the purchasing that goes on for that

22   division.  Did I understand that correctly?

23        A.   Yes, I oversee the purchasing function as well.

24        Q.   Okay.  Is your involvement in the purchasing

25   function more from the business side of things or more from

1          the nutrition side of things?

2                  A.   It is primarily from the business --

3                  Q.   Okay.

4                  A.   -- side.

5                  Q.   So from your perspective or from the business

6          perspective, what are the things that you're looking at as

7          you're going about and purchasing things like fish meal?

8                  A.   Well, first off for the purchasing processes it

9          is a collaborative effort with our nutritionist and our

10         purchasing agent as well as myself in trying to determine

11         the specifications of the ingredients that are needed as

12         defined by our nutrition people whether it is David Brock in

13         aquaculture, or our other animal feed nutritionist.

14                 So that collaborative effort defines the specification

15         of the ingredients we would like to have and then we put our

16         queries in an attempt to identify suppliers that may have

17         products and invite them to submit their products for review

18         of their specifications to see if they will determine or

19         meet our requirements.  If so, then we'll go into a -- in

20         some cases, we'll go into a quoting process where it is

21         competitive bids between the suppliers of common

22         ingredients.  And in other cases where there are proprietary

23         ingredients, we negotiate with that sole source type of

24         purchase activity.

25                 Q.   And does Rangen use a different process for

1      ingredients that it purchases that it uses to make its own

2      feed as opposed to ingredients that it purchases that are

3      going to be incorporated into feed that it is making for

4      somebody else?

5            A.   No, there is no difference at all.

6            Q.   How long have you been involved in the purchasing

7      process at Rangen?

8            A.   Well, since I started in 1997 so it is going on

9      my 17th year.

10           Q.   Okay.  In that time period, have you ever --

11     prior to this case, have you ever been made aware of any

12     complaints involving histamines coming out of feed that has

13     been made in your aquaculture division?

14           A.   Not at all.

15           Q.   How about with nitrosamines?  Have you ever been

16     made aware of any complaints prior to this case of

17     nitrosamines in feed that has come out of your aquaculture

18     division?

19           A.   None whatsoever.

20           MR. MITCHELL:  That is all I have.  Thank you.

21                          **CROSS-EXAMINATION**

22     BY MR. MINNOCK:

23           Q.   So, Mr. Kinyon, you indicated earlier that you

24     purchased fish meal for Rangen or you're part of that

25     process?

1          A.   Yes, uh-huh (affirmative).

2          Q.   And do you understand what that is preserved

3     with?

4          A.   I know what the industry standard is, it is

5     ethoxyquin.

6          Q.   All right.  And for the materials that you have

7     purchased, have they all been preserved with ethoxyquin?

8          MR. MERCER:  Objection, Your Honor, foundation.

9          THE COURT:  Well, if you know.

10         Q.   (By Mr. Minnock) To your knowledge, have they

11    always been preserved with ethoxyquin?

12         MR. MERCER:  Same objection.

13         THE WITNESS:  Yes.

14         Q.   (By Mr. Minnock)  And ethoxyquin is not a nitrate

15    based product, right?

16         A.   No.

17         MR. MINNOCK:  Okay.  Thank you.

18                    **REDIRECT EXAMINATION**

19    BY MR. MERCER:

20         Q.   Mr. Kinyon, how many times has Rangen been sued

21    in the last say five years?

22         MR. MITCHELL:  Objection, judge.

23         THE COURT:  Sustained.

24         MR. MERCER:  No other questions.

25         MR. MITCHELL:  May this witness be excused, Your

1    Honor?

2         MR. MINNOCK:  No objection.

3         MR. MERCER:  No objection.

4         THE COURT:  No problem.  Thank you, sir.  You may be

5    excused.  Call your next witness.

6         MR. MERCER:  Plaintiffs call David Brock.

7         THE CLERK:  Raise your right hand.

8                        **DAVID LORING BROCK,**

9       called as a witness at the request of the Plaintiff,

10            having been first duly sworn, was examined

11                      and testified as follows:

12         THE WITNESS:  I do.

13         THE CLERK:  Have a seat right over there.

14         MR. MERCER:  Can you state your name and spell it for

15    the record, please.

16         THE WITNESS:  Yes.  It is David Loring, L-O-R-I-N-G,

17    Brock, B-R-O-C-K.

18                      **DIRECT EXAMINATION**

19    BY MR. MERCER:

20         Q.   Good morning, Mr. Brock.  You have worked for

21    Rangen since July of 1990; is that correct?

22         A.   That is.

23         Q.   Over 23 years?

24         A.   Yes.

25         Q.   Do you have a master's degree?

1          A.   Yes.

2          Q.   Your first job at Rangen was quality control

3    technician; is that right?

4          A.   That is correct.

5          Q.   As the quality control technician you monitored

6    incoming ingredients for animal feed?

7          A.   Yes.

8          Q.   After two or three years you became the manager

9    of the quality control program; is that right?

10         A.   Four years.

11         Q.   Four years?

12         A.   No, no it was a year and about four months.  I

13   was a tech before I became the manager.

14         Q.   Okay.  In 2004 or 2005, you became Rangen's

15   aquaculture feed nutritionist?

16         A.   Yes.

17         Q.   Pull that microphone up a little bit.  And what

18   -- and you're still Rangen's aquaculture feed nutritionist?

19         A.   That is correct.

20         Q.   Are you currently the aquaculture nutritionist

21   and quality control manager over aquaculture at the Buell

22   Idaho location of Rangen?

23         A.   Yes.

24         Q.   And you had that position in 2010, both

25   positions?

1          A.   Yes.

2          Q.   Was Joy Kinyon your supervisor in 2010?

3          A.   Yes.

4          Q.   Is mink feed mixed in the aquaculture division at

5     Rangen?

6          A.   Yes.

7          Q.   Did Rangen mix mink feed for National Feeds in

8     2010?

9          A.   Yes.

10         Q.   Did Rangen mix mink lactation crumlets for

11    National Feeds on March 30, 2010?

12         A.   Yes.

13         Q.   In 2010, was it Dre Sanders at National Feeds who

14    provided the lactation crumlets formula for National -- for

15    Rangen to mix that mink feed?

16         A.   Yes.

17         Q.   Was it your responsibility to make sure that the

18    mix list was accurate before it went to the mixer operator?

19         A.   Yes.  Dre provides the formula, I input it into

20    my formulation system, and from there a mix sheet is

21    generated by the foreman at the plant.

22         Q.   Was the mix list accurate?

23         A.   Yes.

24         Q.   Did Rangen mix the lactation crumlets according

25    to National Feeds' formula?

1          A.   Yes.

2          Q.   Did National Feeds give Rangen any quality

3     specifications for the lactation crumlets?

4          A.   No, other than the only spec they provided was

5     that there was to be no whole pellets in the crumlets.

6          Q.   Okay.  Was fish meal the primary ingredient for

7     the National Feeds lactation crumlets manufactured on

8     March 30th, 2010?

9          A.   I have not committed those formulas to memory so

10    I'm not sure of the exact amount of fish meal that went into

11    that formula.

12         Q.   So you have no memory of what the primary

13    ingredient for mink feed would be?

14         A.   Define primary.

15         Q.   The most?

16         A.   No, I would say in many of their formulas fish

17    meal is not the primary ingredient in their formula.

18         Q.   Who supplied the fish meal that was used for the

19    mink lactation crumlets, Rangen or National Feeds?

20         A.   So this was a fish meal that Rangen had in their

21    inventory and National Feeds -- Rangen had this fish meal in

22    their inventory.

23         Q.   So the answer to my question is Rangen?

24         A.   Yes.

25         Q.   Rangen provided the fish meal that went into the

1     March 30, 2010, formula?

2          A.   Yes.

3          Q.   Did National Feeds provide any fish meal to

4     Rangen for mink feed in 2010?

5          A.   No.

6          Q.   In 2010, did Rangen check any of its fish meal

7     for histamine?

8          A.   No, we didn't have --

9          Q.   In 2010 did Rangen check any of its fish meal for

10    nitrites?

11         A.   No.

12         Q.   That is because it wasn't a specification that

13    National Feeds required; is that correct?

14         A.   It was not a specification that National Feeds

15    required nor was it --

16         Q.   I just want you to answer my questions.  Thanks.

17    Did Rangen ship the National Feeds lactation crumlets

18    directly to Kent Griffeth in Preston, Idaho in April

19    of 2010?

20         A.   I can't be sure that I know who shipped it

21    without looking at shipping documents.

22         Q.   Do you know that it was shipped from Rangen to

23    Kent Griffeth?

24         A.   Yeah, I think I have seen that there was a -- I

25    have seen a bill of lading that indicates that it was

1      shipped.

2           Q.   But it didn't go through National Feeds, it went

3      directly from Rangen to Griffeth; is that correct?

4           A.   Typically the way it works is National provides

5      us an order form that indicates how they would like to have

6      the feed delivered.  And so it is at their direction that we

7      -- on how we ship it.

8           Q.   But in answer to my question, you believe that

9      the bill of lading you have seen shows it going directly

10     from Rangen to Griffeth?

11          A.   Yes.

12          Q.   Did Rangen prepare and send the invoice to

13     Griffeth on behalf of National Feeds?

14          A.   No.

15          Q.   Do you know who prepared it?

16          A.   No.

17          Q.   In 2010, was mink feed a large or small part of

18     the feed produced by Rangen?

19          A.   As Mr. Kinyon stated earlier, it is less than 10

20     percent.

21          Q.   In 2010, did you know whether one type of fish

22     meal was better for mink than another type?

23          A.   No.  While I have a basic --

24          Q.   I just want you to answer my questions yes or no.

25          THE COURT:  Let him answer it.

1          Q.    (By Mr. Mercer)   Okay.   Go ahead.

2          A.    Well, I have a basic understand of animal

3    nutrition and understand that animals require clean water, a

4    source of wholesome food and mink are, you know, no

5    exception.   The specific requirements of mink on a

6    nutritional basis like this I'm not that familiar with.

7          Q.    And you didn't know in 2010 either, did you?

8          A.    Can you repeat the question or --

9          Q.    My question, my original question was, in 2010

10   did you know whether one type of mink feed, one time of fish

11   meal was better for mink than another?

12         A.    Usually in those cases I relied on my resources

13   to determine questions like that.   And in a case like that,

14   I would have called Dre Sanders and discussed that with him.

15         Q.    Okay.

16         A.    And so that would have been up to Dre Sanders.

17         Q.    Okay.   So let me try a third time.   In 2010, did

18   you know whether one type of fish meal was better for mink

19   than another?

20         A.    No.

21         Q.    In 2010, did you know anything about mink

22   nutrition?

23         A.    As I have previously stated, I think I have a

24   basic understanding of the nutritional requirements of

25   domestic animals.   But if I would have specific questions on

1        mink nutrition, I would have used my resources or including

2        calling Dre Sanders of National.

3             Q.   In 2010, did you know anything about mink

4        nutrition?

5             A.   Yes.

6             Q.   I'm going to -- do you recall your deposition

7        being taken in this case?

8             A.   Yes.

9             Q.   I'm going to open your deposition and hand it to

10        you and ask you to turn to Page 158 Line 25.  Are you there?

11        Do you see that, Page 158?  Do you recall your deposition

12        being taken on June 30th, 2012?

13             A.   Yes.

14             Q.   I'm going to read a question that was asked and I

15        would like you to read your answer.  Well, let's just take

16        those four, herring, sardine, menhaden, catfish, is there a

17        preference as to which of those would be better for mink

18        feed or are they basically, as you have said earlier, all in

19        the eyes of the nutritionist?  And your answer?

20             A.   No, not understanding mink nutrition at all, I

21        don't understand and recognize how fish meal works in mink

22        and, you know, the basis for its formulation value.

23             Q.   Also turn to Page 192 Line 14.  I'm sorry, 192

24        line 21.  Are you there?  The question asked was, okay, and

25        based on your education and experience, I have heard some of

1    your answers and you mentioned that you referred to Dre

2    Sanders about questions about mink nutrition.  And what I'm

3    taking from you is that you do not consider yourself an

4    expert in mink nutrition, is that accurate?  And your

5    answer?

6         A.   I don't know a thing about mink nutrition.  Am I

7    an expert?  No way.

8         Q.   In 2010, did you know anything about mink

9    nutrition?

10        A.   No.

11        Q.   Did you retain, on behalf of Rangen, samples of

12   the lactation crumlets you mixed for National Feeds on

13   March 30, 2010?

14        A.   Yes, that was standard policy.

15        Q.   Did Rangen test those samples?

16        A.   No.

17        Q.   Did you send those samples to National Feeds?

18        A.   No.  Excuse me, let me -- the standard policy

19   when we made National Feeds was to sample it during the run,

20   and have a run composite sample that was then split into two

21   samples, one of which Rangen kept, and one which we sent off

22   to National.

23        Q.   So did you send those samples to National Feeds?

24        A.   We send a sample of every run of feed to

25   National.

1          Q.   And did you send the March 30, 2010, sample to

2     National Feeds?

3          A.   Yes.

4          MR. MERCER:  No other questions.

5                        **CROSS-EXAMINATION**

6     BY MR. MITCHELL:

7          Q.   Mr. Brock, let's back up just a little bit.  What

8     is your educational background?

9          A.   So I went to Colorado State for my bachelor's and

10    there I studied fish and wildlife science and got my

11    bachelor's in fish and wildlife science.  Subsequent to

12    that -- with an emphasis on aquaculture.  Subsequent to

13    that, I went to the University of Washington for several

14    semesters where there was some renowned fish nutritionists

15    and studied fish nutrition, aquaculture, and also feed

16    manufacturing.

17         Subsequent to that, I was accepted into a master's

18    program as Mississippi State and pursued a master's there

19    under a fish nutritionist.  While there, I also studied fish

20    nutrition and aquaculture as well as wildlife.  And

21    eventually during that process I wrote a thesis, did

22    research, collected data, analyzed the data and wrote a

23    thesis which I defended at the end of my master's process

24    and I achieved a master's of science there in what was

25    called wildlife science.

1          Q.   Did your master's degree have any particular

2     emphasis?

3          A.   Yes, definitely, aquaculture nutrition.

4          Q.   And what was the process, you touched on it a

5     little bit, but can you flesh out a little bit the process

6     that you went through to get your master's degree?

7          A.   So I had been interested in nutrition and

8     aquaculture nutrition after my bachelor's and so I was

9     accepted in -- to get my master's degree, I was accepted

10    into the program at Mississippi State that paid me a small

11    stipend and so while at Mississippi State I took courses in

12    aquaculture nutrition, in aquaculture, um, we did research

13    projects down -- they had a research farm and so we would do

14    nutrition projects, I would participate in those down on the

15    farm at Mississippi State.  And meanwhile, I was also doing

16    research on striped bass larval nutrition and that is what

17    my thesis was on.

18         Q.   Now you -- you were just talking about your

19    knowledge of mink nutrition or your lack of knowledge

20    regarding mink nutrition.  Is the formula that Rangen used

21    to make the feed in this case something that you put

22    together?

23         A.   No.

24         Q.   Whose formula is it?

25         A.   I received that formula from National, Dre

1      Sanders specifically.

2           Q.   And even though you don't have a background or

3      expertise, shall we say, in mink nutrition, do you still

4      utilize your education and training and experience when

5      those formulas come in?

6           A.   Most definitely.  I understand the ingredients

7      that we have in-house well.  I review the formula, you know,

8      to make sure that it will manufacture correctly and produce

9      the desired feed.  And then if in looking over the formula I

10     see any issues, I will typically get on the phone to Dre

11     Sanders and discuss those with him.

12          Q.   And who is Dre Sanders?

13          A.   Dre Sanders is the nutritionist for National.

14          Q.   Is Dre the one that develops the formulas that he

15     sends over?

16          A.   Honestly I'm not sure how Dre goes about

17     developing the mink formulas.

18          Q.   Okay.  Now, as of March 30th, 2010, how long had

19     you been working for Rangen?

20          A.   20 years.

21          Q.   And in those 20 years, had Rangen ever received a

22     complaint about histamines in feed that it made?

23          A.   No.

24          Q.   In those 20 years had Rangen ever received a

25     complaint about nitrosamines in the feed that it made?

1          A.   No.

2          Q.   You mentioned when you were being examined by

3     counsel that your first position with Rangen was as a

4     quality control technician.  Did I understand that

5     correctly?

6          A.   Yes.

7          Q.   What is that position within Rangen?

8          A.   So what a quality control technician does in the

9     aquaculture feeds division at Rangen is first of all inspect

10    ingredients coming in.  When a load of ingredients comes in,

11    um, the fellow unloading it and a quality control technician

12    will get up and whether it is a railcar or a truckload or a

13    bag load, inspect the ingredients.  They will pull some

14    samples, look for anomalies, things that are not consistent

15    in the ingredients.  They'll smell it, they'll probe it and

16    take moistures to make sure that the moisture content is

17    within our specifications.  And then from there, then the

18    quality control technicians also involved in monitoring feed

19    production, making sure that the feed they produced meets

20    the specifications for that diet and collecting data and

21    that kind of thing.

22         Q.   Okay.  And how long were you a quality control

23    technician?

24         A.   About a year and four months.

25         Q.   And what position did you assume at that point?

1          A.   So after that I was the director of quality

2     control.

3          Q.   So you were promoted to the position of director

4     of quality control?

5          A.   Yes.

6          Q.   And what are your responsibilities as the

7     director of quality control?

8          A.   So as the director it was -- well, I did spend

9     time in the mill, it was a little bit more involved with

10    managing the quality technicians.  I would -- I would work

11    with them on training of mill employees, I would work with

12    them on developing specifications, and I would work with the

13    manufacturing people on developing specifications, and then

14    I would work with the buyer on ingredients and

15    specifications for the ingredients.

16         Q.   Okay.  Do you still hold that position today?

17         A.   Yes.

18         Q.   Okay.  Do you hold any other positions at Rangen?

19         A.   So yes, as the head nutritionist with the

20    aquaculture division.

21         Q.   And how long have you held that position?

22         A.   20 years, since 1994.

23         Q.   What do you do as the nutritionist in the

24    aquaculture division for Rangen?

25         A.   So as nutritionist, again I work with the

1    manufacturing people to help them understand some of the

2    ingredient issues, concerns to be on the lookout for.  I

3    work with, again, the QA technicians on specifications.  I

4    work with the purchasing agent and the division manager on

5    purchasing ingredients and developing specifications for

6    those ingredients.  I also work with the research group out

7    at the hatchery doing research on different fish diets, on

8    different ingredients, and then also attend some meetings

9    to, you know, continue to work with -- I work with some

10   university individuals, researchers on fish diets and

11   nutrition.

12       Q.   Okay.  Now, let's turn to the relationship

13   between Rangen and National.  And as I understand it, there

14   are a number of types of feed that Rangen makes for

15   National?

16       A.   That is correct.  We make -- so National has

17   formulas for the various life stages of mink.  They have

18   feed for reproduction, lactation, early growth, growth,

19   furring and maintenance.  And so we make formulas, I

20   believe, for all of those stages.

21       Q.   And how is the manufacturing process for National

22   initiated with Rangen?

23       A.   So what happens usually is that we get an order

24   from -- an e-mail from one of the National secretaries that

25   is a spreadsheet that details the type of diet that they

1    want, the number of pounds, how it is to be shipped, and

2    again the name of the product and the form of the product.

3    There is kibbles which are made in an extruder, and then

4    there is crumlets that are made on a pellet mill.

5         Q.   Okay.

6         A.   And so from there, what will happen --

7         Q.   Hold on a second, would you.  I would like to --

8         A.   Okay.

9         Q.   You mentioned that you receive the order on a

10   spreadsheet.  Would you take a look at Exhibit Number 37 for

11   me in your notebook there.  I'm going to take a big risk and

12   shift this cart around and move the screen so people can

13   see.

14        MR. MINNOCK:  Say when.

15        Q.   (By Mr. Minnock)  Hopefully people can see.  Is

16   Exhibit Number 37 the type of spreadsheet that you were

17   referring to?

18        A.   Yes.

19        Q.   And is it typical to receive spreadsheets like

20   this with a number of names on it, we see Kent Griffeth, I

21   can't read this one here, maybe it shows up better in that

22   copy there, Scott Harris, Glen Alder?

23        A.   Yes.  So we would typically receive -- that was a

24   -- that would be an ongoing spreadsheet for the orders that

25   are in and the last order placed would typically be on the

1      bottom of it.

2          Q.   Okay.  So as we're looking at the spreadsheet

3      here, walk me through each of these categories of

4      information that we can see on here?

5          A.   So the first order we have is from Kent Griffeth.

6      It details his contact information under his name, next is

7      the name of the diet that he has ordered.

8          Q.   Is that lactation crumlets?

9          A.   Yes.

10         Q.   Okay.

11         A.   The next column is the type of processing used to

12     make that feed and it says steam.

13         Q.   What does that mean?

14         A.   That is the manufacturing process used to make it

15     called steam pelleting.

16         Q.   Are there different types of manufacturing

17     processes that might be used?

18         A.   Yes.  Like I mentioned, some of the National

19     Feeds is also a kibble which is run on a different piece of

20     equipment that makes a product that would look like a dog

21     food, a piece of dog food would be a kibble, it would be a

22     floating, where this would be a steam pelleted and

23     compaction pelleted it would be a sinking pellet.

24         Q.   Okay.  And then what is the next category of

25     information that we have here, 20,000 bags?

1         A.    Yes.  So the header on the 20,000 above that says

2    pounds.  And so that is the column that tells us how many

3    pounds and then the form of the -- how they want it

4    packaged.  Occasionally, we will package some of their

5    product in tote bags, this was a 50-pound paper bags.

6         Q.    Okay.  And then what is the next piece of

7    information that we see on this order sheet?

8         A.    So the next piece of information is the order

9    date that it was ordered, and then the next column it is the

10   date they would like to have it delivered.

11        Q.    And was the feed ready to be delivered on

12   April 5th of 2010?

13        A.    You know --

14        Q.    Let me ask it this way.  What date was the feed

15   manufactured?

16        A.    You know, I would have to look at the run report

17   to see the specific date.

18        Q.    Would it show on the mix sheet?

19        A.    Yes.

20        Q.    Okay.  We'll look at that in a little bit here.

21   And then what is the designation for the deliver pick up?

22        A.    So that was usually how they -- if we were to

23   arrange the freight or if the customer would pick it up, so

24   that is usually the information that was detailed there.

25        Q.    Okay.  And in looking at this spreadsheet were

1     there other orders that were made the same day as the

2     Griffeth order?

3          A.   So on this order sheet there is Kent Griffeth

4     order, Keith Jonsson order, and Scott Harris order.

5          Q.   So is the Keith Jonsson the second one that

6     doesn't come through on my copy?

7          A.   Yes.

8          Q.   Okay.  So we have got the -- we have gotten to

9     the point where this order comes in from National, what is

10    the next step in the process that you folks go through in

11    making feed for National?

12         A.   So what I would do when this order came in is

13    check and see what the product is that they wanted.  And

14    um -- and once I identify that, I would look to make sure

15    that I had a formula for that product.  And if not, I would

16    contact Dre and say Dre hey, you know, so and so just

17    ordered and I need a formula for whatever he has ordered.

18    And Dre would then work that up and e-mail it over to me.

19    Um, after that, we would look to make sure that we had

20    adequate stocks of ingredients to make that formula, and

21    then production would begin to work it into the production

22    schedule.

23         Q.   Who supplies the ingredients that are used to

24    make -- that Rangen uses to make the feed for National?

25         A.   So some of the ingredients are supplied by Rangen

1     and those would be the standard ingredients that we would

2     have in stock already for making our aquaculture feeds, and

3     then National would provide the other ingredients.

4          Q.   Okay.  What do you mean the other ingredients, do

5     you mean the ones that Rangen doesn't stock?

6          A.   Correct.

7          Q.   Okay.  And how does Rangen distinguish between

8     the ingredients that it uses to make its own feed, and the

9     ingredients that it supplies to make feed for other

10    companies?

11         A.   It is identical.  The ingredients we would use to

12    make National Feeds are identical to the same ones we would

13    use to make our fish needs.

14         Q.   Okay.  What steps does Rangen take to make sure

15    that the ingredients that it supplies both to its own feed

16    and to the feed that it makes for others are quality

17    ingredients?

18         A.   So that starts with identifying our suppliers and

19    making sure that we're using suppliers that are -- are good

20    suppliers and that are legitimate businesses.  From there

21    what we would do is we would identify ingredients that that

22    supplier has that we're interested in, we would receive

23    information on their ingredients specifically, and the

24    purchasing agent would typically do a lot of this.  And then

25    once she received those specifications on the ingredients,

1    she would pass them onto me.  I would look them over and

2    make sure that they were consistent with ingredients we were

3    looking for, and I might request a sample if I wanted to see

4    kind of what that ingredient looked like.  And then from

5    there, I would -- once those -- if we did end up purchasing

6    an ingredient from that supplier, when it came in we would

7    do, you know, a thorough sampling of it and send it out for

8    analysis to make sure that that ingredient met the

9    specifications and appeared like it should.

10        Q.   Once you go through that process of vetting a new

11   supplier, is that the point where Rangen stops testing the

12   ingredients that come in?

13        A.   No.  We have an ingredient analytical matrix that

14   we use to make sure that we continue to analyze ingredients

15   from all suppliers consistently to make sure that they're

16   meeting the Rangen specifications.

17        Q.   Now, are you aware of any industry standards that

18   require a feed manufacturer to test fish meal for

19   histamines?

20        A.   No.

21        Q.   And are there any industry standards that require

22   a feed manufacturer to test fish meal for nitrosamines?

23        A.   No.

24        Q.   How about finished feed?  Is there any standard

25   that requires a feed manufacturer to test finished feed for

1      histamines?

2          A.   No.

3          Q.   And how about nitrosamines?

4          A.   No.

5          Q.   Okay.  So in the -- after the testing -- moving

6      on from the testing process, is that where the quality

7      control for Rangen stops?

8          A.   So from beyond the testing of the ingredients?

9          Q.   Is there anything that Rangen does for purposes

10     of quality control beyond just simply testing some of the

11     ingredients?

12         A.   No.  I mean our quality control program then

13     continues on into the manufacturing process.  We educate and

14     emphasize to our employees that they need to observe

15     ingredients as they're being unloaded, that they -- when

16     they're put into the grinding system they are observed and

17     when they're being manufactured there is often a foreman

18     there and a QA tech to observe the manufacturing process to

19     make sure that the product that is coming out of the end of

20     that manufacturing process and going into the bag is

21     consistent with the specifications.

22         Q.   How does Rangen typically receive the fish meal

23     that it buys?

24         A.   I would say that most of our fish meal comes in

25     by rail, some by truck.

1        Q.   So for the stuff that comes in by rail, is there

2   a process that Rangen uses that lets it visually inspect

3   almost the entirety of a load of fish meal?

4        A.   So like I have mentioned, initially we have guys,

5   people up on top of the car probing it with long sampling

6   probes to get down off of the top of the car into the middle

7   of it looking for any issues.  And then we're unique in that

8   at the Buell Feed Mill in that we unload into boxes.  So

9   every load of ingredient is unloaded into one ton metal

10  boxes and that gives us an opportunity, with the guy that is

11  unloading, to observe all of the meal coming off, all of the

12  ingredient coming off of the truck or railcar.

13       Q.   Okay.  Were those same steps followed from the

14  start of the testing process through the process you just

15  described for the ingredients that were used to make the

16  plaintiffs' feed in this case?

17       A.   Yes.

18       Q.   The specific form of feed that Rangen made for

19  the plaintiffs in this case is called a crumlet.  What is a

20  crumlet?

21       A.   So a crumlet is a feed that is produced on a

22  compaction or a steam pellet mill.  It starts off going

23  through the die and coming out as a pellet and then we cool

24  that pellet and then run it through a crumbler.  And the

25  crumbler is like two very large rolling pins that are seated

1      right next to each other and depending on how close you put

2      those rolling pins together we crack that crumble and make

3      what is called a crumlet.

4              Q.   And once it goes through that rolling process,

5      what is the consistency of the feed?

6              A.   So it would be like course bread crumbs or Panko

7      bread crumbs or something like that.

8              Q.   And does Rangen --

9              THE COURT:   Now might be a good time to give these

10     folks a chance to go get something to eat.

11             MR. MITCHELL:   Perfect.   We'll let you have your lunch

12     or breakfast.   And remember what I told you.   Come on back

13     at 20 minutes after one and we'll get started right at 1:30.

14     Appreciate your help.   You may be excused.

15             THE CLERK:   Please stand for the jury.

16             (Whereupon, the jury left the courtroom.)

17             THE COURT:   Tell me how you're doing on your

18     witnesses?

19             MR. HANCEY:   Well, Your Honor, this is David Brock so

20     as soon as he is done, we're going to move on to our

21     economist Dr. Roberts.   And I just want to -- I want to put

22     on the record that we're going out of order than how we

23     would prefer to put our witnesses on because National people

24     are not available.   We would prefer to finish with

25     Dr. Roberts, but they're not here until tomorrow so we're

1    going to proceed with Dr. Roberts, the economist, and then

2    we will have no more witnesses.

3         THE COURT:  Okay.

4         MR. MINNOCK:  Mr. Buscher and Dre Sanders have

5    confirmed though will both -- Dre Sanders and Ed Buscher,

6    the witnesses they want, will be here promptly at 9:30

7    tomorrow morning.

8         THE COURT:  Tomorrow.  Okay.  And following them, what

9    have you got lined up.

10        MR. MITCHELL:  We'll likely have Dr. Wustenberg for

11   Rangen and probably Mr. Hoffman for National.

12        MR. MINNOCK:  Yeah, we're going to talk at lunch about

13   which witnesses we intend to call and we'll have a better

14   idea.

15        THE COURT:  Okay.  1:30.

16        MR. MITCHELL:  Thanks.

17        THE COURT:  Thank you.

18             (Recess was taken at 12:09 p.m.)

19                  (1:30 p.m.)

20        THE COURT:  Let me just be clear on your proposed

21   witnesses, counselor.  As I understand it, you're interested

22   after this witness in dealing with two additional so-called

23   adverse witnesses.

24        MR. HANCEY:  Yes.

25        THE COURT:  And they're set to come in here tomorrow

1        at 9:30.

2              MR. MINNOCK:  At 9:30 they'll be here.

3              THE COURT:  Do you contemplate them being very long?

4              MR. HANCEY:  No, Your Honor.

5              THE COURT:  Brief.  Are they National or are they

6        Rangen?

7              MR. HANCEY:  They are two National Feeds witnesses.

8              THE COURT:  Okay.  And you have got your -- you have

9        got your economics professor.

10             MR. HANCEY:  He is going to follow Mr. Brock.

11             THE COURT:  Well yes, I was thinking you were

12       lamenting the fact that you were changed in order and wanted

13       to bring on the other two before you brought the good doctor

14       on.

15             MR. HANCEY:  Well, that is our preferred order of

16       witnesses, it is not possible, and we're going to proceed

17       the other way.

18             THE COURT:  Okay.  Now theoretically, you will be

19       through after the good doctor absent possible rebuttal of

20       some kind?

21             MR. HANCEY:  We'll be through after the two National

22       witnesses.

23             THE COURT:  But if the order is as you preferred,

24       after the doctor?

25             MR. HANCEY:  Yes, correct.

1          THE COURT:  Okay.  Now, is the doctor long-winded or

2     is he short?

3          MR. HANCEY:  That is a great question.  I think that

4     the direct examination of Dr. Roberts will be -- it is hard

5     to predict, but I would say about an hour.

6          THE COURT:  Okay.  Now, how are you fellows doing on

7     your instruction requests?

8          MR. HANCEY:  I think that we actually got that

9     resolved.  I know that Allison put in a lot of time to clean

10    up the titles and also put citations at the bottom of each

11    one so we have a new set.  Has it been filed yet?

12         MR. MINNOCK:  This has not been e-filed.  I asked them

13    not to e-file it until it met as to your approval as to how

14    you want your format.  I haven't looked through these, they

15    just came this morning.  But my understanding is that

16    Ms. Fletcher is overseeing that.

17         THE COURT:  Well, now, two short witnesses plus the

18    good doctor, okay.

19         MR. HANCEY:  Correct.

20         THE COURT:  Now tell me who you have got?

21         MR. MINNOCK:  Right now we anticipate calling

22    Dr. William Wustenberg, who is a viability expert.  We also

23    have plans to call two -- we have on our witness list two

24    toxicologists and two accounting experts.

25         THE COURT:  Okay.

1          MR. MINNOCK:  Now depending upon how the testimony

2     goes, we may shorten those witnesses or eliminate them.

3          THE COURT:  Well, I'm just trying to figure out

4     timing.

5          MR. MINNOCK:  We anticipate all witnesses being done

6     with the exception Patricia Talcot can't be here -- one

7     witness can't get here until Tuesday morning.  But other

8     than that, we anticipate completing all evidence by Friday

9     afternoon.

10          THE COURT:  Uh-huh (affirmative).

11          MR. MITCHELL:  She can't be here until Tuesday

12     morning.

13          THE COURT:  Well, I thought of this as a possibility,

14     and because of the lamentations concerning order, if we let

15     you finish up with him today depends, and you wanted to

16     proceed as you had originally planned, that we could let

17     these folks go home a little early today and let you proceed

18     tomorrow and that would give you a chance, for whatever

19     reason, of examining your own requests and give me a chance

20     also and my staff and plow ahead and ostensibly get

21     everything done by way of evidence Friday and spill over

22     briefly Tuesday morning.  If we're then in a position to

23     move ahead, we could maybe deal with instruction conferences

24     Tuesday afternoon and let you argue Wednesday.  But that is

25     just thinking about it.  But I didn't want to do that if it

1    is your preference to go ahead today with the good doctor.

2         MR. HANCEY:  I'm sorry, just give me one minute with

3    my colleague.  Your Honor, we're inclined to go forward with

4    Dr. Roberts as per our plan B if everybody is in agreement

5    with that.

6         THE COURT:  So you will bring him on this afternoon?

7         MR. HANCEY:  Immediately following this witness.

8         THE COURT:  Oh, that is fine.  That is fine.  I just

9    wanted to be helpful.

10        MR. MERCER:  We appreciate that very much, Your Honor.

11        MR. HANCEY:  Thank you, yes.

12        THE COURT:  Okay.  Let's bring the jury in.

13        MR. MINNOCK:  Your Honor, I have additional copies if

14   you would like.  They brought me like 10.

15        THE COURT:  I'm sorry?

16        MR. MINNOCK:  I have additional copies of these

17   instructions requests if you would like.

18        THE COURT:  The fewer the better.

19        MR. MINNOCK:  They brought me 10.  I don't know why,

20   but they did.

21        THE CLERK:  Please stand for the jury.

22        (Whereupon, the jury returned to the courtroom.)

23        THE COURT:  Again, thanks, folks, sit down and relax.

24   And it looks like everybody is here.  The record will so

25   show the jury is present, the counsel, and parties.

1          And counselor, you may proceed.

2          MR. MITCHELL:  Thank you, Your Honor.

3          Q.   (By Mr. Mitchell) Mr. Brock, right before we

4     broke for lunch, we had just finished talking about what a

5     crumlet is.  Do you recall that?

6          A.   Yes.

7          Q.   Okay.  Does Rangen make a crumlet itself for its

8     own label?

9          A.   We make something that we call a crumble which is

10    manufactured in a similar way but sized slightly

11    differently.

12         Q.   And what is the difference in process between a

13    crumble and a crumlet?

14         A.   They're exactly the same except that we,

15    subsequent to crumbling it, we run it over a series of, the

16    Rangen product, over a series of screens to further define

17    the size.  We have crumbles sized from number zero up

18    through number four.

19         Q.   Kind of like sifting the crumble down to a

20    certain size?

21         A.   Correct.

22         Q.   Okay.  What is the process that Rangen goes

23    through to make crumlets and crumbles up to that point?

24         A.   So up until that point what we would do is the

25    foreman would produce a mix sheet and give it to the mixer

1    man.

2         Q.   How does he produce a mix sheet?

3         A.   So the process there would be that I would see on

4    the schedule for a specific day that they are needing a mix

5    sheet for a certain product and the certain number of pounds

6    and I would send that off my formulation system to a system

7    that they can produce a mix sheet like this (indicating).

8         Q.   Okay.  Would you take a look at Exhibit 36 in

9    your book, please.  Are you there?

10        A.   Yes.

11        Q.   Okay.  What is Exhibit 36?

12        A.   So Exhibit 36 is a mix sheet for mink lactation

13   crumlets.

14        Q.   Is it for the lactation crumlets in this case?

15        A.   Yes.

16        Q.   So as we look at Exhibit 36, what is the

17   information that we see up here in the header?

18        A.   So at the top would be information on the name of

19   the diet, oh some numbers associated with what we call the

20   work order.  When a mix sheet is produced it also goes along

21   with a work order to account for putting the product back

22   into inventory, that kind of thing, and relieving the

23   ingredients.

24        Q.   What do you mean when you say relieving the

25   ingredients?

1          A.   So in order to keep track of the amount of

2     ingredients we have on site, you know when ingredients come

3     in we put them into inventory and so if a, you know, a

4     truckload of fish meal comes in, we put in 50,000 pounds

5     into inventory and in order to track inventory, we need to

6     take that out of inventory when we use it.

7          Q.   Okay.

8          A.   A certain amount.

9          Q.   So as we move down below the header here to the

10    body of the mix sheet, walk us through line-by-line what it

11    is, the information that we're looking at here?

12         A.   Okay.  So this is the list of the ingredients at

13    the top that we would kind of call the major ingredients.

14         Q.   Is that what shows up here underneath the

15    description category?

16         A.   Yes.  So that describes the name of the

17    ingredient and then to the right of that is the batch

18    quantity of the ingredient, that is how much we put in the

19    mix, and then to the right of that is what we call the

20    cumulative quantity.

21         Q.   And what is the cumulative quantity?

22         A.   So when we do our major ingredients they go --

23    they are dropped from ingredient bins into a large hopper

24    that sits above the mixer.  And this large hopper would be

25    like a large mixing bowl but it is on load cells or scales.

1      And so that it can accumulate major ingredients in that.  So

2      if we added 100 pounds of fish meal and then 100 pounds of

3      corn, that cumulative number out to the right would be 200

4      after the corn.

5          Q.   And then I see out here at the far column some

6      checks and Xs.  What are those?

7          A.   So those represent when a mixer man puts that

8      ingredient into the mix, he will -- he will mark that, that

9      it was added, that ingredient.

10         Q.   Why are there five columns on this first page of

11     the mix sheet?

12         A.   So that means that we made five mixes.

13         Q.   On this side.  And then there is two pages to

14     this particular mix sheet, correct?

15         A.   Right.  And so there was another three mixes made

16     on the second mix sheet.

17         Q.   That is why we're seeing the three columns of Xs

18     here?

19         A.   Yes.

20         Q.   Okay.  And now you talked about the major

21     ingredients being kind of in this upper category here

22     (indicating) looks -- it is the --

23         A.   Actually the top five.

24         Q.   Top five?

25         A.   -- are what we consider majors.

1          Q.   And what is a major ingredient for Rangen?

2          A.   So that would be fish meal, corn, poultry meal,

3     blood meal.

4          Q.   What causes Rangen to classify a particular

5     ingredient as a major ingredient versus a minor ingredient?

6          A.   The amount that is added to the mix, and if it is

7     typically added in through the bin system or if it is

8     scooped in, we usually consider that more of a minor

9     ingredient.

10         Q.   Okay.  So is that the second grouping of

11    ingredients that we see on the mix sheet?

12         A.   Second and third.

13         Q.   Second and third both, okay.  And who supplies

14    the major ingredients?

15         A.   So the first one is the sardine meal and that

16    would be a Rangen supplied.

17         Q.   Okay.

18         A.   So the second ingredient is blood meal and that

19    would be Rangen supplied.  The third ingredient is corn and

20    that would be Rangen supplied.  And the fourth ingredient is

21    menhaden fish meal and that would be Rangen supplied.  And

22    the fifth ingredient would be beet shreds and that is Rangen

23    supplied.

24         Q.   So at least on this mix sheet Rangen supplied all

25    of the major ingredients?

1           A.   Yes, that is correct.

2           Q.   Did Rangen supply any of the minor ingredients?

3           A.   So if you will remember the first ingredient was

4      the Vitamin C that Rangen developed, so that is -- that is a

5      Rangen ingredient.

6           Q.   That is the Stay-C here on number six?

7           A.   Right.

8           Q.   That is S-T-A-Y hyphen C?

9           A.   Yup.  Rangen would provide the biotin.

10          Q.   What is biotin?

11          A.   That is a vitamin pre-mix.

12          Q.   Okay.

13          A.   Supplies a vitamin called biotin.

14          Q.   How about the next items on the list?

15          A.   So the next -- the next three are supplied by

16     National.

17          Q.   What are those three?

18          A.   So there is vitamin -- or there is the first one

19     is called 4X mineral that is a mineral premix.  The next one

20     is 500 mineral supplied by National, and then the next one

21     is a vitamin and mineral combination provided -- supplied by

22     National.

23          Q.   Who supplies the skim milk and the dried egg?

24          A.   National.

25          Q.   Okay.  And what about the last grouping of the

1    minor ingredients?

2         A.   All right, so that would again be the first one

3    is National.

4         Q.   What is the first one?

5         A.   Premix, it looks like 95785, it is a National

6    ingredient.

7         Q.   Okay.  And how about the second one?

8         A.   The second one is a binder that helps kind of

9    glue it all together and that is provided by Rangen.

10        Q.   Okay.

11        A.   And the third one is salt, and that is -- that is

12   provided by Rangen.  The fourth one is liver meal and that

13   is provided by National.

14        Q.   Okay.  And it looks like there is some poultry

15   fat and poultry spray added later on?

16        A.   Correct.

17        Q.   And who supplies those?

18        A.   Rangen.

19        Q.   So once this mix sheet is generated, who does it

20   go to?

21        A.   So the foreman will generate it and he will take

22   it down to the mixer man.

23        Q.   How is it generated?

24        A.   It comes off my formulation system into another

25   -- AD or JD Edwards Software System that converts it into

1    this format.

2        Q.   Okay.  And so the -- it gets generated and then

3    taken where?

4        A.   Down to the mix -- the mixer man in the mixing

5    room.

6        Q.   And what does the mixer man do with the mix

7    sheet?

8        A.   So the mixer man -- the first thing he would do

9    is probably look down the mix sheet and see what ingredients

10   he needs to go get in the various warehouses that Rangen has

11   in order to make this mix.  And so he and maybe some helpers

12   or the foreman would go accumulate those ingredients in

13   front of the mixer that weren't majors and that weren't

14   already there.

15       Q.   So he is going to look for any minor ingredients

16   that he needs to gather to put into the mix?

17       A.   Correct.

18       Q.   What -- describe that process for me?

19       A.   So the -- all of the mink ingredients are stored

20   in a certain place in an individual warehouse, and so he

21   would go over there and look down through here and say, you

22   know, which of the National provided ingredients do I need

23   to get over there, and then he would go get them and bring

24   them back.

25       Q.   And what about the Rangen supplied ingredients?

1          A.   Again, depending on if those were right by the

2     mixer, he would -- nothing would have to happen there but

3     some of them he might have to go, you know, go get.

4          Q.   Does he measure the quantity of the ingredients

5     that he is gathering?

6          A.   Usually he will estimate how many he needs for

7     the mixes he is making in that day, and then go get, if

8     they're in 50-pound bags, he'll make sure that he gets that

9     amount or more.

10         Q.   Okay.  And so once he gathers all of the

11    ingredients together, does he move them kind of to a central

12    location then?

13         A.   Right.  So they're accumulated right in front of

14    the mixer, and other ingredients are moved out of the way so

15    it is only the mink ingredients, you know, in there when he

16    is making the mixes.

17         Q.   And when he has all of the ingredients assembled

18    for the batches that he is going to be doing, what is the

19    next step in the process?

20         A.   So the next step would be to start dropping the

21    -- he would drop the majors.

22         Q.   How does that process work?

23         A.   So again, like on the sardine, he would add 1,330

24    pounds into that accumulator container on top of the mixer.

25         Q.   How does he add those 1,330 pounds?

1          A.   So that is a computer-controlled, you know,

2     mixing system in that he would type in how many pounds of

3     that ingredient he wanted and he would push a button to

4     release it from the bin and it would start accumulating.

5     And once it hit 1,330, it would shut it off.

6          Q.   Okay.  And does he go through that same process

7     with all of the major ingredients then?

8          A.   That is correct.

9          Q.   And then how are -- how does he handle the minor

10    ingredients?

11         A.   So then out in front of the mixer he would begin

12    weighing those up individually just using a scoop and a

13    scale.

14         Q.   Okay.  And once those are measured out, what

15    happens to the -- what is the next step in the process?

16         A.   So those go into a micro-hopper that on the side

17    of the mixer which eventually would convey them up into the

18    mixer.  And once those are all accumulated there in the

19    micro-hopper, he would begin dropping the major ingredients

20    into the mixer.

21         Q.   How does he do that?

22         A.   Basically he tells that bowl up on top of the

23    mixer to open up and start discharging into the -- into the

24    mixer.

25         Q.   How does the bowl above the mixer know what to

1    do?

2         A.   So at least initially I mean there is -- there is

3    a -- I believe there is a button that he has to push to tell

4    the -- to tell it that he is ready to go and then it -- the

5    computer takes over from there.

6         Q.   Okay.  And what kinds of things does the computer

7    control?

8         A.   It controls how long the mix is mixed and then

9    some liquid additions.

10        Q.   How about does it control when ingredients are

11   added?

12        A.   Yes.  So what happens is he cannot start adding

13   the micro ingredients until a certain amount of the major

14   ingredients have been added to ensure that, you know, they

15   end up in the mash and get mixed up well.

16        Q.   And so once -- you just referred to a mash.  What

17   is the mash?

18        A.   So mash refers to what we're building here.  So

19   once we're done mixing all of these things together, it

20   would kind of be like once you have completed mixing a cake,

21   everything is mixed together, and then we're ready to send

22   it off to, in our case, the mill or put it in the oven.

23        Q.   Okay.  And what is -- how does it get from the --

24   the mixer to the mill?

25        A.   So once everything is mixed up in the mixer, then

1    the mixer man opens the discharge port and begins to go out

2    through a series of conveyors and augers up into a bin that

3    sits above the mill.

4        Q.   Before we leave the mixer, does Rangen do

5    anything to make sure that it achieves a thorough mix of the

6    feed that it prepares?

7        A.   Yes.  So we have what we call a mixer test that

8    we perform twice a year to ensure that the ingredients that

9    we are adding to the mix get mixed up well.  And what that

10   involves is we take a standard mix and we add some salt to

11   it, just like we were adding one of these micro ingredients,

12   and let it mix the computer controlled amount of time and

13   then we sample it ten times as that mix is leaving the

14   mixer.

15       We take those samples down to our research facility,

16   our lab at our research facility, and those are analyzed for

17   salt, and then we come up with what is called a coefficient

18   of variation to see what concentration they -- that varies

19   and that tells us how well it is mixing.

20       Q.   And what is the -- you called it a coefficient of

21   variation?

22       A.   Yes.

23       Q.   Yes?

24       A.   Yes.

25       Q.   What is a coefficient of variation?

1          A.   That tells you how much each of these -- so if

2     you have ten numbers, we have ten salt analysis that we did,

3     the coefficient of variation tells you how much variability

4     there is in those numbers.

5          Q.   And is there a target within the feed industry

6     for that coefficient?

7          A.   It is 10 percent or less.

8          Q.   Okay.  And did Rangen go through those -- that

9     testing process for its mixer in 2010?

10          A.   Yes, it did.

11          Q.   Do you recall what the results were for those

12     tests?

13          A.   I think they were ones and twos.

14          Q.   Okay.  And when you say ones and twos, is that

15     one percent to two percent?

16          A.   One percent, two percent, yup.

17          Q.   Okay.  So we are moving from the mixer through

18     the conveyor system up into a bin that sits above the pellet

19     mill, I think that is where we left our story.  Now when it

20     is -- how does it get from the bin above the pellet mill

21     down into the pellet mill itself?

22          A.   So it is a gravity fed bin designed to feed a

23     pellet mill and so it feeds gravity-wise into an auger that

24     then feeds what we call a pre-conditioner before the pellet

25     mill and the pre-conditioner injects steam into the mash to

1      heat it and then from there it enters the pellet mill.

2          Q.   What does the pellet mill do?

3          A.   So the pellet mill -- this mash that has been

4      steam injected now is very hot.  And what we have on the

5      pellet mill is a die that the die is about two and a half

6      feet high and it is open in the middle and imagine this die

7      having an edge on it that has a whole bunch of holes in it.

8          And what happens is when it is set up on a pellet

9      mill, the mash comes in the front of the die and there are

10     rollers that contact the mash and push it through the holes

11     basically.

12         Q.   And once the mash gets pushed into those holes,

13     what happens to the mash?

14         A.   So then it gets -- it experiences a lot of

15     pressure there and a lot of compaction and it compacts the

16     mash into a pellet.  The starch is, because it has been

17     semi-cooked, is now sticky and it kind of holds that

18     everything else together in the pellet and you come out with

19     a pellet, you know, maybe about the size of a diameter of a

20     pencil or something like that.

21         Q.   Okay.  And once it goes through that process,

22     where do the pellets go?

23         A.   Okay.  Then they go up into a cooler and the

24     cooler is designed to hold onto those pellets, they're kind

25     of hot, they have got some moisture coming off of them, and

1     they need to reside in the cooler for about 20 minutes where

2     we're pulling just ambient air through the feed and cooling

3     it off, and that kind of sets the pellets up to be kind of

4     hard.

5          Q.   Once they get cooled down to -- once they get

6     cooled down, where do they go then?

7          A.   So if we're going to make a crumlet, then that is

8     when they get crunched up at the bottom of the cooler by the

9     crumbler and then from there they would go to an oiler bin.

10          Q.   And what happens in the oiler bin?

11          A.   So in the oiler bin, they accumulate in this

12     oiler bin until it fills up to a certain point, and then

13     that trips a switch that then discharges into the spray

14     sprayers and we spray oil on top of them.

15          Q.   Okay.  Once the oil gets sprayed on the crumlets,

16     what is the next step in the process?

17          A.   Then they get transported into an area where we

18     will put them into bags.  There is another hopper there that

19     accumulates the feed and it has got a bagging scale on it,

20     and the mill worker will hang a bag on it, and the scale on

21     the bin weighs out 50 pounds of product and then that drops

22     down onto a little conveyor, he puts a tag on it, sews it,

23     stacks it on a pallet.

24          Q.   What steps does Rangen take during -- throughout

25     that process to make sure that the feed it's making for

1   National is a quality feed?

2        A.   So through that process there will be a pellet

3   mill operator standing there looking to make sure we're

4   making good pellets, that they're holding together well, um,

5   then we will crumble them and then when that finished feed

6   comes out into the bag, when we're starting up the run we'll

7   have the foreman and a quality control technician there to

8   observe it and make sure that it, you know, looks like it is

9   supposed to and will take some samples there to make sure

10  the moisture content is in line with what we expect and

11  check out any other quality parameters at that time.

12       Q.   Okay.  Do the quality control procedures that

13  Rangen uses from the point where it -- from the ingredient

14  point all the way through the finished feed point meet

15  industry standards for feed millers?

16       A.   Yes.

17       Q.   How does Rangen charge National when it makes

18  feed for National?

19       A.   So what we do is we provide every couple of

20  months we provide a price for the ingredients for their

21  mixes.  And so, you know, we take the price for all of the

22  ingredients you saw on the mix sheet that are Rangen

23  provided.  We give them the price that -- for those

24  ingredients and we send them that price every couple of

25  months.

1                And so then when it comes time to bill National, we

2        bill them at that price and then any milling number, the

3        costs for running it through the mill, and then we will also

4        bill them freight on that if we set up the load to be

5        delivered.

6                Q.   For the ingredients that National reimburses

7        Rangen, does Rangen charge anything above its cost of the

8        ingredients?

9                A.   No.

10               Q.   In the 24 years that you have worked at Rangen,

11       to your knowledge has Rangen ever purchased fish meal

12       preserved with nitrites?

13               A.   No.

14               MR. MERCER:  Objection foundation.

15               THE COURT:  Well, the answer can remain.  To his

16       knowledge, whatever his knowledge is.

17               MR. MITCHELL:  Thank you, Judge.

18               Q.   (By Mr. Mitchell)  To your knowledge, in the

19       24 years that you have worked at Rangen, what is the

20       preservative that has been used in the fish meal that Rangen

21       does purchase?

22               MR. MERCER:  Objection foundation and request voir

23       dire.

24               THE COURT:  Well, we'll let him go ahead and the

25       objection is overruled at this point, but you perhaps ought

1        to rephrase and demonstrate his specific knowledge in that

2        specific area.

3               MR. MITCHELL:  Certainly.

4               Q.   (By Mr. Mitchell)  Mr. Brock, do you have -- you

5        participate in the purchasing of fish meal at Rangen;

6        correct?

7               A.   That is correct.

8               Q.   And you have done that since you became the

9        nutritionist for the aquaculture division at Rangen?

10              A.   Yes.

11              Q.   That was 19 years ago?

12              A.   20.

13              Q.   20 years ago, pushing 20 years, 19 or 20 years?

14              A.   Yes.

15              Q.   Okay.  So in that period of time and in that

16       context, have you spoken with vendors or seen materials from

17       vendors concerning the ingredients that Rangen is buying?

18              A.   Oh, yes.

19              Q.   That would include fish meal?

20              A.   Yes.

21              Q.   And are you familiar in that context and in your

22       role and experience as someone who participates in the

23       purchasing of bulk fish meal with the industry standards for

24       the preservation of fish meal?

25              A.   Yes.

1          Q.   And what is that industry standard?

2          A.   Ethoxyquin.

3          MR. MERCER:  Objection, nonresponsive.  Move to

4     strike.  Lack of foundation.  Best evidence rule.

5          THE COURT:  Well, demonstrate his knowledge or the

6     source of his knowledge.

7          MR. MERCER:  You asked what is that standard and my

8     objection --

9          MR. MITCHELL:  We have walked through his -- we have

10    walked through --

11         Q.   (By Mr. Mitchell) You have got 19 years of

12    experience in purchasing fish meal?

13         A.   Yes.

14         THE COURT:  Talking about a standard.  The question

15    related to standard.

16         Q.   (By Mr. Mitchell)  Got it.  Okay.  Let me come at

17    it to you this way.

18         Have you inquired of vendors from which Rangen

19    purchases fish meal concerning what they use to preserve the

20    fish meal that they sell?

21         A.   Yes.

22         Q.   And have you ever heard one of those vendors

23    indicate that they use nitrites to preserve fish meal?

24         MR. MERCER:  Objection.

25         THE WITNESS:  No.

1          MR. MERCER:  Hearsay.

2          THE COURT:  I'll sustain the objection.

3          Q.   (By Mr. Mitchell)  And have you -- have any of

4     those vendors ever indicated to you that they use anything

5     other than ethoxyquin to preserve their fish meal?

6          MR. MERCER:  Objection, facts not in evidence.  Move

7     to strike.

8          THE COURT:  I'll sustain the objection.

9          MR. MITCHELL:  Your Honor, it is not being offered

10    for --

11         THE COURT:  You might have him tell us what the make

12    up of the fish meal is, as far as he knows.

13         MR. MITCHELL:  Okay.

14         THE COURT:  If there is a consistency with the

15    ingredients, what are the ingredients.

16         MR. MITCHELL:  Certainly.

17         Q.   (By Mr. Mitchell) Are you familiar with how fish

18    meal is made?

19         A.   Yes.

20         Q.   Okay.  Walk us through the process.

21         MR. MERCER:  Objection, request voir dire again on

22    this subject.

23         THE COURT:  Well, you'll have a chance to cross.  So

24    move on.  Put your questions.

25         Q.   (By Mr. Mitchell)  What is the process by which

1      fish meal is made?

2           A.   So --

3           MR. MERCER:  Objection foundation.

4           THE COURT:  Go ahead, overruled.

5           THE WITNESS:  So fish meal is made by companies that

6      typically own boats and they have a land base processing

7      plant and the boats then go out from their processing plant

8      and usually using the same sometimes a troll capture fish

9      that are in schools.  And then they will bring these fish

10     into the hull of the boat which in modern times are

11     typically refrigerated to keep them cool, and then once they

12     have a load they -- and they only stay out, you know, less

13     than a day to preserve freshness, they will then come into

14     the plant and they will pump those fish into large cookers,

15     and they will cook them for a prescribed period of time.

16     And then the next step is to run them through a press where

17     they're able to separate the cooked -- the pieces from the

18     liquid, there is a lot of water in there and a lot of oil.

19     And so they move the oil and water off into one stream and

20     the dry, I think they call it presscake, into another

21     stream.  The presscake will go through a dryer and those are

22     usually low temperature dryers to preserve the quality of

23     the protein.  And then once that happens, then they'll go

24     into a bin and prior to packaging they will spray

25     antioxidant on them.  The fish meal plants I have seen they

```
1       were --

2               MR. MERCER:  Objection foundation.

3               THE COURT:  Overruled.  Go ahead.

4               THE WITNESS:  Were spraying ethoxyquin, liquid

5       ethoxyquin onto them.  The other -- so that is how they make

6       the meal and then the water and the oil line are run through

7       a centrifuge because oil and water are different densities,

8       they spin off the oil and that becomes fish oil, and then

9       the water sometimes they add it back onto the meal, and

10      other times they just discard it.

11              THE COURT:  Do they grind it up?

12              THE WITNESS:  Um, because they have cooked it and run

13      it through some screws and stuff like that, it is fairly

14      fine, but oft times they'll have a hammer mill on the end of

15      the process line to grind it, grind it finer, yes.

16              THE COURT:  They press it into cakes or something?

17              THE WITNESS:  They call that presscake because it is

18      coming out of the cooker in a kind of a wet fashion that

19      when they put a lot of pressure on it, it turns into a cake.

20      But when we get it, it is kind of like it is a fine

21      flowable, flowable meal.

22              THE COURT:  It is granular?

23              THE WITNESS:  Yes.

24              Q.   (By Mr. Mitchell)  Mr. Brock, did any of Rangen's

25      manufacturing activities take place in Utah?
```

1          A.   No.

2          Q.   And when the feed was delivered, where was it

3     delivered?

4          A.   To the Griffeth farm.

5          Q.   And where is the Griffeth farm located?

6          A.   In Preston, Idaho.

7          Q.   Preston, Idaho.

8          MR. MITCHELL:  Thank you.  No further questions.

9                      **REDIRECT EXAMINATION**

10    BY MR. MERCER:

11         Q.   Mr. Brock, in your lengthy explanation about how

12    fish meal is manufactured you referred, I believe, to the

13    ones I have seen; is that correct?

14         A.   That is part of my experience with antioxidants,

15    yes.

16         Q.   But you have never seen fish meal being made,

17    have you?

18         A.   Actually since my deposition I have been to a

19    fish meal plant and seen it being made.

20         Q.   Oh, but up until your deposition when you said

21    you have never seen fish meal being made, you hadn't?

22         A.   That is correct.

23         Q.   This is some recent visit to a fish meal

24    manufacturer?

25         A.   Yes.

1          Q.   Where was that?

2          A.   In Mexico.

3          Q.   And when did you go to Mexico to watch this?

4          A.   So it would have been the March time frame last

5     year, 2013.

6          Q.   March of 2013.  Did Rangen send you?

7          A.   Yes.

8          Q.   They paid you to go watch fish meal being made in

9     March of 2013?

10         A.   Actual, we had received an invite from a fish

11    meal manufacturer down there that wanted us to come see him,

12    how he made fish meal.

13         Q.   What was the name of that manufacturer?

14         A.   So the supplier was Atlantic Commodities, I

15    misspoke, Atlantic Commodities is somebody we buy fish meal

16    through.  They invited us to come see one of the plants down

17    in Mexico.

18         Q.   So Rangen buys fish meal from Atlantic

19    Commodities which is located in Mexico?

20         A.   No, they're a broker in the United States.

21         Q.   They're a broker.  So they're not the fish meal

22    manufacturer, they're just a broker of fish meal?

23         A.   Correct.

24         Q.   And they invited you -- so they're just a broker.

25    How did they invite you to -- did they invite you to the

1    brokerage?

2         A.   No, then they have a -- they have a producer down

3    there that is making fish meal that they wanted us to see.

4         Q.   So they invited you down to one of their clients,

5    a producer of fish meal, to look at that producer's

6    facility?

7         A.   Correct.

8         Q.   So you were not there at the invitation of the

9    actual producer, just the broker?

10        A.   I actually think he and the manufacturer decided

11   that they had made some upgrades in their plant and they

12   wanted to promote it as being new and they were using some

13   new techniques to make the fish meal and they wanted to have

14   some of their customers see it.

15        Q.   So they had upgraded since 2010?

16        A.   I suspect they were in the process of upgrade

17   during that time.  I am not sure of the total duration of

18   how long it took them to make the entire upgrade.

19        Q.   And this is the only opportunity you have ever

20   had to see fish meal be made?

21        A.   It is the only time I have seen it.  I have had

22   other invites that I was not able to take them up on.

23        Q.   And so was this the same producer from whom

24   Rangen got its fish meal in 2010?

25        A.   I would have to look at the documents to see if

1          that was the case or not.

2                Q.   Where are those documents, by the way?

3                A.   Well, there is some documents on analytical

4          information here.

5                Q.   Perhaps you could show them to me.  You're

6          telling me there is a document about the fish meal that

7          Rangen purchased to put into the Kent Griffeth lactation

8          crumlet order?  Because I have never seen that document.  I

9          would like you to show it to me.

10               A.   I'm not sure how everything is organized here,

11         but if you know where in this book the analytical charts are

12         for the fish meal, I can show you the information you seek.

13               Q.   There aren't any.  But you're telling me, and

14         this is very interesting to know, that there are documents

15         about the fish meal that Rangen purchased for the Kent

16         Griffeth lactation order in March of 2010, correct?

17               A.   I believe so.

18               Q.   You have just never been able to find them.  Is

19         that why we don't have them?

20               A.   No.  I was under the impression that we provided

21         all of that information in discovery.

22               Q.   To whom did you give these documents?

23               A.   I would assume -- I mean Hans.  I would think

24         that we gave it to our counsel.

25               Q.   Mr. Mitchell?  Is that the Hans you mean?

1          A.   Yeah.

2          Q.   What do those documents say?

3          A.   The one I'm looking for is an analytical summary

4     that shows what the protein and fat was on fish meals that

5     Rangen had received.

6          Q.   I think you also told Mr. Mitchell that you had

7     run test results on the fish meal you received.  Where are

8     the test results from the -- from Rangen's tests on the fish

9     meal that it used?

10         A.   Well, I thought they were in this packet

11    somewhere.

12         Q.   You probably couldn't find them in there.

13         A.   Well, I mean there is --

14         THE COURT:  Why don't we take a moment, folks, and let

15    me give you an early recess here briefly.  Ten minutes.  Go

16    enjoy a drink or a snack or something.  Remember what I told

17    you.

18         (Whereupon, the jury left the courtroom.)

19         THE COURT:  And counsel, why don't you take a minute

20    and help the witness find the documents.

21         MR. MITCHELL:  There is nothing in the exhibit book,

22    Your Honor.

23         THE COURT:  I'm sorry?

24         MR. MITCHELL:  The documents that he is referencing

25    are not in the exhibit book, they are not an exhibit in this

1     matter.

2          THE COURT:  Well, are they available?

3          MR. MITCHELL:  That I don't know.  I will -- I brought

4     my file, I'll look and see if I have got them in my file.

5          THE COURT:  All right.  Well, let's take 10 minutes

6     and have you look rather than spar back and forth here.  If

7     there is a document that is interesting, let's find it.

8          (Recess was taken from 2:23 p.m. to 2:40 p.m.)

9          THE COURT:  Did you find what you're looking for?

10         MR. MERCER:  Found one, not the other.

11         THE COURT:  I'm sorry?

12         MR. MERCER:  We found one, one document, not the

13    other.

14         THE COURT:  Okay.  Is there another?

15         MR. MITCHELL:  Your Honor, there may well be another,

16    it is not here with my file.

17         THE COURT:  Okay.  But you're ready to go ahead?

18         MR. MERCER:  We're ready.

19         THE COURT:  Okay, bring the jury in.

20         THE CLERK:  Please stand for the jury.

21         (Whereupon, the jury returned to the courtroom.)

22         THE COURT:  Again, relax, folks.  Take heart, we're

23    getting there.

24         Counselor, you go ahead.  The jury is present, counsel

25    and the parties present.

1          MR. MERCER:  Thank you, Your Honor.

2          Q.   (By Mr. Mercer)  Mr. Brock, prior to the break we

3     were trying to find a couple of documents.  One was the

4     specification sheet you told us you received with the fish

5     meal that you used in the lactation crumlets in this case.

6     Were you able to find that document?

7          A.   I don't believe I ever said that I received a

8     specification sheet on the fish meal.  I said that I had --

9     I knew the supplier of the fish meal from some documents

10     that I had discussed in my deposition.

11          Q.   Oh, so when the fish meal comes on the freight

12     car, it comes with no specifications?

13          A.   What do you mean by specifications?

14          Q.   Um, any information on what is in there?

15          A.   I don't see all of those, all of that paperwork

16     of all of the loads, but I have seen some of them.

17          Q.   But, in fact, in this case we don't have any of

18     that information on the fish meal you purchased from an

19     outside source that was used for the crumlets in this case,

20     correct?

21          A.   I don't know.

22          Q.   Now we were also looking for test results

23     conducted by Rangen on fish meal.  And you were able to find

24     those, is that right, during the break?

25          A.   You were able to find them, yes.

1          Q.   Well, so when your deposition was taken, you were

2     asked about Exhibit 98 which is now in front of you?

3          A.   Correct.

4          Q.   Is that the document --

5          A.   Yes.

6          Q.   -- you were referring to?

7          A.   Yes.

8          Q.   What is that we're looking at?

9          A.   What this is is a summary --

10         Q.   Just tell me -- let me ask you this first.  Whose

11    handwriting is that?

12         A.   Um, I believe it would be an administrative staff

13    person probably by the name of Cheryl Herzinger.  She would

14    input these from the analytical reports into this file.

15         Q.   What did you have to do with that document?

16         A.   So when I review the analyticals as they come in

17    from the lab, and then she puts them into this book that I

18    will then when we go to use meal for making feed I will

19    reference what these -- this analytical information to use

20    in my formulations.

21         Q.   You mentioned while you have been talking to us

22    today that Rangen kept a sample from the lactation crumlets

23    in this case; is that right?

24         A.   Yes.

25         Q.   Does Rangen still have it?

```
1              A.   I turned that over to Mr. Hans Mitchell.

2              Q.   And he has it now?

3              A.   I don't know.

4              Q.   Do you know if he has ever produced it to anyone

5       in this case?

6              A.   I don't know.

7              Q.   Do you know if it has ever been tested?

8              A.   I don't know.

9              Q.   You don't know if it has or hasn't?

10             A.   I don't.

11             Q.   All you know is that --

12             MR. MITCHELL:  Your Honor, I have to object to the

13      line of questioning.  We offered to submit the sample for

14      testing to --

15             MR. MERCER:  Objection.  Not his testimony.

16             THE COURT:  We'll deal with this matter and the court

17      but if -- you still have it?

18             MR. MITCHELL:  Yes, it is still in our possession.

19             THE COURT:  Okay.  Let's move on.

20             Q.   (By Mr. Mercer)  You mentioned a couple of times

21      when you were talking to Mr. Mitchell, or at least one time

22      you mentioned that these crumlets went into the oven; is

23      that right?

24             A.   No, cooler.

25             Q.   Well, didn't you mention an oven and at one point
```

1      you say semi-cooked?

2            A.    That was the pellet mill.

3            Q.    Pellet mill.  So you weren't talking about the

4      lactation crumlets in this case?  Do the lactation crumlets

5      in this case go into an oven?

6            A.    No, I don't recall having said an oven.  If I

7      did, I misspoke.

8            Q.    Did you say they had to be cooled?

9            A.    Yes.

10           Q.    Why do they have to be cooled?

11           A.    Because in the manufacturing process that I

12     described, I mentioned that there was steam and heat

13     generated in order to cook the starch and what we call

14     condition the mash.  When that is then run through the die,

15     there is added temperature that occur -- that the

16     temperature of the mash increases a little bit further up to

17     over 200 degrees and so the combination of that temperature

18     and the steam that is input into the mash then needs to be

19     cooled down and the steam needs to dissipate.

20           Q.    So the crumlets do get up to at least 200 degrees

21     during the process?

22           A.    Right.

23           Q.    Also, while you were going through this entire

24     process of producing these crumlets, I don't recall you ever

25     mentioning anything about cleaning or sanitation.  Is that

1      right, you never mentioned that?

2          A.   I don't believe so.

3          Q.   Is formaldehyde ever used as a preservative in

4      fish meal?

5          A.   No.

6          Q.   You're sure it is never used?

7          A.   My experience indicates that it is not.

8          Q.   So you wouldn't have any idea why it would --

9      might show up in a test result done on the crumlets in this

10     case?

11         A.   No.

12         Q.   Mr. Mitchell asked you if Rangen has ever

13    received any complaints from any other customer about

14    histamines or nitrosamines.  Do you recall that?

15        MR. MITCHELL:  Your Honor, I believe that misstates my

16    question.

17        THE COURT:  Well, why don't you just put your direct

18    question.

19         Q.   (By Mr. Mercer)  Has Rangen ever received any

20    complaints from any customers about histamines to your

21    knowledge?

22         A.   Not prior to this case, no.

23         Q.   How about nitrosamines?

24         A.   No.

25         Q.   Has Rangen received any complaints from any

1      customers about mink lactation crumlets generally?

2           A.   What do you mean generally?  I mean other

3      complaints?

4           Q.   Yes.

5           A.   I believe there was one with Mr. Griffeth and

6      that would be all I can recall.

7           Q.   Duane Weeks?

8           MR. MITCHELL:  Objection, Judge.

9           THE WITNESS:  I don't --

10          MR. MERCER:  Opened up.

11          THE WITNESS:  I don't recall Mr. Weeks ever feeding

12     crumlets.

13          Q.   (By Mr. Mercer)  So you don't recall a complaint

14     about lactation crumlets from Duane Weeks against Rangen?

15          A.   No, I do not.

16          Q.   The Stembridges?

17          MR. MITCHELL:  Objection, Judge.

18          THE COURT:  Well, he is just asking if he knows.

19          THE WITNESS:  Not a specific complaint, no.

20          Q.   (By Mr. Mercer)  Well --

21          A.   I mean Lee --

22          Q.   What kind of complaint?

23          A.   Not specifically from the Stembridges, no.

24          Q.   Well you said not specifically, what do you mean?

25          THE COURT:  Why don't we deal with the substance.

1          Let's move on.

2                MR. MERCER:  No other questions.

3                THE COURT:  Anybody else?

4                MR. MITCHELL:  Can this witness be excused, Judge?

5                THE COURT:  Well, we'll talk about that, but at this

6     point he may step down.

7                MR. MITCHELL:  Thank you.

8                THE COURT: He has been your designated representative,

9     hasn't he?

10               MR. MITCHELL:  He has, judge.

11               THE COURT:  Okay.  Well, let's use him as your

12    designated representative.  And your next witness?

13               MR. HANCEY:  Dr. Wade Roberts, Your Honor.

14               THE COURT:  Sir, if you will come forward and be

15    sworn.

16               THE CLERK:  Please raise your right arm.

17                              **WADE ROBERTS,**

18         called as a witness at the request of the Plaintiff,

19              having been first duly sworn, was examined

20                      and testified as follows:

21               THE WITNESS:  I do.

22               THE CLERK:  Thank you.  Have a seat right over here,

23    please.  And can you state your name and spell your name for

24    the record, please.

25               THE WITNESS:  Yes.  My name is Wade Roberts, W-A-D-E

```
 1       R-O-B-E-R-T-S.

 2                        DIRECT EXAMINATION

 3   BY MR. HANCEY:

 4       Q.   Dr. Roberts, good afternoon.  Can you tell the

 5   jury where you grew up, please?

 6       A.   Yes, I grew up in Utah.  In California, mostly

 7   Utah.

 8       Q.   Were you currently reside?

 9       A.   In Syracuse, Utah.

10       Q.   Are you married?

11       A.   Yes, I am.

12       Q.   Do you have children?

13       A.   Yes.  I have got a six-year old boy in first

14   grade, and I have got boy/girl twins that are four.

15       Q.   Are they a handful?

16       A.   Yes.  Going from one to three was quite the

17   change.

18       Q.   Where did you attend college?

19       A.   University of Utah.

20       Q.   Okay.  And what degrees do you hold, Dr. Roberts?

21       A.   I have a bachelor's in economics and business and

22   a PhD in economics.

23       Q.   When did you earn those degrees and from where?

24       A.   I earned my bachelor's in 2004 from the U, and I

25   also earned my PhD from the U in 2009.
```

1          Q.   And you mentioned both of those degrees are in

2    economics?

3          A.   That is correct.

4          Q.   Where are you currently employed?

5          A.   Western Governors University.

6          Q.   What is your position there?

7          A.   Professor of economics.

8          Q.   How long have you been a professor of economics

9    for that university?

10         A.   For Western Governors I was hired in October

11   of 2012.

12         Q.   Do you teach classes for Western Governors?

13         A.   Yes, I do.

14         Q.   What classes do you teach?

15         A.   I teach the micro/macro series, the global

16   business, the quantitative analysis.  I also teach in the

17   MBA program the global economics courses.

18         Q.   Have you done any other teaching in the field of

19   economics?

20         A.   Yes.

21         Q.   Where?

22         A.   I have taught more than a dozen economics and MBA

23   courses at the University of Utah, at Westminster College,

24   and also at Weber State University.

25         Q.   And how long have you been doing teaching or

1    lecturing on economics?

2         A.   I guess 2006 while I was concurrently doing my

3    graduate degree I started teaching as an adjunct at the U

4    and that continued through 2012.  I taught from 2010 to 2012

5    at Westminster College, and then for just a year, in 2010, I

6    believe, at Weber State University in Ogden.

7         Q.   Okay.  Are you a member of any professional

8    organizations?

9         A.   Yes, I am.

10        Q.   Tell us about those?

11        A.   I am a member of the World Economics Association

12   specifically the Vietnamese National Chapter.  I am also a

13   member of the AEA, the American Economic Association.  I am

14   a member of the National Association for Business

15   Economists.  And then also -- let's see what else is there,

16   Geneva International Convention for Humanitarian Demining

17   which deals with economics in this case.

18        Q.   Okay.  Have you received any honors or other

19   professional recognitions in economics?

20        A.   Yes.  I was recognized for my development work in

21   Cambodia by international organizations.  I also got

22   professor of the year award last year at Western Governors,

23   my first year there.  Among --

24        Q.   You managed to make the subject of economics

25   interesting?

1          A.   I don't know about that.

2          Q.   All right.  Have you contributed to any academic

3     texts in the field of economics?

4          A.   Yes.

5          Q.   Which ones?

6          A.   I was recognized as a major contributor to George

7     Borjas Fifth Edition of his *Labor Economics* text.

8          Q.   Is that book used as a school textbook?

9          A.   Oh yeah, it is the major one used in

10    universities.

11         Q.   Have you published any other articles or books

12    related to economics?

13         A.   I published a book with Cambria Press in 2011

14    titled *Landmines in Cambodia: Past, Present, and Future*

15    which was an economic work.

16         Q.   Now, have you previously served as an expert

17    witness in a court of law, Dr. Roberts?

18         A.   Yes, I have.

19         Q.   How many times?

20         A.   Three times in the U.S., four or five in

21    Cambodia.

22         Q.   Were you asked to serve as an expert economist on

23    any of those occasions?

24         A.   Yeah, each one.

25         Q.   Were you asked to calculate economic damages in

1    those cases?

2         A.   Yeah, on all about but one.

3         Q.   Is calculating damages something you typically do

4    as an economist?

5         A.   Certainly.

6         Q.   Do you think economics has application in this

7    particular case involving mink?

8         A.   Yeah, most definitely.

9         Q.   Why?

10        A.   Economics is a social science that is equipped

11   with various tools in which we can observe the full impact

12   of an effect.  So the effect to something where I would say

13   there is a business disruption beyond just looking at

14   something like how costs or revenues fluctuate you can also

15   incorporate opportunity costs and growth rates.  You're able

16   to bring in information about adjustments for inflation in

17   an effort to capture everything with respect to that action.

18        Q.   Could you explain to the jury the questions I

19   asked you to investigate for purposes of this case?

20        A.   Yes, sir.

21        Q.   What are they?

22        A.   You asked me to determine whether or not damage

23   had occurred to the Jonssons following the feeding of

24   crumlets in 2010.  And if so, if I did indeed find damage,

25   you asked me to quantify that in monetary terms.

1          Q.   What types of materials did you utilize or rely

2     on in the course of your investigation into those two

3     issues?

4          A.   I started with an academic literature review

5     delving into the details of in connection with economics

6     mink ranching, ranching in general.  I relied on documents

7     that were provided by the Jonssons, by the Griffeths, also a

8     similar type case.  Also documents that in general speak to

9     the effect of mink ranching.

10         Q.   Are these the types of materials that are

11    normally relied upon by economists when trying to calculate

12    damages?

13         A.   Yes, they are.

14         Q.   Okay.  Did you rely on any other information in

15    trying to answer the questions I asked you to look into?

16         A.   Yes.  I conducted interviews with the Jonssons,

17    with the Griffeths.  I did a field visit to the Jonssons

18    ranch.  I conducted an interview with the Jonssons' banker,

19    also with Michael Patrick from Patrick Fur Farms.  I also

20    reviewed the depositions that were relating to the case.

21         Q.   Is this also the type of information that is

22    reasonably relied upon by economists doing what you're

23    trying to do here?

24         A.   Certainly.

25         Q.   After considering the materials and information

1     that you just told us all about, were you able to answer the

2     questions?

3           A.   Yes, I was.

4           Q.   Okay.  Dr. Roberts, do you have an opinion to a

5     reasonable degree of probability whether the Jonssons

6     suffered any losses after feeding the lactation crumlets to

7     their mink in 2010?

8           A.   Yes, I do.

9           Q.   What is your opinion?

10          A.   That they did indeed suffer damage.

11          Q.   What type of or types of damages, briefly?

12          A.   Damage essentially to three type of mink, three

13    category of mink.

14          Q.   Three different categories of mink that they own?

15          A.   Yes.

16          Q.   Okay.  Do you have an opinion to a reasonable

17    degree of probability as to what the amount of damages is

18    that the Jonssons suffered?

19          A.   I do.

20          Q.   Okay.  And what is your opinion on that question?

21          A.   That they suffered no less than $3,409,621.00.

22          Q.   Could you describe how you arrived at the number

23    you just provided?

24          A.   Yes.  I did an analysis in which I looked at the

25    historic performance of the Jonssons' ranch with respect to

1      the production of their mink, with respect to the

2      performance at market, meaning how -- the types of prices

3      that they captured relative to the average industry

4      performer.  I incorporated growth rates, I generally did an

5      overview of their performance prior to 2010 when the feeding

6      of crumlets took place.

7           From that point I was able to statistically describe

8      that information and then look at each year starting in

9      2010, and compare the outcome of those years to the historic

10     performance.  Using very high degrees of confidence, I was

11     able to show that indeed in each year there were significant

12     damages in one area or another for every year following the

13     feeding of crumlets.

14          Q.   Okay.  Now, you testified earlier, if I

15     understood you correctly, that the Jonssons suffered damages

16     to three different categories of mink on their mink ranch;

17     is that correct?

18          A.   That is correct.

19          Q.   Okay.  What is the first category of mink that

20     was damaged in this particular case?

21          A.   Let's go with the kits, the babies that are

22     produced.

23          Q.   The baby mink?

24          A.   Yes.

25          Q.   Okay.  What damages did the Jonssons suffer to

1      their kits in this case?

2           A.   Generally, they suffered damage for the kits that

3      died and for the kits that were expected to be born that

4      weren't born.

5           Q.   And how do you distinguish between those two

6      categories between kits that died, kits that were expected

7      to be born but that were not?

8           A.   Well, okay, so a basic example for the kits that

9      died, if you had a breeder population that produced 10

10     offspring, 10 kits, all of which died, and that death was

11     abnormal from a statistical perspective, then I could value

12     those -- those kits by taking them to market and looking at

13     the prices that were captured in that specific year.

14          Q.   So what you're talking about in terms of dead kit

15     damages are kits for which we actually see bodies?

16          A.   That is correct.

17          Q.   And how would you calculate damages generally in

18     that type -- for that category of kits?

19          A.   Generally I would -- I would.

20          Q.   Using the example that you gave of 10 offspring

21     that all died?

22          A.   So I would take the 10 offspring to market in

23     that year, look at the prices that were captured, and

24     multiply the quantity that were - that had died by the

25     price, the appropriate prices, at market.

1       Q.   So let's say for purposes of that hypothetical

2    that the price that the Jonssons could expect to receive for

3    a mink pelt was $50.00, what would the damages be in your

4    example of 10 dead kits?

5       A.   So 50 multiplied by 10 would be $500.00 in that

6    example.

7       Q.   $500.00.  Now, the other sort of subcategory

8    among kits that you referenced or kits that were expected to

9    be born but were not; is that correct?

10      A.   That is correct.

11      Q.   Okay.  Give me an example of how you would

12   calculate damages generally to that subcategory of kits?

13      A.   Okay.  Sticking with the same line of logic, if

14   we had a breeder population that was expected to produce ten

15   kits but instead only produced five, and I am able to show

16   that the production of five is statistically lower than a

17   specific threshold, so I'm confident that that five is

18   abnormal, then I am able to adjust the five that were

19   produced to the ten that should have been produced based on

20   their history, again take that quantity of five in this

21   instance and value it at market in the appropriate year.

22      Q.   So again, for purposes of this hypothetical if

23   the average pelt price that the Jonssons could expect to

24   receive was $50.00 a pelt, what would the damages be?

25      A.   You just multiply the 50 by 5 which is $250.00.

1          Q.   The five, again, being kits that were expected to

2     be born but were not for whatever reason?

3          A.   That is correct.

4          Q.   Did you calculate or have the opportunity to

5     calculate the Jonssons' actual damages in this case to kits

6     that died and kits that were expected to be born but were

7     not?

8          A.   I did.

9          Q.   Okay.  And what are the Jonssons' damages in that

10    category?

11         A.   For this category it totals $1,298,665.00.

12         Q.   And in what year or years did the Jonssons suffer

13    those damages?

14         A.   Starting in 2010 and every year beyond so '11,

15    '12 and '13.

16         Q.   How did you calculate the Jonssons' damages

17    relating to this category of mink, the kits that died or

18    those that were expected to be born but were not?

19         A.   I followed the same logic.  I was able to look at

20    production from the past, I was able to say based on the

21    Jonssons' mink ranch and the history of the ranching what

22    typical performance was and I was able to describe that

23    performance from a statistical perspective.

24         Q.   How many years of data did you review for that

25    purpose?

1          A.   Back to 2003.

2          Q.   So from 2003 to 2013?

3          A.   Yes.  But characteristically those time periods

4     need to be distinguished, the 2003 until the 2010 feeding,

5     because in economics, we consider the event that is being

6     called the feeding of crumlets in 2010 we call that an

7     exogenous shock.

8          And so in order to test whether or not the outcome

9     beyond that exogenous shock was distinct, statistically I

10    need to characterize the period of time prior to the 2010

11    feeding in an effort to understand it.  So while I did look

12    at that full range of years, it is important to, I think,

13    point out that I described the 2003 to 2010 time period in

14    an effort to understand what happens on the ranch prior to

15    the feeding of crumlets.

16         Q.   So you could compare it to what happened after

17    the feeding?

18         A.   That is correct.

19         Q.   Let's just break this category down a little bit.

20    How did you determine how many kits actually died that the

21    Jonssons owned?

22         A.   In the initial year?

23         Q.   Yes?

24         A.   This was something that the Jonssons actually

25    experienced and saw with their own eyes.

1      Q.   Okay.  And how did you generally determine the

2      number of kits that should have been born but were not?

3      A.   Using just basic math and statistics, I'm able to

4      show what is average.  I am able to look at the full range

5      of low to high, I am able to characterize a confidence

6      interval and to say that with the certain degree of

7      probability they would likely fall within a specific range.

8      Q.   Again, looking at the seven or eight years of

9      data that preceded 2010?

10     A.   That is correct.

11     Q.   How did you determine -- I think you said earlier

12     that the basic formula for this category of damages is

13     taking the number of dead animals or the number expected to

14     be born, whichever the case, and multiplying it by the price

15     one could expect to receive at market for a pelt; is that

16     correct?

17     A.   That is correct.

18     Q.   How did you determine in this particular category

19     of damages what price the Jonssons could expect to receive

20     at market for a pelt in a given year?

21     A.   I looked at their price performance in their

22     history.  So critically, this is something that needs to be

23     understood in a relative fashion.  I am able to go back and

24     not only see how the Jonssons performed at market, but I am

25     able to compare that to the entire industry and I'm able to

1    see where they are at as a ranch relative to the industry

2    overall.  And in so doing, prior to the feeding of crumlets,

3    I was able to see that on average the Jonssons outperformed

4    the market by .61 percent.

5         Q.   When you say that the Jonssons historically

6    outperformed the market, are you talking about the prices

7    that the Jonssons obtained historically relative to the

8    prices an average mink rancher in the industry obtained?

9         A.   That is correct.

10        Q.   Backing up just one second on something that you

11   touched on earlier, why did you review 10 years worth of

12   data in your analysis?

13        A.   Because there was 10 years worth of data to look

14   at.  It is my opinion as a social scientist that if data

15   exists in something like this, and if I were to ignore that

16   or only look at the smaller subset of that, that would be

17   irresponsible.  I should consider the production and price

18   performance throughout as much time period as I can capture

19   the data.

20        Q.   Now, you mentioned that this first category of

21   damages relating to kits is just shy of 1.3 million dollars,

22   correct?

23        A.   That is correct.

24        Q.   Okay.  Can you walk through with me how you

25   calculated or the methodology that you used to calculate

1          that number for one of the years you described?

2                A.    Sure.   Okay.   So as an example, let's say in 2010

3          the Jonssons had 5,800 mahogany mink that they bred.   So

4          these are the breeders.   They bred these 5,800.   Given their

5          historic performance, they typically produce 5.5 kits per

6          breeder which if it was a traditional year, that would give

7          them 31,900 kits.

8                Q.    On just the mahoganies?

9                A.    Yes.

10               Q.    Okay.

11               A.    Just as an example.   So I'm picking just kind of

12         one year's production for one type of mink.

13               Q.    Okay.

14               A.    They did not produce 31,900 they instead produced

15         25,366.

16               Q.    What is that difference?

17               A.    That is a shortfall of 6,534 mink.   Now

18         critically before I can consider that a loss, I have to test

19         it empirically and I have to see whether or not the

20         shortfall is statistically distinct from history.   So, you

21         know, if it was just a bad year that is one thing.   If it is

22         lower in performance than it has ever been, that is

23         something entirely different.

24               Indeed, this was something that was lower than any

25         historic performance.   And so I can quantify the damage from

1      this specific example by taking those 6,534 mink to market

2      that year and looking at a price of the average industry

3      performer and adjusting it to .61 percent above that average

4      industry participant which in this case would have put the

5      prices for pelts at $77.42.

6           Q.   Just so we're clear, that 77 and 42 -- $77.42

7      price is what the Jonssons could have expected to achieve

8      that year based on the fact that they historically performed

9      above average?

10          A.   That is correct.

11          Q.   Okay.  Continue.

12          A.   So in multiplying the $77.42 by 6,534 pelts,

13     which were the shortfall in that year, that gives me a

14     figure of $505,835.00.

15          Q.   Did you employ that methodology in calculating

16     the Jonssons' damages for this first category relating to

17     kits for the years 2010, '11, '12 and '13?

18          A.   Yes, the methodology of multiplying the quantity

19     shortfall by the price at market, absolutely.

20          Q.   Are you confident in your calculations of damages

21     in this category?

22          A.   Extremely confident.

23          Q.   Why are you so confident?

24          A.   Because my entire analysis took a conservative

25     approach.  I made use of 95 percent confidence intervals

1      throughout my analysis in an effort to be certain about any

2      loss that may have occurred.

3          Q.   What is a 95 percent confidence interval?

4          A.   It is a way of understanding data.  Let me give a

5      little example.  Say I know the history of their performance

6      for their mahogany mink, and I know that they have

7      performed, well in this case on average 5.5.  I also know

8      with 95 percent confidence that the range in which they

9      should fall is between the 4.4 and 6.6.  So any -- so if

10     another data point were to occur, which is the question that

11     is asked in this type of train of thought, then with

12     95 percent confidence, I can state that that data point

13     would fall within that range.  When it doesn't, when it

14     falls outside of that range, then I consider as a scientist

15     that point to be characteristically distinct.

16         Q.   And can you restate that point without using the

17     words data point?  I mean when you're talking about a data

18     point, what data point is at issue here?

19         A.   So yeah when I refer to a data point I'm looking

20     specifically at an occurrence of an event.  So, for example,

21     say in one year the Jonssons get a 5.5 kits per litter on

22     their mahogany mink, that is the data point.  So in looking

23     at all of the years previous to the feeding of crumlets, I

24     can characterize the entire performance and capture the

25     95 percent confidence intervals.  Then I look at each

1      isolated instance after that.  So I look at 2011 and '12 and

2      '13 and see how it compares to that confidence interval.

3           Q.   So with respect to this first category of damages

4      relating to mink, to kits, what can you say with 95 percent

5      confidence statistically?

6           A.   I can say that in every year following feeding of

7      crumlets they had a result that was statistically distinct

8      from their past history.

9           Q.   Would it have been acceptable in your field of

10     expertise to use a lower confidence interval than

11     95 percent?

12          A.   Oh, certainly.

13          Q.   Why?

14          A.   Well, 95 percent is very -- is a very aggressive

15     conservative approach.  It is certainly not required.  I

16     have used, as an example, I have done a lot of work, some

17     social policy work, based on statistical analysis and

18     economics in the country of Cambodia for landmines.  And I

19     was only able to capture 80 percent confidence intervals

20     which is much less than 95 but still very acceptable.

21     Policy following those findings has been implemented and is

22     working quite well.  And 95 percent confidence is near

23     certain.

24          Q.   If it is acceptable for you to have used a lower

25     confidence interval, which I assume would have increased the

1    Jonssons' damages; is that correct?

2         A.   That is correct.

3         Q.   Why did you choose to employ a 95 percent

4    confidence interval?

5         A.   Well, ultimately I had to make a decision about

6    how conservative to be within an analysis.  And my personal

7    approach is to be very conservative in an effort to present

8    a bear minimum figure of loss.

9         Q.   Did your damages calculation in this first

10   category relating to kits extend beyond 2013?

11        A.   No, they do not.

12        Q.   Now, you testified earlier again the Jonssons

13   suffered damages in three categories of their mink.  What is

14   the second category of mink you're talking about?

15        A.   The mink whose price performance suffered

16   following the feeding of crumlets in 2010.

17        Q.   Can you sort of expand on that explanation?  What

18   do you mean by this particular category of damages?

19        A.   Okay.  So of the -- of the mink that were

20   produced, it is important to consider not just quantity

21   which was just described, but also quality which relates to

22   the prices that they're able to capture for the pelts when

23   they're taken to market.

24        Q.   Of the mink that survived?

25        A.   That is correct.

1          Q.   Okay.

2          A.   So I'm able to look at how the Jonssons performed

3     in each of the years beyond the feeding of crumlets and

4     compare that to their past history.  And using it as a

5     benchmark of the average industry performer.  And I am able

6     to -- I find that in 2011 and 2013 they actually performed

7     below where they have ever performed in their history of

8     ranching.

9          Q.   Regarding the prices they obtained at the market?

10         A.   That is correct.

11         Q.   Did you calculate the Jonssons' damages to this

12    second category of mink you have described?

13         A.   Yes, I did.

14         Q.   What is your number?

15         A.   It totals $167,000 -- $167,997.00.

16         Q.   How did you calculate the damages in this

17    category as far as methodology?

18         A.   Okay.  What I did, again, I characterized the

19    period of time prior to the feeding of crumlets with respect

20    to their price performance at market.  Then I looked at --

21         Q.   What years did those include?

22         A.   All the way back to 2003.

23         Q.   Okay.

24         A.   Then I was able to look at each isolated incident

25    after, so the years '11, '12, and '13, and compare how they

1    performed relative to the average market participant and

2    come up with a figure.  And when that figure in 2011 and

3    2013 actually falls even beyond the 95 percent confidence

4    interval, it is actually outside of the historic range of

5    ever performing at market.  So what I was able to do is look

6    at what they did capture from those pelts and adjust it to

7    .61 percent above the average industry performer and that

8    adjustment gives me the number of damages.

9         Q.   Is the simple way of saying it then that you took

10   the difference between their historic average price per

11   pelt, which is .61 percent above market average, and take

12   the difference of that number and what they actually

13   achieved at market in those years?

14        A.   That is correct.

15        Q.   How did the Jonssons' mink perform at market in

16   the years 2011, '12 and '13, the years following the feeding

17   of the crumlets?

18        A.   Okay.  So to give a frame of reference here,

19   while I have already stated that they on average performed

20   .61 percent above the average market participant, the low

21   points experienced in 2011 and 2013 are actually lower than

22   they have ever performed.

23        Q.   How poorly did they perform in those years?

24        A.   In 2011, they were 2.85 percent below the average

25   industry performer.  And in 2012 they were actually

1    2.34 percent above and then again in 2013 they were

2    1.83 percent below.

3        Q.   Can you explain how the Jonssons could have

4    performed well below their historical averages for the years

5    2011 and 2013 but outperformed the market average in the

6    year in between 2012?

7        A.   Yes, certainly.  The Jonssons noticed the

8    performance of their breeders and -- well let me back up

9    even further.  The Jonssons long ago made an effort to

10   purchase very high quality improvement breeders in an effort

11   to produce good mink, meaning large, and possessing the

12   qualities that would capture a high price at market.

13       And since that time, they have actually implemented a

14   strategy of growing from inside of their herd which is a

15   typical strategy.

16       Q.   What do you mean by growing inside of their herd?

17       A.   Holding some of their best kits from each year

18   over and making them the breeders for the next season.

19       Q.   As opposed to doing what?

20       A.   Buying them from other ranchers.

21       Q.   Okay.  So this process allowed them to each year

22   select the best offspring and make them breeders.  So this

23   process over a lot of time ends up contributing to the very

24   high quality and large mink, which is what they're after.

25       So when the feeding of crumlets in 2010 took place,

1          the performance immediately following that fell.  And they

2          keep their breeders one more season to see if they would

3          produce again and seeing that they weren't producing where

4          they had from their history, they made a decision to pelt

5          out some of those best breeders, more than a thousand of

6          their best breeders were pelted that year.  And so --

7               Q.   Ones that they normally would have kept?

8               A.   Correct.  So the implication of that is critical

9          to understand because even though those breeders weren't

10         producing with respect to quantity, they themselves were

11         large and, you know, having been genetically selected for

12         more than a decade, they were quite desirable.  So when they

13         were sold with all of the other pelts, it actually drove the

14         average price up.

15              Q.   So maybe I didn't understand your answer on this

16         part.  But why did the -- why did the Jonssons sell these

17         breeders, these particular breeders you mentioned that you

18         said they otherwise would have wanted to keep around because

19         of their superior characteristics?

20              A.   Because they weren't producing kits like they

21         should have.

22              Q.   But the reason why they fetched high prices at

23         the market is because they themselves were still superior

24         mink?

25              A.   Yeah, they were the best ones.  I mean so when

1    looking at the overall average price at market, the numbers

2    actually above the average industry participant but it is

3    because they pelted out the best breeders that they had.

4        Q.   Going back to these three categories of mink that

5    you say suffered losses in this case, what is the third

6    category of mink?

7        A.   Excuse me their breeder mink.

8        Q.   And those are the mink, as I understand it, that

9    they hold over year after year to produce kits; is that

10   correct?

11       A.   That is correct.

12       Q.   Okay.  What damages in this case relate to this

13   third category of mink that you have identified as breeders?

14       A.   There is three subcategories, if you will, that

15   tell each specific story.  The first were the breeders that

16   died initially following the feeding of crumlets in 2010.

17   The second category deals with mink that the Jonssons

18   intended to use as breeders in an effort to continue

19   expanding and growing their ranch operation but could not

20   given the losses that occurred in 2010.  And then the third

21   category deals with the breeders that were purchased

22   externally or outside of their own herd in an effort to

23   replace the ones that died or were harvested.

24       Q.   Well, okay, so for lack of a better word I'm

25   going to use the word subcategory to describe those three

1      things that you just said.  Let's talk about the Jonssons'

2      damages that relate to this first subcategory within the

3      breeder mink, okay?  And I think you said that is the

4      breeders that actually died?

5              A.   That is correct.

6              Q.   How many of the Jonssons' breeders actually died?

7              A.   A total of 450.

8              Q.   And when did they die?

9              A.   In 2010 and '11.  Mostly 2010.

10             Q.   Did you calculate the Jonssons' damages relative

11      to their breeder mink that actually died?

12             A.   I did.

13             Q.   And what is that figure?

14             A.   It totals $197,540.00.

15             Q.   How did you calculate that amount?

16             A.   Well, I took the number, which is 450, and I

17      multiplied it by a price of $500.00 per breeder, a price

18      that would be required in order to replace an equal or like

19      quality breeder.  And when I multiplied those together, I

20      get 225,000.  From that point, I make consideration and

21      accountability for the fact that they did get some value

22      from them because they sold them at market as pelts.  And so

23      in looking at the value that they captured when selling at

24      market, I subtract off $27,460.00 which gives me that figure

25      I stated of $197,540.00.

1          Q.   So did you -- did you account for then the value

2     that they did receive for selling the breeders that died at

3     market?

4          A.   Yes, certainly.

5          Q.   Okay.  How did you determine the $500.00 breeder

6     replacement cost that you described?

7          A.   Well, it is not necessarily me determining it, it

8     is an actual price quote from Patrick Fur Farms which is a

9     place in Wisconsin that sells equal quality breeders.

10          Q.   Okay.  Now the second subcategory within this

11     breeder category relates to, as you described it, breeders

12     that the Jonssons wanted to keep to continue growth but

13     could not?

14          A.   That is correct.

15          Q.   Is that correct?

16          A.   Yes.

17          Q.   What do you mean by that particular -- describe

18     the subcategory for the jury?

19          A.   Okay.  So the story line with this that is

20     critical to understand, the Jonssons had intention to

21     continue growing their mink ranch operation as is evidenced

22     by the fact that that is what they were doing.  If you look

23     at an 11-year period prior to the feeding of crumlets, they

24     were averaging 7.9 percent growth per year which frankly is

25     quite aggressive for a business operation.

1              Q.    Eight percent growth rate relating to their

2      breeders?

3              A.    Seven, nearly 8, 7.9 percent meaning from one

4      year to the next, they would hold over enough of their kits

5      and make them breeders so that their breeder population grew

6      by nearly eight percent --

7              Q.    Okay.

8              A.    -- from year to year.  Now, the three-year period

9      between 2006 and 2009, they actually restricted their growth

10     rate in an effort to save up capital, again a very common

11     strategy among business profit maximizers.  Their intention

12     was to save capital in an effort to build four new sheds

13     that would house breeders.  So looking again at expansion.

14     And in 2010, they did indeed build these four new sheds.

15             Q.    Before or after feeding the crumlets?

16             A.    Before, I believe.

17             Q.    Okay.

18             A.    And these four sheds had a capacity of housing an

19     additional 1,900 breeders.  And this was their plan was to

20     as soon as they could get those sheds built that, of course,

21     they would fill them with breeders.  That is the whole

22     intention.  They weren't able to, given the loss that was

23     experienced in 2010, they weren't able to fill the mink

24     sheds that they had.

25             Q.    Let me stop you.  When you say they were unable

1    to fill the mink sheds they had built, what does that mean?

2         A.   They couldn't justify keeping, from those that

3    were left, any more than they kept around 300.

4         Q.   Rather than how many?

5         A.   Rather than keeping 1,900.

6         Q.   Okay.

7         A.   They had to consider several things.  At that

8    point when loss was experienced, it was no longer just an

9    issue of we want to fill our sheds, it was we need to

10   consider the loss that we have experienced, we need to be

11   able to pay back our banker, we need to be able to, you

12   know, keep functioning as a business.  And right now, it

13   wasn't, given the loss that was experienced, it was no

14   longer the most logical decision to hold over a full 1,900

15   as they otherwise would have.  So they were 1,600 short of

16   filling the sheds that they just barely built.

17        Q.   Do you know what the Jonssons did with those

18   1,600 mink you say they wanted to keep but were not able to

19   for financial reasons?

20        A.   Yeah, they harvested them.

21        Q.   So didn't the Jonssons then receive a benefit by

22   selling those pelts at the market?

23        A.   Well yes, they received a benefit and I

24   subtracted that off of the figure.  But it is critical to

25   distinguish the value of a breeder as separate from the

1     value of a pelt.  They are two markets entirely.  A pelt

2     captures a certain value when it is sold once at market.  A

3     breeder produces lots of offspring for several years.  So

4     the value of a breeder is much higher than the pelts sold

5     from the mink.

6          Q.   Why?

7          A.   Because of its capacity for production.

8          Q.   Now you mentioned earlier that there are two

9     different ways a mink rancher who wants to grow their mink

10    operation to do that by holding over kits internally and

11    making them breeders for the following season, or purchasing

12    new breeders from outside or external sources; is that

13    correct?

14         A.   That is correct.

15         Q.   Okay.  You also mentioned, I believe, that the

16    Jonssons, to your knowledge, had always employed a strategy

17    of growing from within; is that correct?

18         A.   Not always.  Long ago, prior to 2003, and I have

19    been talking with Michael Patrick, the owner of Patrick Fur

20    Farms, long ago they purchased high quality breeders in an

21    effort to start from a strong stock.  And from that point,

22    then they implemented this internal growth strategy in an

23    effort to continue to improve upon that stock they initially

24    had.

25         Q.   Have you been able to determine whether or not

1      the Jonssons purchased any outside breeders for the data

2      that you -- that was made available to you prior to 2010?

3           A.   No, they did not.

4           Q.   Have you had the opportunity to calculate the

5      Jonssons' damages relating to this second subcategory of

6      breeder mink relating to their inability to grow their

7      breeder herd as expected?

8           A.   Yes, I did.

9           Q.   What is that figure?

10          A.   The total figure is $705,552.00.

11          Q.   How did you calculate that number, Dr. Roberts?

12          A.   Well, I used the same methodology for the last

13     one, last category I described, which is I recognized there

14     were 1,600 that otherwise would be breeders.  I took that

15     number, that figure, and multiplied it by again the $500.00

16     per breeder mink price that would be required to replace a

17     like breeder from a 2013 price quote.  Multiplying those two

18     numbers together gives me $800,000.00.  And then from that

19     point, I subtracted off the amount of revenue that they

20     could capture, did capture, when they brought them to market

21     instead of keeping them as breeders which was $94,448.00.

22     So subtracting the 94,448 from the 800,000 left me with a

23     remaining 705,552.

24          Q.   Okay.  Thank you.  What is the third subcategory

25     of damages within the broader category of breeder mink?

1          A.   The breeders that were purchased from external

2     sources.

3          Q.   And describe your basis for considering that a

4     damages category?

5          A.   Well, one of the most important things to

6     consider from my perspective is that this is a behavior that

7     was distinct from their past behavior.  The fact that

8     between 2003 and 2010 they're growing completely internally

9     shows a strategy of improving the nucleus of herds that they

10    have which is something that was taught over a few minutes

11    of phone conversation with Michael Patrick.  He said this is

12    very strong strategy for mink ranchers to implement.  It

13    helps them to improve from year to year, and to get a

14    stronger genetic nucleus of herd.

15         Now, in so doing, if they were to go out and buy some

16    lower quality breeders and integrate them in the herd is

17    probably not the wisest decision.  They did go out and buy

18    nearly 2,000, well a thousand nine hundred four in total.

19         Q.   Well, before you get there, let me ask you why

20    weren't the Jonssons able to continue their historic

21    strategy of growing from within after feeding the crumlets

22    in 2010?

23         A.   Because following that initial shock, they lost

24    several thousand mink.  They had bank loans that were due.

25    The quality of those that was -- that were produced was

1    lower.  They were in a situation where everything changed.

2    And from that point they had to do what was in their best

3    interest from that point moving forward which was a

4    different choice than they would have made without the loss.

5         Q.   Where did the Jonssons purchase these outside

6    mink you have referenced?

7         A.   From three local small time ranchers.

8         Q.   How did the replacement breeders they actually

9    did purchase compare to the breeders they had lost?

10        A.   Well, they were markedly inferior, smaller, less

11   quality.

12        Q.   Do you know why the Jonssons didn't go out and

13   purchase replacement breeders that were comparable to the

14   ones they lost?

15        A.   Yeah, there is a couple of major reasons.

16        Q.   Why?

17        A.   The first reason is that the timing was extremely

18   inconvenient.  In 2010, they had just put up four new sheds

19   which they saved for back since 2006 as is evidenced by the

20   restriction in their growth rate.  So they were capital

21   short, they didn't have the savings to go pay at the time it

22   was $250.00 a breeder, the price has gone up since.  They

23   didn't have the capital to do that.  The other problem is a

24   supply restriction.  A place such as Patrick Fur Farms can't

25   provide hundreds of mink on a day's notice.  This is

1      something you need to give quite a bit of advanced

2      notification on.

3           Q.   How many breeders did the Jonssons purchase from

4      outside sources, or have they purchased, following the 2010

5      feeding of the crumlets?

6           A.   In total?

7           Q.   Yes?

8           A.   1,904.

9           Q.   Have you calculated the Jonssons' damages

10     relative to the little over 1,900 outside mink they had to

11     purchase following 2010?

12          A.   Yes, I did.

13          Q.   What is that figure?

14          A.   It totals $1,142,400.00.

15          Q.   In what year or years did the Jonssons suffer

16     those damages?

17          A.   2011, '12 and '13.

18          Q.   How did you calculate the number you just

19     provided?

20          A.   Excuse me, essentially I followed just three

21     steps.  I considered the number again that they purchased

22     externally which is 1,904.  I multiplied it by the price

23     they paid which was about $100.00 per mink and which gives

24     me $190,400.00.

25          Q.   $100.00 a mink they paid for what?

1          A.    Per breeder that they purchased externally.

2          Q.    Of the inferior replacement mink?

3          A.    Yes.

4          Q.    Okay.

5          A.    The ones that they would not have otherwise

6     purchased.

7          Q.    Okay.

8          A.    So that gives me 190,400.  And from there I also

9     add what it would require to replace a breeder of equal

10    quality to what they had prior to the feeding of crumlets in

11    2010 which again is the same price quote $500.00 in 2013.

12    So multiplying 500 by 1,904 gives me $952,000.00.  And then

13    when I add those two figures together, I get the

14    $1,142,400.00 figure.

15         Q.    Why do you think that the Jonssons should be

16    compensated for the inferior outside breeders they

17    purchased?

18         A.    Because this is something that they otherwise

19    would not have done if production would have remained

20    consistent where with it was.

21         Q.    Why did you include in your damages calculation

22    for this particular subcategory the cost of replacing the

23    inferior breeders they did buy with what you're saying are

24    comparable breeders at $500.00 a head?

25         A.    Because in an effort to return someone to a

1     position where they would otherwise be, you would have to

2     replace the quality of that product.  And so if you didn't

3     replace the breeders with a high quality breeder, then you

4     would continue to experience production shortfall and

5     quality mishap.

6          Q.   Okay.  Now, have we covered all of your primary

7     damages calculations relating to the three categories of

8     mink we have discussed?

9          A.   I believe so.

10         Q.   Okay.

11         A.   Yeah.

12         Q.   Did you make any additional adjustments to the

13    numbers you have already provided to the jury?

14         A.   Yeah, certainly.

15         Q.   What adjustments did you include?

16         A.   I considered costs and I also made adjustments

17    for inflation.

18         Q.   Okay.  Well, let's take costs first.  What costs

19    did you consider in your analysis?

20         A.   There is two types of costs that need to be

21    considered.  First, the costs that would have been

22    experienced by the Jonssons if production was normal but

23    were not experienced.  And second --

24         Q.   Costs they saved; is that right?

25         A.   Or didn't experience, didn't encounter.

1          Q.   Okay.

2          A.   The second type would be the costs that they did

3     incur because of a production shortfall that they otherwise

4     would not have incurred.

5          Q.   Well, let's take the first category of those

6     costs first.  What kind of costs would the Jonssons have

7     normally incurred had production been normal post 2010 but

8     actually did not?

9          A.   Well, for all of the mink that would have been

10    produced they would have had to pay to feed them, they would

11    have vaccinated them, they would have been subject to

12    commission fees when they harvested the mink.

13         Q.   Did you calculate the costs the Jonssons would

14    have incurred had production been normal?

15         A.   Yes, I did.

16         Q.   What is that figure?

17         A.   It totals $378,442.00.

18         Q.   How did you arrive at that calculation?

19         A.   Well, given that this all took place in the past,

20    I was able to look at what the actual costs were for raising

21    mink on the Jonssons ranch during those years.  So I was

22    able to use the specific data, for example, you know, say 17

23    cents per pound for feed in 2010, but it was 20 cents in

24    2012.  I was able to use the actual data of costs and apply

25    it to the would be mink if they would have been produced.

1   Q. Now, is the category of costs that you have just

2 described something that needs to be added or subtracted

3 from your damages calculation?

4   A. These are costs they would have incurred if

5 production were normal.  So these are subtracted off of

6 damage.

7   Q. Did you do that?

8   A. Yes, I did.

9   Q. Okay.  Now the other costs that you described are

10 costs that the Jonssons actually did incur but you're saying

11 otherwise wouldn't had production been normal after 2010; is

12 that correct?

13   A. That is correct.

14   Q. Okay.  What kind of costs are you considering

15 there?

16   A. There's -- the Jonssons administered 34,000

17 additional booster vaccinations to their mink and had to pay

18 for the man-hours which took 420 man-hours at $10.00 an hour

19 in order to administer those supplemental vaccinations.  And

20 they also incurred additional interest expense subsequent to

21 the fact that their production was lower than it should have

22 been.

23   Q. From their bank loan?

24   A. That is correct.

25   Q. Have you calculated those additional costs?

1          A.   Yes, I did.

2          Q.   What is that figure?

3          A.   It totals $203,172.00.

4          Q.   And how did you calculate that number?

5          A.   Well, what I did is I looked at the actual costs

6     incurred from the additional booster vaccinations and labor

7     required to administer those.  I also spoke with their

8     bankers and were able to determine the additional amount of

9     interest that they had to pay on their loans subsequent to

10    the fact their production was lower than it otherwise would

11    have been.

12         Q.   Is this subcategory of costs something that you

13    add or subtract to your damages calculation?

14         A.   These are added.

15         Q.   And did you add that into your calculation?

16         A.   Yes, sir.

17         Q.   Now, one other thing you mentioned, Dr. Roberts,

18    is inflation.  Just generally what is inflation?

19         A.   Inflation is an adjustment we make to a monetary

20    figure in an effort to restore the purchasing power to a

21    certain year, for example.

22         Q.   Why did you consider inflation in your damages

23    calculation?

24         A.   Because the damages that were calculated were

25    considered within their respective year.  And in order to

1    understand the purchasing power behind that figure, it is

2    important to bring it forward into today's dollars, or I

3    should say more precisely December of 2013 dollars.

4         Q.   That is because?

5         A.   That is when I ended my analysis.

6         Q.   Okay.  Did your inflationary adjustments increase

7    or decrease your overall damages calculation?

8         A.   Increase.

9         Q.   By how much?

10        A.   Totalled $72,737.00.

11        Q.   Okay, Dr. Roberts, thank you.  Now I just have a

12   few more questions.  Did you incorporate any guesswork or

13   speculation into your damages calculation?

14        A.   No.  Everything that has been calculated here is

15   from things that have already occurred, it is from data that

16   is observable.  It is from the facts that are before me.

17        Q.   Are any of your damages calculations relating to

18   damages that are in the future or that have not already

19   occurred?

20        A.   No, I only considered past loss.

21        Q.   Now, in this case you provided an expert report

22   sort of summarizing your opinions back in April of 2013; is

23   that correct?

24        A.   That is correct.

25        Q.   Okay.  Does your testimony today differ in any

1        way from the opinion you gave in that report?

2            A.   Yes, it does.

3            Q.   In what ways?

4            A.   There were three major changes that I made to the

5        report that I submitted in April.  The first change had to

6        do with a sample size adjustment.  More specifically, when

7        the report was due in April of 2013, the Jonssons had only

8        sold 18 percent of their lot at market.  So it wasn't done

9        yet.  So the figure that was provided was contingent on the

10       idea that the 18 percent was reflective of the full lot.

11           After the sales had concluded, I went back in to

12       verify that it was indeed accurate and I found that the

13       prices were not the same throughout the duration of market

14       and I made an adjustment downward which subtracted off

15       damages for the Jonssons.

16           Q.   What is the second main way in which your

17       testimony today differs from your report?

18           A.   The second adjustment deals with live sale of

19       breeder mink.  The --

20           Q.   What do you mean by that?

21           A.   Well, information came to light after the --

22       after the report was submitted in April about, excuse me,

23       live sale of breeders which was critical to understand and

24       integrate throughout the report.

25           Q.   Well, before you continue, what do you mean by

1      the live sale of breeders?

2           A.   So the Jonssons sold some of their kits to

3      outside sources in order to provide them a breeder stock.

4           Q.   So you're talking about rather than selling

5      certain mink as pelts at market, they're selling live

6      animals to other ranchers?

7           A.   Correct.

8           Q.   Okay.  And how did that, the addition of that

9      information, affect your testimony?

10          A.   Well, it ended up changing the kits per litter

11     averages, it ended up actually echoing throughout the whole

12     report.  And in the net, it ended up subtracting again off

13     of the damage figure that was initially cited.

14          Q.   What is the third way in which your testimony

15     today differs from your report from April of last year?

16          A.   I simply adjusted the inflation from the time

17     period of April in order to account for the months that had

18     transpired through December of last year.

19          Q.   What was the net effect of these three

20     adjustments you just described to your overall damages

21     calculation between the report and today's testimony?

22          A.   It ended up reducing the damage figure by

23     $540,547.00.

24          Q.   Resulting in the figure you provided at the very

25     beginning of today, the 3.4 million dollars?

1          A.    That is correct.

2          Q.    May I use your board?

3          MR. MINNOCK:  Of course.  Of course.  That is not

4     mine.  Do you want the chart or that?  That is not even mine

5     so you can use whatever you want.

6          Q.    (By Mr. Mercer)  Dr. Roberts, can I indulge you

7     for one minute to come down to this white board and

8     summarize your calculation of damages for the categories you

9     have discussed today?

10         A.    Okay.

11         Q.    Come on down.

12         MR. MINNOCK:  I want to leave that up here but leave

13    half where we can do a little work ourself.  Go ahead.

14         THE WITNESS:  I will do my best.

15         MR. MINNOCK:  All right.

16         THE WITNESS:  Sorry, it is over.

17         MR. MINNOCK:  You do what you have got to do and we'll

18    figure something out.  We'll figure something out.

19         Q.    (By Mr. Mercer)  Go ahead and go back.

20    Dr. Roberts, just one more question.  Is this a true and

21    accurate summary of your expert opinion of the Jonssons'

22    damages suffered in this case?

23         A.    It is.

24         MR. MERCER:  Thank you very much.  No further

25    questions.

1          THE COURT:  Counselor, I'm going to give these folks

2     another break.  10 minutes.  Remember what I told you.

3     We'll be in recess for 10 minutes.

4          THE CLERK:  Please stand for the jury.

5          (Whereupon, the jury left the courtroom.)

6          MR. MINNOCK:  Your Honor, before you go, Your Honor,

7     let me just -- did you update your charts when you made

8     these three changes?

9          THE WITNESS:  Which charts?

10          MR. MINNOCK:  The one on Page 13 and the one that

11     showed the sales.

12          THE WITNESS:  Page 13 of my April report.

13          MR. MINNOCK:  Yeah, did you update that chart?

14          THE WITNESS:  Throughout my report, yes, not actually

15     on the report.

16          MR. MINNOCK:  Okay.  Never mind then.  Thank you, Your

17     Honor.  We'll do it another way.

18          (Recess was taken from 3:54 p.m. to 4:05 p.m.)

19          THE COURT:  Everybody is here and --

20          MR. MINNOCK:  Yes.

21          THE COURT:  -- why don't you bring in your jury.

22          THE CLERK:  Please stand for the jury.

23          (Whereupon, the jury returned to the courtroom.)

24          THE COURT:  Thanks, folks, sit down and relax.

25     Counselor, you may proceed.

1          MR. MINNOCK:  Thank you.

2                      **CROSS-EXAMINATION**

3     BY MR. MINNOCK:

4          Q.   Good afternoon, Mr. Roberts.

5          A.   Good afternoon.

6          Q.   Okay.  I have some questions for you.  The first

7     thing I want to do is understand your role in this case.

8     You talked earlier about causation and the eating of the

9     lactation crumlets was the cause of these damages.  Let me

10    make sure I understand what you're actually saying.  You're

11    not testifying that there was anything wrong with the mink

12    feed, right?

13         A.   Is that a question?

14         Q.   Yeah.

15         A.   Um, I first would say in correcting I didn't use

16    the term causation, and to your specific question, no, I am

17    not talking anything about the biologic makeup.

18         Q.   Let me ask it more specifically.  I think you did

19    use the word causation, and I think this was something you

20    and I talked about in your deposition.  You used the word

21    correlation, correct?

22         A.   That is correct.

23         Q.   Okay.  Whether or not there was a causal link

24    between the lactation crumlets and any other of the mink

25    deaths, you leave to someone else?

1          A.   Yes.   That link genetically I cannot provide.

2          Q.   Okay.   And so if a previous expert in this

3     case --

4          THE COURT:   No, skip if.   Put your questions to him.

5          Q.   (By Mr. Minnock)   All right.   So now let's talk

6     then about each one of these categories and I want to make

7     sure that I understand them better.

8          The first one that you have got up here is entitled

9     kits, right?   And what you -- in your report, that is

10    referring to the section on pelts not taken to market,

11    right.

12         A.   Kits specifically have reference to the offspring

13    from the breeders.

14         Q.   That either died or were never born?

15         A.   That is correct.

16         Q.   Okay.   And the way that you determined whether or

17    not there was a loss was you used what you defined as a

18    95 percent confidence interval?

19         A.   That is correct.

20         Q.   And the way you do a 95 percent confidence

21    interval is you, and you're welcome to come down and take a

22    look at this, but what I did is I charted the dark mink

23    using the figures that you put together and just put them on

24    a chart, and what you do is you establish a lower confidence

25    interval and an upper confidence interval, right?

1          A.    The 95 percent confidence, yes, that is what it

2     does.

3          Q.    Right.  And so the bottom of the 95 percent

4     confidence interval for blacks was 2.8?

5          A.    That is correct.

6          Q.    And the high was 4.3, as I recall?

7          A.    Yes, that is correct.

8          Q.    Okay.  And so what you do then is you look at the

9     production and you say if something falls between 2.8 and

10    4.3, then that is consistent with what historically has

11    occurred on the ranch, right?

12         A.    Yes.

13         Q.    Okay.  And so if you find something between those

14    two, you don't -- you can't conclude that there has been a

15    loss because it falls within that range?

16         A.    That is the idea, yes.

17         Q.    All right.  And if something falls outside of the

18    range, you use the term exogenous shock?

19         A.    Okay.

20         Q.    Which means that there is something going on that

21    is causing them not to be within the range that you would

22    expect them to be?

23         A.    That is correct.

24         Q.    Okay.  Now, let's talk specifically about then

25    the black mink.  And I know you have made some changes to

1        this chart and we'll update this as we go along, but you

2        didn't make any changes with respect to the black mink; is

3        that right?

4                A.   That is not correct.

5                Q.   Okay.  So we're looking at chart R-3.  Did you

6        make changes to R-3 for black mink?

7                A.   Is information changed there, yes, it is.

8                Q.   What information changed?

9                A.   Um, specifically with regards to black mink in

10       2013 after the 18 percent sample was realized as a full set,

11       then I was able to see that the actual black accomplishment

12       with respect to kits per litter was 2.66 which is below the

13       lower bound of the threshold.

14               Q.   So you originally determined that in 2013 that

15       there was no loss, but now you're saying based on the full

16       data you have concluded that there was a small loss?

17               A.   For the blacks we found that the 2013 figure for

18       the full set that was sold did bump the blacks beyond the

19       95 percent threshold which indicates a loss.  However, there

20       was also implications on the price side which in the net the

21       change from the 18 percent to the full set ended up

22       subtracting like $170,000.00 off of the figure.

23               Q.   Okay.  So let me make sure I understand what

24       you're saying.  On the kit section, the damages may have

25       arisen, but on the price it would have gone down so

1    therefore the net was that there was no actual loss with

2    respect to blacks?

3         A.   That is a completely different framework than I'm

4    using so I don't know that I'm comfortable answering it.

5         Q.   All right.  Well, let's go back and look at what

6    we know historically.  You got this data from the Jonssons

7    and from their banker, right?

8         A.   Actually, primarily it is critical to rely on the

9    information from the market.  So when they actually sell,

10   there is a published record that I can access that shows me,

11   you know, the precise number that are sold, of which type

12   and so forth.  And I did acquire information from the

13   Jonssons and from the bankers and so forth.  However, the

14   numbers that I opted to go with in a conservative effort and

15   also believing them to be the most accurate, were the

16   numbers that were reflected when things were sold at market.

17        Q.   Okay.  So the most accurate numbers in your mind

18   show that the Jonssons based on the 2010 crop that ate

19   lactation crumlets produced 3.72 kits per litter?

20        A.   That is correct.

21        Q.   And so you concluded two things from that.  One,

22   that it was their best year in five years or since 2007?

23        A.   I -- well you can say it that way, I don't feel

24   comfortable making that assertion, however.

25        Q.   It was the highest kits per litter among blacks

1      in five years?

2          A.   It was barely above average relative to their

3      performance back to 2004, but yes, it was above average.

4          Q.   Okay.  And, in fact, it fell within the

5      95 percent confidence interval?

6          A.   That is true.

7          Q.   In fact, it fell just slightly above average?

8          A.   Yes.

9          Q.   Okay.  So based on your conclusions, they did not

10     suffer any -- any loss in terms of actual mink not being

11     born during the year 2010?

12         A.   With respect to black mink?

13         Q.   Yes?

14         A.   That is true.

15         Q.   Okay.  Now, let's talk then about mahogany mink.

16     And this was one of the areas where you did make a change;

17     is that right?

18         A.   That is true.

19         Q.   And the change that you made is that in 2011 you

20     originally concluded that there were -- that they had sold

21     only 21,016 mink, right?

22         A.   That is correct.

23         Q.   And then you discovered that they had some live

24     sales?

25         A.   That is true.

1          Q.   Now, when you were talking with Mr. Hancey, how

2     many lives sales did you incorporate into that?

3          A.   Let's see I believe in -- let me double check.

4     There were 5,520 sold in 2011.

5          Q.   Okay.  And so that is what -- and what does that

6     raise the kits per litter to?

7          A.   Well, 5,520 plus 21,016.

8          Q.   No, no, I meant what is the instead of?

9          A.   Kits per litter.

10         Q.   Kits per litter, yeah.

11         A.   It moves it from a 3.42 to a 4.37.

12         Q.   Okay.  And the 95 percent confidence interval

13    that we're talking about is, for that, actually it is

14    different than these numbers for black, it is 4.4 to 6.6?

15         A.   That is accurate, yes.

16         Q.   Okay.  So based on the 5,500 you added, it put

17    the amount .03 below the 95 percent confidence level?

18         A.   It put it outside of the range, yes.

19         Q.   All right.  Now, in this case we have had

20    testimony that in fact -- well, and let me show you this so

21    you can do this yourself, that there was, as a total, 36,520

22    minks sold in the year 2011, okay.  And Mr. Jonsson and his

23    son testified that all but 100 of the live sales were

24    mahoganies, okay?

25         A.   Okay.

1        Q.   So in other words, there were actually live sales

2   in 2010 of 7,638, okay?

3        A.   Okay.

4        Q.   So if you add those 2000 into your number of kits

5   and recalculate the kits per litter, what do you come up

6   with?

7        A.   I'm confused with your methodology.

8        Q.   You have added in -- you assumed that there were

9   5,500 live sales, right?

10        A.   Okay.

11        Q.   I am telling you that the Jonssons told the jury

12   on Monday there were in fact 7,638 live sales?

13        A.   Unless there is a missing receipt somewhere I --

14   I saw with my own eyes the receipt for 5,520.

15        Q.   Well, let's assume that they're correct and there

16   were 7,638 mahogany live sales.  What does that do to the

17   kit average per litter?

18        A.   I would have to calculate it precisely, but it

19   would increase it.

20        Q.   And it would increase it such that there was in

21   fact no -- it would be within the 95 percent confidence

22   interval?

23        A.   That I would have to check with the actual

24   numbers.

25        Q.   Well, let's go ahead and do it.  I can tell you I

1    calculated it and it was 4.74 kits per litter, but you go

2    ahead and do it yourself.

3         THE COURT:  You're not the witness, counselor, so let

4    him testify.

5         MR. MINNOCK:  Well, I'm just wondering --

6         THE COURT:  You're not the witness, counselor, put

7    your next question.

8         THE WITNESS:  I don't have a calculator in front of me

9    but I --

10        Q.   (By Mr. Minnock)  Okay.  But the way that we

11   calculate that -- here is a calculator.  So I want you to

12   assume then that there were 7,638 live minks sold?

13        A.   Mahoganies?

14        Q.   Mahogany live sales?

15        A.   Okay.

16        Q.   So you would add that to your 21,016, right?

17        A.   Okay, state the number again, seven thousand --

18        Q.   638 live sales?

19        MR. HANCEY:  Your Honor, I am going to object.  It

20   calls for speculation.

21        THE COURT:  Well, I don't understand your question.

22        MR. MINNOCK:  My question is this --

23        THE COURT:  I don't understand your objection.

24        MR. MINNOCK:  What is that?

25        THE COURT:  The objection was stated, restate your

1    objection.

2          MR. HANCEY:  He had the objection.

3          THE COURT:  Yes.

4          MR. MINNOCK:  You mean my question?

5          THE COURT:  I'm waiting.  He wants you to restate the

6    objection.

7          MR. HANCEY:  It calls for speculation because

8    Dr. Roberts has already testified that he saw the documents

9    that form the basis for his opinion.  He is being asked to

10   speculate on something he hasn't seen.

11         THE COURT:  Well, he is asking him to assume a

12   different number, and the end product of that number.  He

13   can assume the number and he can give the calculations.

14   There is nothing wrong with that.

15         MR. MINNOCK:  What would the calculation be?

16         THE COURT:  The number may or may not be correct, but

17   he can assume the number.

18         Q.   (By Mr. Minnock)  Assuming what I told you is

19   correct, what is the number?

20         A.   When I add those two figures together and I

21   divide by 5,800 I get 4.9403.

22         Q.   So that would be well within the 95 percent

23   confidence interval?

24         A.   That would be.

25         Q.   And so if those numbers were true, then that

1      would reflect no loss among the mahoganies in 2010?

2          A.   That would be statistically distinguished.  The

3      critical point I feel that needs to be brought out here

4      though is that in my analysis I suffered from a serious

5      shortfall in the sense that unfortunately the Jonssons

6      didn't keep separate records.  So what I am having to do

7      here is I am having to observe the mink that consumed

8      crumlets in the same pool with the mink that did not consume

9      crumlets as an end product.  I can't separate the two

10     effects out.

11         I know from a related case how things look when I can

12     see them separately.  But because of the limitation in this

13     case, what I have done is I have opted to look for a loss

14     only when the collective pool can still be below the

15     95 percent threshold.  So to state there is no loss I think

16     is inaccurate.  I think it needs to be stated more in terms

17     of in a collective pool then the number would be at a 4.94.

18         Q.   Okay.  And so the herd, mahogany herd as a whole

19     fell within the 95 percent confidence interval?

20         A.   That is not what I'm saying.  I'm saying a 4.94

21     would, yes.

22         Q.   Yes, if the numbers I gave you were correct.

23     Well let's talk about that.  The only group we know that ate

24     the lactation crumlets that you were able to differentiate

25     was the black mink, right?

1          A.   State that again.

2          Q.   Well, the mahoganies were split between Cedar

3     Valley and Lehi, right?

4          A.   Okay.

5          Q.   Right?  I mean that is what you understand?

6          A.   Sure.

7          Q.   And the blacks were all at Lehi, right?

8          A.   Okay.

9          Q.   So the only ones we know on the -- that were on

10    the Lehi ranch and ate the crumlets are the blacks, right?

11         A.   Yes.

12         Q.   And your findings were that their kit average

13    went up after this?

14         A.   Not necessarily that they went up, but I am -- I

15    am looking at the performance relative to past performance.

16    To make a statement about trend of up or down gets quite

17    tricky and misleading.

18         Q.   Okay.  But the point is, is that they had their

19    best year in five years, the only ones that we know ate the

20    lactation crumlets?

21         A.   Well, to my knowledge most ranchers experienced a

22    very favorable year subsequent to weather and other things

23    that year.  So really it is everything needs to be

24    considered together.

25         Q.   Right.  And everything is considered together

1    when you look at it over time and create a 95 percent

2    confidence interval.  That is the whole point, right?

3         A.   Yes.

4         Q.   Okay.  Now, let's go back to that because I do

5    want to ask you about that.  You said that if something

6    falls below that lower level of the 95 percent confidence

7    interval that some exogenous shock has occurred, right?

8         A.   Yes.

9         Q.   If your 95 percent confidence interval is correct

10   with respect to black mink, there was an exogenous shock in

11   both 2009 and 2010, true?

12        A.   That theoretically doesn't pan out.  I see where

13   you're trying to go with that.  You can't compare a result

14   prior to the exogenous shock taking place.  It is from the

15   selective pool prior to the event occurring.

16        Q.   No, my question is did you determine what the

17   exogenous shock was in 2009 that caused them to fall below

18   the 95 percent confidence interval?

19        A.   That is actually inaccurate to state.  That data

20   point needs to be where it is at in order for the 95 percent

21   confidence interval to be created.  That is part of this sub

22   -- that is part of the set of data that was observed

23   initially as the normal conditions for the Jonsson ranch.

24   To go inside of it and say well, I noticed that inside of

25   the set there is a low number is just really a misleading

1      way of trying to look at data.  Of course there is a low

2      number, that is the point.  I'm looking at all of the

3      performance prior.  To simply say one year is low, that is

4      noted.  That has gone into the calculation of where the

5      confidence interval is.  If that data point changed,

6      everything would change.

7            Q.   Let's go then to 2012 with respect to the

8      mahogany.  And in 2012, did you assume any live sales?

9            A.   I am not certain.  Are you pointing with the

10     lower chart or are you --

11           Q.   No, no I haven't put it up yet.  Did you assume

12     any live sales in 2012?

13           A.   Yes.

14           Q.   How many live sales did you assume in 2012?

15           A.   I have record of 850 mahogany and 240 black.

16           Q.   Okay.  If the Jonssons testified that there were

17     2,906 mahogany live sales, what would that do to the

18     mahogany mink kits per litter?

19           A.   Again, I have data that shows it was 850.  So if

20     we're going off on an conjecture of maybe, I can certainly

21     calculate numbers, but I am not confident as a scientist in

22     relying on anything that I haven't seen.

23           Q.   Okay.  Well, you have seen the fact that they had

24     3,000 -- or in 2011 -- or '12 they sold 34,327 mink and you

25     have only on this chart accounted for 31,421.  So there is

1    3,000 that are on this document that aren't on your

2    document, right?

3         A.   There is going to be discrepancies between all of

4    the numbers that the Jonssons post there and the numbers and

5    figures that I am using.  That is -- that is to be expected.

6         Q.   Okay.  Well, I want you to assume that they

7    testified that there were 2,906 mahogany live sales and what

8    does that do to the number?

9         A.   Real quick -- sorry, do you have a pen?  It is

10   more complicated than that because there is the distinction

11   in the number of breeders they had.  So it is not just

12   simply adding things up.

13        Q.   Yeah, I understand.

14        A.   It puts it at 4.38.

15        Q.   4.38?

16        A.   That is correct.

17        Q.   Adding 2,906 only goes from 4.22 to --

18        A.   I have to add in the -- let's see, 22,082, which

19   is the combination of those two figures, and subtract out

20   the 1,106 that they held over to increase their breeding

21   herd, so that gives me 20,976.

22        Q.   Right.  So you take 5,791 subtract out 4,781,

23   right?  Why don't you give us the formula so we know what

24   your formula is.  How did you do that?

25        A.   Okay.  Look at the distinction between the number

1       of breeders they have in one year and hold over.  Because if

2       you have -- if you're growing internally and here it gets

3       more complicated because they are also purchasing some

4       externally, but essentially the production for one year is

5       not just the number that they bring to market, but you also

6       have to see if there is -- if they kept any from that stock

7       in order to increase their breeding herd which here you can

8       see that they do.  They go from 4,781 to 5,887.  So they

9       increase it by over 1,100 breeders.  So those are also

10      considered as part of the production.  Noting that 96 of

11      those were purchased in that year.

12          Q.   All right.  So what that shows us is if that goes

13      for 4.37 then we're .3 under the 95 percent confidence

14      level?

15          A.   Um --

16          Q.   If that number is correct?

17          A.   With 95 percent confidence, which again is a very

18      conservative effort.  I think with the way this is headed, I

19      think it is safe to point out that, you know, if how

20      confident do you want to be about an event?  And if you're

21      trying to barely cross the 95 percent threshold in an effort

22      to show there wasn't loss, I think that is a very tricky way

23      of pointing out information.

24          Q.   I'm not trying to do anything, I'm just asking

25      you questions.

1           A.   Okay.

2           Q.   Let's go to the next category which is the mink

3      with the price production reduced, okay?  So this is the --

4      this is what we're looking at when they actually take the

5      mink to the market, right, and what happens is what you're

6      comparing is how the market looks as a whole versus how they

7      did.  And you compare that and historically you found that

8      they were .61 percent above the market?

9           A.   Above the average market participant, yes.

10          Q.   Okay.  Now, in doing that, you simply took the

11     aggregate comparison involving the typical number of mink.

12     You did not break it down by grades, sex, size, things of

13     that nature?

14          A.   Boy that would get incredibly cumbersome.

15          Q.   I understand.  I just want to make sure that that

16     wasn't something that you did.

17          Now, one of the things that you talked about the

18     Jonssons doing is actually selling some of these live sales,

19     these breeder mink; right?

20          A.   Yes.

21          Q.   And in considering how they did vis-à-vis the

22     market, if they hold back a certain amount of their

23     commodity and sell it in another market, don't you have to

24     consider that?

25          A.   If they also sold -- consider it with respect to

1      what, production?

2         Q.   Let me show it to you demonstratively.  I'm going

3      to write on the back of this thing.  Let's assume that I got

4      100 products, okay?  And over here I sell 90 of them at one

5      market for $50.00 and I sell 10 of them for $200.00 at a

6      different market.  To determine how well that this

7      particular product performed for the year, I would need to

8      combine those, right?

9         A.   I am a little bit confused with what you're

10     doing.  Are you saying you are selling pelts or are you

11     selling live breeders or what is going on?

12        Q.   Let's assume they are breeders?

13        A.   Okay.

14        Q.   Let's assume they're pelts?

15        A.   Which one?

16        Q.   They're mink.

17        A.   Well, it matters which one.  So I can do it

18     either way, just let me know what you want to do.

19        Q.   Well okay, let's assume this.  Let's assume that

20     instead of pelting out the best mink in their herd they

21     decide to sell them as breeders.  Did you take that into

22     account at all in your analysis?

23        A.   Sell the nonperforming ones out?

24        Q.   Well, whether they're nonperforming or not I

25     guess is the question, right?

1          A.   Well, I used testimony from the Jonssons in

2     interviewing them that the reason they pelted them out was

3     because they were not performing.  If they were to somehow

4     sell those that would be quite misleading.  Their testimony

5     was that they pelted them.  So that is what I used.

6          Q.   But they also sold some live and you would assume

7     those live ones were not defective as you called them?

8          A.   Otherwise they would have a pretty poor name as a

9     reputation.

10          Q.   Right?

11          A.   If you are selling breeders that don't produce.

12          Q.   But those breeders that they sold live, had they

13     pelted them, would have, as you indicated for 2011, been the

14     higher quality pelts at market, right?

15          A.   The ones that they sold that were the highest

16     quality.

17          Q.   Yeah?

18          A.   Ask it again.

19          Q.   We're confused.  Let me go back and make sure we

20     understand each other.

21          You told us that the reason that the Jonssons were so

22     high in 2011 is because they took a bunch of mahogany

23     breeders and they pelted them out.  And the reason that they

24     were -- that because they pelted those out they were higher

25     in the market.  Do you remember that testimony?

1          A.   I do.

2          Q.   In 2010, instead of sending those and pelting

3     them out, they sold them live, right?

4          A.   2012?

5          Q.   2010?  We talked about the 7,000 sales, you had

6     5,500, I had 7,000?

7          A.   Again, I mean that goes back to the your -- you

8     giving me a number that I am not comfortable using but --

9          Q.   Your number was 5,500, right?

10         A.   That is correct.  5,520, I believe.

11         Q.   5,520.  Those 5,520 that were sold live would

12    have driven up their price at market, right?  Because they

13    were above average mink, right?

14         A.   When you sell a live breeder you're giving it to

15    someone to use for their breeding population you're not

16    pelting it out.

17         Q.   I am aware of that.  But what I'm saying is let's

18    assume that they had not sold any of those mahoganies live,

19    okay?  I want you to assume they didn't sell any to the

20    Griffeths, any to anybody, they sent them to market instead.

21    You told us those would be the prime mink because they are

22    the big ones, right?  And that is what happened in 2011, or

23    I'm sorry '12, that caused them to be above the market?

24         A.   My testimony with respect to 2012 was testimony

25    that I did not count damages with respect to price

1    performance at market for specific reasons.  So damages were

2    not calculated for that year, they were discounted entirely.

3    Even though I have good reason to understand why it was

4    higher, I am not able to separate out the specific mink that

5    were sold off as the best breeders versus the typical pelts.

6        If I could distinguish that effect, I would be able to

7    see, as I can in a like case, in the Griffeth case, I would

8    be able to see the precise impact from the mink that ate the

9    crumlets, for example, and to see, as is the case in the

10   Griffeths, that it was only those mink that were impacted.

11       Q.   Okay.  Let's talk then about the breeders.  I

12   want to talk about the breeders.  On the breeders, as I

13   understand what you just told me, is that Jonssons would not

14   sell to their friends substandard breeders, right?

15       A.   I indicated that if they were to sell

16   non-performing mink to those that they know in the mink

17   circles, those that are breeding, it wouldn't be the wisest

18   thing for them to do.

19       Q.   And, in fact, the only testimony that you have

20   about how good those breeders are comes from Kent Griffeths

21   who bought 400 of them, and his average the next year was

22   5.92, right?

23       A.   I can't make a statement about that.

24       Q.   You didn't read his deposition?

25       A.   No, you're asking me about information that is --

1        that is separate.  If you're --

2             Q.   You say --

3             A.   You said the only statement I can make about the

4        quality of the mink.  I can make lots of statements about

5        the quality of the mink simply from the fact that they have

6        gone a decade growing internally and selecting with very

7        meticulous behavior which of the offspring is largest and

8        likely to produce the best with the best pelts.  So, you

9        know, the idea that they sold their best breeders for

10       nonperformance there is a lot of indication that they were

11       of high quality.

12            Q.   Well, no, that is my point.  The 5,500 that

13       you're accounting for and a different number that I have,

14       you're assuming those are quality mink, right?

15            A.   The 5,500 that they sold?

16            Q.   Yeah, the live sales?  The live sale breeders,

17       you're assuming those are quality mink.

18            A.   Again, you're mixing two situations.  I talked

19       about the sale when they brought breeders to market.

20            Q.   And I'm sorry you are right in terms of I think

21       you and I are not tracking and let me make sure I understand

22       what we're talking about.

23            A.   Okay.

24            Q.   When I say quality mink, what I mean is quality

25       breeders?

1          A.   Okay.

2          Q.   In other words, when the Jonssons sold mink to

3     Kent Griffeths, they expected those mink to perform well,

4     right?

5          A.   I would think so.

6          Q.   Okay.  So they would -- they're not selling those

7     to the Griffeths in order to be sub-standard mink, right?

8          A.   I would guess that they wouldn't.

9          Q.   Okay.  And so if that is the case, then if they

10    wanted to increase their herd in 2011, because you indicated

11    that the normal growth of their herd internally would be to

12    add 1,600 mink, right?

13         A.   I indicated that their normal growth rate was

14    7.9 percent.  And in 2010, there was a specific event that

15    needs to be considered, specifically the building of four

16    new sheds that would house 1,900 breeders.

17         Q.   Right.

18         A.   That wasn't typical.

19         Q.   No, I understand that.  But you're saying they

20    needed 1,600 mink?  1,600 new breeders?

21         A.   They could have housed 1,600 more breeders, yes.

22         Q.   Let me put -- not to put too fine a point on it,

23    you're asking my client to pay for 1,600 new mink at $500.00

24    each, right?

25         A.   Yes.

1          Q.   Okay.  When, in fact, they sold over 5,000

2     mahogany mink as live breeders for $100.00 each, right?

3          A.   They sold breeders, yes.

4          Q.   Well, here is my point.  What you're telling me

5     -- your analysis goes something like this.  They sold 1,600

6     live mink to Kent Griffeths and others at a total of

7     $100.00, it actually more than that according to

8     Mr. Jonsson, and that I should pay $500.00 each to buy them

9     back?

10         A.   First of all, the 1,600 figure is being confused.

11    The 1,600 is a shortfall of what they could have filled in

12    their sheds and weren't able to given the massive death that

13    occurred.

14         Q.   Right.  But if they wanted to replace those, they

15    had them on stock, they just shouldn't have sold them?

16         A.   No, they kept everything that they arguably could

17    keep.  They were not able to grow the way they had expected.

18    They had saved capital for three years.

19         Q.   Wait, let me make sure --

20         A.   They had built four new sheds.  They had the

21    capacity to house 1,900 more and they weren't able to.  What

22    I need to do in my position as a scientist is I look at the

23    evidence to say is there sufficient evidence to warrant the

24    idea that there was capital savings going on.  That there

25    was indeed a building of sheds.  It would be different if

1      they said we had planned on building sheds but they didn't.

2      But they had the new sheds, I saw the growth rate

3      distinction.

4           There is a lot of evidence to suggest that they would

5      have indeed kept 1,900 more breeders.  Trying to confuse an

6      argument about them selling at the same time as them

7      suffering and there were so many things going on.  They had

8      neighboring ranches also suffering following the feeding of

9      crumlets in 2010.  People reached out saying I can't make my

10     loans, I'm struggling here, can you help me out.  Breeders

11     were exchanged.  There was a lot of things going on.  But so

12     to simply report it as one simple story I think is very

13     mislead.

14          Q.   No, no you're not misunderstanding.  You're

15     misunderstanding what I'm asking you.  I'm asking you did

16     they have 1,600 breeders on their farm that they could have

17     kept instead of selling?

18          A.   They were not able to justify keeping 1,600 for

19     several reasons.  They always keep the best they have.  That

20     is the reason why they grow it at nearly eight percent rate.

21     If they could justify keeping more they probably would have

22     grown at a faster rate.  The other problem you have to

23     consider is it is not just an issue of filling the sheds.

24     They also have to consider the accomplishment of sufficient

25     revenue at market in order to stay current with their

1    bankers and not go under.  Their decision at the point of

2    2010 moving forward was the best rational decision that a

3    businessman could make given the particulars of the

4    circumstances they experienced.

5         Q.  Okay.  All right.  Let me ask you a little bit

6    about these costs added.  The cost added figure, as you

7    indicated, is if they don't make 4.0 -- one of them is the

8    interest rate, right?  That if they don't make 4.0 or I'm

9    sorry 4.5 on their average kits, then they have to pay a

10   penalty, right?

11        A.  That is -- that is an interesting way of looking

12   at it.  Essentially what happens is the following.  They

13   take out, they borrow money from the bank with the

14   expectation that they're going to produce at normal rates.

15   Okay.  If they do produce at normal rates, they're able to

16   satisfy the demands of the contract, of the loan they have

17   with the businessmen.  If they're not, then what ends up

18   happening is they're not able to pay everything in the way

19   that they otherwise would, and the outstanding balance now

20   incurs additional interest.

21        Q.  Okay.  And so for them, based on what the bank

22   determined, they had -- they did not meet that interest

23   threshold in any year other than 2004 and 2006, right?

24        A.  That is not interest threshold, it is a total

25   revenue capture.  It is the amount of money they can make at

1    market given the number of mink that are born and survive

2    that they can take and, you know, I could have also

3    considered the prices but I didn't.  I just kept it to the

4    number.

5         Q.   Threshold is 4.5?

6         A.   4.5 is the aggregated weighted average between

7    the two.

8         Q.   Which they only met in two years in the ten years

9    you have data?  Well, actually I should say the two years of

10   the seven years before these events, right?

11        A.   I need to go look real quick.  Okay.  So when we

12   have a range, the critical thing to consider is if you point

13   out that some data points inside of a threshold are below --

14        Q.   Here is my --

15        A.   -- let me finish, are below median, that is

16   misleading to say that they only accomplished it in X number

17   of years.  The fact of the matter is that any time that

18   they're below something that is statistically

19   distinguishable, then we're able to say okay now let's

20   consider how much bearing would that have had on additional

21   interest.  And we all experience this when we live our

22   lives.

23        Q.   So let me put it in your terms.  They would have

24   had additional interest in 2005 because they didn't have 4.5

25   aggregate threshold?

1          A.   In a very rudimentary way of stating it, yes.

2          Q.   4.03 in 2007?

3          A.   4.03?  Where are you, I'm sorry.

4          Q.   I'm looking up at the top of this -- of your

5     chart and I'm looking at what the bank determined that their

6     average --

7          A.   You're stating in 2007?

8          Q.   Yeah, 4.03?

9          A.   That is true.

10         Q.   3.87 the next year?

11         A.   Yeah, I mean 5.28 in 2004, I mean --

12         Q.   Right the two years they made it over those seven

13    years?

14         A.   It is an average.

15         Q.   Okay.  So --

16         A.   Variance in an average.

17         Q.   The variance in an average, right, absolutely a

18    variance in an average.  Could be above, could be below in

19    any given year.

20         A.   And the point is to say it is one specific data

21    point after the exogenous event statistically

22    distinguishable.  Not to say oh, well, let's go ahead and

23    look back at the data prior and notice if there is any

24    numbers below an average.  Of course there is numbers below

25    an average.  It is not prior to 2010 that is being

1    considered.

2        Q.  By you at least?

3        A.  I'm not calculating damage from 2010 and prior.

4    I am looking at following the feeding of crumlets.  I was

5    tasked with the assignment of determining whether damages

6    had occurred following the feeding of crumlets in 2010.  And

7    I was able to find very concretely that in every year

8    starting in 2010 that there was a statistically discernible

9    effect in either the number produced or the quality of pelts

10    brought to market or both.  In my mind as a social scientist

11    that is a dead ringer.  Finding something that is that

12    strongly pointing towards damage suggests a very discernible

13    exogenous event.

14        Q.  Well, hold it.  Before we talk about that, let's

15    make sure we understand exactly what you're saying.  With

16    respect to the blacks and you read the Jonssons'

17    depositions, right?

18        A.  I did.

19        Q.  You did.  And you read where they said that in

20    mahoganies they suffered no loss, you read that?

21        A.  This is again something that --

22        Q.  Did you read that?  Did you read that?

23        A.  I did read that.

24        Q.  Okay.

25        A.  But there needs to be an important caveat added

1     to that.  The numbers that the Jonssons point to are numbers

2     when the breeders initially give birth.  These are numbers

3     that are first -- first available.  Given that they have got

4     tens of thousands they don't go back, unfortunately, I wish

5     they did, and count again after the first month of mortality

6     and make those distinctions.  So to say that their numbers

7     are going to be in their testimony or in their depositions

8     different than what I have, I have to go off of what I know.

9     And what I know is what they brought to market.

10          Q.   Right.  And what you know is that with respect to

11    the black mink -- the black mink that they said that they

12    suffered a loss in, you didn't find a loss?

13          A.   That is not true.  There were 450 breeders that

14    died in that initial year that were counted.

15          Q.   Were they counted?  Who told you they were

16    counted?

17          A.   I was told by the Jonssons that they saw them.

18          Q.   They were not reflected in any records that you

19    saw, that is solely based on their testimony?

20          A.   Well, what record would it be?

21          Q.   I'm asking you the question, were there any

22    records supporting that?

23          A.   I did not go off anything but the testimony which

24    is a viable -- okay let me be a little --

25          Q.   I have got to ask a quick one final question.

1          (Whereupon, the court reporter stopped the witness

2           and attorney from talking on top of each other.)

3          THE COURT:  Don't overlap, counselor.

4          MR. MINNOCK:  Well, I'm trying --

5          THE COURT:  I have talked about how Laura is very nice

6     and very careful.

7          MR. MINNOCK:  I am aware.

8          THE COURT:  And very conscientious if you only --

9          MR. MINNOCK:  I --

10          THE COURT:  Her record isn't worth a darn.

11          MR. MINNOCK:  I think I'm actually done.

12          THE COURT:  Rise up.

13          MR. MINNOCK:  We have been over this.  I got it.  I

14     think I understand what you're saying.

15          THE WITNESS:  Can I finish answering the question?

16          MR. MINNOCK:  Well, which question do you want to

17     answer?

18          THE COURT:  Well, I don't want him asking questions.

19     You put your questions.  You're through.

20          MR. MINNOCK:  I thought he said he wanted to answer a

21     question?

22          THE COURT:  Are you through?  Are you through?

23          MR. MINNOCK:  Yes.  Yes, I have turned this off.

24          THE COURT:  Okay.  Let's send you home a little early,

25     folks.  Let's go home.  9:30 we'll start tomorrow, but 20

1    minutes after 9 report in.  We're moving.  So we're getting

2    there.  Take heart.

3          THE CLERK:  Please stand for the jury.

4          (Whereupon, the jury left the courtroom.)

5          THE COURT:  9:30.  Thanks a lot.

6          (Whereupon, court adjourned for the day at 4:51 p.m.

7           The trial will resume on Thursday, January 16,

8           2014 at 9:30 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF UTAH            )

 2                             )ss

 3    COUNTY OF SALT LAKE      )

 4

 5             I, Laura W. Robinson, Certified Shorthand

 6    Reporter, Registered Professional Reporter and Notary Public

 7    within and for the County of Salt Lake, State of Utah, do

 8    hereby certify:

 9             That the foregoing proceedings were taken before

10    me at the time and place set forth herein and were taken

11    down by me in shorthand and thereafter transcribed into

12    typewriting under my direction and supervision;

13             That the foregoing pages contain a true and

14    correct transcription of my said shorthand notes so taken.

15             In witness whereof I have subscribed my name and

16    affixed my seal this 24th day of February, 2014.

17

18                             _____

19                             Laura W. Robinson

20                             RPR, FCRR, CSR, CP

21

22

23

24

25
```