IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| KEITH JONSSON, an | ) | |
| individual; MICHAEL | ) | |
| JONSSON, an individual; | ) | |
| CEDAR VALLEY FUR FARM, | ) | |
| LLC, a Utah limited | ) | |
| liability company, | ) | |
| | ) | |
|      Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 2:11-CV-140BSJ |
| | ) | |
| NATIONAL FEEDS, INC., an | ) | |
| Ohio corporation, | ) | |
| RANGEN, INC., an Idaho | ) | |
| corporation, | ) | |
| | ) | |
|      Defendants. | ) | |
| _____ | ) | |

BEFORE THE HONORABLE BRUCE S. JENKINS

January 16, 2014

Jury Trial

MORNING SESSION

Laura W. Robinson, RPR, FCRR, CSR, CP
144 U.S. Courthouse
350 South Main Street
Salt Lake City, Utah 84101-2180
(801)328-4800

**Appearances of Counsel:**

For the Plaintiffs:                Ryan B. Hancey
                                   Scott O. Mercer
                                   Attorneys at Law
                                   KESLER & RUST
                                   68 South Main Street
                                   Second Floor
                                   Salt Lake City, Utah 84101

For Defendant National             Joseph E. Minnock
Feeds:                             Attorney at Law
                                   Morgan Minnock Rice & James
                                   136 S. Main Street
                                   Suite 800
                                   Salt Lake City, Utah 84101

For Defendant Rangen:              Hans A. Mitchell
                                   Attorney at Law
                                   Carey Perkins LLP
                                   P.O. Box 519
                                   Suite 200
                                   Boise, Idaho 83701

```
                    I N D E X
```

Examinations                                          Page

**WADE ROBERTS**
REDIRECT EXAMINATION                                   605
BY MR. HANCEY
RECROSS-EXAMINATION                                    620
BY MR. MITCHELL
FURTHER DIRECT EXAMINATION                             621
BY MR. HANCEY
**EDWARD JOSEPH BUSCHUR**                              622
DIRECT EXAMINATION                                     623
BY MR. HANCEY
CROSS-EXAMINATION                                      647
BY MR. MINNOCK
**ANDREAS SANDERS**                                    658
DIRECT EXAMINATION                                     658
BY MR. HANCEY
CROSS-EXAMINATION                                      666
BY MR. MINNOCK
**WILLIAM WUSTENBERG**
DIRECT EXAMINATION                                     674
BY MR. MITCHELL
CROSS-EXAMINATION                                      723
BY MR. HANCEY
REDIRECT EXAMINATION                                   747
BY MR. MITCHELL
**RICHARD STEVEN HOFFMAN**
DIRECT EXAMINATION                                     748
BY MR. MINNOCK
CROSS-EXAMINATION                                      776
BY MR. HANCEY
REDIRECT EXAMINATION                                   789
BY MR. MINNOCK
RECROSS-EXAMINATION                                    790
BY MR. HANCEY

<strong>Salt Lake City, Utah, January 16, 2014</strong>

1

<strong>* * * * *</strong>

2

3          THE COURT:  Good morning and --

4          MR. MITCHELL:  Good morning, judge.

5          THE COURT:  -- it looks like we're all here.  Any good

6   reason we shouldn't bring in the jury?

7          MR. MITCHELL:  No, judge.

8          MR. HANCEY:  No, Your Honor.

9          THE COURT:  Okay.  Why don't we bring them in.

10         Sir, you were in the witness chair, and if you will

11  resume your chair, we would appreciate that.

12         THE CLERK:  Please stand for the jury.

13         (Whereupon, the jury returned to the courtroom.)

14         THE COURT:  Good morning, ladies and gentlemen.  Sit

15  down and relax and I hope you got a good night's sleep.

16         It looks like everybody is here, so counsel, you may

17  proceed.

18         MR. MITCHELL:  Thank you, Your Honor.

19         Q.   (By Mr. Mitchell)  Dr. Roberts, as I understand

20  it, the report we have been working from in large part with

21  your testimony so far has been the report that was dated

22  April 8th of 2013.  Is that your understanding as well?

23         A.   You have been using both numbers from the

24  original and also the adjustments that were made to that

25  report, yes, sir.

1          Q.   We'll get to the adjustments here in a minute,

2     but I want to confirm that the last report that you issued

3     in this case was the report dated April 8th of 2013?

4          A.   That is correct.

5          Q.   You have made adjustments to the number in there

6     but you haven't issued another report based on those new

7     numbers?

8          A.   No, I was not requested to.

9          Q.   Okay.  Now, you were also deposed in this case

10    less than a month after you issued that April 8th report,

11    correct?

12         A.   That is correct.

13         Q.   In fact, you were deposed on May 3rd?

14         A.   I would have to look at the exact date.

15         Q.   Do you have your deposition there in front of

16    you?

17         A.   Yeah, that is correct.

18         Q.   Okay.  Now, since that deposition, were you

19    provided with additional information?

20         A.   I was provided with information within the

21    deposition with respect to the additional live breeders that

22    were sold, and then I also went back to check and confirm

23    that the 18 percent sample size was indeed accurate.

24         Q.   Okay.  So the only additional information that

25    was provided to you came at the time of your deposition?

1          A.   And from what I gathered in looking at the end of

2     year sales for 2013.

3          Q.   Okay.  So those were the only two additional

4     pieces of information that came to your attention after your

5     deposition?

6          A.   I don't know that I would say it is the only

7     pieces of information.  As far as documents wise, that would

8     be -- that would be true.  I have also spoken with Michael

9     Patrick from Patrick Fur Farms since then.  I have had

10    several conversations about the topics since then so the

11    information continues to come in this case and as each year

12    passes, things start to change again with continued loss.

13         Q.   Okay.  And so you haven't issued an actual -- you

14    haven't actually issued a --

15         THE COURT:  Counselor, let's move on.  Let's deal with

16    the substance.

17         MR. MITCHELL:  Okay.

18         Q.   (By Mr. Mitchell)  So I believe -- do you agree

19    with the statement, Dr. Roberts, prices are often indicative

20    of quality not always but there is a strong association

21    between value and price?

22         A.   Certainly as an economist, yes.

23         Q.   Okay.  If you would just limit it to yes or no

24    when it is a yes or no question I would appreciate it, okay?

25         A.   Okay.

1          THE COURT:  Well, he is entitled amplify his answers.

2          MR. MITCHELL:  Okay.

3          THE COURT:  If there is a need to amplify the answer.

4     It isn't just yes or no.

5          THE WITNESS:  Okay.

6          Q.   (By Mr. Mitchell)  Now, Dr. Roberts, I would like

7     you to help me see if I understand your math correctly

8     because it is a kind of some of is goes like that to me, it

9     is just me. (Attorney waving hand over the top of his head.)

10         As I understand it, you have calculated the kits per

11    litter averages by dividing the number of sales produced in

12    a given year, for a given category, by the number of

13    breeders after you take into account the impact on the total

14    sales figure that changes in the number of breeders had

15    relative to the past season.

16         A.   Yeah, very close.  So I look at the change that

17    took place with respect to holding breeders over.  So if

18    they have, for example, 1,000 more in one year than the --

19    than the year previous, and they didn't purchase those

20    externally, then I know they came from what was produced

21    from their herd.  So I am able to consider that as part of

22    their production.  So I then add that figure to the number

23    that were sold as pelts in an effort to get an accurate

24    reflection of the total number produced, and then I divide

25    that by the breeder base that produced it, yes.

1          Q.   So the way I understand the math as you have done

2     the math is this:  If we look, for example, at 2011, and

3     this is page -- the chart from Page 13 of your April 8th

4     report, correct?

5          A.   Yes.

6          Q.   Okay.  So if we look at 2011, if we want to

7     calculate the number of mahogany sales per litter what we

8     would do is start with the number of breeders in 2010,

9     correct?

10          A.   Yes.

11          Q.   Okay.  Because we're looking at sales in 2011

12     were actually produced in 2010?

13          A.   Produced, yes, from the breeders in 2010, that is

14     correct.

15          Q.   Okay.  So we see in 2010 we have breeders at

16     5,800 in your chart here, and in 2011 they drop down to

17     4,630.  And as I understand it, what we want to do then is

18     we want to actually subtract 5,800 from 4,630.  And that

19     comes to a deficit of 1,170 breeders.  Am I correct so far?

20          A.   Yes.

21          Q.   Okay.  And then because we want to account for

22     that change in the averages, what we do is we add that

23     negative 1,170 into the total of mahogany kits of 21,016,

24     correct?

25          A.   Yes.

1        Q.   Okay.  And if we do that, we can accomplish that

2   by 21,016 minus 1,170 and that gives us 19,846.  And that

3   reflects the total number of mahogany kits produced after

4   accounting for the change in breeders relative to 2010.

5   With me so far?

6        A.   Yeah, I'm following your argument, yes.

7        Q.   Okay.  Now, is that how you have -- up to this

8   point is my math consistent with yours?

9        A.   The math is, but there is a slight distinction

10   with what you're referring to.  You keep referring to those

11   sold at market as our ultimate goal of understanding what

12   that number is.  But we need to get all of the numbers

13   considered together.

14        Q.   Correct.  All I'm doing right now is trying to

15   reproduce your math as it came out on your report of

16   April 8th, 2013.  We'll get further along.  All I'm trying

17   to do is reproduce this 3.42 number.

18        So we're at 19,846, and in order to figure out what

19   that averages out to, we have to look a year back because

20   that is where those kits were actually born and raised.  And

21   so we're going to divide 19,846 by 5,800 equals 3.42.  Is my

22   understanding of your math about how you get to this number

23   correct?

24        A.   Yes, it appears to be.

25        Q.   Okay.  And then if we go through and do the same

1    calculation -- if we go through there is -- it becomes just

2    a little bit different in 2012 because of the way that the

3    changes in the breeders came about.  There is a couple other

4    numbers that we have to take into account for 2012, isn't

5    there, to get to your 422 number in 2012?

6        A.   Well, there are also changes that take place in

7    2011, too.  There is changes that take place to each of

8    those years given the information.

9        Q.   Oh, sure.  I'm just talking about there is -- it

10    works out -- well, we'll walk through 2012 here and see if I

11    am still on track with what you're doing.

12        A.   Okay.

13        Q.   Okay.  As we move to 2012 and the mahogany kits,

14    we have 5,791 breeders in breeder mahoganies in 2012 and we

15    had a change the previous year where they purchased 151

16    mahogany breeders, correct?

17        A.   Correct.

18        Q.   So we have to account for that, right?

19        A.   Yes.

20        Q.   So what we do is we're going to subtract 151 from

21    that total, and then after that we are going to also

22    subtract 4,630 because that is what the breeder number was

23    in 2011, correct?

24        A.   Yeah.

25        Q.   Okay.  Who knew my junior high school teacher --

1    if my junior high school teacher could see me now working on

2    order of operations.  And if we go through and subtract

3    first 5,791 from 151 and then 4,630, that is going to give

4    us a positive 1,010, correct?

5         A.    Yes.

6         Q.    Okay.  And so then we take that 1,010 and add

7    that into the kits produced of 19,176?

8         A.    That is correct.

9         Q.    And that is going to give us 20,186 kits produced

10   relative to the 2011 season, correct?

11        A.    Yes.

12        Q.    Okay.  So then we take that 21 -- 20,186, divide

13   it by 4,630, and that is going to give us a figure of 4.22,

14   correct?

15        A.    Yes.

16        Q.    Okay.  Did I understand correctly yesterday that

17   you have calculated the 95 percent confidence interval for

18   the Jonssons' mahogany mink as being 4.4 to 6.6 kits per

19   litter?

20        A.    That is correct.

21        Q.    Now, have you seen Exhibit Number 34 before?

22        A.    Yes, I have.

23        Q.    That was sent to you by Michael Jonsson, wasn't

24   it?

25        A.    It was.

1          Q.   Okay.  And as I read this letter, this contains

2     Michael's calculations of the total number of animal sales

3     corresponding to each year identified, correct?

4          A.   That is correct.

5          Q.   Okay.  And so in 2011, he calculated total sales,

6     and when I say total sales what I mean is pelts plus live

7     sales.  Is that your understanding as well?

8          A.   Yes, but there is an important caveat to point

9     out.  The numbers from what we're looking at right here will

10    not jive with the numbers from my report because they

11    include also other mink he sold outside of black and

12    mahogany which I did not include in my analysis.  I looked

13    at strictly what was sold with respect to black and mahogany

14    based from the evidence and the reports that I could obtain.

15         Q.   Okay.  The jury has already heard what the live

16    sales in there represent, so we'll let the jury decide that.

17    But this reflects the total live and pelt sales as

18    calculated by Michael Jonsson for the years 2004 through

19    2012, correct?

20         A.   I think it is important to point out you

21    mentioned that the jury has heard that there was additional

22    live sales, but I think, again, that is misleading because

23    this number also includes information about not just live

24    sales but pelts that were sold outside of the category of

25    black and mahogany.  So it is a way of, I feel, trying to

1      mislead with numbers.  The numbers in my report are factual

2      and accurate and can be easily regurgitated by looking at

3      the records from the auction home.  So trying to say this

4      number right here from Michael in trying to identify all of

5      the loss on his ranch is a bit misleading because I only

6      calculated the damage to his ranch for black and mahoganies.

7           Q.   All I have asked you -- I haven't compared

8      anything.  All I have asked you is is it your understanding

9      that these numbers are Michael's calculation of the total

10     sales coming off their ranch?

11          A.   Again, I am not qualified to look at anything

12     beyond the analysis I have performed which is respect to

13     blacks and mahoganies.  I have seen this and I realize that

14     the numbers are close, but they also include things that are

15     not a part of this analysis.

16          Q.   Okay.  Let's do it this way, Dr. Roberts.  Take a

17     look at your version of Exhibit 34, it is in your binder

18     right there on your left hand side.

19          A.   Okay.

20          Q.   Okay.  And I am looking at the very last sentence

21     of the paragraph preceding these numbers.  As I read that it

22     says, and as for mink sold over the years, these are the end

23     of year sales pelts and live sales combined.  Did I read

24     that correctly?

25          A.   It doesn't -- yes.

1          Q.   Okay.  Now, as I understand what you have -- what

2     you did in preparing this version of your chart, you looked

3     at the auction records for the Jonssons and obtained the

4     total sales for three categories, the black mink, the

5     mahogany mink, and the total mink, and identified the total

6     pelt sales as market sales in each category.  Is my

7     understanding of what you have done there correct?

8          A.   Yes.

9          Q.   Okay.  So if we -- if we take and that is true

10    all the way through 2011, '12 and '13, correct?

11         A.   Yes, with an understanding those numbers did

12    change.  But yes, for the chart, yes.

13         Q.   Okay.  So the numbers, the total numbers in each

14    of these categories changed or was it just the numbers

15    changed in 2013?

16         A.   Well, we had -- when information came with

17    respect to additional live breeders that were sold, it was

18    important for me to incorporate those into the aggregate

19    number which went back through and changed all of the

20    information with respect to the kits per litter.

21         Q.   Okay.  Okay.  So you're -- the changes you're

22    talking about are your incorporation of the live sales into

23    your calculations?

24         A.   That is correct.

25         Q.   Okay.  But as these numbers sit up here right

1    now, the 28,782, the 31,421, and the 42,427 are the pelt

2    sales that you have been able to determine based upon the

3    auction records from the Jonssons?

4        A.   Yes.

5        Q.   Okay.  So let's do this.  Let's look at what the

6    total number of live sales were for the Jonssons.  And we're

7    going to assume that the difference between the pelt sales

8    you have identified here and the total sales identified by

9    Michael Jonsson in Exhibit 34 equals live sales and see what

10   that does to the average?

11       MR. HANCEY:  I am going to object to that.  That has

12   been asked and answered.  He said that is not part of his

13   analysis.

14       THE COURT:  You may wish to rephrase your question,

15   counselor.

16       Q.   (By Mr. Mitchell)  I'm going to ask you to

17   assume, for purposes of this question, and this series of

18   questions, that the difference between -- that the testimony

19   has been that the difference between the auction sales and

20   the numbers identified in Exhibit 34 are live sales of

21   mahogany breeders with the exception of 100 old black

22   breeders that were sold in 2011.  Just assume that for

23   purposes of this line of questions, okay?

24       A.   I have to say as a scientist it is not okay

25   because I have information to the contrary.  So making an

1    assumption is in direct violation of my body of knowledge I

2    am not comfortable with.

3           Q.   We're working on a hypothetical here.  And the

4    hypothetical is that this is what the testimony has been.

5    So if we take 36,520 from 2011 as identified by Michael

6    Jonsson as being the total sales for that year, and we

7    subtract out the total pelt sales of 28,782.  So if we take

8    36,520 and subtract 28,782, what does that give us?

9           A.   Besides the biggest calculator in the world,

10   7,738 is the answer to that.

11          Q.   7,738.  And for purposes of this hypothetical,

12   we're going to assume that of that 7,738, 100 is -- were

13   black breeders.  And if we take out those black breeders,

14   that is going to give us 7,638 live mahogany sales in this

15   hypothetical.  So if we add in 7,638 to 21,016, what does

16   that give us?

17          A.   Those two numbers combined equal 28,654.

18          Q.   28,654.  Okay.  So now if we go through and do

19   the math, let's see what that average is.  For 2011, we're

20   going to start again at 4,630 and we're going to subtract

21   5,800 and that gives us, as I recall, a negative deficit of

22   1,170, correct?

23          A.   Yes.

24          Q.   Okay.  So we're going to then subtract that 1,170

25   from 28,654 and that is going to give us, I believe, a

1      number of 27,484?

2          A.   That is correct.

3          Q.   Okay.  So we have got 27,484 and then we're going

4      to go and we're going to divide 27 -- whoops, 27,484 by

5      5,800, the number of breeders in 2010.  And by my

6      calculations, that gives us a kit per litter average of

7      4.74?

8          A.   The number comes out to 4.7386.

9          Q.   If we round it up?

10         A.   I disagree with the premise.

11         Q.   I understand you disagree.  I am just asking you

12     if my math is correct.  We'll just take the numbers as they

13     come, 4.73 using those figures in that math?

14         A.   Yeah, I mean you could round that if you're just

15     going to do two decimals to the 2.74 but yes, that is --

16         Q.   Okay.  So let's do the same thing for 2012.  In

17     2012 we have got, according to Michael, 34,327 live sales?

18         MR. HANCEY:  Objection, mischaracterizes the evidence.

19         MR. MITCHELL:  I'm sorry, you're right.

20         THE COURT:  Yeah.

21         Q.   (By Mr. Mitchell)  We have got 34,327 total sales

22     and we have got pelt sales in mahogany of 31,421 total in

23     2012.  By my calculations -- well, what does that -- what

24     does that number come out to?

25         A.   2,906.

1          Q.   2,906.  If we add then 2,906 to 19,176 what does

2     that give us?

3          A.   22,082.

4          Q.   22,082 mahogany sales.  So if we are going to

5     calculate the averages, we're going to start with 5,791 and

6     then we're going to subtract the 151 and also the 4,630 to

7     get a figure of 1,010?

8          MR. HANCEY:  Your Honor, I'm going to object to the

9     form.

10         THE COURT:  At this point overruled because of the

11    nature of the inquiry.

12         MR. MITCHELL:  So then we add --

13         THE COURT:  Nothing but mathematics at this point.

14         Q.   (By Mr. Mitchell)  So then we add the 1,010 to

15    the 22,082.  What does that give us?

16         A.   Totals 23,092.

17         Q.   23,092 sales.  And then we go and divide 23,092

18    sales by the breeders, total mahogany breeders of 4,781, and

19    what does that average out to?

20         A.   That averages to a 48,299.

21         Q.   So if we're rounding and being consistent, a 4.83

22    average for 2012.  I did -- have I done, I understand you

23    don't agree with the premise.

24         A.   Your math is right.

25         Q.   The math is correct.  Okay.  How did the -- have

1    you told us how the numbers for 2013, 2013 changed in each

2    of these categories?

3           A.   What do you mean told you?

4           Q.   I'm sorry.  I don't recall.  I know you spoke

5    yesterday that you talked about doing your -- I think it was

6    an 18 percent sampling?

7           A.   Yes.

8           Q.   An extrapolation.  Did I -- am I recalling that

9    correctly?

10          A.   Yes, for 2013.

11          Q.   And then you got additional sales data for 2013

12   to check whether that was an accurate extrapolation?

13          A.   That is correct.

14          Q.   And did the 2013 numbers change?

15          A.   Yes, they did.

16          Q.   And which way did they change?

17          A.   Well, the blacks end up showing a loss now which

18   they didn't previously.

19          Q.   Okay.

20          A.   Given the quantity that ended up being produced

21   and graded as black.  So everything within respect to black

22   changes because prior to that it was -- it was negated.

23          Q.   And then did the mahoganies go up or down?

24          A.   The mahoganies were reduced dramatically.

25          Q.   Okay.  And then so across the board in 2013

1          the -- that would bleed over into the total sales so the --

2          was this 42,427 an extrapolation number in 2013?

3          A.   Um, let's see yes.  Yes, it was.

4          Q.   And so what did the total number of pelts sold

5          end up being?

6          A.   Let me look real quick here at my other paper.

7          Okay.  Let me just maybe read a little bit from here.

8          Q.   All I want to know is what did this total figure

9          end up being?

10          A.   So the 31,201 that were mahogany ended up being

11          actually 30,335.

12          Q.   Okay.

13          A.   So you could substitute that number there.  And

14          then with respect to the blacks, instead of producing the

15          11,226 we end up getting -- my intention in doing this was

16          to measure loss so in areas where there is not loss I have

17          to go and figure the numbers out for myself.

18          Q.   Have you -- do you have just a total -- a total

19          pelt -- an actual total pelt number for the year?

20          A.   Um, I am going to have to add it between the two.

21          Doing an aggregated figure for me is much less reliable and

22          so it is done more in an effort to compare it to the numbers

23          from the other experts but because I have this aggregated

24          data, that is the direction I have gone.

25          Q.   Okay.

1          A.   So --

2          Q.   You know what, it is -- it is not -- it is okay.

3     It is okay, don't sweat it.  Now, did you account for any

4     live sales in 2013?

5          A.   Okay, sorry.  Say that again.

6          Q.   Did you account for any live sales in 2013?

7          A.   2013 as far as live sales are concerned?

8          Q.   Yes.

9          A.   I have -- so during the 2013 year or from the

10    2013?  When are we talking?  There is the two ways of

11    classifying the years.

12         Q.   Certainly.  What we're looking at is if we're

13    going to -- so for example, I'm talking about the same type

14    of categorization as the 5,500 number that you have used in

15    doing your calculations.

16         A.   Okay.  So then precisely the adjustment was made

17    for 5,520 breeders in 2011 and for 850 mahogany and 240

18    black in 2012.

19         Q.   Okay.  So we have 850 black live sales?

20         A.   Mahogany.

21         Q.   Oh, I'm sorry mahogany.  And then the 200 number

22    was?

23         A.   240 black.

24         Q.   And 240?

25         A.   Yes.

1       Q.   Black.  And where did that information come from?

2       A.   During the deposition I believe it was you who

3  brought up the fact that there were live sales unaccounted

4  for in the report.  And in recognizing that those were not

5  provided to me, I went and found that indeed that was

6  accurate.  There was a miscommunication with the information

7  given to me and as soon as I had that information, I went

8  back and recalculated essentially the majority of the report

9  in order to reflect those numbers.

10      Q.   My question was much simpler.  Where did these

11 numbers come from?

12      A.   From Michael Jonsson.

13      Q.   Okay.  Were you -- have you accounted in any

14 fashion, or have you been provided any information, let's

15 start there.  I'm just curious if you have been provided

16 information and then we may or may not get into what

17 information, if there was?

18      A.   Okay.

19      Q.   Have you been provided with any information about

20 the prices that the Jonssons were getting for the animals

21 that they sold live?

22      A.   Yes.

23      Q.   Okay.  And where did that information come from?

24      A.   Again from them.

25      Q.   Okay.  And what were you told about the prices

1       that they received in 2011?

2           A.   There was -- so the story line behind that is

3       that after they suffered the significant losses they were in

4       a situation where it was necessary for them to have enough

5       revenue to pay their bank loans which typically means taking

6       and pelting, pelting out sufficient amount of your kits from

7       that year.  They were approached by some other small

8       ranchers around and asked instead of you pelting, we would

9       pay you a similar price for what you would get from the pelt

10      if we could have those as live breeders.  They ended up, I

11      believe, charging a price that was similar to what they

12      could have got for a pelt adjusted for some of the care

13      expenses in getting the animal to them.

14          Q.   Okay.  Maybe my question wasn't clear, I don't

15      know.  What were you told they got for a price for live

16      sales in 2011?

17          A.   Okay.  For the live sales?

18          Q.   For the live sales?

19          A.   I do have that here.  Let's -- sorry, you have to

20      bear with me for a minute while I pull it from the report

21      here.

22          Okay.  So March 2011 they sold -- they have got

23      several invoices which collectively add up the -- okay the

24      850 -- the total for the invoices were see $413,500.00 for

25      the collective breeders in 2011.

1        Q.    What does that work out to as a price per head?

2        A.    Let's do -- I have to add up the number again.

3    So they sold 200 breeders at $79.00 specifically.  20

4    breeders at 108.  So on that invoice it was 17,960.  400

5    breeders were sold at $79.00, an additional 25 for $108.00,

6    totalled 34,000 on that invoice.  Another 25 at $132.00 each

7    totalling 3,300, and then finally another 4,000 breeders,

8    which is the bulk, at $80.00 each.  And the last one of 85

9    or 850 breeders were sold at $110.00 each.

10        Q.    Okay.  And do we have that kind of information

11    for the breeders that were sold in 2012?

12        A.    I got it all down.  That is great.  Yes.  Let me

13    -- actually, I probably don't have that information with me

14    for that year.  I believe it was the similar premise that

15    they sold it at a similar price.

16        Q.    Do you have at least an aggregate sales figure in

17    terms of dollars and then numbers sold so we can at least

18    get an average?

19        A.    I didn't bring that with me, no.

20        Q.    It is not -- it doesn't even show up in your

21    report?

22        A.    Well, the results of it do.  The areas where

23    there is no loss considered I discount entirely and don't

24    delve into the details.  I focus on areas where loss is.

25        Q.    Okay.

1          A.   Not where loss is not.

2          Q.   Okay.  Now, of the breeders sold -- well at least

3    look at this just a little bit for the 2011 numbers and you

4    think the -- your recollection is that the 2012 sales prices

5    were similar to the 2011 sales prices?

6          A.   Yes.

7          Q.   Okay.  So at least as far as 2011 goes, what was

8    the average pelt price for mahoganies in 2011?

9          A.   Let me calculate it from there.  Is that what

10   you're asking.

11         Q.   Yeah, actually, in fact, I'll just look at your

12   report on Page 29.  Chart R-10, because I want to make sure

13   that I understand this, that I'm reading this correctly.  So

14   your chart on R-10, as I understand it, you have looked at

15   the market as a whole to calculate what the average -- the

16   average buyer would have received for a mahogany pelt in the

17   years 2010 through 2013?

18         A.   That is correct.

19         Q.   Okay.  And, in fact, actually maybe even the

20   cleaner place to look is going to be on Page 28 on chart

21   R-9?

22         A.   Okay.

23         Q.   Okay.  So on chart R-9 on Page 28, as I read it,

24   you have got an average mahogany price for 2011 of 76.95.

25   Am I reading that correctly?

1          A.    That is correct.

2          Q.    Okay.  Now, does the chart on R-9 does that

3    reflect your calculation of what the Jonssons could have

4    expected to receive for an average mahogany pelt at market

5    in 2011?

6          A.    This is just simply the average mahogany price.

7    It doesn't adjust for the expectations of the Jonssons'

8    greater than average performance.

9          Q.    Okay.  So we have got an average performance of

10   76.95 in 2011, and then I think you go through and make that

11   adjustment on Chart R-10?

12         A.    Yes.

13         Q.    Okay.  And is that what we see where we see

14   average mahogany prices adjusted in 2011 of 77.42?

15         A.    Yes.  It goes up by 47 cents a pelt.

16         Q.    77.42 is what the Jonssons could have expected to

17   have received for their pelts at market in 2011.  Okay.

18         MR. MITCHELL:  No further questions.  Thank you.

19                       **REDIRECT EXAMINATION**

20   BY MR. HANCEY:

21         Q.    I just have a few questions for you, Dr. Roberts.

22         As a point of clarification, you referenced at one

23   point in time that the Jonssons sold 850 mahogany live

24   breeders and 240 black breeders in a particular year.  What

25   year was that in?

1          A.    They sold the 850 mahogany and 240 black breeders

2     in 2012.

3          Q.    Okay.  So if the board reflected 2013, that was a

4     mistake, correct?

5          A.    I'm not sure what was going on there.

6          Q.    Okay.  Now, do you remember that long line of

7     questioning that you just went through concerning Hans'

8     hypothetical about live sales and total sales and that sort

9     of thing, correct?

10          A.    It is fresh in my mind, yes.

11          Q.    Now, you mentioned on several different occasions

12     that you didn't agree with his underlying premise; is that

13     correct?

14          A.    Yes.

15          Q.    Why didn't you agree with that or what didn't you

16     agree with?

17          A.    Well, you know, I teach a lot of classes on

18     statistics involving math, advanced regression analysis

19     where -- where essentially using math as a tool, using

20     statistics as a tool to gain insight into some social

21     reality.  When I selected the conservative threshold of

22     95 percent, that was in an effort to be extremely cautious

23     about making a statement that loss existed meaning that

24     whenever a data point was observed following the feeding of

25     crumlets, it was compared to this threshold of confidence.

1          And when we create a threshold such as this we're able

2     to say look, given statistics based on the past performance,

3     95 out of 100 times they would fall within this threshold.

4     It is a very safe way of looking at it.  The trickery here

5     is very, very simplistic.  I mean it is -- it is as obvious

6     as only using three years of data which is also done.  It is

7     the idea that you could somehow discount the argument

8     entirely if the data point were just beyond the lower part

9     of that threshold.  When, in fact, all of that may do, if it

10    were true, is mean that you're now 90 percent confident that

11    there was loss.  Look there is -- there is so much that is

12    discounted simply from the fact that unfortunately for the

13    Jonssons they didn't keep separate records for the mink that

14    were -- we'll call them good.

15         Q.   When you say they can't keep separate records, do

16    you mean they can't track separately the performance of

17    their mink on the Lehi Ranch that had the problems as

18    opposed to records for the mink on the Cedar Valley Ranch

19    that were normal?

20         A.   That is correct.

21         Q.   Why is that significant in your mind?

22         A.   Well, it means a lot.  Actually, this -- my

23    experience with this case has -- has been very interesting

24    because initially, I am -- I produced a report for the

25    Jonssons in an effort to understand loss, without the

1      separate records from the good and the bad.  Which means

2      what I have to do is I have to look at the performance with

3      that group altogether.

4           Q.   The --

5           A.   The good and the bad.

6           Q.   The high performing ranch the Jonssons said had

7      the best performance ever, with the low performing ranch?

8           A.   Yes, that is correct.

9           Q.   What effect does that have on your ability to

10     calculate damages?

11          A.   I can't see the full loss.

12          Q.   Why?

13          A.   Because there is a muting, there is a dampening

14     of the effect.

15          Q.   An offset?

16          A.   Absolutely.  And the reason why I say this is

17     interesting is because I had the same situation with respect

18     to data for the Griffeths who also fed the same product in

19     the same year to the same animal.  And initially I was under

20     assumption that their data was also only looked at in the

21     aggregate, pooled together.  After I submitted the initial

22     report in that case, Mr. Griffeth called up saying I don't

23     understand what is going on we had a meeting.

24          MR. MINNOCK:  Your Honor, I'm going to object to the

25     discussion about the Griffeth's case.

1          THE COURT:  I'll sustain the objection.  Let's confine

2     your redirect to issues here.

3          MR. HANCEY:  Thank you, Your Honor.

4          Q.   (By Mr. Hancey)  Do you have an opinion on how

5     separate records in this particular case, what kind of a

6     bearing that would have on your damages calculations?

7          A.   Absolutely.

8          MR. MITCHELL:  Objection, calls for speculation.

9          THE COURT:  Well, he is just saying he wished he had

10    better records.  I understand that.  Let's move on.

11         MR. HANCEY:  Okay.

12         Q.   (By Mr. Hancey)  Dr. Roberts, you mentioned

13    during cross-examination that you were only charged with

14    analyzing sales pertaining to black mink and mahogany mink;

15    is that correct?

16         A.   Yes.

17         Q.   Is it your understanding that there are other

18    colors of mink on the Jonssons' ranches?

19         A.   There are but they're not the majority.

20         Q.   What kinds of colors?

21         A.   There is pastels, there is lots of different

22    colors that they have.  And that is common for ranchers to

23    have.  They typically don't specialize in things such as

24    pastel.  There are a few ranchers that seem to do that, most

25    of the time black and mahogany and that is often driven by

1      the price the -- there is more certainty with blacks and

2      mahoganies, there is different trends there, but the bulk of

3      the demand worldwide is for that.  There are only selective

4      markets for the smaller less raised mink.

5          Q.   What bearing does the fact that the Jonssons sell

6      other colors of mink you didn't analyze have on the

7      difference between the numbers we see in the Michael Jonsson

8      letter of total sales and what you have calculated in this

9      case?

10         A.   Well, we're talking about different things.

11     We're -- this analysis looked at black and mahogany mink

12     only.  The numbers that were initially sent in the letter

13     that was put on that exhibit reflect everything in the

14     aggregate.  It is not a fair comparison to make statements

15     between those two.  I would have to add a third category and

16     measure mahogany separately in order to account for a

17     portion of that.

18         Q.   Now, you mentioned just a couple of minutes ago

19     that it would be, I don't know what your word was, improper

20     or incomplete to only consider three years of data in this

21     case.  What did you mean by that statement?

22         A.   Well, it was one reason why in that exhibit that

23     this shows all of the black mink, the mahogany mink, the

24     total mink.  And then if -- I don't know if you noticed but

25     at the bottom there was Karraker and the Hoffman which were

1     the other two respects that were written with respect to

2     this matter and they only used the three years prior to the

3     feeding of crumlets in an effort to compare numbers there.

4          Q.   These are the experts for the defendants?

5          A.   Yes, which importantly was provided after my

6     report.

7          Q.   What problem do you have with the approach of

8     only analyzing three years of data with respect to the 10

9     years of data that you analyzed?

10         A.   It paints a different picture.

11         Q.   In what way?

12         A.   If you were to take simply the three years prior

13    and analyze it you're going to get different results.  The

14    end -- the number of observations needs to be as high as it

15    can within a similar sphere in order to make a fair

16    comparison.  If you have a data for eight years, why

17    wouldn't you use it.  There is nothing characteristically

18    distinct about their rats during that time, so it just gives

19    a more accurate reflection.

20         It is my opinion that selecting only three years, when

21    I had previously given information about the full range of

22    years is what we call data mining which is looking for data

23    that serves your purpose.

24         Q.   You talked at length yesterday, Dr. Roberts,

25    about the various records and information that you reviewed

1        in trying to come to an opinion in this case.  Now, starting

2        with 2010 and continuing through 2013, was there ever a year

3        where you found the Jonssons did not suffer losses?

4             A.   No.  In fact, more precisely there was never a

5        year where a loss could not be shown with very strong

6        statistical certainty.  Beyond that 95 percent threshold,

7        there was always an impact in the aggregate sense meaning

8        pooling the good with the bad to the Jonsson Ranch.

9             Q.   With the masking effect?

10             A.   With the masking effect.  When the masking effect

11        is removed, I am actually able to see a much clearer picture

12        where it was only the mink that consumed the crumlets that

13        had any sort of deviation with respect to a lower production

14        or higher mortality.  The mink that did not consume the

15        crumlets did not have an effect.

16             Q.   Now, you also discussed certain instances where

17        you did not measure damages such as price, the price

18        performance category for the 2012 year; is that correct?

19             A.   Yes.

20             Q.   Does the fact that you did not measure damages in

21        that instance mean that there were no losses?

22             A.   No.  No.

23             Q.   Why not?

24             A.   In fact, it is my opinion having analyzed now

25        the mink from the Jonssons and then the mink from the other

1    two ranches that have similar situations, it is my opinion

2    that significant loss is occurring having been able to view

3    the mink separately through the Griffeth lens.  And as soon

4    as I was able to see that, I realized there was a true

5    muting effect.

6         MR. MINNOCK:  I think we just say we weren't going to

7    talk about Griffeth.

8         THE COURT:  Sure.

9         MR. HANCEY:  Thank you, Dr. Roberts, no further

10   questions.

11        THE COURT:  I have a question, counselor, that you

12   might explore.  I'm interested in the third category dealing

13   with interests and the acquisition of new breeders.  Perhaps

14   you could put some questions to the witness to educate me,

15   anyway, in reference to that particular category.

16        MR. HANCEY:  The acquisition of outside breeders?

17        THE COURT:  Yes.  At that point plus the interest

18   factor that you talked about.

19        Q.   (By Mr. Hancey)  Well, Dr. Roberts, there has

20   been questions in some of your testimony over the last

21   couple of days about the Jonssons' purchase or acquisition

22   of outside breeders.  In other words, breeders from sources

23   that weren't their own ranch, correct?

24        A.   Yes.

25        Q.   First of all, how many breeders did the Jonssons

1      purchase from outside sources following the feeding of the

2      crumlets?

3           A.   In total they purchased 1,904.

4           Q.   Okay.  And how much did they pay for those

5      breeders?

6           A.   Well, they paid about $100.00 on average.

7           Q.   How did the breeders they purchased from outside

8      sources compare to the ones they had lost?

9           A.   They were distinctly inferior in size and

10     quality.

11          Q.   What about capability of production?

12          A.   And that is the -- that is the point is when we

13     look at the value of a breeder, we consider everything, its

14     capacity to provide.

15          Q.   And you may have said this yesterday, but do you

16     know why the Jonssons purchased outside breeders that were

17     inferior to the ones they had lost?

18          A.   Yeah, because their capital was tied up in the

19     newly built sheds, and the supply of high quality

20     improvement breeders is not something you can ask for over

21     night.  So there is both a supply restriction and a capital

22     constraint.

23          Q.   Have you calculated the damages the Jonssons

24     suffered that pertained directly to the purchase of breeders

25     from outside sources?

1          A.   Yes.

2          Q.   Okay.  And what is your calculation?

3          A.   For breeders purchased outside it totals

4     $1,142,400.00.

5          Q.   And explain how you arrived at that calculation,

6     Dr. Roberts?

7          A.   I multiplied the purchase price which averaged

8     $100.00 by the 1,904 breeders which gives me $190,400.00.  I

9     then added to that the cost that would need to be incurred

10    in order to acquire a high quality breeder similar to what

11    they had prior to the feeding of crumlets which is $500.00

12    in 2013, something that will likely increase, multiplied by

13    1904 which gives me 952,000, and adding those two figures

14    together gives me the 1.142 million dollar figure.

15         Q.   Thank you.  Now, the judge asked a question about

16    interest.  Did you factor interest rates into your damages

17    calculation?

18         A.   Certainly I did.

19         Q.   How did you do that?

20         A.   Well, first I think that the premise is critical.

21    The idea with the interest is that, you know, they always

22    pay interest on their loans.  I think that is not -- that is

23    not an issue, that is not what is being asked for here.

24         The distinction here is the following.  When there is

25    a disruption in business, you have to consider what would

1    have been and compare it to what was.  And the gap between

2    those two things which was experienced with respect to a

3    production shortfall, and I didn't even consider the quality

4    shortfall, that would have been an additional, that would be

5    more -- more difficult to interpret and less conservative so

6    I left it out entirely, but the shortfall that was

7    experienced with respect to production meant that the

8    Jonssons were left with less revenue to pay off their loans

9    at the end of the year.  And because of that, they end up

10   incurring additional interest on the portion of the loan not

11   paid off.

12        Q.   And what is the value you assign to the interest

13   related damages in this case?

14        A.   Well each year is a little different.

15        Q.   Well, in total?

16        A.   Okay.  Let's see, I didn't actually combine or

17   add just interest, I added it by year so --

18        Q.   Then go ahead by year.

19        A.   Okay.  So in 2010 it totalled 19,157.  In 2011,

20   it is 25,919.  And in 2012, it is 61,841.  And in 2013, it

21   is now 10,834.

22        MR. HANCEY:  Does the court have any other questions

23   on this line of inquiry?

24        THE COURT:  They retained the inferior breeders?

25        Q.   (By Mr. Hancey)  Did they retain the inferior

1          breeders, to your understanding?

2              A.   Yeah.   When you buy a breeder, it has got about a

3          three-year life cycle, according to my understanding, so you

4          will use it -- essentially the reason why it has three-year

5          life cycle again is just a production reality.   They look at

6          how many on average it produces in the first and second and

7          third year, and it gets to a point of diminishing returns

8          where it is no longer advantageous to keep, its production

9          falls beyond a certain point.

10             So given -- I mean I guess in a full answer to your

11         question, did they retain for the lifecycle of the breeder,

12         meaning the mink, yes.   But the lifecycle of many of those

13         is already over.

14             Q.   If I understood your damages calculation in this

15         category correctly yesterday, you're telling the jury that

16         in order to make the Jonssons whole for breeders that they

17         had to purchase from outside sources, they would need to

18         first be compensated for the $100.00 a piece they did spend

19         on the 1,904 breeders they purchased that were inferior, but

20         then also be reimbursed $500.00 for each breeder that they

21         lost which is what you said the replacement cost of a

22         breeder that is comparable to what they lost; is that

23         correct?

24             A.   That is correct.

25             Q.   Okay.   Do you see that as double counting?

1          A.   No, not in any way.

2          Q.   Why not?

3          A.   Because when an event occurs, the whole idea

4     behind calculating damages is what amount would it take to

5     get someone back to a like position.  The reality was is if

6     the event had not occurred, they would have never incurred

7     the cost of purchasing outside breeders.  They would have

8     never experienced the reduction in productivity from those

9     breeders.  They would have never experienced the shortfall

10    when taken to market with respect to price.  And they would

11    have still had a high quality breeder.  If you want to

12    return a like position, you need to consider all of those

13    things.  Look, if someone gets in a car accident and fault

14    is on Joe, okay, and that has been determined, what would

15    Joe need to do in order to remunerate the person in the

16    accident.  He would need to consider whether the car was

17    damaged, he would need to consider whether or not a leg was

18    broken, he would need to consider all of the effects, he may

19    even have employment ramifications.  The point is that when

20    you look at damage, it is important to bring someone back to

21    a position they would otherwise be without the incidence.

22         Q.   How do you account -- I mean do you assume that

23    the 1,904 inferior breeders they brought into their ranch

24    had some production?

25         A.   Of course they did.  I have already accounted for

1       that.

2              Q.   How have you accounted for that production from

3       the inferior mink in your calculation?

4              A.   They bring them in and I can see at the end of

5       the year when they're brought to market all of the numbers.

6       I can see the prices that were captured, I can see they're

7       lower.  I can see the number of pelts produced.  I can see

8       that it is lower.  That is part of the reason why there is a

9       production shortfall.

10             Q.   But do you have to subtract any revenues they

11      received from kits birthed by those inferior breeders in

12      your calculation?

13             A.   No.

14             Q.   Why not?

15             A.   Because look, they're looking at having say a

16      salary at the end of the year, okay.  If it is reduced down

17      to say say they typically make 100,000 in a year and it

18      reduced to 80,000, to think that you would need to subtract

19      the 80,000 because the 80,000 was provided by this other

20      employment opportunity, it would be ludicrous.  The point is

21      to say how does the 80 compare to the 100?  What is the

22      actual gap?  And that is what has been measured here is the

23      shortfall.

24             Q.   In other words, to prove any production that the

25      Jonssons received from the inferior mink they purchased,

1    doesn't match up to the level of the expected production for

2    the mink that they lost; is that correct?

3         A.   That is correct.

4         MR. HANCEY:  Okay.  I have no further questions.

5         THE COURT:  Anything else for him?

6                      **RECROSS-EXAMINATION**

7    BY MR. MITCHELL:

8         Q.   Do you have your deposition there,

9    Dr. Roberts?

10        A.   I do.

11        Q.   Would you turn to Page 19, please.

12        A.   Sorry, I was coughing.  What?

13        Q.   Page 19?

14        A.   Okay.

15        Q.   Are you with me?

16        A.   I am.

17        Q.   Okay.  Starting at Line 11, um, question, well

18   here is a question say.  That you say, okay, at the end of

19   2011 they showed a marked decline, how do you know that that

20   marked decline came from Lehi, Cedar Valley, or both?

21   Answer, it doesn't matter.  I am counting in the aggregate

22   sense.  Okay.  Did I read that correctly?

23        A.   You did.

24        Q.   Thank you.

25        A.   Can I respond to that or --

1                    **FURTHER DIRECT EXAMINATION**

2     BY MR. HANCEY:

3          Q.   I guess I'll give you the opportunity,

4     Dr. Roberts, to explain the answer that was just read from

5     your deposition.  Can you do that?

6          A.   Absolutely.  My response there is it doesn't

7     matter because I can only view the outcome at the end of the

8     year.  So I can only see in this case how the good and the

9     bad performed together and measure loss, if the combined

10    performance is so far below where it was, that it is outside

11    of that confidence interval.

12         Q.   Even with the good of the Cedar Valley offsetting

13    the bad of the Lehi?

14         A.   Yeah.  Because in this case, I couldn't measure

15    it separately whereas on the other ranch I can see that

16    separately.

17         MR. HANCEY:  Okay.  That is all I have.  Thank you

18    very much.

19         THE COURT:  Let me give you your morning break, folks.

20    15 minutes.  Remember what I told you.  Don't talk to

21    anybody about this case.

22         THE CLERK:  All rise for the jury.

23         (Whereupon, the jury left the courtroom.)

24         THE COURT:  Got your two other witnesses that --

25         MR. MINNOCK:  They're here ready to go.

1          THE COURT:  Okay, fine.  15 minutes.

2          MR. MINNOCK:  Thank you, Your Honor.

3          THE COURT:  We'll be in recess.

4          (Recess.)

5          THE COURT:  Why don't I bring your jury out.

6          THE CLERK:  Please stand for the jury.

7          (Whereupon, the jury returned to the courtroom.)

8          THE COURT:  And the record will show that the jury is

9     present and counsel and the parties are present and call

10    your next witness.

11         MR. HANCEY:  Plaintiffs call Ed Buschur.

12         THE COURT:  Sir, if you will be sworn, please.

13         THE CLERK:  Please raise your right hand.

14              **EDWARD JOSEPH BUSCHUR,**

15       called as a witness at the request of the Plaintiff,

16            having been first duly sworn, was examined

17                 and testified as follows:

18         THE WITNESS:  I do.

19         THE CLERK:  Thank you.  Please take a seat in the

20    witness stand.  Please state your name and spell your name

21    for the record.

22         THE WITNESS:  Sure.  My name is Ed Buschur, it is

23    actually Edward Joseph Buschur, E-D-W-A-R-D, J, and Buschur

24    is B-U-S-C-H-U-R.

25    //

1                          **DIRECT EXAMINATION**

2      BY MR. HANCEY:

3          Q.   Good morning, Mr. Buschur.

4          A.   Good morning.

5          Q.   As I understand it, you are the president of the

6      defendant National Feeds; is that correct?

7          A.   That is correct.

8          Q.   You also held that title back in 2010,

9      springtime, right?

10         A.   That is correct.

11         Q.   Okay.  Now, in 2010, National Feeds had a

12     contractual relationship with the other defendant Rangen; is

13     that correct?

14         A.   That is correct.

15         Q.   Okay.  And let me just have you flip in that

16     exhibit book right there, sir, to Tab Number 10.  Exhibit

17     10?

18         A.   Okay.

19         Q.   I don't think that is it.  I think that is 11.

20     Actually, that might be 9.  Yeah, that is 9.

21         A.   The Fur Feed Production Agreement.

22         Q.   That is right.  Is that a true and correct copy

23     of the contract we're talking about?

24         A.   Yes, it is.

25         Q.   Okay.  Now under that contract, Mr. Buschur,

1    Rangen manufactured feed products for National which

2    National then sold to customers; is that correct?

3         A.   That is correct.

4         Q.   Okay.  And one of the products that Rangen

5    produced for National Feeds was the lactation crumlets at

6    issue in this case, right?

7         A.   Yes.

8         Q.   Now, National owns the lactation crumlets

9    formula?

10        A.   That is correct.

11        Q.   Okay.  And National supplies that formula to

12   Rangen so it can follow the recipe, right?

13        A.   That is correct.

14        Q.   And then in 2010, Rangen was responsible for

15   going out and purchasing many of the ingredients that went

16   into the lactation crumlets, right?

17        A.   That is correct.

18        Q.   And that would include the fish meal as one of

19   those?

20        A.   Yes.

21        Q.   And Rangen would get those ingredients from its

22   own suppliers, correct?

23        A.   Yes.

24        Q.   Once Rangen obtained the crumlet ingredients, it

25   would mix them altogether and make the finished crumlet

1    product, correct?

2         A.   Yes.

3         Q.   And then it would bag the product into some bags,

4    right?

5         A.   Um, in the case of crumlets, yes.

6         Q.   In the case of the crumlets it would affix a

7    National Feeds sticker to the bag, right?

8         A.   Yes.

9         Q.   And then it would in some instances ship them to

10   National Feeds' customers, right?

11        A.   Yes.

12        Q.   And that is what happened here.  Rangen was

13   responsible for shipping the lactation crumlets to the

14   Griffeth Ranch?

15        A.   On the lactation crumlets, correct.

16        Q.   And then National Feeds would pay Rangen for both

17   the ingredients that Rangen had purchased as well as an

18   additional amount for what you call a manufacturing fee; is

19   that right?

20        A.   Correct.

21        Q.   Now, in the contract between National Feeds and

22   Rangen, Rangen guarantees to National Feeds that it will

23   produce products that are not adulterated; is that correct?

24        A.   I believe so.

25        Q.   Do you know what adulterated means?

1          A.   It means that they're not conforming to industry

2     best practices.

3          Q.   And a product that contains a poisonous substance

4     would be adulterated, correct?

5          A.   I would consider it, yes.

6          Q.   And so if, for example, Rangen was to manufacture

7     a product for National Feeds that contained a poisonous or

8     harmful substance in it, it would be violating its

9     contractual guarantee to National Feeds?

10         A.   Yes, as I read it here.

11         Q.   Now let me have you flip in your exhibit book,

12    sir, to Exhibit Number 37.  That is Tab 37.  Do you

13    recognize that document?

14         A.   Yes.

15         Q.   It is a two page document.  The first page is an

16    e-mail from you to many people including David Brock at

17    Rangen, and this was sent on March 15th, 2010, correct.

18         A.   That is correct.

19         Q.   And this is the e-mail that you sent to Rangen at

20    the time that you first informed Rangen of the combined

21    Griffeth and Jonsson lactation crumlet order, correct?

22         A.   That is correct.

23         Q.   And the second page of that document is simply a

24    spreadsheet that shows sort of a summary of the orders you

25    were conveying by way of this e-mail; isn't it?

1          A.   Yes.

2          Q.   And one of the instructions that you have put on

3     this spreadsheet here is for Rangen to put the Keith Jonsson

4     order in with the Griffeth order, right?

5          A.   That is correct.

6          Q.   Now, isn't it true that you have been involved in

7     the animal feed business for some time?

8          A.   Yes.

9          Q.   And you know quite a bit about animal nutrition,

10    correct?

11         A.   Not a nutritionist but I have a lot of

12    experience.

13         Q.   For example, you started attending nutritional

14    seminars when you were 17, right?

15         A.   That is correct.

16         Q.   And you used to work very closely with a

17    nutritionist named Harry Egbert who sort of showed you the

18    ropes; right?

19         A.   That is correct.

20         Q.   And you continue to go to nutritional seminars to

21    this day, right?

22         A.   Yes, quite often.

23         Q.   In fact, sometimes up to six to eight nutritional

24    conferences a year?

25         A.   Depending on how busy I am with my other work,

1    but yeah, I attend several a year.

2         Q.   And you have had some private tutoring in the

3    area of animal nutrition, correct?

4         A.   That is correct.

5         Q.   All right.  So with your experience in animal

6    nutrition, you know that certain ingredients or substances

7    can be harmful to certain animals, correct?

8         A.   In some cases, yes.

9         Q.   And you also are aware that a particular

10   ingredient can simultaneously be harmful to one animal but

11   completely healthy to another animal, right?

12        A.   Well, it would depend on the species of animals.

13        Q.   It would.  But there are occasions when that is

14   the case, right?

15        A.   Occasions like if you would look at the digestive

16   system of one animal is monogastric they fall pretty similar

17   together as other monogastrics where a dairy cow would be a

18   ruminant so they would fall very similar to other ruminants.

19        Q.   Well an example of this phenomenon would be

20   something called rumensin right?

21        A.   Yes.

22        Q.   You're familiar with rumensin, right?

23        A.   Yes.

24        Q.   You have got a dairy cow background?

25        A.   Yes.

1          Q.   And rumensin is a -- or rumensin is a form of

2     monensin, right?  Monensin, M-O-N-E-N-S-I-N.

3          A.   Yes.

4          Q.   And monensin can be used as a supplement to --

5     well in cattle feed to sort of increase the quality of the

6     milk in a dairy cow, right?

7          A.   No, it is more of a feed efficiency factor that

8     they put it in for.

9          Q.   But it is used as a supplement to improve the

10    quality of a cow, right?

11         A.   Improve the quality it is --

12         Q.   Is it helpful to a cow?

13         A.   It is helpful to the cow.  But it is for the --

14    for the amount of feed it takes to produce a gallon of milk.

15         Q.   And it is deadly to horses, isn't it?

16         A.   Correct.

17         THE COURT:  Why don't you pull that mike a little

18    towards you and speak into the mike so that everybody up

19    here can hear.

20         THE WITNESS:  Is that better?

21         Q.   (By Mr. Hancey)  Now, because some ingredients

22    can be simultaneously harmful or helpful, depending on the

23    species as you have said, would you agree that it is

24    extremely important for a company in the animal feed

25    business to know what ingredients are harmful to which

1       animals?

2            A.   Yes, I would say that is true.

3            Q.   And that knowledge is really specie specific,

4       right?  So, for example, if you're in the business of -- if

5       you're in the cow feed business, for example, then you

6       really need to know what ingredients or substances are

7       harmful to cows, right?

8            A.   Correct.

9            Q.   And if you are in the mink feed business, then

10      you really need to know what substances or ingredients can

11      be harmful to mink, correct?

12           A.   Correct.

13           Q.   Because if you are wrong or you don't know, a lot

14      of animals could get sick and die, right?

15           A.   That is possible.

16           Q.   Now, you know that there are certain ingredients

17      and substances that can be harmful to mink, correct?

18           A.   Yes.

19           Q.   For example, you're familiar with something

20      called histamines?

21           A.   That is correct.

22           Q.   And you know that histamines can form in raw fish

23      sometimes due to improper handling techniques, correct?

24           A.   Yes.

25           Q.   And that might occur before fish is ground up and

1    made into fish meal, correct?

2          A.   That is when it would occur, yes.

3          Q.   Okay.  And if that happens, then you could end up

4    with fish meal that contains histamines; isn't that true?

5          A.   That is possible, yes.

6          Q.   And you know that histamines can be a problem in

7    fish meal, right?

8          A.   It is not common, but it could happen, yes.

9          Q.   And you're aware that it has happened, right?

10         A.   Again, I don't know specifically a case that had

11   high histamines, but it is possible to have high levels of

12   histamines.  Whenever you purchase fish meal, they give you

13   a histamine sample in many cases.

14         Q.   I have placed your deposition up there on the

15   table.  Do you see it over there in the corner of the table

16   there?

17         A.   Yes.

18         Q.   It says your name on the front.

19         A.   Yes.

20         Q.   Okay.  Let me have you turn in that document, in

21   that deposition, to Page 129, please.  Now you had your

22   deposition taken back in July of 2011; is that correct?

23         A.   Yes.

24         Q.   Okay.  And when you answered questions in your

25   deposition, you were doing so under oath; is that right?

1          A.    Yes.

2          Q.    Okay.  So are you on Page 129?

3          A.    Yes.

4          Q.    Okay.  Let me direct your attention there to the

5    bottom of the page, okay.  The question asked of you was,

6    what do you understand about what creates a histamine?  Can

7    you read your answer for me, please?  It spills over on to

8    Page 130?

9          A.    I have got it, yeah.  It is generally a problem

10   in raw fish.  Improper handling of fish until acid is put in

11   -- on it, to preserve it.

12         Q.    Then the next -- over?

13         A.    Or until it is dried down.

14         Q.    Very good.  Okay.  And then the next question

15   was, do you know whether it can be a problem in fish meal,

16   histamines?  And what was your answer?

17         A.    It certainly can be.

18         Q.    Now, you're aware that histamines can be harmful

19   to mink, correct?

20         A.    Yes.

21         Q.    And you knew that back in 2010 as well, correct?

22         A.    Yes.

23         Q.    And just to be -- we're going to hear from him in

24   a few minutes, but in 2010 National feeds employed Dre

25   Sanders as its in-house nutritionist; is that correct?

1          A.   Yes.

2          Q.   Okay.  Now, in 2010, as I understand it, fish

3    meal was a major ingredient in the lactation crumlets.  Fair

4    statement?

5          A.   There are several ingredients but --

6          Q.   One of the largest, right?

7          A.   As far as the protein, yes.

8          Q.   I mean it made up about 25 percent of the

9    product, didn't it?

10         A.   Yeah, but 75 percent of the product wasn't fish

11   meal so it was not the majority of the product it was a

12   minority of the product.

13         Q.   It was a minority with respect to the totality of

14   all of the ingredients, right?

15         A.   Correct.

16         Q.   But it was a majority with respect to individual

17   ingredients, correct?

18         A.   I would say correct, yes.

19         Q.   Okay.  And you're aware that fish meal, which is

20   a major ingredient in the lactation crumlets, always

21   contains some sort of preservative, right?

22         A.   That is correct, ethoxyquin.

23         Q.   Not always ethoxyquin, right?

24         A.   Well actually the conversation that I have had

25   with my supplier is --

1      Q.   I don't want to hear about conversations from

2  other people.  It is not always ethoxyquin though, is it?

3      A.   Again, there are two options on fish meal,

4  ethoxyquin and mixed tocopherals.  I have confirmed that

5  time and time again with our suppliers.

6      Q.   If fish meal does not contain a preservative it

7  spoils; is that true?

8      A.   Yes.

9      Q.   Okay.  And there are many different types of

10  preservatives one of which is nitrites; isn't that correct?

11      A.   I am not familiar with that as a preservative as

12  I don't know if a specific company that would use nitrates

13  as a preservative.

14      Q.   Have you ever heard of nitrites before?

15      A.   I have.

16      Q.   Okay.  Do you know that they can form into

17  nitrosamines?

18      A.   I do.

19      Q.   And do you know that nitrosamines are harmful to

20  mink?

21      A.   I do.

22      Q.   And you know that for that reason nitrites should

23  never be used as a preservative in mink feed; is that

24  correct?

25      A.   Correct.  Again, I don't know --

1          Q.   Well --

2          A.   -- anyone that does use it as a preservative.

3          Q.   And you knew that back in 2010 as well, right?

4          A.   I was aware that the two preservatives that you

5     need to use in fish meal are ethoxyquin and mixed

6     tocopherols which our suppliers use.

7          Q.   And back then you knew that nitrosamines were

8     harmful to mink; correct?

9          A.   Me personally no, but the people in my company

10    had advised me that yes.

11         Q.   National Feeds knew?

12         A.   Correct.

13         Q.   Is it true that National Feeds designed the

14    lactation crumlets specifically to be used during the

15    lactation cycle of the mink?

16         A.   That is correct.

17         Q.   And you understand that as a very critical period

18    in the mink's lifecycle, right?

19         A.   Yes.

20         Q.   National Feeds expects that mink ranchers like

21    the Jonssons will purchase the lactation crumlets to feed to

22    their mink during that cycle, right?

23         A.   Correct.

24         Q.   And National Feeds expects that ranchers like the

25    Jonssons will purchase the lactation crumlets and mix them

1    together with some other sort of feed like feed from the

2    coop in this case to then feed to their mink, right?

3         A.   Correct.

4         Q.   And National Feeds expects that mink ranchers

5    will be feeding the lactation crumlets to their pregnant

6    mink, right?

7         A.   That is correct.  Well, I am sorry, that is not

8    correct.  The lactation will not be fed to pregnant mink but

9    to feed to mink once they have whelped.

10        Q.   So you're telling this jury that National Feeds

11   does not expect mink ranchers to feed lactation crumlets to

12   mink that are pregnant?

13        A.   That is where our reproduction crumlet would fall

14   in.  And our company has different phases.  It is

15   reproduction during the reproduction period.  Lactation

16   during the lactation period.  And so the early growth period

17   would follow the lactation period.  And then there would be

18   grow max and then grow fur.  We kind of have a --

19        Q.   Let me have you --

20        A.   -- a whole host of products to cover the whole

21   year.

22        Q.   The whole cycle, right?

23        A.   Yes.

24        Q.   Let me have you turn to Exhibit 12 in that

25   binder, please.  What do you understand, Mr. Buschur, about

1   the whelping season on a mink ranch?

2       A.   The whelping season?

3       Q.   Yes.  How long does it last?

4       A.   Well, it can be somewhere between five and

5   ten days, sometimes, you know, give or take.

6       Q.   Are you familiar with the phrase peak whelp?

7       A.   Yes.

8       Q.   What does peak whelp mean?

9       A.   It is the day that the majority of your mink have

10  their kits.

11      Q.   Well, it is -- if the whelping season is a bell

12  curve, starts here and ends here (indicating), the peak

13  would be the middle, right?

14      A.   The day the majority of the mink had their kits.

15  Now, it is affected by how much light and you can shorten

16  your whelp time period down by lighting your mink, or you

17  can expand it by lighting a few barns and not lighting other

18  barns.  So it means some farms have a real tight period and

19  some farms -- it is more of a management on farm, you know,

20  every farm is a little different depending on how they

21  manage their farm.

22      Q.   Let me have you look at Exhibit 12 there, sir.

23  Do you recognize that?

24      A.   Yes.

25      Q.   That is a National Feeds' promotional brochure;

1      is that correct?

2              A.   Yes, that is correct.

3              Q.   And it advertises the superior characteristics

4      and qualities of the lactation crumlets product, right?

5              A.   Yes.

6              Q.   Let me direct your attention to the section there

7      on the first page that says feeding guidelines.  Do you see

8      that?

9              A.   Yes.

10             Q.   About half way in the middle of that paragraph, I

11     am going to read, feed from peak whelp to June 1st.  Do you

12     see that?

13             A.   Yes.

14             Q.   In other words, National Feeds is telling

15     ranchers, through this publication, to feed the lactation

16     crumlets to their mink while they're still pregnant; isn't

17     that right?

18             A.   They're saying --

19             Q.   Is that right?

20             A.   They're saying from peak whelp forward so a

21     majority --

22             (Whereupon, the reported stopped the attorney

23              and witness from talking on top of each other.)

24             THE COURT:  Counsel, here we go again and I'm going to

25     sic Laura on you.  She is tough when she is tough.  So don't

1     don't -- get a response.

2          THE WITNESS:  To answer clearly there has to be a

3     period wherever you decide to switch over.  You're not

4     individually feeding each mink differently.  So from the

5     time period that most of your farm has whelped, is when you

6     start adding it in.  You could -- you wouldn't want to feed

7     it any earlier than you -- than you have to because the two

8     products change dramatically.

9          Q.   (By Mr. Hancey)  Mr. Buschur --

10         A.   You want -- yes do some pregnant minks get it

11    because they're on the tail-end of that bell curve?  Yes.

12    But you don't know your bell curve until after they start to

13    slow back down.

14         Q.   Mr. Buschur, if a bell curve is like this,

15    (indicating), and you say feed at peak whelp which is the

16    highest point of that arch?

17         A.   Right.

18         Q.   Half of the mink are still pregnant; isn't that

19    true?

20         A.   The second half, yes.

21         Q.   The Jonssons testified that they fed the

22    lactation crumlets when their herd --

23         THE COURT:  No.  No.  Skip reciting.  We have heard

24    the testimony, counselor.  Put your question.

25         MR. HANCEY:  Fair enough.

1          Q.   (By Mr. Hancey)   If the Jonssons fed the

2     lactation crumlets to their mink herd at the Lehi Ranch when

3     it was two-thirds whelped, that would have been past the

4     peak whelp period, correct?

5          A.   Correct.

6          Q.   Now, you have Exhibit 12 in front of you.

7     Exhibit 12 makes certain representations about what the

8     lactation crumlets will do if fed to mink, correct?

9          A.   Correct.

10          Q.   One of the representations on here says it will

11     reduce a rancher's kit losses, correct?

12          A.   Correct.

13          Q.   In other words, less baby mink will die, right?

14          A.   Yes.

15          Q.   Another one down there on the bottom is it will

16     improve lactation for better size, size of the mink, right?

17          A.   That is correct.

18          Q.   You'll have better quality mink, correct?

19          A.   Correct.

20          Q.   Another one says, it will improve kit growth,

21     right?

22          A.   Yes.

23          Q.   So feed lactation crumlets and your baby mink

24     will grow faster and bigger, right?

25          A.   That is correct.

1      Q.   And another promise that you make in this

2  material is it will minimize your female losses, right?

3      A.   That is correct.

4      Q.   And by that you mean you'll have less mother mink

5  die, correct?

6      A.   That is correct.

7      Q.   Now, isn't it true that National Feeds encouraged

8  mink ranchers to feed the crumlets as a high percentage of

9  the mink's total diet?

10      A.   20 percent of the diet is the recommendation.

11      Q.   Is it really?  Is it?

12      A.   Well, up to 100 percent, but the recommendation

13  is 20 percent.  That was my understanding of how everyone in

14  the west was feeding it.  We have had people feed it at

15  100 percent in 2010 and have had no problems whatsoever.

16      Q.   And, in fact, National Feeds alerts its

17  customers, like the Jonssons, that the lactation crumlets

18  can be fed as 100 percent of a mink's diet, right?

19      A.   It says that here, yes.

20      Q.   It says that in the promotional material in

21  Exhibit 12, right?

22      A.   Correct.

23      Q.   Now, you have testified that Rangen purchased

24  most of the ingredients that went into the lactation

25  crumlets in 2010 including the fish meal, right?

1          A.    That is correct.

2          Q.    Okay.  Now, in 2010, National Feeds did not

3     instruct Rangen where to purchase the fish meal it used in

4     the crumlets; is that correct?

5          A.    That is correct.

6          Q.    In fact, at that time period, you didn't even

7     know, or National didn't know, where Rangen was getting its

8     fish meal because Rangen wouldn't disclose its suppliers to

9     you; is that correct?

10         A.    We had several conversations on the different

11    suppliers of the fish meal.

12         Q.    Is that not a correct statement?

13         A.    Well, it is correct and it is not correct.  I

14    didn't know specifically on every batch of feed, but I

15    generally knew who they were using for suppliers.

16         Q.    Suppliers?

17         A.    Again, I wouldn't be able to quote specifically

18    what suppliers supplied the fish meal for this batch, but I

19    knew who their supplier chain were.

20         Q.    Let me have you look at your deposition, sir,

21    Page 126.

22         A.    Okay.  What line?

23         Q.    Okay.  I don't want this to be out of context so

24    I'll try to start higher up in the page.  On Line 4, you

25    were asked, what do you understand to be any health issues

1    with regard to fish meal?  And what was your answer?

2         A.   I'm sorry, what line again?

3         Q.   Line 6 is your answer.

4         A.   Line 6, okay, health issues with regard to fish

5    meal.

6         Q.   And the question was any concerns, and you gave a

7    really long answer, but I want you to read that to the jury,

8    please.

9         A.   Certain things we look at is whenever there is a

10   sample we check the moisture levels of it, we check to see

11   if there are any noted toxins.  We really don't, in regards

12   to Rangen, again, they're buying so much fish, they are

13   making so much fish feed that if they're not using quality

14   products they're going to have a major problem.  So --

15   continue on to the next paragraph?

16        Q.   Yes.

17        A.   So, I let them use their industry best practices

18   and guarding their fish contacts.  They don't share with me

19   where they buy their fish, you know, they're as concerned

20   about me going in and getting fish meal away from them.  It

21   is a tight market.  It is not available -- it's not

22   available, he doesn't want me calling over to one of my

23   other plants trying to get fish meal bought out underneath

24   of him.  So he guards that information.

25        Q.   In other words, Rangen didn't want National Feeds

```
1        cutting out the middleman and going directly to its supplier

2        so it didn't share where it bought its fish meal with you;

3        isn't that correct?

4             A.   No.

5             Q.   Isn't that what you just read?

6             A.   That is not how I'm reading this.  It is not a

7        fair interpretation of what I was saying.

8             Q.   So when you say they don't share with me where

9        they're buying their fish, you didn't mean that?

10            A.   Well, again, I don't know every load when they

11       buy -- where that load of fish came from.

12            THE COURT:  It says what it says.

13            THE WITNESS:  I generally know.

14            THE COURT:  Let's just move on.

15            MR. HANCEY:  I'll move on.  Thank you.

16            THE COURT:  The ordinary question is were those

17       questions made or given and was that answer made.

18            MR. HANCEY:  I did that.  I'll move on, Your Honor.

19            THE COURT:  Okay.

20            Q.   (By Mr. Hancey)  In 2010, National Feeds simply

21       let Rangen wheel and deal on the fish meal; is that right?

22            A.   They used their industry best practices when they

23       purchased their incoming ingredients.

24            Q.   Did National Feeds in 2010 let Rangen wheel and

25       deal on the fish meal?
```

1          A.   We let them purchase the ingredients.

2          Q.   And in 2010, National Feeds would allow Rangen to

3     use whatever fish meal happened to be at Rangen's plant;

4     isn't that correct?

5          A.   Well, specifically it stated in our formula for

6     which fish meals they were to use.  If there was a change,

7     we needed to direct that change.  I mean not all fish meals

8     are the same, there are different species of fish.

9          Q.   In 2010, National Feeds expected that Rangen

10    would test the ingredients it brought in from suppliers;

11    correct?

12         A.   Yes.

13         Q.   But National Feeds did not require Rangen to test

14    ingredients for histamines; isn't that true?

15         A.   Again, I think Rangen follows the testing

16    requirements that are set forth by the United States

17    Department of Agriculture.  So if that test isn't in there,

18    I'm not familiar with whether or not it is or not.

19         Q.   My question is National Feeds didn't specifically

20    instruct Rangen to test for histamines; is that correct?

21         A.   We did not.

22         Q.   And neither did National Feeds specifically

23    instruct Rangen to test for nitrosamines, correct?

24         A.   Again, we had no reason to.  It is so rare to

25    have any kind of level of nitrosamines.

1          Q.   In 2010, you had no idea what preservatives were

2     being used in the fish meal that Rangen was purchasing for

3     use in your products, correct?

4          A.   That is not correct.

5          Q.   Let me have you look at your deposition again,

6     please.  Page 131, Line 14.

7          Okay, here is the question asked.  Do you know

8     anything about the preservatives, talking about Rangen, do

9     you know anything about the preservatives that are used, the

10    preservatives they used with the fish meal?  What was your

11    answer?

12         A.   I mean I am assuming they're using -- I said no,

13    I don't know for sure.  I said I don't know.  I don't have

14    any knowledge.

15         Q.   And then on Page 132, the topic came up again.

16    The question on Line 11, and do you know whether there are

17    preservatives or preservatives that are put into the fish

18    meal?  And what was your answer on Line 13?

19         A.   Yes.

20         Q.   And the question, do you know what kinds?  What

21    was your answer?

22         A.   Again, I'm -- I know the fish meal that I have

23    purchased in the past contains BHA, BHT or ethoxyquin,

24    depending on if it is going into my dog feed or mink feed.

25    That is my experience.  And I don't know what Rangen is

1      doing.

2           Q.   You didn't know what Rangen was doing, did you?

3           A.   On specific batches I don't know if it was either

4      the dog food or the mink feed but they weren't asking me

5      specifically what they were using.

6           Q.   Were you being truthful in your deposition?

7           A.   I was.

8           MR. HANCEY:  No further questions.  Thank you,

9      Mr. Buschur.

10          THE WITNESS:  Thank you.

11                          **CROSS-EXAMINATION**

12     BY MR. MINNOCK:

13          Q.   Good morning, Mr. Buschur.

14          A.   Good morning, Joe.

15          Q.   Let's start at the very end of this examination

16     that you had with Mr. Hancey and let me make sure I

17     understand what you're saying with respect to the

18     preservatives.

19          You participate in a number of companies, one of which

20     is National Feeds, correct?

21          A.   That is correct.

22          Q.   Do you have a separate company called Buschur

23     Feeds as well?

24          A.   That is correct.

25          THE COURT:  Is your green light on.

1          THE WITNESS:  It is, I have got to speak up.

2          THE COURT:  Use the mike.

3          MR. MINNOCK:  I'm trying to be on her good side today.

4          THE COURT:  Well, you know --

5          Q.   (By Mr. Minnock)  But I will speak up.  So you --

6     you have Buschur Feeds and National Feeds?

7          A.   That is correct.

8          Q.   And what does Buschur Feeds do?

9          A.   It is a business that we first started back in

10    2001 and is primarily dairy feeds, but we have sold feed for

11    a number of different animals.

12         Q.   All right.  As part of the process of preparing

13    feeds for that company, or for National Feeds, have you had

14    occasion to purchase fish meal yourself for your companies?

15         A.   Yes, many occasions to.

16         Q.   All right.  And so who are the general

17    manufacturers of -- I mean are there a lot?

18         A.   No, there is only a handful.

19         Q.   Who are they?

20         A.   I mean you're going to work with IPC which is

21    International Protein Company, you're going to work with

22    Skoolers, um, a west coast company.  Um, it is right on the

23    tip of my tongue but there are three pretty main suppliers

24    of the fish meals.

25         Q.   All right.  And have you purchased from all of

1     them?

2          A.   I'm sorry, Roswell is the third one.

3          Q.   Roswell.  And have you purchased from all of

4     them?

5          A.   Yes.

6          Q.   All right.  When you have purchased for that,

7     what have they told you has been the preservatives that they

8     have used?

9          MR. HANCEY:  Objection hearsay.

10         THE COURT:  We'll listen.  Go ahead.

11         THE WITNESS:  There is only two that they handle.  It

12    is ethoxyquin and mixed tocopherols.

13         Q.   (By Mr. Minnock)  Now before we go onto those two

14    we have heard a little bit about ethoxyquin.  What do you --

15    what is mixed tocopherols?

16         A.   Mixed tocopherols is the higher end of the two

17    products.  I say higher end, it is more expensive.  It is

18    used in the higher end dog foods because the ethoxyquin is

19    kind of getting a bad rap over the years with a higher end

20    all natural, if you will, it is a Vitamin E product.

21         Q.   Okay.  During the time that you have purchased

22    fish meal, and how long have you been doing it?

23         A.   13 years.

24         Q.   Has any company ever offered to send you nitrite

25    preserved fish meal?

1          A.    Never.

2          Q.    Prior to 2010, were you even aware that nitrite

3    preserved fish meal was available in the United States from

4    anybody?

5          A.    Again, I was not sure.

6          Q.    Okay.

7          A.    No.

8          Q.    All right.  So tell us a little bit about

9    National Feeds.  How long has the company been around?

10         A.    Since -- National Feeds has been around for a

11   long time, um, early 1900s.

12         Q.    Okay.  When did you purchase the company?

13         A.    In 2008.

14         Q.    And when you purchased the company in 2008, who

15   did you purchase it from?

16         A.    A company by the name of Milk Specialities.

17         Q.    Okay.  And when you took over the company, was

18   Rangen one of the Tollmillers that National was using?

19         A.    Yes, they were.

20         Q.    And did you continue contracting with them?

21         A.    Yes, I did.

22         Q.    Prior to deciding whether you would continue the

23   contract with them, did you do any investigation into them?

24         A.    Yes, I did.

25         Q.    What investigation did you do into Rangen?

1           A.   Well, I had the pleasure of knowing a

2     nutritionist that worked in the Idaho area, and he was

3     getting some of his dairy feeds made by Rangen.  I had a

4     brief conversation with him, as well as with Milk

5     Specialities, the company that I purchased from, I talked to

6     their manager and they said that they were really great to

7     work with.

8           Q.   Okay.  And did you inspect their plant?

9           A.   Prior to the purchase I had not, but shortly

10    after the purchase I did.

11          Q.   Well, and when you were deciding whether or not

12    to continue to use them as a Tollmiller, did you inspect

13    their plant?

14          A.   Yes, I did.

15          Q.   Did you talk with them about their operations?

16          A.   Yes, I did.

17          Q.   And did you talk to them about this issue about

18    what preservatives were being used for the fish meals that

19    they purchased?

20          A.   Um, you know, we had conversations about it and

21    it involved primarily around whether we were able to

22    continue to use ethoxyquin.  And I said well if we switch to

23    using our --

24          THE COURT:  I don't know who is on the other end of

25    the conversation.

1          Q.   (By Mr. Minnock)   This is somebody from Rangen,

2     right?

3          THE COURT:   Time, place, who is present.

4          Q.   (By Mr. Minnock)   Let's go back and lay some of

5     this foundation.   This is back during the period that you

6     were discussing with Rangen whether to continue to use them

7     as a Tollmill?

8          A.   Correct.

9          Q.   And who was the conversation with?

10         A.   David Brock.

11         Q.   Okay.   And did you -- you were talking about one

12    of your concerns had to do with dog food?

13         A.   When we purchased the company we knew that they

14    were going to have to find another supplier for our dog

15    foods.   So we were entertaining the idea of having Rangen do

16    that for us.   And that is where the conversation with

17    ethoxyquin preserved fish meals came up.

18         Q.   Okay.   Let me ask you, you talked a little bit

19    with Mr. Hancey about some of the products.   And what I want

20    to do is briefly help the jury understand what these

21    products do.   You talked about -- well first of all, what is

22    the purpose of adding these supplements to the coop feed?

23         A.   Well, I mean we're basically -- it is kind of two

24    part.   We're trying to reduce the level of bacteria that is

25    present in the mink feed.

1      Q.   Okay.  Well let's start talking about that.  How

2    does the reproduction crumlets or the lactation crumlets

3    assist in reducing bacteria?

4      A.   By the nature of some of the bi-products that the

5    coop as well as many other feed companies or feed -- mink

6    feeders if you will throughout the U.S. they bring in like

7    products they come from slaughter houses or from other areas

8    to feed the mink.  In some cases, those products aren't

9    optimal as far as how they have been preserved.  So we tend

10   to see higher levels of bacteria.  Our product, by being dry

11   and very well preserved, it cuts that bacteria just by

12   purely putting a low bacteria, low moisture product with a

13   high moisture, in some cases, high bacteria product.  And

14   that is where the field research and, you know, the 40 plus

15   years of experience that National has had with the crumlets

16   has shown all of the benefits.

17     Q.   Okay.  So now let's talk about reproduction

18   crumlets.  What purpose does the reproduction crumlets serve

19   in the life of a mink?

20     A.   So the reproduction crumlets what we're trying to

21   do is increase the packet size to the mink.  When I say

22   packet size, I mean they're trying to condition their minks

23   so that they're, you know, they're healthy, they're ready

24   for breeding, they're ready to be a good mother, if you

25   will, they're ready to produce milk.  And in order to do

1    that, you need to lean them down, you need in the fall when

2    you're trying to select your breeders you want them as big

3    and as healthy as you can get them, healthy is a bad word,

4    big and furry as you can get them.  When it comes into

5    breeding time, you need to be able to lean them down so that

6    they're able to milk well.

7         One way of doing that is to provide a high quality

8    protein, yet a really low fat level.  And in many cases it

9    is a challenge for the wet feed guys to find low fat feeds.

10   So what we do is we put a -- it helps keep the stomach

11   stretched out, it is like a high fiber, excuse me, high

12   protein crumlet that they can add in that keeps the stomach

13   stretched out and still gives them the protein that they

14   need to be ready to breed and to gestate after breeding.

15        Q.   And let's talk about lactation crumlets.  What

16   purpose does that serve in this?

17        A.   Well, the idea is after you feed the reproduction

18   you go into lactation and the stomach has stayed stretched

19   out.  When you're trying to fit the mink to, you know,

20   skinny down to lean down, she still has a stretched out

21   stomach so she is ready to eat as much feed as she can.  So

22   by switching to lactation crumlets, you're giving them more

23   energy dense feed.  So now at that point, your mothers have

24   whelped or the majority of the mothers have whelped, you're

25   ready for them to start producing milk.  And about two to

1    three weeks after they have whelped, they really have a

2    challenge to be able to produce enough milk.  The kits start

3    to grow.  If you had good production, in many cases the

4    females can't maintain an energy level they milk down, if

5    you will, they lose their weight, and they have trouble

6    maintaining.  So by raising the plane of nutrition in their

7    feeds, as well as cutting the bacteria so they can absorb

8    and utilize everything that is in the feed, our field

9    research has shown that it is very beneficial to those

10   mothers.

11        Q.   All right.  Now, going back to your selection of

12   Rangen, is there something about Rangen's manufacture of

13   other products that led you to continue to use Rangen?

14        A.   Mainly the other employees at National in the

15   past experience has been if a plant is making fish feeds,

16   they have to watch their quality control and the incoming

17   ingredients so close because any little variations can cause

18   a lot of problems.  And Rangen is a very large fish feed

19   manufacturer.

20        Q.   Okay.  And are there similarities between a mink

21   digestive system and a fish digestive system?

22        A.   Yes, there is.

23        Q.   Okay.  And so if something was going to affect

24   mink, it would affect fish and vice versa?

25        A.   In most cases it would be that way.

1          Q.   Okay.  One of the questions was asked earlier in

2     the trial about a shelf life on the lactation crumlets tag.

3     Do you put a shelf life on it?

4          A.   No, we don't.

5          Q.   And why not?

6          A.   Well, it is meant to be fed during that season.

7     It is not -- we don't want to give the idea that you should

8     feed it in any other seasons.

9          Q.   Now, did -- you obviously at some point in 2010

10    heard from the Jonssons and the Griffeths about the problems

11    that they were claiming on their ranches, correct?

12         A.   Yes, later that fall.

13         Q.   And what did you do when you found out about

14    that?

15         A.   Well, immediately we called Rangen and told them

16    to put the sample -- preserve the sample, and then we took

17    our sample and as well as the sampling that came back from

18    other feeds in that time period and had them tested.

19         Q.   Okay.  And I don't want to go through all of the

20    tests, but at that point the tests that were being done were

21    not for nitrosamines or histamines, right?  Well histamines

22    was, I think?

23         A.   It was in -- I believe in approximately three

24    weeks to a month after the first sample was sent out we

25    circled the wagons again.  When that sample didn't show

1     anything, and we went in further to see if we could find a

2     reason that this feed could not be conforming to what it

3     should have been.

4          Q.   Did any of the testing results from your samples

5     show any problems?

6          MR. HANCEY:  Objection, best evidence.  We don't have

7     the samples.

8          THE COURT:  Sustained.

9          MR. MINNOCK:  Well, I think that is probably right.

10    My ultimate point though is that the sample that you --

11         THE COURT:  No, if you have got a question.

12         MR. MINNOCK:  I am --

13         THE COURT:  Put your question.  Not argue your point.

14    Put your question.

15         Q.   (By Mr. Minnock)  The sample that you retained

16    was utilized for testing on the Jonssons and Griffeths feed,

17    right?

18         A.   Correct.

19         MR. MINNOCK:  Okay.  I believe that is all of the

20    questions I have for you.  Thank you, sir.

21         THE COURT:  Counselor?

22         MR. MITCHELL:  No questions, judge.

23         MR. HANCEY:  No further questions for this witness,

24    Your Honor.

25         MR. MINNOCK:  Your Honor, may this witness be excused?

1          MR. HANCEY:  No problem.

2          MR. MINNOCK:  Thank you.

3          MR. HANCEY:  No problem, Your Honor.

4          MR. MITCHELL:  No problem.

5          THE COURT:  Thank you, sir.  And your next witness.

6          MR. HANCEY:  Yes.  Our next witness is Dre Sanders.

7          THE COURT:  Okay.  Sir, if you will come forward

8     please and be sworn.  Please raise your right hand.

9                          **ANDREAS SANDERS,**

10      called as a witness at the request of the Plaintiff,

11            having been first duly sworn, was examined

12                     and testified as follows:

13          THE WITNESS:  Yes.

14          THE CLERK:  Thank you.  Take a seat in the witness

15     stand.  Please state your name and spell your name for the

16     record, please.

17          THE WITNESS:  My name is Andreas Sanders,

18     A-N-D-R-E-A-S S-A-N-D-E-R-S.

19                      **DIRECT EXAMINATION**

20     BY MR. HANCEY:

21          Q.   Good morning, Mr. Sanders.

22          A.   Good morning.

23          Q.   Thanks for coming today.  I understand that you

24     are the nutritionist for National Feeds; is that correct?

25          A.   That is correct.

1          Q.   And you were also the nutritionist for National

2     Feeds back in 2010, correct?

3          A.   Yes.

4          Q.   Now, is it true that you do not have a degree in

5     nutrition?

6          A.   That is correct.

7          Q.   And you do not have a degree in animal nutrition

8     science either, correct?

9          A.   That is correct.

10         Q.   And you're not a veterinarian, right?

11         A.   Right.

12         Q.   You're not a toxicologist, right?

13         A.   Correct.

14         Q.   But you have read some books on nutrition, right?

15         A.   Yes.

16         Q.   And sometimes when you have questions about

17    animal nutrition, you pick up the phone and call a

18    researcher?

19         A.   Right.

20         Q.   Now, as I understand it, you have been the person

21    responsible for formulating National Feeds' products

22    including lactation crumlets since 2008; is that correct?

23         A.   Well, the formulas I more or less inherited when

24    I came on board with National Feeds.  So they were already

25    in place when I got the job.

1          Q.   But by the time -- and that was in 2008, right?

2          A.   Yes.

3          Q.   When you came to National Feeds?

4          A.   Yes.

5          Q.   So by the time 2010 rolled around, you were the

6     person in charge of formulations for National Feeds

7     products?

8          A.   Right.

9          Q.   Now, you're aware, Mr. Sanders, that when a

10    company like National Feeds is producing a product like

11    lactation crumlets, production issues can arise; is that

12    correct?

13         A.   Could you please repeat the question.

14         Q.   You're aware that when a product like lactation

15    crumlets is being manufactured, production problems can

16    arise?

17         A.   With mink production you mean?

18         Q.   No, with feed production, with production of the

19    product itself?

20         A.   Well, obviously that is always a risk of issues

21    when you produce anything.

22         Q.   And, in fact, fair to say that when there is the

23    production of a feed product you expect that there is going

24    to be some sort of a production problem, correct?

25         A.   No, I didn't expect any problems.

1       Q.   Let me direct your attention to your deposition

2   that is sitting right up there in the corner to the left of

3   you.  It might be underneath something.  I'll help you find

4   it if you don't see it.  It may be under that one, sir.

5       A.   Oh, yes.

6       Q.   And you recall your deposition being taken in

7   this case, let's see if I can read the date, back in 2011

8   July, right?

9       A.   Yes.

10      Q.   Okay.  Can I direct your attention to Page 43 of

11  that deposition.  Okay.  Now on Line 11 you were asked this

12  question, let me put it this way, were there any problems

13  with Fromm, and Fromm, by the way, is a feed manufacturer

14  kind of like Rangen; is that correct?

15      A.   Yes, that is correct.

16      Q.   Okay.  Let me put it this way, were there

17  problems with Fromm that in your mind would make you, on

18  behalf of National, want to terminate the relationship with

19  Fromm?  And what was your answer, sir?

20      A.   No.

21      Q.   Continue, just your whole answer there?

22      A.   No, but we had some issues in the past that I

23  mean there was some reproduction issues going on which we

24  eventually didn't figure out what was the actual reason.

25  But again, if you produce something, I mean there is always

1    issues.

2         Q.   If you produce an animal feed product there is

3    always the possibility of there being issues, correct?

4         A.   Right.

5         Q.   And because production problems can occur in the

6    animal feed manufacturing process, would you agree that it

7    is extremely important to be very cautious during the

8    production process?

9         A.   Yes.

10        Q.   And specifically cautious about the individual

11   ingredients that are going into the recipe for the product,

12   right?

13        A.   Yes.

14        Q.   Now, as the nutritionist for National, you have

15   been involved in determining what kinds of fish meal, what

16   types of fish to be used in National products, right?

17        A.   Well, again, the formulas were in place when I

18   took the job.  And my attitude was to try to stay as close

19   as possible if there are changes to be made to stay as close

20   as possible to the original formula.

21        Q.   And one of the factors that you used to determine

22   what kind of ingredients should be used in National Feeds

23   products is how much those ingredients cost, right?

24        A.   Well, it is a factor but necessary -- not

25   necessarily when there is a lack of product or a lack of

1    ingredients, sorry, then cost is not number one, not for

2    sure.  It is the nutritional values that have those

3    ingredients that makes them eligible for replacement.

4         Q.   But back in 2010, National Feeds would allow its

5    Tollmiller, like Rangen in this case, to just use whatever

6    fish meal it had available at its plant, correct?

7         A.   Well, we definitely discussed what fish meals

8    were to be used.  And depending on availability, there is

9    possibilities to, you know, use more or less from one fish

10   meal or replace a fish meal.

11        Q.   Well, okay, let me have you turn to Page 50 of

12   your deposition.  Okay.  And on Line 10 you were asked,

13   would that specification for sardine fish meal have come

14   from you and what was what was your answer?

15        A.   Not necessarily, no.

16        Q.   And then you were asked who would -- from whom

17   would it have come?  And if I am reading your answer right

18   it says, well, probably it could be -- I don't know where

19   you're referring to directly, but I mean if a certain fish

20   meal is not available at a certain Tollmill, we might decide

21   just to go with whatever is available at the Tollmill; is

22   that right?

23        A.   Yes.  But I want to add here it is not that we

24   are going to make concessions to the nutritional value of

25   the final product.

1          Q.   Even though in 2010 you were designated as

2     National Feeds' nutritionist, you did not supervise or play

3     any role in Rangen's efforts to purchase ingredients to be

4     used in the lactation crumlets, correct?

5          A.   That is correct.

6          Q.   Okay.  And it is also correct that National Feeds

7     does not test the ingredients that Rangen purchases for use

8     in the lactation crumlets back in 2010, right?

9          A.   That is correct.

10          Q.   National Feeds' position at that time is that

11     testing of the ingredients was Rangen's responsibility,

12     right?

13          A.   Yes.

14          Q.   So National at that time wouldn't step in and,

15     for example, tell Rangen to test certain ingredients,

16     correct?

17          A.   We didn't have any reason to do that, no.

18          Q.   Okay.  When it comes to individual ingredients

19     that were used in the lactation crumlets, National Feeds

20     simply relied on whatever Rangen's quality assurance

21     programs were, correct?

22          A.   Yes.

23          Q.   And to the extent National Feeds did any testing

24     at all in 2010 on the lactation crumlets, it tested for

25     protein, fat, ash and peroxide value, right?

1          A.   And moisture.

2          Q.   And moisture.  But it didn't test for

3     nitrosamines, did it?

4          A.   No.

5          Q.   It didn't test for nitrites, right?

6          A.   No.

7          Q.   And it didn't test for histamines; correct?

8          A.   Correct.

9          Q.   And National Feeds in 2010 didn't require Rangen

10    to test for those three things either, correct?

11         A.   That is correct.

12         Q.   In 2010, Mr. Sanders, did you have any particular

13    knowledge or experience with histamines?

14         A.   No.

15         Q.   In 2010, you knew that fish meal is always

16    preserved with something, correct?

17         A.   Yes.

18         Q.   If it is not preserved, fish meal spoils, right?

19         A.   Right.

20         Q.   As the nutritionist for National Feeds, were you

21    aware in 2010 of nitrosamines?

22         A.   Well, obviously in literature nitrosamine comes

23    by once in a while where it was a problem 20, 30 years in

24    different animal feed production.

25         Q.   But my question was, were you aware of

1    nitrosamines in 2010?

2         A.   Well not related to our feed, no.

3         Q.   Did you know that nitrosamines could form from

4    nitrites in 2010?

5         A.   Yes.

6         Q.   Did you know that nitrosamines were harmful to

7    mink in 2010?

8         A.   Yes.

9         MR. HANCEY:  No further questions.  Thank you for

10   coming, sir.

11        MR. MINNOCK:  Yes.  Very briefly, Your Honor, less

12   than ten minutes, Your Honor.

13        THE COURT:  Well, that is fine.

14                      **CROSS-EXAMINATION**

15   BY MR. MINNOCK:

16        Q.   Thank you.  Mr. Sanders, could you review for the

17   jury your educational qualifications and what you have done

18   to learn about mink nutrition in order to do your job?

19        A.   Well, I had my education as a medical analyst

20   back over in the Netherlands.  When I started in the mink

21   industry, I got the opportunity from my boss at that point

22   to travel around to America, Denmark, anywhere where there

23   was a significant mink production going, because there was

24   no education for mink nutritionist as such, so I got a lot

25   of connections, as well in the U.S. and Europe talking to

1    existing mink nutritionists.  And besides that, I got the

2    opportunity to run a laboratory next to the wet feed company

3    that I was working for where I could do all kinds of tests

4    on the feed and I was also allowed to do actual research on

5    mink because the owner of the wet feed company has had

6    multiple mink farms themselves.  So combining existing

7    information with information I gathered from my own research

8    over the years that kind of introduced me to the, well, mink

9    feed nutrition.

10        Q.   How long have you been involved in mink feed

11   nutrition?

12        A.   I started in '85.

13        Q.   So 27 years or 28 years?

14        A.   28 years.

15        Q.   And in Europe, were you overseeing or serving as

16   nutritionist for a lot of mink farms?

17        A.   Yes.  When I stopped working with the feed

18   company at that point we fed over 3,000,000 mink every

19   summer.  So there was a significant amount of mink.  And

20   there was -- they were located in Holland, Belgium, France,

21   Poland, so we had a very big area where we served mink farms

22   with fresh wet mink feed.

23        Q.   Now, let me ask you a little bit about this

24   concept of ingredient replacement.  Mr. Hancey asked you

25   some questions about the sources.  When you were dealing

1    with Rangen, would Rangen be the one that would select, for

2    instance, which supplier of sardine meal?

3         A.   Yes.

4         Q.   Okay.  But if there was no sardine meal, and it

5    had to be replaced with another kind of fish meal due to

6    unavailability, would you be the one that specified that?

7         A.   Well, then David Brock and I would discuss what

8    would be available and eventually make a choice how to

9    replace the fish meal.

10        Q.   And when you say how to replace the fish meal, do

11   you mean the amounts of a different kind of fish meal that

12   would have the same profile as what you were replacing?

13        A.   Right.  Well, we were looking at the amino

14   profiles which is important.  And sometimes if you replace

15   one fish meal you can replace it with one other ingredient

16   or with multiple other ingredients.  So it is not necessary

17   just to choose one on one, but you could take it out

18   completely and replace it by two or three other ingredients

19   and finally get the same amino acid profile in this case if

20   we talk about fish meal.

21        Q.   Okay.  In 2010, were you aware of any fish meal

22   company that was preserving its fish meal with nitrites?

23        A.   No, because in my mind that was something from --

24   something from the past that, you know, people didn't use

25   that for decades.

1          Q.    Okay.  One final question, or two final

2     questions, I guess.  You were asked some questions about

3     testing and how you tested for peroxide value, moisture, ash

4     and I think proteins and fats.  How many tests are generally

5     available that you could do if you wanted to test for

6     everything in mink feed?

7          A.    Well, that is -- it could be thousands.  There

8     are thousands ingredients in the feed that you could test

9     on.

10         Q.    Okay.  And why do you test for the ones you do?

11         A.    Because it is important that the big nutrients,

12    protein, fat, carbohydrates that they are in place, that is

13    our first concern, that is why we test on protein, fat, ash,

14    moisture.  And one other important part is the quality of

15    the product itself.  So it is not the amount, but the actual

16    quality and that is why we test on PVs.

17         Q.    Do you get a sample of every batch that is done

18    by Rangen, right?

19         A.    Yes.

20         Q.    Do you inspect each one of those samples?

21         A.    Yes.

22         Q.    And what are you looking for?

23         A.    Well, first of all the appearance, if it is a

24    crumble, the color, the smell, um, extruded pallets is the

25    form, how many fines are in it.  So it is just whatever you

1    can see.  And, you know, you look for a certain color in the

2    product or a certain smell.  And if that is there, then for

3    me there is no reason to be afraid that there is something

4    off spec especially if you sent over the years samples out

5    on a regular basis and they all come back fine.  At that

6    point, you know, you don't have a reason to test 100 percent

7    and then you make just a choice.  And if you test it comes

8    out fine, so there is no reason to do more testing than we

9    did.

10        MR. MINNOCK:  Okay, thank you.  That is all of the

11   questions I have.

12        MR. HANCEY:  No further questions.

13        MR. MINNOCK:  No questions.  May this witness be

14   excused?

15        THE COURT:  Appreciate your help.  Let's take our noon

16   break, folks, and remember what I have told you.  If you

17   will report back in at 20 after one, we'll get started at

18   1:30.  Thank you for your attention and you may be excused.

19        (Whereupon, the jury left the courtroom.)

20        THE COURT:  Do you have any others?

21        MR. HANCEY:  No, Your Honor.

22        THE COURT:  Okay.  Do you anticipate resting then?

23        MR. HANCEY:  We anticipate resting after -- the first

24   thing after lunch.

25        THE COURT:  Okay.  Tell me who you have got lined up?

1    MR. MINNOCK:  The first witness will be Dr. William

2    Wustenberg, who is a veterinary toxicologist, and then

3    following him will be Rick Hoffman and that should get us

4    through today.  Tomorrow, Jon Karraker, and then I think

5    that is -- we don't have anybody else tomorrow, right?

6        MR. MITCHELL:  No.

7        MR. MINNOCK:  Then we don't have anybody else except

8    for one witness who will be here on Tuesday morning Patricia

9    Talcot, if we call her.  So tomorrow afternoon, we

10   anticipate either resting or letting you know that we'll be

11   having one witness on Tuesday morning from out-of-state.

12       THE COURT:  Uh-huh (affirmative).

13       MR. MINNOCK:  Dre, you can come down.

14       THE COURT:  Are you suggesting you may not have

15   somebody on Tuesday?

16       MR. MINNOCK:  Yeah, depending on how the testimony

17   goes, we may or may not have additional witnesses next

18   Tuesday.

19       THE COURT:  Okay.  So that you may possibly rest

20   tomorrow?

21       MR. MITCHELL:  Correct.

22       THE COURT:  Okay.  Well that is -- let's re-assemble

23   at 1:30.  I have a little matter ahead of that, but it

24   should take two minutes.  I think we're all right.

25       MR. MINNOCK:  Thank you, Your Honor.

1            MR. HANCEY:  Thank you, Your Honor.

2            (Whereupon, court recessed at 12:09 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF UTAH              )

 2                               )ss

 3    COUNTY OF SALT LAKE        )

 4

 5           I, Laura W. Robinson, Certified Shorthand

 6    Reporter, Registered Professional Reporter and Notary Public

 7    within and for the County of Salt Lake, State of Utah, do

 8    hereby certify:

 9           That the foregoing proceedings were taken before

10    me at the time and place set forth herein and were taken

11    down by me in shorthand and thereafter transcribed into

12    typewriting under my direction and supervision;

13           That the foregoing pages contain a true and

14    correct transcription of my said shorthand notes so taken.

15           In witness whereof I have subscribed my name and

16    affixed my seal this 24th day of February, 2014.

17

18                        _____

19                        Laura W. Robinson

20                        RPR, FCRR, CSR, CP

21

22

23

24

25
```