1          THE COURT:  Rest?

2          MR. HANCEY:  Your Honor, we rest.

3          THE COURT:  Okay.

4          MR. MITCHELL:  Your Honor, we'll call William

5    Wustenberg.  Dr. William Wustenberg.

6          THE COURT:  Okay.  Let me bring the jurors in.

7          (Whereupon, the jury returned to the courtroom.)

8          THE COURT:  And thanks again, folks.  Sit down and

9    relax.  And, sir, if you'll be sworn, please.

10          THE CLERK:  Please raise your right hand.

11                    WILLIAM WUSTENBERG,

12      called as a witness at the request of Defendant,

13          having been first duly sworn, was examined

14                and testified as follows:

15          THE WITNESS:  Yes, I do.

16          THE CLERK:  If you'll, please, take a seat at the

17    witness stand.  Say your name and spell your name for the

18    record, please.

19          THE WITNESS:  My name is --

20          MR. MITCHELL:  Sit down and use the mike.

21          THE WITNESS:  I'll do it in order, then.

22          William Wustenberg.  Last name is spelled

23    W-U-S-T-E-N-B-E-R-G.

24    //

25    //

1                          DIRECT EXAMINATION

2     BY MR. MITCHELL:

3         Q.    Dr. Wustenberg, would you, please, run through your

4     qualifications for us, please?

5         A.    Okay.  So I grew up in the fur business.  I was a

6     third generation mink farmer in my family on the Oregon Coast.

7     Grew up in family where my mother had a master's in mink

8     nutrition, which is just a little bit of a kind of an

9     obtuse degree, but was surrounded by that as I was growing up.

10    I went to Willamette University, W-I-L-L-A-M-E-T-T-E, in

11    Salem, Oregon.  I have a bachelor's in chemistry.  Went on to

12    veterinary school and at the program between Washington State,

13    Oregon State and University of Idaho.

14              THE COURT:  Everybody hear back there?

15              THE WITNESS:  Are you okay?

16        Q.    BY MR. MITCHELL:  You can move the mike forward

17    just a little bit, too, and it will pick it up a little

18    better.  The mike will actually move toward you.

19        A.    Yeah, I'm sure.

20              I graduated in 1983, and that fall I was hired as

21    the director of nutrition and veterinary services for Fur

22    Breeders Agricultural Co-Op, which is the co-op that supplies

23    mink feed to all the ranchers in Utah and Idaho or most of

24    them that belonged to the co-op.  My duties there included

25    doing ration formulation and then providing veterinary

1    services for all of the 264 farms that were members at that

2    time.  And they would frequently either, if they were having

3    problems on the farm, they would call me and I would either go

4    to the farm or they would bring me animals for me to be able

5    to do pathology on them, postmortem exams.  And they also

6    generously gave me a budget to be able to use laboratory

7    services to be able to try to figure out what the problems

8    were on those farms.  We also had a 750 breeder female

9    research farm that we did nutrition work on, and then we had a

10   laboratory that we did feed quality testing and testing for

11   Aleutian Disease and various other sorted special projects and

12   so forth.

13           And then in 1985 or '86, it's a little hazy, I

14   moved back home to the Oregon Coast where my family is and the

15   home farm is and participated in the farm, but then also

16   started an animal feeds and nutritional testing laboratory,

17   mostly in that area doing dairy feeds and equine feeds, but

18   also doing make feed analysis, too, mostly for nutritional

19   components, a lot protein and fat and all of that kind of

20   stuff that's in it.

21           And as I went along, I continued on occasion, not

22   too infrequently, to actually continue to do consulting work

23   for farmers who were having problems around the United States

24   and would hire me to come to their farm or help them figure

25   out why they were having death losses on their farms or if

1    they could improve production and disease control and so

2    forth.

3           In 1989 I met my lovely wife, who is from

4    Minnesota.  And we lived in Oregon briefly, and then we ended

5    up moving to Minnesota where she's from, as her parents were

6    in ill health, and she was as in most families the one that

7    got tapped, the sibling that got tapped to take care of them.

8    So on that move, I sold my laboratory business, and I actually

9    got hired by a company Pathology Associates International.

10   Their main office was in Fredrick, Maryland, and they did

11   contract toxicology and pathology research for various and

12   assorted clients.  And I was hired because they had been --

13   they had a contract from the Department of the Army to

14   investigate the toxicity of some pollutants that were in the

15   Rocky Mountain Arsenal.  Rocky Mountain Arsenal is actually

16   north and west of the old Denver Stapleton Airport.  For many

17   years, it was way out in the desert.  In 1850s they made sera

18   nerve gas out there.  And when they got a bad batch of sera

19   nerve gas, which I made them clarify it wasn't bad enough,

20   they would then supposedly detoxify it.  And at that time

21   disposal was an open online pits.  They just dumped it out

22   there.  It was a desert, it evaporated and the problem went

23   away, except it didn't.  One of the compounds had a huge long

24   lifespan of stability in ground water, and it was showing up

25   in wells offsite and so forth.

1          And so some of the original research that had been

2     done on the toxicology of that compound had actually been done

3     in mink at Michigan State by Dick Aldrich, one of my

4     colleagues.  And those studies had been just small little

5     studies to try to just see, is it really bad or is it not so

6     bad?  And there were some confusing results and so forth.

7          So we at PAI were hired to actually repeat most of

8     those studies doing subchronic, you'll probably hear that term

9     again, which happened to be at that time labeled as a 90-day

10    study, a chronic and reproductive trial, and then also to look

11    at exactly how this chemical compound is processed or

12    metabolized by the body and so forth.

13         So that went on for about two and a half or three

14    years.  And in the process -- I actually managed all of those

15    studies, was on site, helped write all of the technical

16    protocols and all of that kind of stuff, and then ended up

17    testifying several times in front of the Colorado State Water

18    Quality Board, in front of the National Science Foundation

19    Committee on Toxicology in an attempt to use our information

20    to establish how much would be considered to be a safe amount

21    to have in the water.

22         So the EPA and states, for almost all different

23    kinds of contaminates that can be in the water all the way

24    from nitrates in wells to pesticides that might be in there go

25    through this kind of process to establish how much would

1    actually be considered safe and how much would actually cause

2    toxicity.  And those methods have been used for a long time

3    and, you know, definitely work because we have the safest

4    water supply in the world.  So we used all of those toxicology

5    risk assessment and methodologies and so forth.

6          So Desert Storm came along, and the Army ceased all

7    nonessential funding.  And that was me.  I was nonessential at

8    that point.  So I actually got a chance to start into the

9    human medical device industry.  I'm not exactly sure why the

10   first company hired me.  I jokingly say it's because I could

11   spell FDA.  Since that time -- well, I set up a laboratory to

12   do toxicity testing of medical device materials, so everything

13   from Band-Aids to implantable hearts are all made out of

14   plastics and metals and ceramics and things.  And one of the

15   steps in the process to actually be able to make sure that

16   those things are going to be okay and get approved by the FDA

17   is to show that they are safe and they aren't going to pose a

18   tocological risk or cause toxicity in patients that use them.

19         And so I was hired to set up a lab to actually do

20   that testing.  I was there for about two and a half years.

21   And then I started my own consulting business.

22         And since 1997, I've had Alternate MD Consulting.

23   I've done work for in excess of 500 different medical device

24   companies from things as simple as Band-Aids to artificial

25   heart pumps to artificial knees, intraocular lenses,

1    intraocular treatments for glaucoma, neurologic devices that

2    go in the brain to help if you have hydrocephalus.  It's

3    just -- the number is -- I meet people quite often who

4    actually have a product that I in some small way helped make

5    sure it was safe.

6            But the bulk of my work is actually biomaterials,

7    toxicology.  So all of these plastics and all of these metals

8    and so forth have chemicals in them that can actually come out

9    of them into your body after they're put in.  And so we

10   actually do analytical work in the testing labs to try to

11   figure out how much of each of those compounds might come out

12   and what they are, identify what they are.  And then I get

13   those results, and I compare them with what is in the

14   literature, what's been previously published for all of those

15   chemicals, to try to establish what would be considered a safe

16   exposure limit.  And then I can go back and look and see

17   whether the amount that we think might come out of those

18   devices is above that or if it's the order of magnitude, you

19   know, or a lot lower than that.  And then we can make some

20   judgments about whether those materials are going to pose a

21   potential risk to patients or not.

22           THE COURT:  Do you have your next question?

23           MR. MITCHELL:  Yes, Your Honor.

24      Q.   BY MR. MITCHELL:  Let's back up just a little bit.

25   I want to talk a little bit about your work at the Fur

1    Breeders Agriculture Cooperative.  And when you would get a

2    call from a rancher because they were having a problem on

3    their farm that -- or their ranch that they wanted you to help

4    them out with, what process would you undertake to try and

5    figure out what was going on on their place?

6         A.   So obviously you're on the phone with them when

7    they call.  So taking into account the time of the year and

8    the part of the production cycle, if the animal is pregnant or

9    you're in the fall when they're growing rapidly, ask a number

10   of questions.  You know, how many animals do they have on the

11   farm?  How many of them are they seeing a day dying?  What do

12   they see and what do they look like?

13        Typically what I would do then would be to have

14   them actually get some animals that had either been just

15   deceased or were very sick, and we would euthanize them and

16   get them to my lab so that I would actually do the postmortem

17   exams and start to do some diagnostic work to see if we could

18   figure out exactly what was going on.  That information is

19   really invaluable.  I would encourage them to actually keep

20   track either on a calendar or whatever how many they were

21   losing a day that they thought so that they could have some

22   idea of what their losses were across time.

23        And sometimes the pathology work would actually

24   tell you what was going on.  You would do the postmortem

25   exams, and if they had an infectious disease you could

1    recognize, and you could tell them what to do about it pretty

2    shortly.  Other times I would actually go visit the farm on

3    more complicated problems and try to figure out what was going

4    on.

5         Q.   When you would go out and visit the farms, what

6    were you looking for when you went out there?

7         A.   All kinds of everything.  I mean, general husbandry

8    skills.  Getting an idea how they're managing their animals,

9    what kind of pens they have, whether the animals look healthy

10   or not.  A lot of times, you know, you would spend some time

11   just walking through and looking at individual animals to see

12   if you could see some that are showing early signs of a

13   disease but haven't actually been identified yet.  Talk to the

14   rancher a little about the history of what's going on, get a

15   feel for kind of their past history of health problems and so

16   forth.

17        You know, if there were samples to be taken, if we

18   suspected that there was -- typically it wasn't feed.  But

19   because at that time the Fur Breeders Agricultural Co-Op

20   prohibited people from adding extra ingredients to their feed.

21   So if you were a member of the co-op, you were contractually

22   required to only feed their feed.

23        Q.   Now, the consulting work that you have done on this

24   case, have you done that for free?

25        A.   No.

1      Q.   What is the rate of compensation that you have been

2  paid for your consulting work on this case?

3      A.   375 an hour.

4      Q.   And is that any different from other consulting

5  work that you do for other entities or individuals?

6      A.   I mean, my standard medical device rates are lower

7  than that.  But typically the work that I do for legal cases

8  is much harder and requires a much higher level of

9  performance.

10      Q.   Okay.  So, okay.  What kinds of materials have you

11  taken a look at in trying to come up to speed on this case?

12      A.   Do you have my report?  Because it's got a list and

13  there are so many of them, I can't remember.  I'm sorry.  I

14  can start.  But....

15          So I've looked at the depositions of Keith and

16  Michael Jonsson.  There was a whole set of exhibits that were

17  originally provided.  It seems like it was several hundred

18  pages of things, in this case from Keith.  I've looked at the

19  deposition of Ed Buschur, the exhibits that were provided with

20  that.  I've looked at Jeff Hall's original report and two

21  other of his documents.  I think he did an addendum to his

22  report, and then there's one other.  Maybe it's his

23  deposition.  I've looked at what reports were available from

24  the Utah -- they were a diagnostic lab where they actually

25  took mink in and had them looked at and where they did their

1    diagnostic work.  There was also some mink that was submitted

2    to University of Wisconsin diagnostic lab where they did

3    pathology work, postmortems and exams and so forth.  I know

4    there are at least 16 lab analysis reports for lactation feed

5    itself.  Some of those may be duplicates, so it's maybe only

6    14.  And then there were other samples of other either

7    National Feeds or fishmeal or so forth that were submitted.

8    So, I don't know, maybe there are 25 or so feed analysis

9    reports and lab reports.  And then a number of technical

10   references that include some of those, the Koppang from 1978,

11   Anderson from I think it's 1978 and a number of others.

12        Q.   Have you seen the feed delivery records for the

13   Jonssons in this case?

14        A.   Yes.

15        Q.   And for what period?

16        A.   I think it was provided -- I know it was provided

17   for like April, May, June of 2009, 2010 and 2011, I believe.

18        Q.   Any other materials that you have, that you can

19   recall right now that you've looked at in getting up to speed

20   on this case?

21        A.    Not that I can recall right now.  But, you know,

22   it's banker's boxes full of stuff, so I apologize.

23        Q.   Okay.  Let's talk about some concepts.  Can you

24   explain what toxicology is?  What does that term mean and

25   encompass?

1          A.    Right.  So literally it's the scientific study of

2     toxins.  That's the interpretation.  As it's practiced,

3     toxicologists' jobs are to basically investigate the potential

4     for chemical compounds to cause disease or adverse things, bad

5     things to happen to people and animals.  And there's

6     environmental toxicologists that are looking at what happens

7     to the environment, too, so it depends on which area of

8     expertise you have.  So we also look at the mechanisms by

9     which those chemical compounds actually cause disease.  And

10    many times we're asked, often asked to try to establish again

11    how much is too much and how much is safe.

12          So, you know, the fact of the matter is that all of

13    us today that are in this room have been exposed to

14    potentially toxic compounds.  I had coffee this morning.  I've

15    been exposed to a carcinogen.  If you ate something out of a

16    plastic container, there are things that leach out of that.

17          THE COURT:  Yeah.  I'd be interested, counselor,

18    and I'm sure everybody would be, the assignment given to him

19    for the specific work that he did in reference to the stuff

20    that we're dealing with here.  Background is interesting, but

21    I think we need to focus.

22          MR. MITCHELL:  Certainly.  It's -- I think before

23    we can provide the context for the assignment, I think there

24    are some terms that need to be walked through.  But we'll try

25    to keep it a little more focused in getting those terms out,

1    and that's it.

2         Q.   BY MR. MITCHELL:  So how about the term acute?  In

3    the veterinary and/or tocological world, what does that term

4    mean?

5         A.   Don't you love the way we throw terms around and

6    expect everybody to understand what they are?  Acute means

7    near term, immediate, relatively quickly.

8         Q.   Is there a specific time period that we can

9    reference for that term?

10        A.   Days.

11        Q.   Okay.  And what about the phrase or the term

12   subacute?

13        A.   Actually let's go to chronic next, okay?

14        Q.   Okay.

15        A.   And then I'll explain, because subacute and

16   subchronic are kind of just in-between.  So chronic --

17   compounds that are chronic, chronic toxicity is you're exposed

18   to low levels that do a little bit of damage, but they don't

19   necessarily impair you on a daily basis.  But the cumulative

20   effect over time will then lead to much more serious disease.

21        Q.   Is there a time period that we can reference for

22   purposes of the term chronic?

23        A.   Yeah.  Half a year to years.

24        Q.   So then let's talk about subacute and subchronic.

25        A.   So subacute, I mean, there's some variability in

685

1      that definition, but probably -- probably somewhere -- it's

2      longer than acute, actually, and so it's in, you know, a few

3      weeks.

4           Q.    And then is that synonymous with subchronic?

5           A.    No.

6           Q.    What is that?

7           A.    Subchronic is generally considered to be two

8      months, three months, somewhere in that gap between.  And it

9      depends on who you talk to, to be honest with you.

10          Q.    How about the term dose?

11          A.    Right.  So dose is actually what we've been -- I

12     mean, it's the amount of a chemical compound that you consume

13     and take into your body.  And typically in toxicology we

14     refer, we measure that by the number of milligrams per body

15     weight.  And because we tend to work in metric, it's per

16     kilogram of body weight per day.

17               And so as I was getting at a little earlier,

18     toxicology is all about dose because all of us are exposed to

19     low levels of potentially toxic compounds, but they're below a

20     dose or an exposure rate that actually is able to cause any

21     damage at all.  And we've been given that wonderful system to

22     deal with those things and not have them cause a problem.

23          Q.    Have you ever heard the saying, the dose makes the

24     poison?

25          A.    Absolutely.

1          Q.    What does that mean?

2          A.    So, I mean, probably the best way to get at that is

3    an example.  Most of us have taken Tylenol at one point or

4    another.  It's considered to be an extremely safe drug.  The

5    Extra Strength Tylenol has 500 milligrams of acetaminophen per

6    tablet.  The directions say that if you're above 12 years old

7    ou should take two every six hours, not to exceed six of those

8    in a 24-hour period.  If you're below -- and not to continue

9    that beyond 10 days.

10          So, in fact, Tylenol is actually pretty toxic if

11    you take too much of it.  So if you take 10 of those things

12    three times a day and continue doing that for several days,

13    you're actually going to cause liver damage.  And if you take

14    a whole bottle of it, you're probably going to die right away,

15    or you're going to survive if you get health care and you're

16    going to need a liver transplant.

17          So all of these things that we get exposed to,

18    whether it's in the feed or whether we take them willingly or

19    so forth, have some threshold above which they will cause a

20    toxic effect.

21          Q.    Okay.  Can you contrast the term dose with the term

22    concentration?

23          A.    Right.  And, okay.  So, yeah.  This is one area

24    where even I have to go back and check myself periodically,

25    too, when I'm doing a lot of the calculations and so forth.

1    So we measure concentrations of these chemical compounds in,

2    for example, here the feed, and we talk about parts per

3    million usually.  So parts per million are one milligram per

4    kilogram of that feed.  So if you have one part per million of

5    some chemical in there, if you took everything else out but

6    that chemical, you'd end up with one little milligram of it

7    sitting in there.  That's the concentration in the feed.

8           That translates to the dose that you actually take

9    in by how much you eat.  So if you eat only a little bit of

10   this you're only going to get a little bit of it.  If you eat

11   the whole bucket of it, the whole kilogram of it, you're going

12   to get one milligram, if that concentration is one milligram

13   per kilogram.  Now is that clear?

14        Q.    Thank you.  How about the phrase dry matter?

15        A.    This is another one.  So most foods and mink feed

16   in particular, wet mink feed, are actually mostly water.  And

17   when the mink eat it, they absorb the water and do what

18   everybody does with the water.  And the nutrition comes from

19   what they call the dry matter.  And it probably comes from the

20   way they actually analyze the nutrients in feed.

21          So the first thing they do is dry out the feed, get

22   rid of the water, and they actually measure how much is

23   actually in there.  And then they grind that stuff up, the

24   stuff that's already dried.  And then they an- -- that's what

25   they analyze then.

1           And so you can imagine that if you have a pound,

2    mink feed, wet mink feed generally is about 60 to 65 percent

3    water and 40 to -- 35 to 40 percent of the actual nutrients

4    that are in there.  So mink eat wet feed, and so they actually

5    eat to kind of the total number of calories that they need in

6    a day.  And you can estimate them by how much of the wet feed

7    that they eat to how much of the actual dry matter nutrients

8    they took in based off the moisture level of the feed.

9        Q.   Okay.  We've heard a little bit about the life

10   stages of a mink during the year.  So we have the

11   reproduction, the gestation, the lactation and so on and so

12   forth.  Is there -- are there periods during the year where a

13   mink, that the quantity of feed that they will consume will

14   vary?

15       A.   Yeah, absolutely.  Typically, they're on a

16   relatively even keel through February, end of March breeding,

17   and then April.  Towards the middle part of April when they

18   get to the last trimester of their pregnancy, they actually

19   will start to increase.  Same thing is true in humans.  But

20   once they start to have their kits and they start lactating,

21   then their nutritional requirements really skyrocket.

22           So you have a female that weighs a kilogram and a

23   half, she has six kits that weigh about 12 1/2 grams when

24   they're born, which they look about like this.  And by the

25   time they're 21 days old, they will be more than 10 times

1    their original birth rate.  And all of that came from their

2    mother's milk.  So she had to eat to be able to make up for

3    that.

4              So that's probably the most critical period for

5    nutritional requirements is during the lactation period, which

6    lasts out to somewhere around 42 days.

7         Q.   Are you familiar with a compound known as

8    nitrosodimethylamine?

9         A.   Yes.

10        Q.   NDMA for short?

11        A.   Right.

12        Q.   And are you familiar with the problems that can

13   arise in mink if they consume certain levels of

14   nitrosodimethylamine?

15        A.   Right.

16        Q.   And are you familiar with what one would expect to

17   see on an acute, subacute and chronic basis?

18        A.   Based off what's in the literature, absolutely.

19        Q.   So let's walk through that.  And if a -- if a mink

20   suffers an acute NDMA poisoning, what are the signs that you

21   would expect to see in that mink?

22        A.   Typically they have massive liver failure in their

23   death or relatively shortly.  Again, it's depending on how

24   much they're actually exposed to.  But, yeah.  It's pretty

25   rapid.

1      Q.   And have there been any levels established at which

2  you will see that type of acute NDMA poisoning?

3      A.   Yeah.  I think Carter established some of those,

4  and I have the numbers here in my notes here if you want them.

5      Q.   Yeah.  Would it help -- do you want to come down

6  and walk through those?

7      A.   Let me just look and see what I've got here.

8           It's like 58 milligrams per kilogram of body weight

9  is pretty acutely toxic.  Within a week you'll see dead mink.

10          Do you want me to write that?  How's your

11  penmanship?

12     Q.   You know, I may not be the best judge of that.

13     A.   Okay.

14     Q.   You're welcome to come down and walk through those

15  numbers.  But as you do that, you're going to have to use the

16  mike.

17     A.   So there's a guy named Carter who published an

18  article where when he gave 58 milligrams per kilogram of body

19  weight of this NDMA stuff to a bunch of mink, they started to

20  die within five to seven days.  So it's --

21     Q.   Let's put that down as acute.

22     A.   Okay.

23     Q.   Did they do necropsies on those mink?

24     A.   Yes.  Yeah, they did.

25     Q.   What did they find on those mink?

1       A.   NDMA is actually quite a potent liver toxin, so it

2  really blows your liver out, basically.  It causes necrosis,

3  and changes are pretty ugly.

4       Q.   What's necrosis?

5       A.   Necrosis is cell death.  So it causes the liver

6  cells to die.  They're not working anymore.  It's a bad thing.

7       Q.   And has there been any work done to establish a

8  subacute level where you might see changes in mink that have

9  been poisoned with NDMA?

10       A.   One study that comes to mind is -- not that I'm

11  aware of, actually.  The subacute itself, I wouldn't know.  I

12  wouldn't classify that.

13       Q.   Okay.  And how about chronic?

14       A.   Chronic, yes.  So our buddy Koppang from Norway fed

15  mink for 122 days anywhere from .04 milligrams per kilogram

16  per day to 0.17, sorry about the penmanship, milligrams per

17  kilogram per day.  And doses -- after 122 days, they didn't

18  see any deaths in these animals.  Because of the way the study

19  was set up, they actually took many of these animals, all

20  about 14 of them or 20 of them, at the end of the 122 days,

21  and they did postmortem exams on them and looked to see if

22  they could see microscopic changes of the toxicity.  And up to

23  .08 showed no signs of liver toxicity at all in those animals.

24  Animals that had been exposed for the full a little more than

25  the three months at about .13 to .17, depending on the gender

1    of the animals, showed slight changes in the liver that are

2    pretty typical of nitrosamine toxicity.  But these animals

3    looked normal, so they were on their way to a more chronic

4    effect at that point.

5         Q.   Did they pelt all of the animals out in that first

6    portion of the study?

7         A.   No.  They retained 20 of these animals, six males

8    and six -- and 14 females.  And it's a bit of a confusing

9    study.  But they then -- so this would have been in November

10   or December.  They then took all of those animals that they

11   were keeping, and they put them on the highest diet.  They put

12   them on the diet that had the highest levels in it, and none

13   of them were at these low levels anymore.  And then in -- they

14   kept them on the same diet all the way through March where

15   they bred them, and then they whelped them in April and May.

16   So they had their babies in April and May.

17        Q.   Was there any mortality seen at those higher levels

18   in any of the mink that continued on in the second portion of

19   the study?

20        A.   Based off of the way the study reads, the actual

21   males and females themselves did not die that were kept from

22   the original ones.

23        Q.   And were they able to reach any conclusions about

24   any reproductive effects in the mink that continued on through

25   the second portion of that study?

1      A.   Well, unfortunately in this study Mr. Murphy got

2    involved during that period, because one of the things you do

3    is as a scientific principle is if you're exposing animals to

4    this much of something in the feed, you also have another

5    group of animals that are getting the same feed but don't have

6    any of the chemical in them.  It's called the control.  And

7    that's so that you can try to compensate for other things that

8    might be happening in their world that could cause them to

9    have ill health, and then you can then try to narrow down what

10   changes were only because they were exposed to the chemical

11   compound.

12          They had significant loss or lack of survival of

13   the kits in both of their controls and in the ones that were

14   on the -- that had been exposed to these higher levels of

15   NDMA.  Of the 14 females that bred, 11 of them had kits, and

16   they averaged about 4.4 kits at birth.  And then some of those

17   kits died then shortly thereafter.

18          But again, the same problem was going on across

19   their whole farm, even in the ones that weren't exposed to the

20   NDMA.  So it caused our ability a little bit to be able to

21   have a nice clean picture of whether NDMA was actually --

22   there was something else going on.

23          I think what we can say is that these animals were

24   exposed from November through March, April and May to levels

25   that had been shown to actually cause liver toxicity in the

1    females themselves.  So these animals were actually having

2    toxicity from being fed this prior to the time that they

3    whelped.  And even though they were being fed those levels, it

4    didn't completely wipe out their ability to have kids.  I

5    realize it's not the most precise way to do that.  They still

6    had kits, and 30 out of those 44 survived to weaning.  Many of

7    those kits actually went on to develop tumors and died later

8    because this was actually a study to try to look at the

9    development, the carcinogenics or cancer causing features of

10   nitrosamines.

11           Q.   Are you familiar with histamines?

12           A.   Yes.

13           Q.   And what are histamines and how are they formed?

14           A.   So, well, all of us have little cells inside of us

15   that make histamines.  But in this context, any meat

16   byproduct, particularly some forms of fish and so forth, have

17   a high level of the amino acid histidine in them, which is one

18   of the normal amino acids that make up all of our proteins.

19   And under certain circumstances, if during the process of

20   handling those slaughter byproducts they are not cooled

21   sufficiently or right away, actually in some fish for human

22   consumption that happens very rapidly.  The histidine gets --

23   there's an enzyme that actually impacts the histidine.  It

24   turns it into histamine.

25                So most fish byproducts, actually most fresh fish

1    that we actually eat have some low levels of histamine in it

2    all the time.  And we -- it's there.  It only is a problem if

3    it gets to high levels that are above what would actually

4    cause toxicity.

5        Q.   What levels are we talking about?

6        A.   Well, the NRC for mink says that normally rations

7    contain between zero and 30 parts per million.  There are

8    publications that would indicate that levels as high as

9    mid 70 parts per million actually don't affect the feed

10   consumption and/or growth of mink.  So most food poisoning

11   associated with histamines are from eating either fish and/or

12   fish byproducts that have well above 100 parts per million,

13   some of them 3-, 800, whatever, if they've really been messed

14   up.

15       Q.   And if you were to see a mink that has an acute

16   histamine poisoning, what would you expect to see?

17       A.   Typically it's pretty rapid.  They vomit profusely.

18   They get diarrhea, and they're just sick like the worse case

19   of flu that you've ever had.

20       Q.   And how about on a chronic basis?

21       A.   Typically, I don't know reports of any chronic --

22   typically, you know, you'll see -- there is -- when you do a

23   postmortem exam on them, you'll see ones that have been

24   affected.  They have a dilated stomach.  They've got, you

25   know, changes in the stool that is left inside the intestinal

1    track and so forth, if they die from it.  I mean, typically in

2    those animals, if they survive that initial insult and you can

3    keep them on feed, they come back and are going to be

4    relatively normal.

5           Q.   Okay.  What is it that you were asked to do in this

6    case?

7           A.   I was asked to take a look at the information

8    provided and, number one, to try to figure out whether I could

9    determine whether there was anything related to the lactation

10   crumlets that were put into the feed that would explain or

11   would explain why the death losses as claimed by the farmers

12   would have occurred.

13          Q.   Do you want to sit down?

14          A.   Yeah, I would love to.  Yeah.  Am I done?

15          Q.   For a little bit, yeah.

16               So how did you go about -- how did you go about

17   completing your task?

18          A.   So first thing I did was dig through all of the

19   piles of stuff and see if I could actually find any of the

20   postmortem exams and pathology reports that might actually

21   tell us from the standpoint of the mink themselves what sorts

22   of changes were we seeing to allow for some clues about what

23   might be causing losses.  Based off of the record that I've

24   seen, there were no animals that were actually submitted for

25   any pathology work or histopathology or toxicology workup of

1    animal themselves during the time that the reproductive period

2    and shortly thereafter.  So there's a huge void in information

3    that doesn't exist.  The first necropsies were much later in

4    the year, some months later.

5         Q.   And then after you looked for the necropsies and

6    didn't find anything, what is the next information source you

7    looked to turn to?

8         A.   So then I went through the depositions to try to

9    get some description of what it was that was identified as the

10   problem.

11        Q.   And did you find that description that you were

12   looking for?

13        A.   Well, yes, I think I did.

14        Q.   Okay.  And tell us the description that you found

15   significant for purposes of your opinions.

16        A.   So -- and according to the testimony of Keith and

17   Michael Jonsson, they started to put the crumlets in the feed

18   somewhere in mid 20s of April, the original deposition said

19   the 28th.  And then on the Lehi farm itself, they had older

20   females that had already whelped, they were about two thirds

21   of the way whelped, and about a third of them that were still

22   pregnant and getting ready to have their babies.  And most of

23   those were black mink.  They have both black and mahoganies,

24   which are a dark brown mink, on the farm.

25             The way it was described was that on the 2nd, 3rd

698

1    of May, somewhere, they noticed that the animals, these

2    females that had not whelped yet or were in the process of

3    whelping were lethargic.  They weren't eating.  They were

4    having trouble having their kits.  They were having dead kits,

5    and kits were not surviving very many days after they had

6    them.

7         Q.   Did they provide any other signs of what they

8    considered to be poisoning from the feed?

9         A.   Not that I'm aware of.

10        Q.   Okay.

11        A.   So the other thing that I think is pertinent is

12   they specifically were asked and answered that all of those

13   animals that had already whelped were normal.  They were

14   eating normal.  They were in great health.  There were no

15   losses, significant losses associated with those animals.

16        Q.   Why is that significant to you?

17        A.   Well, if you're looking for something that's coming

18   in the feed that is causing an impact on the animals where

19   they're really getting sick from it, it wouldn't be typical

20   that it would only affect just those.  I mean, you think you

21   would see something in the rest of those animals, either

22   decreased feed consumption or not looking right or something

23   in the rest of the animals.

24        Q.   And was there any other information in the

25   description in the depositions that you found pertinent to

1    your considerations?

2         A.    That's kind of a broad question.

3         Q.    Let me ask you this, then.  Did they -- was there

4    any indication of vomiting in the animals?

5         A.    No.

6         Q.    How about diarrhea?

7         A.    No.

8         Q.    How about cannibalism?

9         A.    Not that I'm aware of, no.

10        Q.    How about -- what was the term you used with regard

11   to the stomach?

12        A.    The dilation of the stomach?

13        Q.    Dilated stomach.

14        A.    Right.  So I believe it was in Keith's deposition,

15   he mentioned that he actually did do some postmortems on some

16   mink and that they were not showing dilated stomachs and

17   things that would be relatively typical of -- or really they

18   looked, I guess, normal based off of his --

19        Q.    Was the lack of those signs showing up in the herd

20   significant to you?

21        A.    I've actually known Keith for a long time.  I

22   haven't been in touch, you know, for 25 years since I was

23   actually working here.  But my impression would be that Keith

24   would have some knowledge of what a normal mink would look

25   like inside when you opened it up and if there were marked

1    changes, like a dilated stomach or really blown-out livers or

2    anything like, that that he would be able to tell that.

3          Q.   And how about the lack of vomiting or diarrhea or

4    cannibalism, were any of those significant to you?

5          A.   Yes.

6          Q.   From what respect?

7          A.   Well, those would be relatively typical signs of an

8    overdose of histamines.  And without having those and without

9    having any changes associated with the stomachs and those

10   sorts of things, I think it helps support the fact that

11   probably wasn't related to histamines.

12         Q.   And were you provided any information concerning

13   the method by which the mixed ration that the Jonssons fed to

14   their mink was prepared?

15         A.   Yeah.

16         Q.   And where did that source of information -- what

17   was that source of information?

18         A.   Well, in the original deposition it was indicated

19   that they had a big mixer and that they get the feed pumped in

20   either every other day during April and then switches over to

21   every day into these big insulated tanks.  And the feed is

22   actually pretty close to freezing by the time it gets there,

23   although sometimes it might be as high as 40 degrees by the

24   time it gets there.  This is the wet feed.  And if you're

25   going to mix something else in there, you can't put it in the

1     tank because it's got no batter, no agitators in it.

2              So they would put 100 pounds or two bags of the

3     lactation crumlets into the mixer.  They would add in, at that

4     point it was two 10-gallon buckets of water, and then they

5     would pump the rest of it full of feed.  And they indicated in

6     the original deposition that the mixer held between 700 and

7     750 pounds of feed.

8         Q.   Why was the description of their mixing process

9     important to you?

10        A.   Well, if you've got a certain amount of histamine

11    or nitrosamine in the lactation crumlets and it's only a

12    certain portion of the whole feed because you're mixing it

13    with the wet feed that doesn't have it in it, it will dilute

14    out the quality that is in there.  And what the mink actually

15    get fed is a mixture that is this wet oatmeal kind of

16    consistency stuff that is then the mixture.

17             So if you're going to calculate how much those

18    animals got on a daily basis, you need to understand the

19    actual concentration of either the NDMA or the histamine that

20    is in the actual feed as it was put in the pen and they ate it

21    and then how much of those mink actually ate on a daily basis.

22    That will define the dose.  You recall that description.

23        Q.   Did you also consider the quantity of the wet feed

24    that was utilized in to feed the Jonssons' mink during that

25    April-May-June time period?

1          A.   Yeah.  So I looked -- trying to just use -- the

2     data that we have is from how much got delivered per day off

3     of their statements from the Fur Breeders Agricultural Co-Op.

4     So if you -- if you take the total amount, April is probably

5     the best month to be able to look at this to actually get how

6     much the females ate because by the end of May, the

7     consumption is actually being -- they've already whelped.  The

8     reported problem of their kit survival and lack of

9     reproduction has gone by.  So what I did is I totaled up the

10    amount of feed that was actually delivered to Lehi in April,

11    and they had claimed that they had 4,000 breeder females on

12    the farm.  Divided it by 4,000.  And then I had to take a

13    guess because it wasn't in the deposition.  You also have a

14    few males that are left around, too, for breeders.  So I

15    assumed that they had pelted at least half of their males, if

16    not more.  And, of course, the males aren't where the problem

17    is.

18          So essentially by that calculation of the wet feed

19    itself as it was prepared, they were feeding somewhere around

20    a little less than a half pound a day of feed, somewhere

21    between .4 to .5.

22          Q.   What was significant about that to you?

23          A.   Well, that allows you then to take the analysis

24    data from the testing that they did.  So they had multiple

25    evaluations for NDMA that they sent to various and assorted

1    labs, in some cases actually multiple samples taken and

2    submitted on the same day.  Did I leave my sheet up there?

3              Actually can we project this?

4         Q.   Yeah.

5         A.   I don't know if you can actually see this or not.

6              I don't know if that helps or not.  I know what it

7    says.  Is this still on?

8         Q.   It's on the bottom here.

9         A.   Thank you.  All right.  So this is just the table

10   of some of the analysis for NDMA that was done.  So it was

11   originally analyzed.  There was a sample that was submitted to

12   an Adamson Labs in December of 2011.  And then there were two

13   samples that were sent in March of 2012.  And again, Roger

14   Griffeth, who received, he and the Jonssons split a load that

15   was delivered that by the depositions indicated that it was

16   all from the same batch that had been produced.  So we're

17   making assumptions the bags that Roger had after he finished

18   up his production year actually represent what was fed on the

19   Jonsson ranch.  I have no reason to believe that's not true.

20   It's just acknowledging some of the areas of the assumption.

21             So what they did is they --

22             MR. HANCEY:  I just want to stop here for a second.

23   I don't know what this document is, and I can't find it.  I'm

24   not sure you referenced it, Hans.

25             THE WITNESS:  This is just a summary table.

1          THE COURT:  Is this an exhibit, Counselor?

2          MR. MITCHELL:  No, Your Honor.  It's just a summary

3     of the data that is in the exhibits that are in the record.

4          THE COURT:  Okay.

5          MR. HANCEY:  Well, I object to its use because I

6     have no way of knowing if it's an accurate summary.  I've

7     never seen the document for.  I don't know what the word, the

8     text is under the chart.  I think it's improper to use this.

9          THE COURT:  Why don't you just have him testify as

10    to what he did.

11         MR. MITCHELL:  Okay.

12         Q.   BY MR. MITCHELL:  What did you do to prepare?

13         A.   What I did was I looked at the reports with these

14    dates, with these PL numbers in your official record, and I

15    pulled out the actual numbers that were reported for the

16    nitrosamines and put them into a table.

17         THE COURT:  This is your table?

18         THE WITNESS:  Yes.

19         MR. MITCHELL:  This is.  Yes, this is a table that

20    he has assembled --

21         THE COURT:  This is a table that he created?

22         MR. MITCHELL:  Yeah.  This is a table that

23    Dr. Wustenberg created.

24         THE WITNESS:  Rather than pulling out each of the

25    reports and going through the pages and showing where in the

1    original reports the data was submitted, I simply summarized

2    it in a table.  That's it.

3              THE COURT:  Okay.  Go ahead.

4              THE WITNESS:  Okay.  So we can try this again?

5         Q.   BY MR. MITCHELL:  Yeah.

6         A.   Okay.  That's really nice.  I have no idea how to

7    use this.

8              Okay.  I can run through this really quick.  What

9    they did is they actually tested for -- there's a number of

10   different related nitrosamines here.  There's -- and this one

11   is the NDMA.  So you drop almost all of the letters, and you

12   end up with NDMA.  This is by far the most potent nitrosamine

13   that exists.  These are the results in parts per million.  The

14   highest levels were 0.22.  These other nitrosamines that are

15   present here typically are not looked at very specifically for

16   toxicity.  Yes, they can be toxic, but their actual toxicity

17   is what we say on orders of magnitude less than NDMA.  So tens

18   to 100 times less potent a toxin.

19             That's it.  That's the reason for it, for me to put

20   this together.  So if I'm going to try to calculate how much

21   the mink actually got, I chose the one that had the highest

22   level of NDMA in it or the 0.22 parts per million.

23             Do you want me to walk through those calculations?

24        Q.   Yeah.

25        A.   Or glaze over?

1      Q.   Did you then use that, was it .22 you said?

2      A.   Yes.

3      Q.   Did you then use that .22 to calculate the dose

4   that the Jonssons' mink would have received on a daily basis

5   assuming that was present in the feed when fed?

6      A.   That's correct.

7      Q.   Okay.  So what's going to be the best way to walk

8   through and show how you show your work about how you did

9   those calculations?

10     A.   Probably off of this table.

11     Q.   Okay.

12     A.   I will under full disclosure tell you that these

13  numbers are slightly different than were in my expert report

14  because the numbers have changed.  Since that time I assumed

15  that the batch sizes were 700 pounds.  I'm told now that the

16  mixer capacity was -- it was 760 pounds.  I'm also told that

17  they add 100 pounds of water rather than the two buckets,

18  which would have been 80 pounds, when they were mixing it.

19  And a couple of other assumptions, too.  One is that

20  originally is the dry matter method.  The numbers look

21  suspiciously like doing it like this, and I felt like this was

22  a little bit easier to explain because it actually gives you

23  exactly the concentrations in the feed as the mink ate it.

24  And I can then take the amount that they ate back to actually

25  what was delivered to the farm.

1          But these are the specifics of what went into the

2    mixer.  So there's 100 pounds of lactation that went into it.

3    Total amount of 760.  They added 100 water.  And this is the

4    amount of the wet feed from the Fur Breeders Agricultural

5    Co-Op that made up the difference.

6          So because of all of the NDMA that we're concerned

7    about comes from this 100 pounds and we said that the

8    concentration was 0.22 milligrams per kilogram or parts per

9    million, kilograms is 2.2 pounds.  When you convert that to

10   milligrams per pound, you end up with a 0.1 milligrams per

11   pound of feed.  So out of 100 pounds times 0.1, you end up

12   with 10 milligrams total that went into this whole batch of

13   760 pounds.

14         So if you divide 10 by 760, you end up with

15   0.0013 milligrams per pound.  And then if we convert that back

16   to parts per million, that comes out to be using the

17   milligrams or pounds 2.2 pound per kilograms, you end up with

18   0.029 milligrams for kilograms at parts per million.

19         All right.  So if I actually pull all of the water

20   out of this, so this is the wet feed concentration right here.

21   If I take all of the water out and I measure the amount that's

22   in just the dry stuff in there, concentration is going to be

23   higher, right?  So I have the same amount in this much as a

24   lower concentration.  If I take all the water out, I've got

25   the same amount of nitrosamines in this much, it's going to

1    give you a bigger number.

2              So on a dry matter basis, just for grams, I went

3    ahead and calculated that, and it's .007.  To be able to

4    calculate actually what the mink got on a daily basis I left

5    it in the wet form and I said, okay, this is how much the feed

6    has in it.  If they ate 0.45 pounds and a female weighs

7    1 1/2 kilograms, 3 pounds, give or take, then they would have

8    received or taken in on a daily basis .0034 milligrams per

9    kilogram of body weight per day.  And if they ate a half

10   pound, it's .0043.  So it's essentially the same number.

11        Q.   Now, are there any issues with using an as-fed

12   basis instead of a dry matter basis for purposes of the

13   calculations that you're doing?

14        A.   Actually no; because in this case, I think this is

15   the most accurate way to do it because I actually correlate

16   this back to what feed was actually delivered to the farm and

17   use that as an estimate.  And I use conservative means.  This

18   is probably an overestimate of the total amount that they ate

19   just based off of the way that I did it.  So some people will

20   say that you should actually do everything on a dry matter

21   basis because it's more accurate because sometimes it has more

22   water in it, sometimes it has less.  Actually mink eat to the

23   amount of calories that they consume.  So within a range of

24   probably 55 percent water up to 65 or 75 percent water, if you

25   had add more water they just eat for feed.  They're getting

1    the same calories.  If you happen -- so if you have a ration

2    and you put it out in front of a bunch of mink and it has a

3    differing water content, they will eat more of the wet feed

4    than they do of the dry feed.

5          If you add a bunch of fat to that so all of a

6    sudden it has a lot of calories in, it's kind of like a big

7    old donut, they're going to eat less even on a dry matter

8    basis.

9          So there's other things that could impact it that

10   even if you're doing it on a dry matter basis that you can't

11   take into account.  So I thought this was the most appropriate

12   because it actually looked at the real numbers from the feed

13   deliveries.

14   Q.   How do the numbers that we're looking at here

15   compare to the numbers that we find in the studies where we

16   see toxic effects at any level?

17   A.   Let me look here and see.  All right.  I think this

18   is probably the easiest way to do this.  Again I hope we can

19   get this right here.

20          This is just a summary of data here.  It's got a

21   couple other studies that we haven't talked about in it that

22   you may have heard of.  So if I assume that Koppang which fed

23   wet feed for 122 days, the levels that did not cause any

24   toxicity were .004 to .008 milligrams per kilogram per day.

25   Over this 122 days, they consumed between 4.9 and

710

1    9.8 milligrams per kilogram of body weight.  So that's the

2    total amount they would have eaten over that three-month

3    period of time.  The way I do my calculations, this the

4    maximum daily exposure rate that I can get.

5           And the total exposure rate, I should explain this,

6    this five to seven days, so they added lactation crumlets

7    April 28th, April 27th, April 25th, I'm not sure what the date

8    is anymore.  And by the first of May, five to 10 days later,

9    probably 10 being generous, they started reporting that they

10   saw clinical signs of acute toxicity if it is related to the

11   feed.

12          So these animals had only been exposed to crumlets

13   from the day they put them in till the day they started seeing

14   signs, which is about a week.  The total amount that they

15   would have eaten assuming a five- to 10-day period was only

16   from .02 to .04 milligrams per kilogram total amount that they

17   would have eaten.

18          So if I would look at these dose levels and I

19   compare them to what's considered a safe level from the

20   Koppang study, these levels on a daily basis comparing these

21   two are 10 to 20 times less than what was considered safe.

22   And from a standpoint at a total amount that they consume over

23   a period of time if you're looking at accumulative effect,

24   this is almost 500 times less.  So the exposure as compared to

25   the Koppang study is markedly less.

1    Q.   If the Koppang study -- were the levels in the

2    Koppang study on a dry matter or as-fed basis?

3    A.   These were on -- actually they reported because --

4    so what they did is they took fishmeal that was -- some of it

5    had some nitrosamines in it, some of it had more nitrosamines

6    in it, which actually they had allowed to produce those kind

7    of the way that you would have produced them if it was bad

8    fishmeal that you bought, and then they mixed those in to

9    rations and then fed them to the mink.  But what they did is

10   they actually weighed how much feed they actually ate every

11   day, which is a lot of work but it's a great way to do the

12   study, because if they know how much is in the feed and they

13   know exactly how much they ate every day, they can calculate.

14   So they reported these based off of the amount or the dose

15   that the animal actually ate over that period of time.  So

16   it's -- I mean, it was a really quite -- from that portion of

17   it, it was a well-done study.

18   Q.   Okay.  So let's talk about the two Anderson

19   articles that are up there.  What were they looking at in the

20   1978 Anderson article?

21   A.   Okay.  So these actually were done in mice.  And

22   so, you know, we often do species-to-species extrapolations

23   and so forth.  I mean, most of our water, safe water levels

24   are based off of data we get from rats and mice.  So it's not

25   unheard of to do those, but you have to be very careful when

1    you do that.  This study was set up, and they had like four or

2    five different groups of mice that they -- that they actually

3    put NDMA in one of those groups into the water, and then they

4    bred them after they had been exposed for 75 days to the

5    compound.  And then they looked to see how many litters, how

6    many had kits -- or pups and so forth.  There was actually two

7    portions to the study.  So they were exposed to -- there was

8    only one group had one dose, and they were administered

9    .02 milligrams per kilogram per pound for 75 days.  Their

10   total consumption was about 2 milligrams.

11        In this study, females actually had birthed

12   slightly more pups than the ones that had never been exposed

13   to any of the chemical compounds.  So it was about

14   9.1 pups per female in the control group and about 9.5 in the

15   group that had been fed the NDMA.

16        They did report that there was a higher incidence

17   of stillbirths.  Out of all the kits, I think it was about

18   16 pups were stillborn in this group, which was significantly

19   higher than the control group.  And then pups that died within

20   the first 48 hours, there were 16 that died in the NDMA group,

21   but there were 13 that died in the control group.  So again,

22   it's not a statistical significant difference.

23        So, I mean, basically if you were just to look at

24   that study in a vacuum, you would say there might be a

25   correlation between the NDMA -- the NDMA that they fed and

1    stillbirths only.

2         Q.   But we don't look at things in a vacuum, so provide

3    a little bit of context.

4         A.   All right.  So if we're just looking at this to

5    kind of complete.  So the doses, again, by just comparison

6    back and forth to look at how much we estimated that they got

7    on the Jonsson farm, you know, the dose that they received is

8    five times less than this number.  It's about 100 times less

9    when you look at the total amount that was consumed.

10             So there was some other issues with that study.  It

11   wasn't a perfect study.  It was -- it had its whoops just like

12   the Koppang study has.

13             Anderson got involved in another study in 1989.

14   The primary interest was if you're exposed to nitrosamines

15   while you're pregnant and it's not at fetotoxic levels so you

16   go ahead and have the young, will that -- because this is such

17   a potent carcinogen, will that set up those offspring to

18   actually develop tumors?  So there have been a couple of

19   nitrogen related compounds that looked like that might be the

20   case.

21             So they did an investigation, and they included

22   NDMA in this study.  And because they were interested in only

23   acute exposure, they actually mixed this stuff into sterile

24   saline, and they gave an IV dose of it once during pregnancy.

25   So in those mice, at either the 16th day of gestation or the

1    19th day of gestation the first time they tried to do the

2    study they gave them about 34 milligrams per kilogram as a

3    single dose of NDMA.  None of those females had any pups.

4         So it wasn't exactly the way one wanted to run the

5    study because you can't tell if pups are going to get cancer

6    later on if they're not surviving past parturition.  So they

7    actually established what they considered to be a maximum

8    tolerated dose, which is the highest level that you can give

9    without actually causing loss of any of the pups from

10   stillbirths or early deaths.  And that was 7.4 milligrams per

11   kilogram.  A very high dose.

12        When they gave that IV at either 16 days or 19 days

13   to these mice once, none of the pups died.  There was no

14   difference in survival rate or the pups.  Interestingly

15   enough, they actually do go on to have a little higher risk of

16   having liver cancer later on, but that's like when they're

17   almost at the end of their lifetime.

18        You look at the comparisons for safety margins

19   here.  For a single dose, you know, like over almost 2000

20   times less of a dose that these mink got exposed to.  And if

21   it's a total dose, you're looking at 185 times less.

22        So when I walked through this, I said, okay, we've

23   got a 122-day study that established a safe level, but the

24   reproductive study is a little cloudy because of the reason

25   the way the whole study got managed and bad things happened

1    and it kind of got screwed up.  In the Anderson study where

2    you have one test group that was done that shows there might

3    be an increase in stillbirths at this dose, and we're still

4    below that dose.  And then we've got this acute study where we

5    give them, quite frankly, really, really high doses of NDMA

6    one time IV and didn't see any fetotoxicity.  And we're

7    between hundreds and thousands of times less than this dose.

8           And I think one of the important things is again is

9    by the time they reported that there was a problem these

10   animals had only been exposed for five to 10 days.  So, yes,

11   they fed the feed through June, but the problem that they

12   described is within the first week after they actually put

13   feed in the diet.  So I can't make the numbers add up.

14        Q.   Okay.  Let's turn to histamines a little bit, for a

15   little bit.  Have you done any calculations of the levels of

16   the histamines that were present in the feed that the Jonssons

17   mink consumed?

18        A.   I just happen to have a chart.

19        Q.   Where does this chart come from?

20        A.   I made it up.  I summarized the data from the test

21   reports, and then --

22           THE COURT:  We need to make sure that everybody

23   hears, and you need the mike.

24           THE WITNESS:  I'm sorry.

25           So I again summarized the data straight from the

716

1    test reports that were brought in the evidence and then did a

2    similar set of calculations.

3         Q.   BY MR. MITCHELL:  So let's walk through the math of

4    those calculations.

5         A.   Just to start, though, a couple of things I want to

6    talk about here.

7         Q.   Well, let's identify the test that you're looking

8    at you've got summarized in here and the methodologies that

9    were used to get those results.

10        A.   Right.  So histamine analysis on samples that were

11   identified as lactation in some form or another got done seven

12   times, and you'll see there's a lot of variability here.  This

13   stands for Midwest labs.  They did histamines on some samples,

14   and it would have been in May of 2011, December 2010.

15   Although it's actually in the assay and it's four parts per

16   million in the feed, this is now the lactation crumlet itself.

17        Q.   Before you move on, what methodology did they use

18   in the Midwest labs?

19        A.   All right.  The only thing that they designated

20   here is it was done for LCMS, which stands for liquid

21   chromatography mass spectroscopy, which is why they call it

22   LCMS so you don't have to say that all the time.  It's a

23   pretty sensitive measuring tool, but they don't reference any

24   of the official methods for doing this.  So there's unofficial

25   and there's official methods, and we'll get to that discussion

1    here in a second.

2           In June of 2011, for reasons that are a little

3    unclear to me, they submitted samples that were received by

4    the labs all within a day of each other to Michelson, Eurofins

5    and NSF Surefish.  And so presumably these were all from the

6    same sample.  Michelson, which uses -- I have to think about

7    this, the American Official Association of Chemists or

8    something like that, AFC is the organization that actually

9    writes exactly how all of the testing that is required by law

10   to be done on our food.  So they are the official arbiter of

11   exactly how these tests get done.  And these tests have been

12   shown to be sensitive and repeatable, and they reflect

13   accurately how much any of these chemical compounds, in this

14   case, histamine are in the feed.

15          So Michelson Labs used AOAC methods, and they came

16   up with 24.4.  Eurofins, which identified the sample as being

17   lactation plus 24 percent fishmeal, which I'm not quite sure

18   why there's a difference in identification here, but they came

19   up with a 206 value.  And then NSF Surefish came up with 442.

20   And again, they labeled it as lactation plus 25 percent

21   fishmeal.  These two use the AOAC method.  This one is

22   actually interesting, and I had to go look it up because I had

23   never worked with that test before.  Because people who have

24   fish, you know, they're out in the Alaskan waters or whatever

25   and they want to make sure they're handling your fish

1   appropriately so once it gets frozen and you eat it you don't

2   get sick from it, many companies have developed these rapid

3   tests that can be done within an hour or two.  Take a chunk of

4   the fish, you mash it up, you run it through their system and

5   you get a number.  And there's probably four or five of those

6   out there that are used commercially.  There's about four of

7   them.  To be able to prove that they work well, what you have

8   to do is take equal samples, run them on your new fancy test

9   and compare it what they get on the official test.  And as

10  long as they're reasonably close then you can go ahead and

11  have confidence in the fact.

12          Histaquant is not used commercially very often.  It

13  will underreport like 35 percent of what actually is in some

14  of these samples when it's run like this or it will over

15  report like 365 percent higher, so it's not an accurate assay.

16          So I have a question about that number.  Subsequent

17  to running these, in April of 2012, they ran a couple more,

18  and they're down in single and double digit.  This one was

19  done by AOAC by Eurofins, which is the same one that got this

20  in 2011.  Again, the samples are identified differently.  I

21  don't know why that is.  Anyway, there you go.

22      Q.   So is that the data that you used in coming up with

23  your calculation of the concentration of histamine in the feed

24  as fed to the Jonsson mink?

25      A.   Correct.  Yeah.

1          Q.   Did you focus on a dose or a concentration?

2          A.   We don't have any good information on dose.  We

3     only have information on concentration in the feed from the

4     literature.  So I had to focus -- if I'm going to try to do

5     any comparison, I had to focus on the concentration in the

6     feed.

7          Q.   Okay.  So you focused on concentration.  Walk us

8     through the math that you performed to determine what the

9     levels would have been under the various test results.

10         A.   Okay.  Again, I chose the highest one from Eurofins

11    that was done by the official method and for grams I threw in

12    the Histaquant one that was done by NFS Surefish.  So this is

13    milligrams per kilogram.  2.2 pounds per kilogram.  This is

14    the amount that's actually in a pound.  Again, smaller numbers

15    because a pound is smaller than a kilogram.  Same numbers here

16    for total batch size and everything.

17              So again, in a 760-pound batch of feed, this is the

18    total amount of histamine that comes from 206.  This is the

19    total amount of histamine in milligrams that comes from a 200

20    right here.  I divide that by 760 pounds.  That means the

21    milligrams per pounds are 12 and 26.  To get back to parts per

22    million, I have to take it from per pound to per kilogram.

23    Again, doing the 2.2 thing, it comes out 27 parts per million

24    and 58 parts per million in the feed, in the wet feed as it

25    was fed to the animals.

720

1     Q.   Have you -- based upon your education, training and

2  experience and the materials and information you have reviewed

3  in this matter, have you formed any opinions to a reasonable

4  degree of certainty whether the lactation crumlets caused any

5  harm to the plaintiff's mink?

6     A.   Based off of the information that was provided, all

7  the testing data --

8     Q.   Dr. Wustenberg?

9     A.   Yes.

10     Q.   Before you go there, I just want to know if you

11  have formed any opinions on that subject.

12     A.   Yes.

13     Q.   Okay.  And are the materials and information that

14  you have relied upon in forming those opinions the type of

15  information and materials reasonably relied upon by people in

16  your field?

17     A.   Yes.

18     Q.   Okay.  So how did you go about reaching the

19  opinions that you have formed?

20     A.   So again, I went through this arduous process of

21  calculating how much the animals were actually exposed to

22  based off of the test reports.  Went into the literature to

23  try to figure out what previous work could tell us about how

24  much was too much and how much was safe, so call that a

25  threshold dose, and then compared the numbers.

1    Q.    Okay.  And did you -- what are the opinions that

2    you have formed with regard to the lactation crumlets?

3    A.    I have seen no evidence nor have any of my

4    comparative risk assessments up to this point actually

5    indicated that there was anything in the crumlets that would

6    explain the clinical science that was reported on the farm.

7    Q.    And have you reached those opinions to a reasonable

8    degree of certainty?

9    A.    Yes.

10   Q.    Okay.  And because you have the opinion that -- I'm

11   sorry.  Back up.  I've lost my train of thought.  What was

12   your opinion again?

13   A.    What was my opinion?

14   Q.    Yeah.

15   A.    I have seen no data presented in the test reports

16   and based off of the comparison in the literature that would

17   indicate that the addition of the lactation crumlets was

18   responsible or contained toxic substances that would be

19   responsible for the clinical symptom syndrome as it was

20   reported by the farmer on the farm.

21   Q.    And even though we see both histamines and

22   nitrosamines and particularly NDMA in these test results that

23   you just walked us through, you still reached that conclusion?

24   A.    Yeah.  I say, I mean, going back to my original

25   example, that's the two Tylenol or maybe one or maybe a 10th

1    of a Tylenol three times a day as opposed to 10.

2         Q.   And have you reached those opinions to a reasonable

3    degree of scientific certainty?

4         A.   Yes.

5              MR. MITCHELL:  No further questions.

6              MR. MINNOCK:  I have no questions, Your Honor.

7    Thank you.

8              MR. HANCEY:  Shall I proceed, Your Honor?

9              THE COURT:  Well, maybe I'll give these folks

10   15 minutes to catch up with life.

11             Remember what I told you.  Don't talk about the

12   case with anyone.  Let's take 15 minutes.  We'll be in recess.

13             (Whereupon, the jury left the court proceedings.)

14             (Recess.)

15             THE COURT:  I think we're all here.  Why don't you

16   bring them in.

17             (Whereupon, the jury returned to the court

18        proceedings.)

19             THE COURT:  The record will show the jury is

20   present, counsel and the parties.

21             You may cross.

22             MR. HANCEY:  Thank you.

23                         CROSS-EXAMINATION

24   BY MR. HANCEY:

25        Q.   Good afternoon, Dr. Wustenberg.

1          A.    Hi.

2          Q.    Now, you stated that you're being compensated for

3     your testimony today; correct?

4          A.    That's correct.

5          Q.    Are you being compensated by Rangen?

6          A.    I believe the insurance company.

7                MR. MITCHELL:  Objection, Your Honor.  Move to

8     strike.

9                THE COURT:  We'll strike that.

10               MR. HANCEY:  No objection to that.

11               THE COURT:  Disregard that, ladies and gentlemen.

12         Q.    BY MR. HANCEY:  Now, you've testified for Rangen in

13    a different case than this; correct?

14         A.    I provided a deposition.

15         Q.    Okay.  And that is known as the Stembridge case;

16    correct?

17               MR. MITCHELL:  Objection, Your Honor.

18               THE COURT:  I don't know what your --

19               MR. HANCEY:  In his CV, Your Honor.  I'm asking

20    about one of his qualifications.

21               THE COURT:  Okay.  You're asking if he worked for

22    them more than once?

23               MR. HANCEY:  I'm asking him about another case that

24    he testified in.

25               THE COURT:  Oh, simply that he had a connection

1    with it.

2           MR. HANCEY:  Yes.

3           THE COURT:  Well, to that extent, he may answer,

4    and then let's move on.

5           MR. HANCEY:  Okay.

6       Q.   BY MR. HANCEY:  Do you remember the question?  Is

7    that the Stembridge case?

8       A.   Yes.

9       Q.   Now, you provided an expert report sort of to

10   summarize your opinions in this case earlier in the

11   litigation; is that correct?

12      A.   That's correct.

13      Q.   Okay.  And I'm looking at it here.  It's dated

14   January of 2013; does that sound about right?

15      A.   Yeah, I believe so.

16      Q.   Okay.  And am I correct in stating that in the

17   summary and conclusions part of your report you state that you

18   couldn't find -- you couldn't identify a definitive cause for

19   why the Jonssons' mink died; is that correct?

20      A.   That's correct.

21      Q.   Now, you stated on direct examination that it would

22   have been nice if the Jonssons had obtained necropsy reports

23   like animal autopsies at or near the time their animals were

24   dying in Lehi; is that right?

25      A.   That's generally standard operating procedure.

1          Q.   But in this case we do have lab reports concerning

2     the feed those mink ate; is that correct?

3          A.   Yes.

4          Q.   Okay.  And some of those lab reports show

5     histamines in the feed; correct?

6          A.   That's correct.

7          Q.   And some of them show nitrosamines in the feed;

8     correct?

9          A.   That's correct.

10         Q.   And one of them shows nitrites in the feed;

11    correct?

12         A.   Correct; which, by the way, if you have a

13    fish-based or fishmeal base you will have some level of

14    nitrites naturally.

15         Q.   Have you reviewed the lab report that was performed

16    on the lactation crumlets sample that Rangen has in its

17    possession?

18         A.   You'd have to show me which report that is.  I've

19    looked at multiple ones.  I don't know whose --

20              MR. MITCHELL:  Your Honor, we're going to have a

21    matter to take up outside the jury at this point.

22              THE COURT:  Okay.  Quick recess, folks.  Five

23    minutes.

24              MR. MITCHELL:  Your Honor, can we handle --

25              THE COURT:  And you may be excused.

1          (Whereupon, the jury left the court proceedings.)

2          MR. MITCHELL:  Your Honor, we started down this

3    road when -- I'm sorry, the name escapes -- Mr. Mercer was

4    cross-examining David Brock about the spec sheets, test

5    results and retained samples.  And it appears that Mr. Hancey

6    intends to ask Dr. Wustenberg if he has seen a test result

7    from a retained sample that, from an analysis that was

8    performed on a retained sample that Rangen kept as part of its

9    normal operating procedure.  Your Honor, that retained sample

10   has never been tested because the plaintiffs have declined our

11   offer to perform that test.

12          THE COURT:  Have you tested it?

13          MR. MITCHELL:  No.  It is still sitting in its

14   original container.

15          THE COURT:  Why not?

16          MR. MITCHELL:  Sorry?

17          THE COURT:  I say why not?

18          MR. MITCHELL:  Why not?  Because we have, what,

19   15 test results that have already been done?  We offered --

20          THE COURT:  No.  If you've got a retained sample,

21   that's exquisitely interesting.  But he asked about the

22   existence of a report.

23          MR. MITCHELL:  Right.

24          THE COURT:  If there's no testing, there's no

25   report.

1          MR. MITCHELL:  Exactly.  But the implication -- the

2     implication is that Rangen has somehow avoided testing more so

3     than plaintiffs have done.

4          THE COURT:  That's a different question.  The

5     question is, did he look at a report on something that was

6     tested?

7          MR. MITCHELL:  Right.  But the point is, Your

8     Honor, that both parties have had equal opportunity to perform

9     the testing.

10          THE COURT:  Yeah.

11          MR. MITCHELL:  And there's no way for me to address

12     this in front of the jury, and it's creating --

13          THE COURT:  That's a different question.  Is there

14     a different report?

15          MR. MITCHELL:  No.

16          THE COURT:  There's no report at all?

17          MR. MITCHELL:  There's no report at all.

18          THE COURT:  Okay.

19          MR. MITCHELL:  Because neither party has performed

20     testing on the sample despite the fact that --

21          THE COURT:  Let me have him ask the witness the

22     question he wants to ask the witness.

23          MR. HANCEY:  Thank you, Your Honor.

24     Q.   BY MR. HANCEY:  Have you reviewed a lab report on a

25     lactation crumlets sample retained by Rangen?

1          A.    For this case?

2          Q.    Yes.

3          A.    Okay.  So without having all of the 16 in front of

4     me, I believe that all of those -- actually when it showed the

5     submitter were either Kent Griffeth and/or one of the

6     Jonssons.  I am not aware -- I mean, I have to look at each

7     one of those reports that have been provided to me to confirm

8     or deny with 100-percent certainty, but I don't recall

9     anything that was submitted by Rangen.

10         Q.    Okay.  Thank you.

11               That's my question, and then I'll move on.

12               MR. MITCHELL:  Here's the problem, Your Honor.

13    Both sides have had equal opportunity to --

14               THE COURT:  It's a good idea to go test it.  By

15    God, why not?

16               MR. MITCHELL:  Because we have 16 test results

17    already done on --

18               THE COURT:  I understand that.  But, hey, folks, if

19    you've got a batch and you've got a sample of the batch, it

20    seems that the oddest kind of thing for me why either side

21    hasn't tested the batch.  But that's just an observer.  That's

22    just editorializing.  That's just an old judge who has been

23    sitting here wondering why people haven't tested the damn

24    batch.  But that's just me.

25               Okay.  We'll give them another couple minutes and

1    bring them back in.  Stay away from reports.  Stay away from

2    samples.  Put your questions as to his direct examination.

3              MR. HANCEY:  Can I ask that question, Your Honor?

4              THE COURT:  Pardon me?

5              MR. HANCEY:  Can I ask that question in the

6    presence of the jury?

7              THE COURT:  His answer was as I understood he did

8    not.

9              MR. HANCEY:  Okay.  Fair enough.  Well, yeah.

10             THE COURT:  That was your answer, as I understand

11   it.

12             MR. HANCEY:  I don't think --

13             THE COURT:  Is that your answer?

14             MR. HANCEY:  That's his answer off the record.

15             THE COURT:  No.  Is that your answer?

16             THE WITNESS:  Yep, that's my answer.

17             THE COURT:  Okay.  Put your question and let him

18   give his answer.

19             MR. HANCEY:  Thank you, Your Honor.

20             THE COURT:  Two minutes.  Check with the jury that

21   they're ready to go, and I'll be back here in a couple of

22   minutes.

23             (Recess.)

24             (Whereupon, the jury returned to the court

25        proceedings.)

1          THE COURT:  Sit down and relax, folks.  I'm going

2     to give you your exercise this afternoon, so enjoy it.

3          Put your next question.

4          MR. HANCEY:  Thank you, Your Honor.

5          Q.   BY MR. HANCEY:  Have you reviewed any lab test from

6     a lactation crumlets sample retained by Rangen?

7          A.   Not that I'm aware of.

8          Q.   Now, on direct examination, Dr. Wustenberg, you had

9     the opportunity to get up to the board and draw some --

10    explain your analysis concerning nitrosamine dosages,

11    histamine dosages and so forth.  Do you remember that?

12         A.   Yes.

13         Q.   Okay.  Now, you also stated, I believe, that your

14    nitrosamine and histamine calculations were based at least in

15    part on the amount of co-op feed the Jonssons received at the

16    ranch during that time frame in 2010; is that right?

17         A.   Yeah.  Considering the fact that I used the whole

18    month of April, I think it's a fair estimation, because even

19    as they were adding back crumlets, it still gave me -- I

20    think, you know, that was for the last two to five days of the

21    month, that gave me a rough estimate.  And I used a range from

22    something that was pretty high.

23         Q.   But you don't know whether or not the Jonssons used

24    all of the co-op feed during that time period that was

25    delivered to the ranch; correct?

1      A.   Well, if they were throwing away substantial

2  quantities and not reducing the amount the next day or the

3  next two days that was being delivered to them, I have no way

4  of knowing that.

5      Q.   If they didn't use all of the co-op feed that was

6  delivered to them, then your calculations would be incorrect;

7  right?

8      A.   Typically.

9      Q.   Okay.

10     A.   Because typically most mink ranchers don't like to

11 buy more feed than they actually have to.  So if they finish

12 up a two or one day, it depends on whether they're getting

13 delivered every day or getting delivered every other day, if

14 they have feed left, then that is one of the beauties of

15 belonging to the co-op is you can call them and have them

16 reduce the amount that they deliver the next time around so

17 that you're not buying hundreds of pounds of feeds.

18     Q.   And I appreciate your speculation.  But I'm asking

19 you whether or not you know what the Jonssons did in 2010?

20          THE COURT:  He responded to that.  Put your next

21 question.

22     Q.   BY MR. HANCEY:  Do you know what they did in 2010?

23     A.   Yes.

24     Q.   Do you know whether or not they used all of the

25 co-op feed?

1    A.   I don't know whether they threw feed out.

2    Q.   Now, did your calculations assume that the Jonssons

3    were mixing one batch of lactation crumlets a day?

4    A.   No.  They would make as many batches as they

5    actually needed to be able to feed the mink for that day.

6    750 pounds would not feed 4,000 females.

7    Q.   Did your calculations of nitrosamines and

8    histamines assume that Jonssons were mixing one batch for

9    each -- so each mink ate one time per day?

10   A.   During April, that's typically what happens.  Yes.

11   Q.   Do you know how many times the Jonssons were

12   feeding their mink during April and May of 2010 each day?

13   A.   I know how much feed got delivered to the farm.

14   Q.   But do you know how many times they were feeding

15   their mink each day?

16   A.   If it wasn't in the deposition, then I don't know.

17   Q.   And, in fact, if they were feeding their mink more

18   often than your assumption, then your calculations would be

19   artificially low; correct?

20   A.   Incorrect; because you can't feed more feed than

21   was delivered to the farm.

22   Q.   Now, you expressed concern today that the Surefish

23   lab test on histamine -- you had some concerns about that;

24   right?

25   A.   Yes.

1      Q.   Okay.  Now, in your expert report that you provided

2   in this case, you had the opportunity to review that

3   particular report, didn't you?

4      A.   In January of last year.

5      Q.   And it formed part of the basis for your analysis

6   in this report; correct?

7      A.   Right.

8      Q.   You reference the Surefish lab test in this report;

9   don't you?

10      A.   Correct.

11      Q.   And you don't identify any concerns you had in your

12   expert report with that lab test, do you?

13      A.   Well, things have changed.

14      Q.   Okay.  Now, Dr. Wustenberg, you've talked today in

15   terms of toxicology; right?

16      A.   Correct.

17      Q.   Okay.  Do you have a degree in toxicology?

18      A.   No.

19      Q.   Do you have a degree in veterinary toxinology?

20      A.   I have a veterinary degree.

21      Q.   You're a veterinarian; right?

22      A.   That's correct.

23      Q.   Do you have a degree in animal toxicology?

24      A.   No.

25      Q.   Are you certified as a toxicologist?

1        A.   No.  I would note the Food and Drug Administration

2   accepts probably six or seven risk assessments that I do every

3   month or two as official record of work for the safety of

4   medical products that are being officially sold in this

5   country.

6        Q.   I didn't ask you that question.  Are you a

7   toxicologist?

8             THE COURT:  That's been asked and answered.  Let's

9   move on.

10            MR. HANCEY:  That was nonresponsive, and I'd like

11   it stricken.

12        Q.   BY MR. HANCEY:  Dr. Wustenberg, if fish are allowed

13   to spoil before they're made into fishmeal, histamines can

14   form in the fishmeal; correct?

15        A.   Correct.

16        Q.   In fact, you believe that the spoilage of fish is

17   really the only way that histamine can show up in a finished

18   feed product; correct?

19        A.   In a finished feed product.  Actually there are

20   certain species of fish where there are low levels of

21   histamine that are going to happen no matter what.  So in the

22   typical handling of these fish, unless they're coming right

23   out of the ocean and being refrigerated down to less than

24   40 degrees, which is typically not the case, most fishmeals

25   you buy if you use a sensitive enough method will have some

1    histamine in them.

2         Q.   Does your expert report say this, what I'm about to

3    read:

4              Histamines occur under conditions of wet spoilage

5    as fish byproduct awaits processing in the fishmeal once dried

6    histamines are fairly stable in dried fishmeal products.  The

7    only way additional histamine can be produced in a finished

8    feed is after it is returned to high water content and allowed

9    to spoil.

10             Did you write that?

11        A.   I wrote that, yes.

12        Q.   Are you aware that nitrites can form -- sorry --

13   that histamines can form in fish when the fish is heated?

14        A.   Yeah.  It has a reaction.  Basically it's a

15   degradation of the histamine amino acid.

16        Q.   And are you aware whether or not heat is involved

17   in the manufacturing process for lactation crumlets?

18        A.   Well, heat is certainly involved in the production

19   of fishmeal because you have to dry it.

20        Q.   And in the production of the crumlets themselves;

21   correct?

22        A.   But in the crumlets itself --

23        Q.   Is that true?

24        A.   I don't know.  I don't know their manufacturing

25   process.  But what I can tell you is that heat involved, as

1    long as there is a bunch of water around still, will

2    perpetuate the development of histamine.  In a dry mix, I

3    don't think that's probably going to be the same kind of an

4    issue.

5         Q.   Now, you're aware that nitrosamines can form in

6    fishmeal that has been preserved with nitrites; correct?

7         A.   Actually, it can be formed in those that are

8    preserved with nitrites and those that are not preserved with

9    nitrites, also.

10        Q.   And you are aware that nitrosamines are toxic to

11   mink; correct?

12        A.   Obviously.  We had a conversation about that today.

13        Q.   We did.  And isn't it true that nitrosamines can

14   have short-term clinical effects on mink?

15        A.   When present in high enough quantities and they eat

16   enough of the feed.

17        Q.   And they can also have long-term clinical effects

18   on mink, as well?

19        A.   Yeah.  That's what we talked about, acute and

20   chronic toxicity and the associated levels that would be

21   responsible for that.

22        Q.   Now, you're aware that the lab tests that were done

23   on the lactation crumlets at issue in this case show the

24   presence of not just NDMA but three different kinds of

25   nitrosamines; is that correct?

1      A.    That's correct.  Yeah.  NDBA and NDEA.

2      Q.    In addition to NDMA; right?

3      A.    That's correct.

4      Q.    And they also show the presence of histamines as

5  we've discussed; right?

6      A.    Right.

7      Q.    Are you aware of any studies that have analyzed the

8  combined health effects of those four substances on mink?

9      A.    Actually that's an interesting question because I

10 thought about that.

11     Q.    Are you aware of any studies?

12     A.    If you look at the Koppang study and you look at

13 the way that they actually made the feed.  So they took

14 fishmeal, and they allowed it to essentially degrade, and they

15 helped it along chemically a little bit, to produce several

16 different levels of what they measured was NDMA in the

17 fishmeal that then got incorporated into the diet that went

18 into the feed then got fed to those animals.  Because of the

19 way that NDMA is measured and the fact that they were able to

20 produce it in those feeds at those quantities and because of

21 the chemistry involved in the production similarities of NDMA

22 and diethylamine nitrosamine and dibutyl nitrosamine, those

23 are the other two that you are referring to, and most likely

24 histamine, also, had to be present in that fishmeal.  They

25 didn't bother to quantify those.  But it was based off of an

1    understanding of how they get produced, they had to be there.

2         Q.   Well, I have the Koppang study with me, and I'm

3    sure you're familiar with it; correct?

4         A.   Yeah.  If you're going to start asking about really

5    deep details I'll have to have a copy of it, okay.

6         Q.   Okay.  But you're aware that the Koppang study does

7    reference NDMA by name in it, correct?

8         A.   Correct.

9         Q.   It doesn't reference by name the other kinds of

10   nitrosamines that we found in the lactation crumlets, does it?

11        A.   No.  But like I said --

12        Q.   I'm just asking if it references them.

13        A.   No.

14        Q.   And it doesn't reference histamine anywhere, does

15   it?

16        A.   No, it does not.

17        Q.   Now, you talked a little bit about the Koppang

18   study on direct examination.  The study involved the exposure

19   of nitrosamines to mink; right?

20        A.   Correct.

21        Q.   And in part of the study, they took 14 female

22   mothers, mother mink, and they bred those mink; right?

23        A.   Correct.

24        Q.   Those mink had been exposed to nitrosamines;

25   correct?

1          A.    Yeah.   The higher toxic levels.

2          Q.    And those 14 females combined produced only

3     44 kits, didn't they?

4          A.    That's what was reported in the study, yes.

5          Q.    And by the time of weaning, which was only a couple

6     months after they were born, 30 of those 44 kits remained.

7     The others had died; right?

8          A.    That's what they reported.

9          Q.    They also report, don't they, that by the time

10    harvesting season came around, which would have been around

11    the end of that year, only 23 of the 44 kits still survived;

12    is that correct?

13         A.    Yes; because once they were on feed they were

14    exposed to the feed that had the highest level or toxic

15    levels.  And actually those levels went up, because if you

16    read the article, the fishmeal when they originally started

17    incorporating it into the feed at 7.2 parts per million

18    nitrosamine in it, which meant that those animals were being

19    exposed to -- that were exposed to that high level to

20    somewhere between .13 and .17 milligrams per kilograms per

21    day, if you look in there, it states that later on because

22    they had to make new batches of feed and they had the same old

23    batch of fishmeal they were working off of, that actually went

24    up to 7.8.  So there was actually an increase across the time

25    of that study of the NDMA exposure from what was already a

1      toxic dose.

2              Q.    From weaning to harvesting?

3              A.    Actually the females that were selected in November

4      and the six males were put on the toxic level that had been

5      shown to be liver toxic.  They didn't continue to feed them

6      the .04 and the .08.  They put them all on the high level.  So

7      they have been fed the level that in three months had produced

8      liver lesions in the prior group of animals through the first

9      122 days, and then they bred them, so they've been exposed to

10     that by the time they whelped to, you know, four months worth

11     of that?  Five months?  And then they continued to feed those

12     kits that were born, the 44 that were born.  We don't really

13     know by the time they get to 30.  So the 30 that survived the

14     30 days, they continue to feed them feed that had toxic levels

15     and actually probably higher levels of nitrosamine than were

16     in the original animals, they call them the F-1 or the first

17     generation, that were actually fed.

18             Q.    But I mean, the study at least indicates that the

19     kits per litter of the 14 mothers that were bred was pretty

20     low.

21             A.    Actually, I don't think -- well --

22             Q.    Well, 44 divided by 14; right?

23             A.    Well, if you're going to view that kind of a study

24     in a complete vacuum without taking into account what they

25     commented about in their control animals that had never been

1    exposed to NDMA during the whole course of the study, then

2    that's a true statement.  But you can't do that and actually

3    understand the validity of the data.

4         Q.   Right.  There were other animals in the control

5    group that also had some issues.

6         A.   Right.  So you can't tell if the presence of NDMA

7    actually caused only a 4.4 kit average out of the 11 that --

8    you don't know that.

9         Q.   In fact, you can't really rely on this article

10   100 percent for anything, can you?

11        A.   Actually, yes.  Number one, for 122 days if you

12   feed animals between .04 and .08 milligrams per kilogram per

13   day you are highly unlikely to see any significant toxicity.

14   That is an important threshold to understand.  The other thing

15   is, as I said in my direct maybe not too clearly, was it

16   didn't cause a frank failure.  Okay.  So we know that these

17   females based off of -- based off the doses that they were

18   receiving were actually being affected by the toxicity of the

19   NDMA.  They still produced 44 kits.  So it's not a measure of,

20   you know, was there a 5-percent decrease?  We can't tell that.

21   What we can tell is it wasn't similar to the second Adamson

22   study where they gave them 34 milligrams and none of the

23   females mice had any kits.

24        Q.   Right; which shows that as the doses increased, the

25   mortalities increased; correct?

1       A.   And there is a threshold below which it won't have

2  an effect.

3       Q.   Now, you're aware that in early 2010 during

4  breeding season the Jonssons kept all of their mink, they bred

5  all of their mink at the Lehi facility; right?

6       A.   That was in the depositions, yes.

7       Q.   And then after breeding they separated their herd

8  in two parts, half of them going to Cedar Valley; right?

9       A.   Correct.

10      Q.   You're aware that the Jonssons fed the co-op feed

11  crumlet mixture to their mink at Lehi; right?

12      A.   Correct.

13      Q.   While the mink at Cedar Valley ate just plain co-op

14  feed?

15      A.   Correct.

16      Q.   And you're aware that the Jonssons reported all

17  kinds of health issues and death among their mink at the Lehi

18  ranch, the mink that had eaten the crumlets, just a few days

19  after feeding commenced; correct?

20      A.   In the testimony.

21      Q.   Right.  That's what the case is about; right?

22      A.   That's my understanding.

23      Q.   Okay.  And you're aware that they also didn't

24  report seeing any adverse health effects among their mink in

25  Cedar Valley that didn't eat the lactation crumlets; correct?

1      A.    That's correct.  And they also reported seeing no

2   problems in the females receiving the lactation that had

3   already whelped.

4      Q.    The only known difference to you in the Jonssons'

5   ranching practices among the two ranches was insertion of the

6   lactation crumlets into their diet at the Lehi ranch; correct?

7      A.    Will you say that again?

8      Q.    The only known ranching difference between the Lehi

9   and Cedar Valley facilities in the spring of 2010 that you

10   know about was the inclusion of the lactation crumlets in the

11   mink's diet?

12      A.    Based off of the testimony, I believe that's, yeah,

13   as much as I know.

14      Q.    You also understand that the Jonssons shared the

15   same batch of lactation crumlets with two mink ranchers up in

16   Idaho; correct?

17      A.    I'm not aware of that.  Well, wait a minute, yes.

18   Right.

19      Q.    Kent and Roger Griffeth.

20      A.    Kent and Roger Griffeth, correct.

21      Q.    You're aware that the Griffeths reported taking

22   their shares of the same batch of lactation crumlets and

23   feeding them to their mink on their two ranches in Southern

24   Idaho; correct?

25      A.    That's my understanding.

1          Q.   And you're aware that they reported, again just a

2     few days after feeding the lactation crumlet co-op mixture to

3     their mink in Idaho the same kinds of health problems and

4     death among the mink at the ranches; right?

5          A.   Yeah.

6          Q.   Do you believe that the experience on the three

7     ranches at Lehi and the two in Idaho, we're dealing with three

8     ranches 150 miles apart, same batch of crumlets, same co-op

9     feed, same health problems and death, same reported clinical

10    symptoms, problems starting about the same time after feeding

11    commenced, similar mortality rates, with the fourth ranch

12    having none of those things and just the co-op feed, do you

13    believe that has no bearing whatsoever on whether the

14    lactation crumlets in this case contained poisons that harmed

15    the Jonssons' mink?

16         A.   First of all, I have to take your word for the fact

17    that they died of the same things as you stated because, first

18    of all, we don't have a clue what they died from.  There was

19    no pathology work done.  All we have to go on is basically the

20    testimony of losses.  There's no accounting of the numbers

21    that were lost in a way that allows somebody like myself to

22    actually understand that it's a concurrent record with the

23    events that are occurring.

24         Q.   Are you suggesting that the deaths and the health

25    effects on the three ranches that fed the lactation crumlets

1    in with the co-op feed are simply a coincidence?

2         A.   It's possible.  Absolutely it's possible.  We

3    tested those crumlets for everything known to man.

4         Q.   Over three ranches?

5         A.   Right.  And based --

6         Q.   Excuse me.  Let me finish my question.  Two states,

7    150 miles apart, only known difference, lactation crumlets.

8    You're saying it was a coincidence?

9         A.   Yeah.  It's quite possible that it is.

10        Q.   Thank you.

11        A.   We have no cause of death.  We have no evidence to

12   show that the crumlets were related.  We've tested every way

13   from Sunday on these things for toxic molds or acidity, all

14   sorts of other things, and have not found a single thing that

15   would indicate that those lactation crumlets contained toxins

16   that would cause that kind of an effect.

17        Q.   Except for the presence of nitrosamines and

18   histamines.

19        A.   They're not present at a high enough level.

20        Q.   Thanks.  I have no other questions.  Thank you,

21   sir.

22             THE COURT:  Anything?

23                       REDIRECT EXAMINATION

24   BY MR. MITCHELL:

25        Q.   Dr. Wustenberg, you referenced some time ago in

1    your testimony that mink will tend to consume feed based upon

2    their caloric need.  Can you explain what that means?

3        A.   Yeah.  So, I mean, this is true for humans and all

4    animals.  If you tend to eat and then you feel satiated, it's

5    because you've consumed a certain number of calories.  That's

6    the largest impact of how much we eat and when we feel

7    satisfied.

8        Q.   Okay.  And for mink, will the -- because they tend

9    to eat calorically, does the quantity of feed that they

10   change -- or that they will consume change based upon the

11   frequency of the feeding?

12       A.   Actually it probably goes up.

13       Q.   Okay.  And -- oh, one final question.  Have you

14   been provided with any test results for retained samples of

15   the lactation crumlets from the plaintiffs?

16       A.   No.

17           MR. MITCHELL:  No further questions.

18           MR. HANCEY:  Nothing further, Your Honor.

19           THE COURT:  Thank you, sir.  I appreciate your

20   help.

21           THE WITNESS:  Thank you, Your Honor.

22           THE COURT:  And you're next witness?

23           MR. MINNOCK:  Yes.  We'll call Richard Hoffman.

24           THE COURT:  Sir, if you'll come forward and be

25   sworn, please.

1                    RICHARD STEVEN HOFFMAN, JR.,

2           called as a witness at the request of Defendant,

3              having been first duly sworn, was examined

4                     and testified as follows:

5              THE WITNESS:  I do.

6              THE CLERK:  Okay.  Please take the witness stand.

7    State your name and spell your name for the Court.

8              THE WITNESS:  My name is Richard Steven Hoffman,

9    Junior.

10             MR. MINNOCK:  We're having some technical problems.

11   I'm going to go ahead and start.  Hans, is that okay if I

12   start while he's fixing that?

13                         DIRECT EXAMINATION

14   BY MR. MINNOCK:

15        Q.   Can you tell us -- you told us your name.  And

16   what's your occupation?

17        A.   I'm what's called a forensic accountant.

18        Q.   Okay.  Tell us what a forensic accountant is.

19        A.   A forensic accountant is, I'm a CPA.  I'm also

20   accredited in business valuation.  And forensic accountants do

21   really types of analyses.  I value businesses, so if you

22   wanted to buy or sell a business I'd help you figure out how

23   much the business was worth.  I also do damage calculations in

24   settings like this, all types of cases, where I help figure

25   out the damages in a case.  And then we do consulting for

1    businesses, whether it be help and improve profitability or if

2    they're afraid they have some kind of theft, we will trace the

3    dollars and try and figure out where the dollars are leaving

4    the business where they aren't supposed to.

5            So forensic accountants, I don't do audit work, I

6    don't do tax work.  I do damage valuation, damage calculations

7    and forensic accounting investigations.

8        Q.    Okay.  And by whom are you employed?

9        A.    By a firm called Lone Peak Valuation Group.

10       Q.    And how long have you been employed by that firm?

11       A.    Since it started.  I started Lone Peak with a

12   partner of mine about five years ago, coming up on five years

13   now.

14       Q.    All right.  Who were you employed with prior to

15   that?

16       A.    A firm call LECG, which stood for Law and Economic

17   Consulting Group, which was an international consulting,

18   international forensic accounting group.

19       Q.    Can you tell us your educational background?

20       A.    Sure.  I'm -- I have a degree in accounting, and

21   then I have a CPA, and then I also have that designation

22   accredited in business valuation.

23       Q.    Okay.  Did I retain you in this case to assist me?

24       A.    Yes.

25       Q.    And what did I ask you to do?

1      A.    You asked me to examine and look at damages, the

2   damage issue in this case.

3      Q.    All right.  And is my client compensating you for

4   your work in this case?

5      A.    I believe so, yes.

6      Q.    You hope so?

7      A.    I hope so.

8      Q.    Yes.  And can you tell the jury what rate that you

9   charge?

10      A.    Yes.  I charge there are $375 an hour.

11      Q.    All right.  So you've talked about your educational

12   background.  Why don't you tell us what other qualifications

13   you have that allow you to opine on this kind of a case.

14      A.    Sure.  I've been doing this type of work for about

15   20 years now.  And I started way back with a firm called

16   Coopers & Lybrand, which turned into PriceWaterhouseCoopers,

17   and then I went to LECG.  And so I've been doing this work

18   that entire time.  And CPAs have to have training every year.

19   All of my training for the last 20 years has been in the area

20   of forensic accounting.  I've had the opportunity

21   to -- there's a few organizations, one's called NACVA.

22   They're a few -- they're kind of nerd herds for forensic

23   accountants, and they provide annual training and I've gone to

24   that.  And I've even had the opportunity to teach for those

25   organizations a couple of times.

1          I've taught at the University of Utah where I

2   taught a class on valuation and another one on damage

3   calculations, and then I've had the opportunity to write.  I

4   co-wrote a book on damage calculations, and I've written

5   several articles on the right way to do damages, or to measure

6   damages is better said.

7          Q.   Have you been retained in other cases to perform

8   damage evaluations?

9          A.   Yes.  Many other cases.

10         Q.   Have you been qualified as an expert in courts

11  before?

12         A.   Many, many times, yes.

13         Q.   Approximately how many cases have you performed a

14  damage appraisal in?

15         A.   I don't know.  I mean, I do about -- I work on

16  about 100, maybe 80 to 100 damage calculations a year, all

17  different types.  And I've done that for the last 20 years.

18  So a lot of cases.

19         Q.   And do you do it on behalf of both plaintiffs and

20  defendants?

21         A.   Yes.

22         Q.   And approximately what percentage of each?

23         A.   It's pretty evenly split.  I get asked that, so we

24  pay some attention to that.  So it's pretty evenly split.

25         Q.   So let's start with what you're trying do with a

1    damage assessment.  What are you trying to do?

2         A.   We're trying to figure out how much money the

3    plaintiffs may have lost due to whatever the case happens to

4    be about.  And so I'm trying to measure the amount of money

5    necessary to make the plaintiffs whole for any losses that

6    were sustained.

7         Q.   Okay.  Now, in this case, have I asked you to

8    render any opinions on whether or not the mink were poisoned,

9    not poisoned, anything with respect to the cause of any mink

10   deaths?

11        A.   No.  And I don't know anything about that.

12        Q.   Okay.  And I take it you're not qualified to talk

13   about that?

14        A.   That's right.

15        Q.   Okay.  So when you get this kind of an assignment,

16   what is the first step?

17        A.   Well, I gather some data.  And one of the first

18   things I want to do is I just want to look at the business

19   from a 30,000 foot level, just a big picture of the business.

20   I also want to do some steps to understand the industry a

21   little bit and learn a little bit about the industry.

22        Q.   Okay.  Were you provided some documents to review

23   in this case?

24        A.   I was.

25        Q.   Okay.  Were you provided all of the financial

1     records that the plaintiffs provided in discovery?

2          A.   I believe so.  Yes.

3          Q.   Were you provided with all of the documents from

4     the American Legends Co-Op, which is the auction firm?

5          A.   Many documents.  I assume they were all of them,

6     but I have many of those documents, yes.

7          Q.   All right.  And the documents from the North

8     American Fur Auction?

9          A.   Yes.

10         Q.   And the plaintiffs' depositions?

11         A.   That's right.

12         Q.   And the plaintiffs' tax returns?

13         A.   That's right.

14         Q.   And any other financial data that was produced in

15    the case?

16         A.   That's right.  As well as the report -- actually

17    the reports that were prepared by Dr. Roberts' deposition

18    testimony by him and by others.

19         Q.   Okay.  So why don't we walk through this and talk

20    about, you talked about the 30,000 foot level.  So tell us

21    what is involved in looking at that.

22         A.   Well, you can imagine, so the methods forensic

23    accountants use need to apply to a wide range of cases and a

24    wide range of businesses and a wide range of situations.  So

25    what I'm really talking about is if you had a business that

1    suffers a loss, what you would frequently expect is if you

2    charted that revenue out, you'd see a dip when the loss

3    happened.  If you think of it if something happened to me and

4    my earnings were interrupted, you could map out how much money

5    I was making and it would take a dip whenever they were

6    interrupted.

7            We want to take an initial look at a business that

8    way because you also want to consider what's going on in the

9    economy, especially with businesses.  Sometimes businesses'

10   revenues go up and down, not because of a loss but just

11   because how business changes.

12       Q.   All right.  Did you prepare this chart that we have

13   up here on the ELMO.

14       A.   I did.

15       Q.   Okay.  Can you take the microphone and come up

16   here?  And let's talk about what we're seeing here.  I'll move

17   it up.

18       A.   I think it made it smaller.  It's not square, but

19   it's --

20       Q.   Okay.  Talk to us about what we're seeing here.

21       A.   So this is a reasonableness test.  It's really two

22   different reasonableness tests that I did.

23       Q.   What's a reasonableness test?

24       A.   It's -- that's that test that I was referring to

25   looking at this business from 30 ,000 feet.  So just getting

1    an idea of what's going on in the business over the time

2    period that we're talking about.

3         Q.   Okay.  So go ahead and tell us what you did to

4    conduct these two reasonableness tests.

5         A.   Well, I doubt that you can tell what these numbers

6    say, and I don't know that you need to.  But what I did was I

7    gathered -- so this column says, black pelt sales.  And it's

8    the number of black pelt sales that happened every year.  This

9    first year is 2008.  That's before anything is alleged to have

10   happened in this case.  So I went back, and I got the black

11   pelt sales and I put this whole column, I filled it out by

12   every year of the actual sales before there were any alleged

13   crumlets problems.

14        I did the same thing with mahogany pelt sales, so

15   that's the total.  And then I went and I got the data that we

16   talked about from the auction that has the average sales

17   prices for the pelts, and I multiplied it out.  So you can see

18   that this is the total revenue just based on the number of

19   pelts that they sold every year and based on the actual pelt

20   prices that were going on at that time.  And so I'm doing this

21   because I need to recognize like other things, like barrels of

22   oil or gold, that as the price of the pelt changes, your

23   revenue can go up or down.  It has nothing to do with anything

24   other than the price of pelts.  So I needed to account for

25   that.

1           And so what I did was I said, well, if you go to

2   2010 and if we just assumed that they would make the average

3   number of pelt sales in the next three years that they had in

4   the previous three years and we look at what the prices were

5   really doing because the prices were going up in 2011, we look

6   at what the prices were really doing, here's how much revenue

7   that they would actually have.  So this top number that says

8   $2,112,000.  Then I compared it.  And I went out and I got the

9   actual revenue that they generated from selling pelts.  And in

10  this year it's $2,133,000.  So in other words, the actual

11  revenue was more than just my 30,000 foot level.  They

12  actually generated more from their sales than I was expecting.

13  And these are in the years after the loss.  Now when I did

14  this, I didn't have their 2013 revenue.  So I could only do it

15  for the two years.

16      Q.   So you've got those last two -- that last column

17  you've got in parenthesis which usually indicates a negative

18  or a loss.  In this case is that to indicate how much more

19  they made than you thought they would?

20      A.   Yeah.  Yeah.  I was expecting this to be numbers

21  going the other direction.  I was expecting the revenue to

22  drop compared to that.

23      Q.   If there was a loss?

24      A.   Right.

25      Q.   Okay.  So what did this tell you?

1      A.   Well, this one, this one made me scratch my head.

2   This one tells me there is no loss.  There's no loss from

3   30,000 feet.  It would not be fair for me to say that that

4   means there's no loss.  That just meant that I needed to

5   figure out and look a little bit closer.  I couldn't

6   understand.  If there was a big loss I wouldn't expect it to

7   be this way.

8           And so I looked at it one other way, and that's

9   down here.  Everything's the same, except what I did down here

10   is I assumed that think sold pelts at the highest quantity

11   that they had in the three years before that and mapped it

12   out.  And again, in this one, there's -- in this one their

13   actual revenue was less than my projected in one of the years,

14   but it was the opposite in the other by more.

15          And so again, this test made me not understand

16   where there could be damages or this test does not look like a

17   company that's been damaged from 30,000 feet.

18      Q.   All right.  Now did I ask you to examine the report

19   of Dr. Roberts?

20      A.   Yes.

21      Q.   Okay.  Now, Dr. Roberts, did he prepare more than

22   one report?

23      A.   Yes.

24      Q.   Okay.  And when you prepared your report, did you

25   address the first report?

1        A.    Yes.

2        Q.    Okay.  And did you make several criticisms of

3   Dr. Roberts' report in that report?

4        A.    I did.

5        Q.    Okay.  And in his second report did he adopt some

6   of the changes that you suggested?

7        A.    He made several of the changes that I suggested,

8   and then he undid, some of the things he did adjust.

9        Q.    All right.  So what I want to do, then, is I want

10  you to sort of explain to the jury, do you understand how

11  Dr. Roberts achieved his numbers?

12            THE COURT:  Do you want him back in the witness

13  chair?

14            MR. MINNOCK:  Well, no.  I'm going to put this

15  chart up and he can go through that.  Maybe if I put this up

16  higher we can move that up or back.

17       A.    We could look at sections at a time, too.

18       Q.    Okay.  Sections at a time.  Okay.  So let's start

19  here up at the top.

20            THE COURT:  Maybe you can identify the chart in

21  some way.

22       Q.    BY MR. MINNOCK:  Yes.  Is this the chart that you

23  prepared?

24       A.    Yes.

25       Q.    And does this chart simply show your understanding

1    of how Dr. Roberts did his damage assessment?

2         A.   Yes.  I've recalculated it.

3         Q.   Okay.  So basically a one-page snapshot?

4         A.   That's right.

5         Q.   Okay.  Now, again, some of the numbers that you

6    used came I guess from the first report?

7         A.   That's right.

8         Q.   And so some of these numbers may well have changed

9    in the interim?

10        A.   And I believe I updated it for the second report,

11   but I believe as I understand it they may have changed yet

12   again.

13        Q.   Oh, he had some additional changes here at trial,

14   and the report has not been updated for that.

15        A.   That's right.

16        Q.   Okay.  So at least this helps us understand the

17   analysis.

18        A.   (Witness indicates by nodding head up and down.)

19        Q.   All right.  So there's three separate categories

20   that he's effectively talking about.  The first one is, pelts

21   not taking to market.

22        A.   That's right.

23        Q.   Why don't you explain to us what you understand

24   that to be.

25        A.   I think of pelts not taken to market, that's just

1     the number of mink that he says weren't born that should have

2     been born.  So they couldn't be taken to market because they

3     were never born.

4          Q.   Why don't we actually use this chart because --

5     what's the red on this chart?

6          A.   The red are the specific parts of his calculation

7     where I think that he's made a mistake.

8          Q.   Okay.  Okay.  So then let's go up to the top and

9     talk about this pelts not taken to market.  Now, did you have

10    a criticism about the way he did it in his first one in terms

11    of whether he should have used a confidence interval?

12         A.   Yes.

13         Q.   Did he have a confidence interval in his report?

14         A.   Yes.

15         Q.   And did he suggest he put one in?

16         A.   Yes.

17         Q.   And did he put one in?

18         A.   Yes.

19         Q.   So tell the jury what you meant when you said --

20    Okay.  Tell the jury what you mean by a confidence interval.

21         A.   That's just a statistical term that all it

22    represents is whenever you're trying to measure something that

23    changes for a lot of reasons, you build a confidence interval.

24    And you're saying, look, any changes inside this confidence

25    interval, who knows what has caused those.  That's the

1    ordinary stuff.  If I was to write down what time you show up

2    to work every day, it's probably not the exact same minute.  I

3    know at my shop some of my employees sometimes they show up at

4    7:30, and sometimes they show up as late as 8:30.  And then

5    there's others who are over there between 5:00 till 8:00 and

6    5 after 8:00.  And that range that you'd say is effectively a

7    confidence interval.

8              And that's when you're trying to measure the number

9    of kits that are born to a mink, you've got to account for the

10   fact that they don't all have the exact same amount, so you've

11   got to figure out a range within which it is just a

12   fluctuation in the number of minks -- number of kits per mink.

13        Q.   So if a given year falls within a 95-percent

14   confidence interval -- let me make sure I understand this.

15   When you say a 95-percent confidence interval, does that mean

16   that you expect 95 out of every 100 to fall within that range?

17        A.   That would mean if you're guessing the number of

18   the size of the litter or the number of kits per mink, you'd

19   be right 95 percent of the time, is what you would expect.

20        Q.   And so in 5 percent of the time it may fall outside

21   of that.

22        A.   That's right.

23        Q.   And if you expand that and you say 85-percent

24   confidence interval, then you're less confident because you're

25   opening up a broader range?

1          A.    That's right.

2          Q.    Okay.  So in your mind is the 95-percent confidence

3    interval concept a sound one?

4          A.    Yes.  Especially for something where you're trying

5    to predict the number of kits born or the number of any herd

6    size, I mean, the number of animals born you would use a

7    confidence interval.

8          Q.    All right.  So anything that falls within that

9    95-percent confidence interval would be considered a, quote,

10   normal year?

11         A.    That's right.  Yeah.  You could have -- if you

12   think of almost anything we do in that regard.  If you have a

13   garden and you're growing vegetables, you don't know exactly

14   how many tomatoes you're going to get off a plant.  It's going

15   to be within a range.  So anything that happens within that

16   range, it might be a good year or a bad year, but in that

17   range is not damage.  That's the normal fluctuation in the

18   number of litter size.

19         Q.    Okay.  Now, you had a couple of red dots up here.

20   And can you just briefly explain what the red dots were which

21   indicated that you had concerns with Dr. Roberts' conclusions?

22         A.    Well, yes.  He didn't account for all of the mink,

23   so his calculation of the mink size was wrong because he

24   forgot about the live auction sales.  He measured -- once he

25   calculated, he's measured damages not from the amount that he

1    says is the shortfall to the lower end of the confidence

2    interval, but he's measured it at a higher amount.  So in

3    other words, he's not -- he's calculated what range is a

4    normal variance or what range is a normal change, but then

5    when he went to measure damages he ignored that calculation.

6          Q.   Okay.  So let me make sure I understand.  First,

7    though, on live sales, that's including the live sales into

8    the number to determine the kits per litter?

9          A.   That's right.  When he was tallying up the kits he

10   forgot those.

11         Q.   Right.  And we had a lot of discussion about that

12   the last couple of days, so I don't want to go through all of

13   that again.

14              But let's talk about the second component.  So you

15   have a confidence interval, which I think, let's take the

16   mahogany mink.  The confidence level was 4.5 to 6.6, and the

17   median was 5.5; is that right?

18         A.   Yes.

19         Q.   Okay.  So how did Dr. Roberts calculate damages,

20   and what is your criticism of that?

21         A.   Well, what he did was once he calculated a number

22   that was outside, so he said, hey, these mink have had too few

23   kits, he had to figure out how many kits were missing, how

24   many too few.  And so he measured from the amount that they

25   had all the way to the middle.  And what he should have done

1    was measure from the amount they had to the bottom end to the

2    point that he would have said, that's just the normal

3    variance.  That's just a down year.

4        Q.   So if the 95-percent confidence interval was

5    bracketed at 4.4 and 6.6 with an average of 5.5, if the

6    particular year in question was, say, 4.1, in your mind what

7    would be the appropriate number of kits, the difference

8    between 4.1 and what?

9        A.   4.1 and 4.4.

10       Q.   What was his?

11       A.   He went from 4.1 to 5.5.

12       Q.   Okay.  All right.  Now, let's talk, then, about the

13   second category.  Let's see.  Is this -- this is our second

14   category.

15       A.   We just talked about that.

16       Q.   We just talked about that.  Okay.  So now let's

17   talk about market price, which is the second category.  This

18   is pelts taken to market.  And why don't you explain to us the

19   analysis that Dr. Roberts did and that you understand he did.

20       A.   What he did was he took -- so on the sheets that we

21   have it listed every category of mink that was sold, and it

22   listed the price that was received and it listed the market

23   price.  So what he did is he multiplied those out and looked

24   at the total and said, we didn't get, "we" meaning his

25   plaintiff -- the plaintiff, the plaintiff didn't get as much

1    money as if they would have sold everything at market price.

2    And then he said, he thinks the plaintiff would have actually

3    sold it at more than market price.  And so he made an upward

4    adjustment and said, they should have sold it at more than

5    market price, and they actually sold it at a little bit less.

6    So he's claimed that as damages.  The difference is damages.

7         Q.   And as I recall, he said that historically the

8    Jonssons have been .61 above the market?

9         A.   That's right.

10        Q.   And their performance in 2011, was 1.some-odd

11   percentage, 1.85 or something below that average.

12        A.   That's right.

13        Q.   So he measured the difference between those two

14   numbers.

15        A.   That's right.

16        Q.   All right.  Did you do an investigation into what

17   actually goes into the auction price?

18        A.   I did.

19        Q.   What goes into the auction price?

20        A.   Well, the different categories, you've got

21   different categories, and so size, I mean, those categories

22   reflect the characteristics of each of the mink that are being

23   sold.  And so I have all of the specific categories, and I

24   traced all of that detail and mapped all of that out.

25        Q.   Okay.  So size is a category?

1          A.    Yes.

2          Q.    Sex is a category?

3          A.    Yes.

4          Q.    Grade is a category?

5          A.    That's right.

6          Q.    And there's other categories?

7          A.    Yeah.  The mink, whether it's mahogany or black.

8          Q.    Or black.  Okay.  So does the product mix affect

9    the market recovery?

10         A.    It does.

11         Q.    Okay.  Now, did you understand that Dr. Roberts

12   looked at it from a total market aggregate standpoint?

13         A.    Yes.

14         Q.    All right.  Did you actually get down into those

15   specific categories?

16         A.    Yes.

17         Q.    All right.  Let me put up a couple of these.  And I

18   want to start with this one.  And I know that the numbers in

19   the yellow -- or the green and the red are blank.  And tell me

20   what we're showing over here.  What's this column?  This is

21   another chart that you prepared; right?

22         A.    Yes.

23         Q.    Based on the data?

24         A.    Another chart of stuff that you guys can't see,

25   probably.  What this is, this says, for instance, female

1    breeder.  If it says black over here.  What this is, these are

2    all the categories that I told you about on the auction

3    detail.  So every single one of these is a different category

4    of mink.  Here's whether it's classified as mahogany, black or

5    other.  Here is the number that were sold in each of the

6    years.  So 2009, there were 59 of that top row sold.  There

7    were none of those sold in 2010, 2011.  So all of this comes

8    right off of the auction reports, and I just put it into my

9    spread sheet, which this is a copy of.  And then I looked, and

10   I compared the price for every single one of these.  I

11   compared the price that they actually received for this to the

12   average price, okay.

13        And so what we'll see in the next chart, these are

14   zeros here because I wanted to show the example.  But if it's

15   green, it means that the plaintiffs actually received more

16   money, a higher price than average.  If it's red, they

17   actually received a lower price than average.  And so I wanted

18   to be able to see, what I was expecting was if the crumlets

19   caused lower quality and if the crumlets caused you to get

20   lower prices than you used to get, it should be green -- these

21   are 2009 and 2010.  That's before there were any crumlets

22   given.  It should be green here and red over here.  And so I

23   wanted to see if it was green and red.  So I prepared -- so

24   the next slide I did actually has the numbers in there.

25        Q.   Okay.  So let's take a look at this.  And tell us

1    what this is talking about.

2         A.   So this is that same chart that you just saw, but

3    now I've put in -- this is the actual price and this is the

4    market price.  All the data comes from that same auction

5    sources.  And you can see over here these are the boxes that

6    are really -- really reflect the difference.  So the red box

7    again, so they got below market price.  In 2009 before there

8    were crumlets they got below market price, below market price.

9    They've always gotten below market price for this one.  But

10   down here you can see that they got above market price for

11   whatever that one is, and they've always gotten above market

12   price for that one.

13         And so you can see when I looked at this, again, I

14   was -- it doesn't look like what I was expecting it to look

15   like because it doesn't look like the other chart where it was

16   green and turning into red.  Instead, they looked pretty

17   random.  But I looked further.

18         Q.   Did you look at any particular categories of mink

19   where the losses seemed to be centralized?

20         A.   I did.

21         Q.   And where did you see that?

22         A.   I looked at two things to do that.  So first I

23   looked at the total.  And the numbers, you can't see the

24   numbers, but I don't know that the numbers are as important.

25   This year, in 2009, they did sell for a little bit above

1     market.  2010, before the crumlets, they sold below market.

2     And this year, this is the first year of the loss, or this is

3     the year of the loss that Dr. Roberts counts, and that number,

4     you can't see it, but that number says $62,000.  So they were

5     below $62,000, below market by 62.  So then I looked up here,

6     and another number you can't see is that one.  That one says

7     below by $61,000.

8            So all of these boxes offset each other except for

9     that one, that 61,000.  That's a big number.  If you were

10    looking at these numbers, if you could see these numbers more

11    closely, you could see that's big number.  I think the next

12    closest one, this one right here is 17,000, negative 17,000.

13    But 61 stands out from all the other numbers.

14           And so in 2011, the losses on this one, which

15    they've never sold above market, is what he's counting as

16    damages.  And that's not how we're supposed to measure

17    damages.

18         Q.   Well, we can see that it's red all the way across.

19    But was the number -- the amount of that loss in 2011

20    particularly pronounced in that category?

21         A.   Yes.  Yeah.  This is red, 4,700; red, 17,000; red,

22    61,000; red, 8,800.

23         Q.   So that's, what, about $47,000 -- or $44,000 more

24    that one year?

25         A.   Right.

Case 2:11-cv-00140-BSJ   Document 132-1   Filed 02/25/14   Page 98 of 125

1      Q.   Did you determine why they suffered such a big loss

2   on that?

3      A.   I did.

4      Q.   What was it?

5      A.   If I look back over here, remember this is the

6   quantity, so if I can line these up right.  So what happened

7   is they just sold a whole bunch of it.  In 2011, they sold a

8   whole bunch of them.  These amounts are how many they sold.

9   So in 2009, they sold 2,697.  In 2010, they sold 3,450, and

10  then in 2011, they sold 5,641.  So they sold a whole bunch of

11  mink that they had never sold for as much as market.  And so

12  that is what is causing this loss.

13     Q.   The loss is magnified because the selling of more

14  mink in one category?

15     A.   More mink -- if you sell more of something that you

16  have not sold at market, then it will bring your price down.

17     Q.   And that's a mahogany -- what is that?  Is that a

18  mahogany male?

19     A.   Yes.

20     Q.   Okay.  All right.  Let's go back to our original

21  discussion, then.

22          Now, let me ask you about -- you talked earlier

23  about live sales and how some of the mink were not sold at

24  auction but instead were sold to other farmers as breeders.

25  Do you remember that testimony?

1      A.   Yes.

2      Q.   All right.  What impact would the sale of those

3  breeders live as opposed to the market have on the Jonssons'

4  relationship to the market price?

5      A.   Well, I believe -- let me tell you why I believe

6  this.  Breeders are sold at a higher price than the other

7  ones.  So the breeders, if you take out high-priced ones and

8  they're not in the auction numbers that we looked at, your

9  average price will be down.  So by doing that, it cause -- it

10  makes it look more like there's damages if you've pulled out

11  high-priced breeders.

12      Q.   And I think we saw that this morning from

13  Dr. Roberts.  He outlined what those averages are.  So if the

14  price that they're selling the mahoganies to their friends for

15  is higher than what they're selling at the market for, then

16  that will reduce their profitability vis-a-vis the market?

17      A.   That's right.  If you think of it, if we took the

18  average height of the jury and then we asked all the tall

19  people to step out and we took the average height again, the

20  average would go down.  And that's the same effect that

21  pulling out the breeders would have on average price.

22      Q.   Okay.  Now, based on your calculations, then, how

23  you did this assessment, did you believe that the Jonssons

24  suffered a loss vis-a-vis the market?

25      A.   No, I don't.

1        Q.   Now, the third category is the breeder mink --

2  actually have we gone through these, all the red buttons that

3  we wanted to talk about?

4        A.   Yes.  We've covered all of those.

5        Q.   We're done with breeders?

6        A.   Yes.

7        Q.   Why don't you resume the witness stand, and we'll

8  talk about something else.

9        A.   Do I need to turn this off?

10        THE CLERK:  I can take it.

11        THE WITNESS:  Thank you.

12        Q.   BY MR. MINNOCK:  All right.  Can you explain to the

13  jury how you understand Dr. Roberts assessed breeder losses?

14        A.   Yes.  First I believe that his theory was that

15  because there were some mink that were not born, some of those

16  would have been breeders that didn't exist.  And so instead,

17  the plaintiff had to go buy breeders.  And so what Dr. Roberts

18  did was he found out how many breeders were bought, and then

19  he multiplied that by $600.  And the way he did that is first

20  he multiplied it by $100, which is roughly what they paid for

21  it, and then he multiplied it times $500, which he said he

22  thinks a breeder is worth.  And so he added -- basically he

23  took those, took the breeders that he thinks were purchased

24  times $600.

25        Q.   Okay.  And do you have criticisms of that approach?

1        A.    I do.

2        Q.    All right.  Tell us what your criticisms are of

3   that approach.  Do you have more than one?

4        A.    Yes.

5        Q.    Tell us the first one.

6        A.    The first one is, this ties into the earlier

7   problems.  If he's counted the number of missing mink

8   incorrectly, then that affects this one.  If there aren't

9   missing mink, then there aren't breeders that weren't

10  available.  So if the plaintiff bought breeders, it's not

11  because they were replacing any that weren't available, it's

12  because they bought breeders.  So his first is the problems we

13  discussed earlier affect this calculation.

14           But the second one is, when you're measuring

15  damages, you don't -- you measure how much the plaintiffs had

16  to spend in order to get themselves in as best position as

17  they could.  So I understand they spent $100 for breeder.  And

18  so you pay them back the $100.  You don't -- you don't pay

19  $500 which has never been incurred for breeders.  Those

20  breeders have never been bought.  And in my mind this would be

21  the equivalent of if I had a car sitting out front and you hit

22  my car, rather than just asking you to pay for the repairs, I

23  ask you to pay for the repairs and other repairs that I didn't

24  get and could have gotten and maybe be on another car.  It's

25  not -- it's not the damage number.

1      Q.   Did the mink that the Jonssons sold live, do you

2  assume as an accountant that the price that they charge is the

3  actual price of those breeders -- is the value of those

4  breeders?

5      A.   Yes.  I expect that -- I expected them to behave

6  like prudent business people and charge the market price for

7  it.

8      Q.   So if they sold breeders to other ranchers for

9  either 75 or $100 or $108, then you would expect that to

10  represent the fair value of that mink?

11      A.   That's right.

12      Q.   Okay.  And if they sold them for 500, they would be

13  a $500 mink?

14      A.   That's right.

15      Q.   Okay.  But in this case they never had any mink

16  that they sold for $500?

17      A.   That's my understanding, yes.

18      Q.   What is your second criticism about the breeder

19  analysis?

20      A.   There were two.  The first one was the way it tied

21  in with the number of mink.  The second one was how he valued

22  the mink, valuing them at $600 instead of $100.

23      Q.   Okay.  Do you think that giving them a new $500

24  mink would constitute double counting?

25      A.   It sure would, yes.

1          Q.   Explain that to us.

2          A.   Well, for a couple reasons.  The mink -- the

3     breeder mink lived for as much as, as long as three seasons,

4     three years.  And so you're replacing breeder mink as you go.

5     And so the first way that it does is if there's damages the

6     way that Dr. Roberts has measured, meaning there's mink that

7     weren't born, kits that weren't born, or the pelt size is

8     different, we've already measured that.  And so when you get

9     to the end of the third year, that cycle has already gone

10    through.  And so it's already been accounted for there.

11             But also when they went out and bought replacement

12    mink, they now have the mink that they can say they wouldn't

13    otherwise have.  And so now they're back in that position.  So

14    if that's the case, if you buy a replacement mink and it's

15    appropriate, then the damage number is the amount that it

16    cost.  But you can't then charge another $500 that was never

17    incurred and never bought replacement mink.

18         Q.   Well, what if the mink that they purchased, okay,

19    the breeder mink that they purchased to fill their -- as their

20    females breeders produced lower, how is that accounted for?

21    Or is it already accounted for by Dr. Roberts in other

22    categories?

23         A.   Well, he didn't do his calculations specifically

24    enough to see -- I don't believe it's calculated -- well, I

25    don't believe he's accounted for it.  He didn't do his damage

1    numbers specifically for me to see.  But if the replacement

2    breeders were, there's something wrong with them, then we

3    should measure those and see how much is wrong with them and

4    calculate that.  And he didn't do that.

5         Q.   All right.  Based on your review of all of the

6    documentation that were provided, were you able to determine

7    whether the Jonssons suffered any loss in this case?

8         A.   I have not seen evidence that, normal evidence that

9    exist that they've suffered economic loss as a result of this.

10   I have not seen that evidence.

11        Q.   Do you have any additional opinions in this case?

12        A.   No.

13        Q.   All right.  Thank you, sir.  That's all the

14   questions I have for you.

15                        CROSS-EXAMINATION

16   BY MR. HANCEY:

17        Q.   Good afternoon.

18        A.   Good afternoon.

19        Q.   Okay.  Just to clarify, Mr. Hoffman, you have an

20   accounting degree; correct?

21        A.   Yes, sir.

22        Q.   Okay.  You do not have a degree in economics?

23        A.   No.

24        Q.   You're not an economist?

25        A.   I'm not.  That's right.

1          Q.   Now, you stated I believe that you reviewed

2     Dr. Roberts' April 2013 report in preparation for this trial

3     and your opinions in this case; correct?

4          A.   Yes.

5          Q.   And you're aware that in Dr. Roberts' report he

6     analyzed data, historical data from the Jonssons' ranches

7     going all the way back to 2003, didn't he?

8          A.   In certain parts, yes.

9          Q.   Well, 2003 or 2004, in some instances 2001; right?

10         A.   Certain data, yes.

11         Q.   When that data was available back that far;

12    correct?

13         A.   I believe I took him at his word that that's when

14    it was available.

15         Q.   And in your report, you only considered two

16    historic years prior to the feeding of the crumlets; correct?

17         A.   That's true.  My report my first -- I mean, my

18    report responded to his first report.  So you're comparing an

19    apple to an orange.

20         Q.   I'm comparing your testimony from today; right?

21         A.   My testimony today only went back to financial --

22    or only went back for those years that were covered.

23         Q.   You talked about this spreadsheet, didn't you?

24         A.   Right.

25         Q.   And this spreadsheet only talks about data going

1    back to 2009, doesn't it?

2         A.   That's true.

3         Q.   And that was one year before the feeding of the

4    crumlets; correct?

5         A.   That's true.

6         Q.   You didn't consider in your analysis all of the

7    historical data that was available to you going back to 2003;

8    is that a fair statement?

9         A.   No, I don't think that's a fair statement

10   because --

11        Q.   Did you ignore it, then, because it's not in your

12   papers?

13        A.   Let me finish the first one.  I don't think that's

14   a fair statement because I took the analysis -- that's the

15   analysis that I did, was Dr. Roberts' first report, so I just

16   brought in the same thing that I've always had.  When he

17   updated his and did additional years, I didn't update mine.

18   He made the mistakes that I was talking about, as well.  So

19   you're comparing an apple to an orange.

20        Q.   Okay.  So you've had since April of 2013 at least

21   to update your documentation to consider data going back

22   another seven years, and you chose not to; isn't that true?

23        A.   Yeah.  He made the mistakes I said, so I didn't --

24   I didn't go further into them.

25        Q.   Would you agree with me that when you're

778

1      considering damages one of the things that you need to

2      consider is opportunity costs?

3            A.   It can be.

4            Q.   Do you know what an opportunity cost is?

5            A.   Sure.

6            Q.   Let me give you an example.  I work somewhere that

7      pays me $1,000 a week salary, okay, or wages, let's say, and I

8      want to go on vacation to Hawaii, so I do.  And I go for a

9      week, and the vacation costs me $1,000 in hotel, car and other

10     fun expenses, okay?  Are you with me?

11           A.   I am.

12           Q.   Okay.  That vacation cost me $2,000, didn't it?

13           A.   Well, let's make sure we're on the same page.

14           Q.   Let's make sure.  $1,000 that I spent in Hawaii.

15           A.   Right.

16           Q.   Plus the $1,000 in wages I didn't earn because I

17     wasn't working; right?

18           A.   I assume that that's what you meant, and so then --

19           Q.   And in that scenario I would be accurate; correct?

20     The vacation cost me $2,000?

21           A.   So the question is, would -- did it cost $2,000?

22           Q.   Yes.

23           A.   If you want to count that as opportunity costs and

24     you're not salary, sure.

25           Q.   I'm counting it as a loss.  I lost $2,000 by going

1    on vacation, didn't I?  I got to go on vacation, but I'm

2    $2,000 out of pocket, aren't I?

3         A.   Yeah.  Not many people would call going on vacation

4    to Hawaii a loss, but it would be fair, if it's weekly wages

5    it would be fair to say that it was $2,000 total cost to go to

6    Hawaii.

7         Q.   And in this case, if the Jonssons were in a

8    position at some point where they wanted to grow their herd

9    but couldn't because of losses that they experienced

10   internally and in addition to that they had to go outside and

11   buy external mink, you would need to account for both sides of

12   that coin to quantify losses, wouldn't you?

13        A.   It's possible if they weren't able to do growth,

14   that's a possible scenario, sure.

15        Q.   And your expert report doesn't talk at all about

16   the Jonssons' inability to grow as they wanted to and had

17   historically, doesn't it?

18        A.   Well, I don't know if that's quite accurate.  The

19   notion of growing, they can grow.  If they're going to grow by

20   not buying any mink, then you've got to look at that lost mink

21   analysis, which I have looked at.  And then when you consider

22   the mink that were sold in the live auction, I guess your

23   question assumes, I suppose, that they want to grow by more

24   than the number of mink that they gave away.  But it's

25   possible.  You could create a scenario.  I expect you have

1    different evidence, but you could create a scenario like that,

2    sure.

3         Q.   Where you've got to account for both unrealized

4    loss of growth and external purchases; correct?

5         A.   You could create a scenario where you would want to

6    account for that, sure.

7         Q.   Okay.  Now it's also true that when you're

8    calculating economic damages it's important to look at the

9    whole picture; right?

10        A.   I think that's generally fair.  I'm not sure -- I

11   mean, but, yeah, I think that's generally fair.

12        Q.   Well, for example, when you're trying to calculate

13   damages, you can't just look at sales, for instance, in a

14   vacuum because that wouldn't paint the whole picture, would

15   it?

16        A.   Well, it depends on what's damaged.  You're better

17   off to look at stuff in a vacuum depending on what's damaged.

18   So, for instance, if I -- you know, if I had a case where we

19   lost a salesperson, then absolutely I'd look at sales in a

20   vacuum because I'd want to see the impact of the salesperson.

21   So if you look at more stuff, you start getting noise in the

22   data.  So it depends on the scenario.

23        Q.   Let me give you an example.  Let's say that I own a

24   business that sales widgets, okay?

25        A.   Okay.

1        Q.    And in 2013, I sold 1,000 widgets.  Are you with

2   me?

3        A.    Sure.

4        Q.    Okay.  On December 31st, a fire destroys

5   100 widgets in my inventory.

6        A.    Okay.

7        Q.    And then in 2014, I managed to still sell

8   1,000 widgets for the year.

9        A.    Okay.

10       Q.    You wouldn't say in that scenario that I haven't

11   been damaged; correct?

12       A.    Well --

13       Q.    The sales were the same, but have I still been

14   damaged?

15       A.    I'd say you lost -- I can't remember the number you

16   said.

17       Q.    My damages would be the 100 widgets that I lost;

18   correct?

19       A.    So if you're asking me to assume that you lost

20   100 widgets --

21       Q.    Yes.

22       A.    -- I'd say your damage was 100 widgets.

23       Q.    Regardless of whether or not my sales in both years

24   were the same or not; correct?

25       A.    Yeah.  For that -- for when you describe that type,

1    there would be no need to analyze sales in that scenario

2    because the widgets that you lost would be burned in a fire.

3    I mean, we'd have your inventory records.

4         Q.   And if we expand on my hypothetical, fire destroys

5    100 widgets and so I go over to my competitor and buy 100

6    external widgets and bring them into my inventory and manage

7    to sell 1,000 for 2014, I've still been damaged, haven't I?

8         A.   That's a great hypothetical.  You have, but only

9    the cost that it took you to replace those widgets.  You're

10   out -- you went out and you bought the 100 widgets, so

11   whatever you paid to do that, that's your damage.

12        Q.   If the widgets are equivalent in value; correct?

13   You're making a big assumption there, aren't you?

14        A.   Well, I don't know what the value of a widget is,

15   but I thought I was going with you.

16        Q.   But that's an assumption you would have to make, is

17   that the widgets that I went out and bought from somewhere

18   else are the same in quality and other characteristics as the

19   ones that were burned in the fire; is that right?

20        A.   Yeah.  It's perfect.  If that's true, if they are

21   the same quality, then you're made whole as soon as you get

22   that replacement cost.  If they're not the same quality, then

23   what I'd expect is you take the sales price of the ones you

24   bought and compare it to the sales price of the ones that you

25   didn't buy and you show that they weren't the same quality,

1   and we would measure that.  And that's exactly what should

2   have been done in this case and it wasn't.

3          Q.   If you crash into my $50,000 Mercedes --

4          A.   Uh-huh (affirmative).

5          Q.   -- big, big damage to the side of the car, it goes

6   to the body shop, and you purchase a $10,000 Kia and give it

7   to me, I'm not whole, am I?

8          A.   I wouldn't think you're whole, no.

9          Q.   And if you crashed into my Mercedes and it was in

10  the shop and I don't have the use of a car, in order to make

11  me at least somewhat whole, you would need to pay for a rental

12  car so I can get around in the interim while my car is getting

13  repaired; is that correct?

14         A.   I think that's fair, yeah.

15         Q.   And even though you paid for my rental car while my

16  car is in the shop when the car repairs are finished, I get my

17  Mercedes back, don't I?

18         A.   Right.

19         Q.   And now I'm whole; right?

20         A.   I think so, yes.  So again --

21         Q.   And it's not double counting, is it, to account for

22  the rental car in the interim and the Mercedes that I get

23  back, is it?

24         A.   It's not in your hypothetical.  But the difference,

25  and I wish that that was what Dr. Roberts had done.  The

1    difference here is that the mink, unlike a Mercedes the mink

2    are sold, they're pelted and they're sold.  And so we've got

3    an analysis that Dr. Roberts does that looks over the years

4    and counts the mink as they're sold.

5           So the difference in your hypothetical is if you

6    have a Mercedes that every week you sell or you destroy or you

7    wreck and I run into it and I buy you a rental car for a week,

8    I don't have to get you another Mercedes.  You go through

9    them.

10        Q.   So you give me my rental car --

11        A.   That's the problem with the hypothetical.

12        Q.   I'm getting a benefit from the rental car, aren't

13   I?  I don't have to get the benefit that I got from the rental

14   car in the interim period where my own car is not available to

15   me because you wrecked it, I don't have to give that benefit

16   back to you, do I?

17        A.   I certainly wouldn't expect you to give the benefit

18   back.

19        Q.   Right.

20        A.   If I wrecked the Mercedes I have to pay for the

21   rental.  But when it's done, you've been made whole.  And so

22   just like this, if there's mink that are lost and the

23   plaintiffs replaced them by buying them, then that's the

24   damage amount.

25        Q.   In this case, any value that you get from the

1    replacement mink the Jonssons bought for that temporary period

2    of time when those mink are alive is only partially replacing

3    the production for the quality breeders they lost; right?

4         A.   No.  I don't think that's consistent with the data.

5    That if you're asking me to assume that the replacement mink

6    were somehow inferior --

7         Q.   Yes.

8         A.   -- I don't know.  Nobody's tested that.  But if

9    they're not inferior, then once they get the replacement

10   breeders, they have the breeders.

11        Q.   Okay.  But if you were to learn, sir, that the

12   external mink the Jonssons did have to go out and purchase

13   were markedly inferior to the ones they lost, your calculation

14   would change, wouldn't it?

15        A.   It might.  I'd ask them two questions.

16        Q.   Now, if the Jonssons lost mink, if they owned mink

17   that died from eating the lactation crumlets, they've suffered

18   losses, haven't they?

19        A.   Maybe.  It depends on -- I mean, I assume if they

20   give it to a mink and a mink dies, I assume they pelted them.

21   So if they pelted -- if they didn't, if they couldn't pelt

22   them, then I'd say yes.  If they pelted them and would have

23   gotten a different price, then it would be the different

24   price.

25        Q.   The difference between -- well, if they lost 4,000

1    babies before they were bigger than my pinky, then they have

2    to be compensated for that lost, don't they?

3         A.   Yeah.  If you're asking me to assume they lost

4    4,000 mink, then, I mean, it's back to the inventory analysis.

5         Q.   That's like me losing the 100 widgets in the fire;

6    right?

7         A.   Yes.  If you lost mink that just disappeared and

8    didn't have any salvage value, then that's easy.  You just

9    value those mink and that's the loss.

10        Q.   Likewise, if some of the Jonssons' mink were

11   expected to produce five kit litters and as a result of eating

12   the crumlets only produced litters of one kit, that difference

13   would represent a loss to the Jonssons, wouldn't it?

14        A.   Well, that's where it could.  But again, that's

15   where --

16        Q.   It could or it would?

17        A.   It could.  I need to know a little more in your

18   hypothetical.  In this case, when we're looking at that

19   assumption you've got to recognize the confidence interval.

20   So you would say that the loss -- if that's true, the loss is

21   the distance between how many should have been born and how

22   many at the lower bound of that lot, that confidence interval.

23   So I don't know -- in your hypothetical you didn't say what

24   the confidence interval was.

25        Q.   If the Jonssons had to harvest breeder mink

1    prematurely because those breeders' production wasn't what it

2    was supposed to be and that stunted the growth of their mink

3    operation, the Jonssons have suffered a loss, haven't they?

4        A.   Well, if that's the hypothetical, that would be

5    true.  But that's different than the evidence that I've seen.

6    So that hypothetical is not consistent with -- I mean, if that

7    was true, then what I would have expected is Dr. Roberts to

8    have said, here's the breeder mink that we lost, And here's

9    how much it is.  He didn't do that.  Or I would have expected

10   him to say, here's the breeder mink that were fed the crumlets

11   that had too few kits.  And he didn't do that.  And so --

12       Q.   Dr. Roberts did say in his report Jonssons lost

13   5900 mink in 2010.  And as I understand your testimony, you're

14   sitting there and saying the Jonssons didn't suffer any losses

15   from losing almost 6,000 mink; is that correct?  Is that what

16   you're saying?

17       A.   I'm saying there's no financial evidence of a loss.

18   I don't know whether -- I'm not saying that the Jonssons

19   aren't telling the truth.  I'm saying that the records that

20   were produced by Dr. Roberts don't show any loss.  The records

21   that Dr. Roberts analyzed to figure out whether there were

22   mink not born or not showed different things than what the

23   Jonssons have said, and that they don't support the notion of

24   a loss.  That's all I'm saying.

25       Q.   If the Jonssons had to purchase outside mink to

                                                              788

1   replace breeders they lost, that would represent a damage to

2   them, wouldn't it?

3         A.   If the Jonssons lost -- if there are missing mink

4   and as a result the Jonssons had to buy those, that's a loss.

5   If the Jonssons bought mink but there weren't any missing,

6   that's not a loss.

7         Q.   One more thing.  When you ran your calculations of

8   no damage on the part of the Jonssons, you incorporated data

9   in your analysis for the sales of mink that were not blacks

10  and mahoganies; correct?

11        A.   There is a small amount, I believe.

12        Q.   Well, Dr. Roberts' calculation, you understand, is

13  based on losses to blacks and mahoganies; right?

14        A.   It is; except that those numbers I have tied

15  directly into his.  So his are based on the others to that

16  extent, as well.  It's a small amount, but those numbers tie

17  to his report exactly.

18        Q.   Okay.  I appreciate your time today, Mr. Hoffman.

19  I have no other questions.

20             THE COURT:  Anything else for him?

21             MR. MINNOCK:  Just one question.

22                      REDIRECT EXAMINATION

23  BY MR. MINNOCK:

24        Q.   You said earlier that in one category of loss that

25  you would want to ask two questions.

1           A.    Yes.

2           Q.    What are the two questions?

3           A.    I was asked if the Jonssons lost breeders and

4      bought inferior breeders, is that a loss?  And so then the

5      questions I would have asked are, why would you sell breeders

6      that same year?  So if you're trying to grow your herd, why

7      would you sell breeders and then buy inferior ones?  Because

8      that doesn't make sense to me as a businessman, so maybe

9      there's a reason for that.  And you'd need to know the answer

10     to that to know if there's a loss because then the next

11     question would be, well, how did the ones that you sold

12     compare to the ones that you buy -- that you bought?  So I

13     suppose if you sold really, really bad ones and bought ones

14     that were bad but not as bad as the ones you sold, we could

15     maybe analyze something.  But that's what I'd have to

16     understand that I don't understand to be consistent with that

17     hypothetical.

18          Q.    Thank you.  No more questions.

19               MR. HANCEY:  Just one more.

20                     RECROSS-EXAMINATION

21     BY MR. HANCEY:

22          Q.    And one other possibility, Mr. Hoffman, would be if

23     the Jonssons were trying to increase their black herd,

24     therefore, selling mahoganies but buying black mink; correct?

25          A.    That could be a motivation for selling the

1   mahoganies, but you wouldn't expect them to sell mahoganies in

2   the same year that they're buying inferior ones and claiming

3   it is a loss.  It wouldn't properly be accounted as a loss.

4   If I don't have enough mahoganies because I sold them, that's

5   not a loss as opposed to if I don't have enough mahoganies

6   because something happened to them and they weren't born.

7           MR. HANCEY:  No other questions.

8           MR. MINNOCK:  No questions.  May this witness be

9   excused?

10          THE COURT:  I'm sorry?  I didn't hear you.

11          MR. MINNOCK:  May this witness be excused?

12          THE COURT:  Any objection?

13          MR. HANCEY:  No.

14          THE COURT:  Thank you, sir.  You may be excused.  I

15  appreciate your help.

16          Your next witness?

17          MR. MITCHELL:  I think that's it for today.

18          MR. MINNOCK:  I think our next witness is not due

19  to arrive until morning.

20          THE COURT:  Tomorrow.

21          MR. MINNOCK:  Tomorrow morning.

22          THE COURT:  Okay.  Let's go home early.  Be good to

23  you.  Remember what I told you.  Don't talk about the case

24  with anyone.  We'll see you tomorrow at 20 after 9:00.  We'll

25  start at 9:30.  Thank you.

1           (Whereupon, the jury left the court proceedings.)

2           THE COURT:  Tell me what you've got tomorrow.

3           MR. MINNOCK:  Actually for National Feeds we are

4    resting.  I think that Rangen has one additional witness,

5    Jon Karraker.

6           And then do you want one potentially on Tuesday, or

7    what you're thinking?

8           MR. MITCHELL:  Right now, Your Honor, we're leaning

9    toward calling our accountant tomorrow Jon Karraker and then

10   resting.  But we won't make that final decision until a little

11   bit later this evening.

12          THE COURT:  You both contemplate resting tomorrow?

13          MR. MITCHELL:  Potentially, yes.

14          THE COURT:  Okay.  Let me mention a couple things

15   that we can maybe talk about tomorrow depending on how

16   long-winded your witnesses are.  Plaintiff, of course, seeks

17   damages against each of the defendants.  There's a suggestion

18   in the requests involving instructions that there ought to be

19   some differentiation between the defendants.  As I understand

20   it, there's no action over amongst the defendants, that you're

21   there in effect sitting on the same side.  If there is a

22   difference between the defendants, that may well make a

23   difference in the nature of the requests and in the nature of

24   the instructions.  I don't know whether you're in the same tub

25   or whether you're in different tubs.

1          MR. MINNOCK:  Well, I think our -- you know, we've

2     presented a common defense that we don't believe -- we've

3     presented a common defense that we don't believe that they've

4     suffered a loss.  You've seen all that.  In the event that

5     there is fault, however, I think that we had contemplated in

6     the special verdict having an apportionment done between

7     Rangen and National Feeds.

8          THE COURT:  If you're talking about differences,

9     then the plaintiff needs to give some thought to what specific

10    of the multitude of causes that you've alleged relate to any

11    particular defendant.  Some may be appropriate to both, but

12    some may not be appropriate to both.  I'm interested in making

13    it as simple as possible for the factfinders to deal with the

14    issues that exist.  As I look at the materials, the materials,

15    it seems to me that we all need to focus with some degree of

16    specificity.

17          Now, let me ask maybe a question I shouldn't ask.

18    Have you guys got an agreement or your clients got an

19    agreement as to how to share a loss if there is a loss?

20          MR. MITCHELL:  Not to my knowledge, Your Honor.

21    There's at least nothing between either Joe or I have worked

22    on.

23          THE COURT:  Okay.  Other than the addition of the

24    footnotes in the requests that were submitted, among others

25    the requests talk about punitive damages, if I remember

793

1    correctly.  There's been no evidence here relating to

2    punitives.  I guess that request isn't an appropriate request.

3                 MR. MITCHELL:  We would agree, Your Honor.

4                 MR. MINNOCK:  We were contemplating to make a

5    directed verdict on punitive damages.

6                 THE COURT:  I'm just trying to clarify things so

7    that we don't spin our wheels.  Think about your theories as

8    against specific defendants so that you'll be in a position to

9    articulate those if we have time tomorrow or Tuesday if it

10   spills over.  But as I understand it, no one contests the

11   facts that there were hazardous materials in the feed.

12                MR. MITCHELL:  No one is contesting that there were

13   either histamines or nitrosamines in the feed.

14                THE COURT:  In the feed.  Okay.  Now, in trying to

15   simplify things for people, you only need one good theory.  A

16   half dozen theories often simply confuse these people.

17                MR. HANCEY:  And that's why we framed our proposed

18   verdict form the way we did.  We didn't split it up amongst

19   19 different causes of action.  We tried to simplify because

20   we agree with what you just said.

21                THE COURT:  More of commentary than anything else.

22                Now, these folks are going to be going home

23   sometime tomorrow and coming back sometime on Tuesday.  We're

24   going to have to have an opportunity for an instruction

25   conference, obviously.  So what's your best guess on time on

1    finishing up your witnesses tomorrow?

2            MR. MITCHELL:  I would -- Your Honor, I would

3    say -- well, I don't know about any rebuttal that the

4    plaintiffs might put on, but assuming we're only going to call

5    Mr. Karraker tomorrow I would anticipate concluding somewhere

6    around the morning break.

7            THE COURT:  And he's your accountant?

8            MR. MITCHELL:  Correct.

9            THE COURT:  Okay.  You guys don't estimate very

10   well.  You told me it would take two weeks.

11           MR. HANCEY:  It was all Hans.

12           THE COURT:  Okay.  Thanks a lot.

13           MR. MINNOCK:  Your Honor, one final thing.  So I

14   spent some time going through the jury instruction packet that

15   we gave you.  And many of the instructions dealt with issues

16   that we set them up as pretrial jury instructions and post --

17   you know, post-evidence jury instructions.  Do you want me to

18   leave them as they are until we get through this jury

19   instruction conference, or do you want us to get a head start

20   by removing some of these ones at the outset?

21           THE COURT:  Well, why don't you look through it and

22   tell me the ones tomorrow which ones you withdraw.

23           MR. MINNOCK:  Okay.  I think we can do that.

24           THE COURT:  That could be helpful for me.  There

25   was kind of a strange introductory paragraph, prior to the

1    introduction on both the original and the other where it says,

2    National Feed submits the following memorandum in support of

3    National Feed's motion in limine.  Now you have the

4    introduction.

5              MS. FLETCHER:  Sorry, Your Honor.  That would be my

6    mistake.  I did this at a late hour.

7              THE COURT:  Well, I figured it was something that

8    probably was in one of those automatic machines where you

9    punched the number.  But that's better than some things I've

10   seen.  When it comes to proofreading, for example, the

11   pleadings from a high-priced firm back East, they were in

12   here.  They obviously hadn't proofed, and proofing is

13   different than punching the spell checker.  But it came out

14   that when they were talking about public interest, it came out

15   as pubic interest.  So it pays the proof.

16             See you tomorrow.  9:30.  Thanks a lot.

17          (Whereupon, the court proceedings were concluded.)

18                    *   *   *   *   *

19

20

21

22

23

24

25

```
1    STATE OF UTAH          )

2                           ) ss.

3    COUNTY OF SALT LAKE  )

4              I, KELLY BROWN HICKEN, do hereby certify that I am

5    a certified court reporter for the State of Utah;

6              That as such reporter, I attended the hearing of

7    the foregoing matter on January 16, 2014, and thereat reported

8    in Stenotype all of the testimony and proceedings had, and

9    caused said notes to be transcribed into typewriting; and the

10   foregoing pages number from 673 through 796 constitute a full,

11   true and correct report of the same.

12             That I am not of kin to any of the parties and have

13   no interest in the outcome of the matter;

14             And hereby set my hand and seal, this ____ day of

15   _____ 2014.

16

17

18

19

20             _____

21                     KELLY BROWN HICKEN, CSR, RPR, RMR

22

23

24

25
```

797