1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4

5

```
6   _____
                                            )
    IN RE:                                  )
7                                           )
    KEITH JONSSON, an individual;           )
8   MICHAEL JONSSON,  an individual;        )
    CEDAR VALLEY FUR FARM,                  )
9   LLC, a Utah limited liability           )
    company,                                )
10                                          )
                                            )
11                                          )
                Plaintiffs,                 )
12                                          )
        vs.                                 )   Case 2:11CV140BSJ
13                                          )
                                            )
14  NATIONAL FEEDS, INC., an                )
    Ohio corporation,                       )
15  RANGEN, INC., an Idaho                   )
    corporation,                            )
16                Defendants.               )
                                            )
17  _____)
```

18

19    BEFORE THE HONORABLE BRUCE S. JENKINS

20    JANUARY 17, 2014

21    REPORTER'S TRANSCRIPT OF PROCEEDINGS

22    JURY TRIAL

23

24

25    Reported by:  KELLY BROWN, HICKEN CSR, RPR, RMR

```
 1
 2                     A P P E A R A N C E S
 3   FOR THE PLAINTIFFS:   KESLER & RUST
 4                         BY: RYAN B. HANCEY
 5                             SCOTT O. MERCER
 6                             Attorneys at Law
 7                         68 SOUTH MAIN STREET, SECOND FLOOR
 8                         SALT LAKE CITY, UTAH  84101
 9
10   FOR NATIONAL FEED:    MORGAN MINNOCK RICE & JAMES
11                         BY:  JOSEPH E. MINNOCK
12                              Attorney at Law
13                         136 S. MAIN STREET
14                         SALT LAKE CITY, UTAH  84101
15
16   FOR RANGEN:           CAREY PERKINS LLP
17                         BY:  HANS A. MITCHELL
18                              Attorney at Law
19                         P.O. BOX 519, SUITE 200
20                         BOISE, IDAHO 83701
21
22
23
24
25
```

1                          I   N   D   E   X

2     WITNESS                    EXAMINATION BY              PAGE

3     JON KARRAKER                DIRECT BY MITCHELL          801

4                                 CROSS BY HANCEY             821

5                                 REDIRECT BY MITCHELL        841

6

7                   EXHIBITS RECEIVED IN TO EVIDENCE

8     DEFENDANT'S          PAGE

9     50                   846

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              SALT LAKE CITY, UTAH, FRIDAY, JANUARY 17, 2014

 2                          *   *   *   *   *

 3              THE COURT:  Good morning.  Now how are we doing?

 4     It looks like we're all here.  And bring in your jury.

 5              (Whereupon, the jury returned to the

 6         court proceedings.)

 7              THE COURT:  And good morning again.  Sit down and

 8     relax, folks.  The record will show the jury is present.

 9     Counsel and the parties.

10              And you may proceed.

11              MR. MITCHELL:  We call Jon Karraker, Your Honor.

12              THE COURT:  Okay.  Sir, if you'll come forward and

13     be sworn, please.

14              THE CLERK:  Raise your right hand.

15                          JON KARRAKER,

16         called as a witness at the request of Defendant,

17            having been first duly sworn, was examined

18                 and testified as follows:

19              THE WITNESS:  I do.

20              THE CLERK:  Okay.  Have a seat right over here,

21     please.

22              And can you state your name when you get seated and

23     spell it for the record, please.

24              THE WITNESS:  Jon Karraker.  J-O-N, Karraker,

25     K-A-R-R-A-K-E-R.
```

DIRECT EXAMINATION

BY MR. MITCHELL:

Q.   Mr. Karraker, would you tell us a little bit about your educational background, please?

A.   I grew up in Arvada, Colorado.  I went to public school out there.  My parents moved back East.  I ended up doing my undergrad to Rutgers' back in New Jersey.  I taught school for three years.  I was a history major.  Taught school for three years, Fifth and Sixth Graders outside Washington, DC.  Went back and got an MDA at Dartmouth College, also back East, in accounting and finance, and started with the Big Four accounting firms.  Worked with PriceWaterhouseCoopers.  I was director of their litigation group.  I have been independent for 30 years.  I do strictly litigation consulting, expert testimony, any kind --

Q.   Are you a member of any associations?

A.   Sorry?

Q.   Are you a member of any associations?

A.   Sure.  American Institute of CPAs, Colorado Society of CPAs.

Q.   And do you have any licensure as a CPA?

A.   Yes.  I'm a licensed CPA.

Q.   In what states?

A.   Colorado.

Q.   And I believe you started touching on your work

1    experience.  Can you elaborate on that just a little bit?

2            THE COURT:  I'm having trouble picking you up, so

3    make sure you use the mike.  Is the green light on?

4            MR. MITCHELL:  You know, I had never noticed that

5    green light this whole time.  Is that better?

6            THE COURT:  Yes.

7            MR. MITCHELL:  Okay.

8            THE WITNESS:  Mine's echoing, so I don't know if

9    you're hearing it echo or not.

10           Anyway, I do strictly litigation.  I work -- I

11   testify about 40 percent of the time for plaintiffs, about

12   60 percent of the time for defense.  In terms of the amount of

13   work that I do, about 80 percent of it is defense.  It's any

14   kind of business valuation, lost profits, any kind of

15   accounting matter.

16           Let's see.  As a CPA, my job is to be independent,

17   objective and skeptical with an emphasis on skeptical.  So

18   we're going to talk about some numbers today.

19       Q.   And have you agreed to do the work in this case for

20   free?

21       A.   Oh, I'm $250 an hour.  And I've spent lots of

22   hours.  I've been very thorough on this.

23       Q.   Okay.  What were you asked to do in this case?

24       A.   I was asked to look at it and see if there were

25   damages.

1      Q.   And if you found there were damages?

2      A.   Oh, I've done about 10 different analyses that we

3  will talked about.  And in my opinion, there are no damages

4  here, period.

5      Q.   What materials did you consider in reaching that

6  opinion?

7      A.   A full banker's box worth starting with tax

8  returns, looking at profits, looking at sales revenues,

9  looking at the actual sales of mink, looking at the production

10  numbers, pricing, anything to do with costs, anything to do

11  with the breeders.  This means looking at a lot of auction

12  records.  ALC, if you've heard that term; NAFA, North American

13  Fur Auctions; also looking at the live sales.  So any kind of

14  financial and production information I could get my hands on.

15      Q.   And what was the significance of those materials?

16  What kind of information did they contain that was important

17  in your work in this case?

18      A.   Well, as an example, in looking at profits, I

19  looked at the profits of the company both before and after the

20  alleged incident.  I looked at the sales revenues both before

21  and after the alleged incident.  I looked at the production.

22  I'm going to throw out the term pelts to market per female

23  breeder.  I looked at that both before and after.  I looked at

24  the various live sales.  Looked at breeder purchases.  Looked

25  at Dr. Roberts' report and Mr. Hoffman's report.  Read the

1    depositions of the Jonssons.  Essentially everything.

2        Q.   And once you made it through that mountain of

3    information, did you perform any analyses?

4        A.   Oh, sure.  And the analyses are what we'll talk

5    about today.  There are about 10 analyses that we'll try to

6    run through quickly.  Three of them are very important for you

7    guys to make decisions on.

8        Q.   Why don't you go ahead and list the analyses and

9    talk about just a little bit.  Identify what they are, and

10   then we'll spend a little time talking about the analyses that

11   you've done and how you did them.

12       A.   Okay.  Well, the first area to look at is net

13   profits.  And net profits actually increased after the alleged

14   incident.  And I'll write these numbers on the board later.

15   But in the two years prior, the company lost a lot of money in

16   one year, 200-some-thousand, and then made 60,000.  And then

17   the two years after they made over 100,000 in each year.  So

18   we'll talk about profits both before and after.

19       Q.   And what's the next thing that we'll talk about?

20       A.   Next thing is going to be sales revenues.  And I'm

21   going to say, here's what the sales revenues were before,

22   here's what the sales revenues were after.

23       Q.   And have you also looked just at the historic sales

24   to the sales after the alleged incident?

25       A.   Yes.

1       Q.   And what are we going to talk about there?

2       A.   Just that.  What it was.  And they increased, the

3   sales increased afterward.

4       Q.   What other analyses are we going to look at?

5       A.   With respect -- Can I just go to the board and

6   start writing numbers?

7       Q.   Yeah.  Should we start back at number one?

8       A.   How does this -- how does this work?

9            Can you all hear me?  I'll try not to turn my back

10   to you.

11            The first thing to look at is profit.  Okay, this

12   is net profit.  And the summary number in 2009, the company

13   reported a loss of $330,000.  In 2010, the company had 67,701.

14   And we'll talk later.  A lot of that has to do with pricing.

15   When mink pricing went up, they make profit.  Mink prices were

16   down in 2009 and back up in 2010.

17            And in the two years post incident, the company had

18   $124,734.  This includes various categories.  It includes

19   capital gains on sale of minks.  But the total amount is 124.

20   In 2012, the total amount is 231,829.

21            So the very first thing that I looked at is, what's

22   going on with profit?  And the answer is, in the two years

23   before the company lost money in one year, made a little bit

24   of money the next year.  And then in the two supposedly lost

25   years, the actual profit went up.

1      Q.   And what were the sources of your information for

2   the numbers that we've got up on the board here?

3      A.   Tax returns.

4      Q.   And what were you looking at when you -- what

5   information within those, within the tax returns were you

6   looking at to find those numbers?

7      A.   Two components.  One of them is the profits

8   reported, and the other one is called long-term capital gains,

9   mink sales.

10      Q.   And why is that we're only looking at the two years

11   before this incident?

12      A.   That's all I had.

13           Ready for next?

14      Q.   Yeah.

15      A.   So should I erase it?  Is that the way it's going

16   to work?

17      Q.   Yes.  If they're going to be numbers that you're

18   going to need to use later on, we have the backs of some of

19   these displays over here to write on.

20      A.   No.  I'm fine.  And I apologize.  I have a Denver

21   cold.  I'll try not to breathe on you guys.

22           Okay.  So the first thing that any accountant looks

23   at is profit because obviously it's most important.  The

24   second thing that you look at is sales revenues because often

25   times there's a lot going on that you see in sales revenues

1    that you don't see if you just look at profits.  So the next

2    area is same thing.  What are the sales revenues before, and

3    what are the sales revenue after?

4        Q.    What were you looking at to find the sales revenue

5    information?

6        A.    The sales revenue information comes from a

7    combination of the tax returns, the ALC information and also

8    live sales.  And what I did is I added all of those together.

9        Q.    And what did you find that was of any significance?

10       A.    Well, the first thing that is significant here is

11   that before it was 1.6 million in 2008.  In 2009, 995,000.  In

12   2010, 1,733,000.  And then the sales revenues after are 2490,

13   2872 and 3389.  So what you can see here clearly is that just

14   in total sales revenues which includes the number of mink they

15   sold or pelts they sold and the price, it went up dramatically

16   after the loss period, okay?

17            Now, what I looked at next, and I'm going to go

18   back to the previous numbers.  And this time I'm going to show

19   you -- you've now seen the net profits, and you've seen the

20   sales revenues.  And I'm going to add onto that what

21   plaintiffs are asking for in damages.  So we're back to the

22   profit page where they actually made 124 and 231.  The amount

23   of losses that plaintiffs are asking for through the last

24   report that I saw of Dr. Roberts, Dr. Roberts is asking for

25   $3.9 million in losses.  And so rather than making $124,000 in

1    2011, Dr. Roberts is saying they need to be compensated an

2    additional $1.1 million for that year.  Rather than making

3    231,000, he's got another $900,000 in compensation.  In 2013,

4    1.1.  So on top of the money that they were already making,

5    Dr. Roberts is asking for $3.9 million more.

6            There are two components of that.  The two

7    components of it in terms of quantity, what he called quantity

8    losses, loss in pelts, 1.3.  Loss in price, 0.5.  And then 2.0

9    to spent on more breeder mink.

10       Q.   When you say 1.3, 2.0, are we talking millions?

11       A.   Millions.  Right.  And so as compared to making

12   124,000 and 231,000, which they actually made, Dr. Roberts is

13   saying to compensate these folks, we have to give them another

14   $3.9 million.  He wants to give them 1.1 million total in

15   2011; 900,000, 1.1 million and 800,000.  So he's saying they

16   would have achieved not just what they did, but they would

17   have achieved this entire additional amount in two components.

18   They would have made 1.8 million more profit, and they need to

19   spend $2 million on replacing breeder mink.  And so that's

20   what this case is all about.  And obviously I just don't find

21   any of these numbers that Dr. Roberts has reasonable at all.

22   They're way out of line with any kind of profits that the

23   company has made.

24           Shall I go on?

25       Q.   Yeah.

1    A.    Let's go back to the sales.  And it's important to

2    look at the profits and sales.  I'll go back and forth a

3    little bit.  And so what we have in sales is the actual sales

4    went up a lot.  And so what you see here is the sales were

5    1.7 million.  And the way that it works, again, to be basic, I

6    know I'm a Sixth Grade teacher, you take sales, then you have

7    expenses and then you have profits, okay?  So we're just

8    dealing with the sales part here, and you saw the profits.  So

9    the sales go from 1.7 to 1.4 to 2.8 to 3.4, okay?

10        So after Dr. Roberts is talking about is in total

11   is he says they would have made an additional $2.2 million of

12   sales in those years.  And again, given they were doing so

13   much better it's unreasonable to think they would have been

14   doing this much better.  That's another issue that you'll have

15   to deal with.

16    Q.    Do the plaintiffs have any history of performing at

17   the levels that Dr. Roberts suggests they would have

18   performed?

19    A.    No.  But we really haven't talked about that yet,

20   so let's talk about it next.

21        The next thing to look at is instead of the sales

22   revenues we need to just look at the total number of sales.

23   Total number of sales is two things.  It's pelts to market,

24   which actually go to auction; and it's live sales, where

25   they're selling breeders to other individuals.  The total

1    sales numbers are 29,000, 25,000 and 30,000.  And the actual

2    sales numbers including live sales afterward are 36, 34 and

3    43.  So you can see that the actual sales, the actual pelts to

4    market and live sales increase substantially after the alleged

5    loss period.

6           What plaintiff wants to do here is to add an

7    additional --

8           THE COURT:  I think you need to proceed by question

9    and answer, counselor --

10           MR. MITCHELL:  Certainly, sir.

11           THE COURT:  -- rather than a narrative.  Let's put

12    your question and let's get a response.

13           THE WITNESS:  All right.

14           MR. MITCHELL:  Certainly.

15    Q.    BY MR. MITCHELL:  So we're looking at the

16    historical pelts and actually really animals to sale in one

17    form or another.  And how do -- what is it that is of

18    significance when we compare the historical performance to the

19    post-incident performance that you find of significance in

20    those numbers?

21    A.    What is significant is that after the alleged loss

22    period, in fact, the number of pelts to market and the number

23    of live sales actually increase significantly.  This isn't

24    price.  This is just units.  So it goes up 20 percent.  And

25    then here it's up a full 30 percent.  It's up tremendously.

1    That's the first thing that's important.

2         Q.   And as we're looking at the comparison of

3    historical animals to market versus the post-incident animals

4    to market, are we looking at any factors in addition to simply

5    the total number of sales that occurred?  So, for example,

6    maybe the herd size changes?

7         A.   Oh, sure.  We haven't gotten to there yet.  But

8    when you have more breeders, you're to have more.  We'll get

9    to that next.  But the next thing to look at is what --

10        THE COURT:  It might be well if you answered the

11   question that counsel put.  You say you're going to get to it.

12   Why don't you respond to the question that he just put?

13        THE WITNESS:  Sorry.  What did I do wrong?

14        Q.   BY MR. MITCHELL:  That's okay.  The question is,

15   and just provide a brief synopsis of it, we'll go into it a

16   little more detail later.  But when we're looking at the

17   comparison of historical performance before the incident and

18   the performance after the incident, how did you take into

19   account any changes in herd sizes that might account for some

20   of those variations that you see?

21        A.   That's the next analysis that I'm going to do.  We

22   have to look at the actual sales and also the number of

23   breeders and divide sales by breeders, which do you want me to

24   do that now?

25        Q.   Well, was there anything else of significance that

1    we see that we can find in the historical numbers versus the

2    post-incident numbers?

3        A.   Well, yes.  And that's what plaintiff is projected.

4        Q.   Okay.  So what is it that plaintiff has projected

5    that you find of significance?

6        A.   Plaintiff has projected that the sales in this year

7    would have been 40 and this year would have been 46 and in

8    this year would have been 49.  You can see it's a full 12,000

9    in this one year.  So plaintiff is projecting that the sales

10   would have been much greater.

11       Q.   And why is that of significance?

12       A.   Well, because we have to determine whether or not

13   that's a reasonable assumption.

14       Q.   And did you go about and perform that analysis?

15       A.   Yes.

16       Q.   And how did you do that?

17       A.   Well, what I looked at next was both the sales and

18   the breeders.  So if you take the total sales and divide it by

19   the total number of breeders, these are both blacks and

20   mahoganies, the total sales per female breeder were 3.9 in

21   2008.  It was 3.37 in 2009.  It was 3.93 in 2010.  And then

22   after the alleged incident, 4.6, 4.4 and 4.9.

23       Q.   What is the significance of those numbers?

24       A.   It means that the increase in both sales, revenues

25   and total sales was not due just to adding an awful lot of

1   breeders.  It was that the actual production results in terms

2   of pelts to market plus live sales divided by female breeders,

3   those numbers went up.  In other words, they actually

4   performed better.  A lot better.  This is total.  And you can

5   break it down black and mahogany, and you get the same

6   results.

7       Q.   Okay.  And is there anything else of significance

8   that we can see from those numbers?

9       A.   Yes.  Next what plaintiff projected for blacks is

10  3.57 and for mahoganies is 5.50 going forward for all those

11  years.

12      Q.   And why is that of significance?

13      A.   Well, because we're going to compare what actually

14  happened to plaintiff's projection, and we're going to compare

15  the historical results before to what plaintiff has projected.

16  And so if you do a weighted average, plaintiff looked at this

17  3.9 number and the 3.37 number and the 3.93 number, which are

18  historically 4.1, 3.1 and 4.0.

19      Q.   Now, when you said you need to look at a weighted

20  average, what did you mean?

21      A.   There were more mahogany than blacks, so you look

22  at a total average.  So the actual numbers were 3.9, 3.4, 3.9,

23  both black and mahogany.  And then it became 4.6, 4.4, and 4.9

24  afterward, so they did better afterward.  Plaintiffs is

25  projecting that the blacks would have upon 3.57 and the

1    mahoganies would have been 5.50.  So the weighted number is

2    4.6.  So you can see that the actual numbers are even higher

3    than what plaintiffs are projecting here.  Much higher than

4    they did historically.

5         Q.   Is there anything else within this analysis that is

6    of any significance to you?

7         A.   No.  I think that's it for that one.

8         Q.   So what is the next analysis that you performed?

9         A.   Well, so what we've done so far is we've looked at

10   profit, we've looked at sales revenues, we've looked at sales,

11   and we've looked at productivity, which is the production per

12   each breeder.  The next issue to look at is the actual live

13   sales, which are breeders sold versus the number per plaintiff

14   that Dr. Roberts says they still need to purchase to make the

15   herd whole.

16        Now, what we have here is the live sales, and these

17   are per documents that plaintiff had.  Live sales were 7,700

18   in 2011; were 3,000 in '12; and were 1,000 in 2013.  So the

19   farm actually sold 11,700 live sales to be used by breeders by

20   other farmers.

21        So while they selling 11,700, Dr. Roberts says they

22   need to or should have purchased or should still purchase a

23   total of 4,000, 2000 in that first year.  And this is a clear

24   inconsistency, given that they were making live sales, why did

25   they need to purchase more breeders?  The live sales are

1    breeders.  And so this analysis just doesn't fit.  If you want

2    to increase your herd, you can do it by not making these live

3    sales and adding to your breeders.

4            I'm sorry.  Shall I keep talking, or do you want to

5    ask another question?

6            THE COURT:  Is there another question?

7            MR. MITCHELL:  Yeah.

8        Q.   BY MR. MITCHELL:  Was there anything else of

9    significance in terms of the breeders that you looked at?

10       A.   Live sales breeders the best of the crop were

11   selling for about $100.  Dr. Roberts computed the costs of

12   these 4,000 at $500 per and in some cases higher.  And this is

13   how he got to a $2 million loss.  And I look at it and say

14   they have no need to purchase any of these other breeders,

15   much less at $500 when they were selling 11,000 at $100.

16       Q.   Mr. Karraker, have you ever seen a record of the

17   plaintiffs ever having sold a breeder mink for $500?

18       A.   No.  What we saw is they sold these 1,000 for 110.

19       Q.   Is that the highest figure that you've seen the

20   plaintiffs sell a breeder mink for?

21       A.   Yes.  And the price at market in earlier years was

22   about 80 or something.  But I have not seen how much they sold

23   these others for.

24       Q.   Okay.  So is there anything else that we ought to

25   look at of significance with regard to the breeders?

1        A.    No.

2        Q.    Okay.  And so what's the next analysis that you

3   performed?

4        A.    I'm not going to write it on the board.  It's

5   prices.  And the question is, did prices go down?

6             THE COURT:  The question was, what next analysis

7   did you perform?

8             THE WITNESS:  I'm sorry.

9             THE COURT:  And you can answer that generally.

10            THE WITNESS:  All right.  The next analysis that I

11  performed was look at prices.

12       Q.    BY MR. MITCHELL:  And what did you find of

13  significance in that analysis?

14       A.    Let's just look at one year, which is 2011.

15       Q.    Why are we only going to look at one year?

16       A.    Because it will make the point.

17            This is mahogany.  They actually sold their

18  mahogany at $73 at auction, and the market average was 77.

19  And so it's a little bit less, okay?  Historically they had

20  done about the same in terms of they would have made this 77

21  or a little bit higher.  And then in 2011 and 2012, they were

22  about the same or a little bit less.

23            And so the question is, did price go down?  And the

24  answer is -- and I'm sorry for saying the question, Judge.

25  It's a bad habit.  So the issue here is there were live sales.

1    And the live sales were 100, and this would take up this whole

2    average.  And so it looks to me like they were getting as much

3    in prices after the incident as they were before.

4         Q.   What do you mean they were getting as much in

5    prices after the incident as they were before?  I didn't

6    understand that.

7         A.   Okay.  Before the incident, they were a little bit

8    above market, a little bit above the 77.  After the incident

9    in mahogany they were down to 73.

10        Q.   Is that just at auction that you're talking about?

11        A.   Yes.

12        Q.   Okay.

13        A.   And if we add in live sales at 100, it's about the

14   same.  So I cannot see a price loss.

15        Q.   Okay.  And was there anything else about pricing

16   that was of significance to you?

17        A.   No.  That's it for prices.

18        Q.   Okay.  So what's the next analysis that you looked

19   at?

20        A.   Cost.

21        Q.   And what did you find of significance in cost?

22        A.   Dr. Roberts in doing his analysis said that, okay,

23   we have this much in terms of revenue losses.  We have to

24   subtract out the costs of raising the additional mink that he

25   says they've lost.  And he did that at $19 per mink.  And

1        historically, the company was running at $40.  In other words,

2        if they sell it for 90, any losses they had were actually at

3        $50 a mink.  And Dr. Roberts computed it at 71.  So I disagree

4        with what he did there, also.

5            Q.   Okay.  What information were you looking at when

6        you calculated their actual cost to raise a mink?

7            A.   This is feed.  It's labor.  It's all the direct

8        costs of raising one more mink.  If there is a dead mink, if

9        it had lived, he would have had to feed it.  You would have to

10       have people working on it for labor.  So these are all the

11       specifically related costs to raise one more mink.  This is

12       also an industry number.

13           Q.   And where did that information come from?

14           A.   This came directly from the tax returns.

15           Q.   Is there anything else related to costs that you

16       found of significance?

17           A.   Those are the main areas.  There are other issues

18       about depreciation.

19           Q.   What did you find of significance about

20       depreciation?

21           A.   Depreciation in 2011 and 2012, we're back to the

22       amount of profit they made, 124 in 231.  Depreciate in those

23       years were 553,000 and 337,000.  Depreciate in the previous

24       year was 77.  So a tremendous amount of money.  Depreciation

25       is essentially you spend money.  You have to capitalize it.

1    You can't expense it all in one year.  You have to depreciate

2    it.  It is essentially reinvestment in the business, okay?

3            So what happened in these two years afterward, not

4    only were they making a really good profit, but they had the

5    money to invest 553 and 337 more in improvements to the farms,

6    improvements to the assets.  And so if you particularly say,

7    if you include all of the reinvestments in the business they

8    were doing great in the two years after the alleged incident.

9            Q.   Anything else of significance from those numbers

10   that you found?

11           A.   No.  Just I guess the summary.

12           Q.   Were there any other analyses that you performed?

13           A.   Sure.  I performed an additional 10 analyses, but

14   they're not significant.  There are just really three

15   significant things for you guys.

16           Q.   Okay.  So you've indicated earlier that you

17   reached, that it's your opinion in this case that the

18   plaintiffs have not suffered any losses following the feeding

19   of the crumlets?

20           A.   Sure.  It's zero losses based on what we've talked

21   about.

22           Q.   Okay.  So would you just list out the reasons why

23   you reached that conclusions?

24               THE COURT:  Can he resume the witness chair?

25               MR. MITCHELL:  Is it okay if he lists them on the

1    board?

2             THE COURT:  I'm happy to have him do that.  That's

3    fine.

4             MR. MITCHELL:  I'd prefer it if he just --

5             THE COURT:  He's already gone through them, though.

6             MR. MITCHELL:  Yeah.  We're just doing a quick

7    summary of them.

8             THE WITNESS:  Just the key issues that you guys are

9    going to have to decide.

10            THE COURT:  I thought you were going to list the

11   material.  Why don't you list them?

12            THE WITNESS:  Okay.  First one is productivity.

13   And before, productivity is less than after.  This is kits.

14   This is pelts per market plus live sales.  Productivity, they

15   did better afterward.

16            The second key area is breeders.  They sold 11,000.

17   Why would they need to purchase 4,000?

18            And the third issue is essentially profits,

19   particularly with live sales and depreciation.  They're doing

20   much better before than after.

21       Q.   BY MR. MITCHELL:  Okay.  Why don't you go ahead and

22   take a seat.

23            Mr. Karraker, what was the third thing that you

24   just listed for us?  Was it profits?

25       A.   Sure, profits.  They're doing much better after the

1      alleged incident than they were before.

2            Q.    Okay.  I thought I had misheard you, that you said

3      they were doing better before than after, so I wanted to get

4      that clarified.

5                  So to a reasonable degree of accounting certainty,

6      what is your opinion in this case?

7            A.    There are no losses.

8            Q.    And your opinion is the information, materials and

9      data that your opinion is based on is the type of information,

10     materials and data that accountants reasonably rely upon in

11     forming their opinions?

12           A.    Yes.  The 10 analyses that we've gone through.

13           Q.    Thank you.

14                 I have no further questions.

15                         CROSS-EXAMINATION

16     BY MR. HANCEY:

17           Q.    Mr. Karraker, good morning.

18                 Are you a practicing accountant?

19           A.    I'm a CPA, yes.

20           Q.    Do you do any tax work?

21           A.    No.

22           Q.    You're a professional expert witness; correct?

23           A.    Yes.

24           Q.    And you have been for 30 years; right?

25           A.    Yes.

1          Q.   Do you hold any degrees in economics?

2          A.   No.

3          Q.   How about statistics?

4          A.   No.

5          Q.   You have an accounting degree; correct?

6          A.   No.  I have an MBA.

7          Q.   MBA in accounting; right?

8          A.   No.  I have an MBA.  It's a general MBA.  I took

9     accounting --

10         Q.   And a bachelor's in accounting?

11         A.   No.  I have a bachelor's in history.

12         Q.   Oh, in history.  Excuse me for that.  Yes, that's

13    right.

14              One of the analyses that you just got done talking

15    about had to do with the Jonssons' profits; right?

16         A.   Yes.

17         Q.   Isn't it true that if the Jonssons in 2009 spent a

18    lot of money to build four new mink sheds for their operation

19    to house additional breeders, that would have an impact on

20    their profits; right?

21         A.   Yes.

22         Q.   And after the 2010 feeding of the crumlets, if the

23    Jonssons had breeder mink that they otherwise would have

24    wanted to keep to produce kits over the next three years but

25    instead because of low production they sold those breeders at

1    the market because they were detrimental to their operation,

2    that would artificially inflate their sales revenue for that

3    year, wouldn't it?

4         A.   If I follow that question correctly, yes.

5         Q.   And it would also artificially inflate their sales

6    for that year, wouldn't it?

7         A.   Yes.

8         Q.   You would agree with me, wouldn't you, sir, that a

9    damages calculation is more than just looking at lost profits

10   in certain situations?  Right?

11        A.   Oh, sure.  Like the 10 analyses we did today.

12        Q.   You have to look at the whole picture, don't you?

13        A.   Yes.

14        Q.   If the Jonssons had a history, for example, of

15   achieving annual growth of their mink heard of 8 percent a

16   year over a 10-year period of time and they were unable to

17   achieve that same growth rate because of something like the

18   crumlets, that would be a loss, wouldn't it?

19        A.   No.  What we have here is we have the sale of the

20   11,000 live sales.  They could have kept those and increased

21   the herd.

22        Q.   So are you saying that if I'm a car dealer and my

23   inventory of Hondas is wiped out, I shouldn't sell any more

24   Toyotas?

25        A.   No.  What I'm saying is if they increased the herd

1    by 8 percent per year, if they had kept those 11,000 live

2    sales they could have increased the herd even farther than

3    they did.

4         Q.   Mr. Karraker, you're aware that all of the live

5    sales that the Jonssons achieved after 2010 were sales of

6    mahogany animals; correct?

7         A.   I've been told that.  I've never seen a document of

8    that.

9         Q.   And you have no reason to dispute that, do you?

10        A.   No.

11        Q.   Okay.  And you're also aware that the Jonssons

12   wanted to increase the black breeder portion of their herd;

13   right?

14        A.   No, I'm not.  There's a memo in there saying that

15   the mahoganies have better production and their prices were

16   getting closer to blacks.  One of the Jonssons said,

17   therefore, it makes a lot of sense to move to mahoganies from

18   blacks, which also happened in Utah.  That was the trend.

19        Q.    If the Jonssons wanted to replace the black

20   breeders that they lost in 2010, that has no bearing on

21   whether or not they sell mahogany animals, does it?

22        A.    Not quite.  Your point is could there be a loss in

23   blacks, and the answer is possible.  But they chose to

24   increase the mahoganies instead of blacks.  If they could have

25   kept the mahoganies up and had the blacks up, that's a

1    possibility.

2         Q.   Mr. Karraker, if what I said is true, that they

3    wanted to increase their black herd and sold mahogany animals

4    in the meantime, that's no different than the car dealer who

5    lost all of his Hondas but still wants to sell Toyotas; right?

6         A.   No.  If they had wanted to increase the black herd,

7    they should have gone out and bought more black breeders and

8    made those sales.  And then we would be talking about a real

9    out-of-pocket loss.  That didn't happen.  What happened was

10   they increased their mahoganies tremendously.

11        Q.   Do you know whether or not black breeders were

12   readily available after their losses?

13        A.   I do not.  I do not.

14        Q.   And if I told you that Patrick Fur Farms, which is

15   the source for comparable black breeders, couldn't produce

16   them on such short notice, you have no reason to dispute that,

17   do you?

18        A.   I do.

19        Q.   You don't know one way or another?

20        A.   No, I do know.  Patrick Fur Farm is not comparable.

21   They're 250 to $500 an hour.  They're the Cadillac in the

22   industry.  They are not at all comparable to these, which are

23   $100 an hour breeders.  So Patrick Fur Farm is not comparable

24   at all.  Your question is, were there blacks out there that

25   they could have purchased?  I don't know.  They did increase

1   the mahogany such that the mahogany made up for any potential

2   losses, if any, in black.  Could they have done more blacks?

3   I don't know.

4       Q.   Well, the Jonssons started their black breeder herd

5   by purchasing from the Cadillac in the industry, Patrick Fur

6   Farms; right?

7       A.   I don't know.

8       Q.   More than 10 years ago?

9       A.   I don't know.

10      Q.   And if they did and if they continued to from that

11  point on grow their black herd from within, not by bringing in

12  outside breeders, by taking those Patrick Fur Farm breeders

13  and have them interbreed every year, picking out the best ones

14  every year, then they had Patrick Fur Farm quality black

15  breeders, didn't they?

16      A.   No.  Their blacks were also selling at a lower

17  amount.  No.  Your point is the blacks did go down.

18  Mahoganies went up greatly.  But in terms of the price, no,

19  not at all.

20      Q.   If the Jonssons had a reputation in the industry

21  whereby they could achieve above market average prices for

22  their pelts that they sold at market and damage was done to

23  their reputation, that would be a loss, wouldn't it?

24      A.   Possibly.  I can't deal with damage to reputation.

25  That doesn't show up in terms of the prices the pelts get at

1    market.  And your reputation isn't how they judge the price

2    you get.  It's on the pelts, not the reputation.  Part of what

3    you're saying is a good point.  Part of what you're saying is

4    not right.

5            Q.   Let me switch to sales for a second.  Do you know

6    what the average pelt price at market was in 2009?

7            A.   For what?  Black or mahogany?

8            Q.   For both.

9            A.   2009, the average was $40.16, and the Jonssons got

10   39.10.

11           Q.   Well, I don't want to know what the Jonssons got.

12   I just want to know what the average market price for a pelt

13   was that year.  About $40; right?

14           A.   And 37.82 for mahogany, and the Jonssons got 37.

15           Q.   Sir, I'd ask you to just answer my question,

16   please.

17           A.   I'm sorry.

18           Q.   Thank you very much.  So about $40 a pelt, $39

19   between the two kinds; right?

20           A.   No.  40 for black.  37.82 for mahogany.

21           Q.   Very good.  Okay.  In 2010, the average price, the

22   year of the crumlets, the average price form a mink pelt went

23   up about 50 percent to around $60; isn't that true?

24           A.   Yes.

25           Q.   And the year after that, 2011, the average price

1    for a mink pelt went up to about $75; right?

2         A.   Yes.

3         Q.   And in 2012, it went up to about $85; correct?

4         A.   Yes.

5         Q.   In other words --

6         A.   20 --

7         Q.   -- the market for mink pelts from the year right

8    before the crumlet feeding to two years after it doubled, more

9    than double; right?

10        A.   And it's also up in 2013, yes.

11        Q.   Okay.  You would acknowledge that the Jonssons have

12   no control over the prices one can fetch for a mink pelt at

13   market; correct?

14        A.   Yes.

15        Q.   So is it fair to say, then, that a mink rancher's

16   profits from 2009 to 2013 could be expected to increase every

17   year based on the increase of mink pelt prices during that

18   time?

19        A.   Yes.

20        Q.   Now, I think you're aware that there is a quote, a

21   2013 quote from Patrick Fur Farms indicating that the cost to

22   purchase one of their breeders in 2013 was $500 an animal;

23   right?

24        A.   Yes.

25        Q.   And back in 2010, at the time of the incident, it

1      only cost $250 to purchase a breeder from Patrick Fur Farms;

2      correct?

3           A.   Yes.

4           Q.   So the cost to purchase one of their breeders has

5      essentially doubled in about three years?

6           A.   Yes.

7           Q.   Jonssons don't have any control over that, do they?

8           A.   No.

9           Q.   And just bear with my hypothetical here.  If to

10     make the Jonssons whole they need to be able to go out and

11     purchase comparable breeders to the ones they lost from

12     Patrick Fur Farms today, it's going to cost them at least $500

13     per animal; correct?

14          A.   I don't know that.  If they're purchasing from

15     Patrick, the answer is yes.  If they're purchasing comparable

16     to what they were selling, no.

17          Q.   My question was from Patrick Fur Farms.

18               THE COURT:  Take your turns.

19               THE WITNESS:  Sorry.  From Patrick Fur Farms, yes.

20          Q.   BY MR. HANCEY:  All right.  Thank you.

21               Now, throughout your different analyses we just

22     looked at, you considered some of the historical data relating

23     to the Jonsson mink operation; right?

24          A.   Yes.

25          Q.   Like auction sale records; correct?

1          A.    Yes.

2          Q.    Tax returns?

3          A.    Yes.

4          Q.    But you only considered information going back to a

5     year or two before the crumlet incident; right?

6          A.    No, not quite.

7          Q.    Well, let me walk you through that, sir.

8                MR. MITCHELL:  Your Honor, can he finish answering

9     the question?

10          Q.    BY MR. HANCEY:  I've got your expert report right

11     here.  And they are about --

12                MR. MITCHELL:  Your Honor, can he finish answering

13     the question?

14                THE COURT:  I've tried to suggest that throughout

15     the trial that people take their turns.  Put your question.

16                MR. HANCEY:  I'll ask a different question, Your

17     Honor.

18                THE COURT:  Listen to the answer.  Put your next

19     question.

20                MR. HANCEY:  I'll ask another question.

21                THE COURT:  If you've got a question, put your

22     question.

23                MR. HANCEY:  I'm going to do that right now.

24          Q.    BY MR. HANCEY:  You have several schedules in your

25     expert report, don't you?

1        A.    Yes.

2        Q.    And those are the ones we went through on the board

3    a minute ago; right?

4        A.    Yes.

5        Q.    Schedule Number 1 includes data from 2011 to 2013;

6    correct?

7        A.    Are you looking at my report?

8        Q.    Yes.

9        A.    Yes.

10        Q.    Schedule Number 2 contains data from 2008 to 2010

11    and then into the future; right?

12        A.    Yes.

13        Q.    Schedule Number 3, same thing, go back to 2008;

14    right?

15        A.    Yes.

16        Q.    Schedule Number 4, starts at 2011; right?

17        A.    Yes.

18        Q.    Schedule Number 5 goes back to 2007; correct?

19        A.    Yes.

20        Q.    2006, you went back to 2008; right?

21        A.    Yes.

22        Q.    Two years before the crumlets; right?

23        A.    Yes.

24        Q.    Schedule 7, you go back to 2008?

25        A.    Yes.

1      Q.   Schedule Number 8, you go back to 2008; right?

2      A.   Yes.

3      Q.   2009 -- sorry.  Schedule Number 9, you go back to

4   2008; correct?

5      A.   Yes.

6      Q.   Schedule Number 10, you go back to 2008; right?

7      A.   Yes.

8      Q.   Schedule Number 11, you go through 2008?

9      A.   Yes.

10      Q.   Those are all the schedules we just went through on

11   the board; right?

12      A.   Yes.

13      Q.   Now, when you were analyzing the issues in this

14   case, you had Dr. Roberts report available to you, didn't you?

15      A.   Well, it was after I analyzed it.  But, yes.  I've

16   seen two of Dr. Roberts' reports.

17      Q.   Okay.  And you've also had access to historical

18   data relating to the Jonsson farm, the Jonsson mink ranch that

19   goes all the way back to 2003; correct?

20      A.   Partly.

21      Q.   Dr. Roberts analyzed the data going back to 2003 in

22   his report, didn't he?

23      A.   2004, yes.

24      Q.   And in some cases 2003; right, when that data was

25   available?

1        A.    No.   There's no analysis.   There's a listing of

2    some of the data.   But the analysis starts in 2004.

3        Q.    If you had considered the extra years of data that

4    were available to you, at a minimum you would have been

5    working from a larger sample size; correct?

6        A.    No.   Your assumption is wrong.

7        Q.    Wouldn't that be a larger sample size?

8        A.    I did look at that data.   I did look at

9    Dr. Roberts' report.   I did look at the years for '05, '06 and

10   '07.   I did not include them in my report.   I did look at

11   them.   I did analyze them.   It's the same.

12       Q.    Mr. Karraker, you looked at all the data, and you

13   purposely selected the data that was helpful to what you

14   wanted it to say while ignoring the rest of it; isn't that

15   true?

16       A.    No, it's not.   The numbers here for 2007 are kits

17   per litter 4; 2006, 4.6; 2005, 4.3; 2004, 5.3.   That is

18   consistent with the last three years of 387, 377 and 378.

19   It's consistent.   I didn't find putting that many more years

20   in my report useful.   I did look at it.   My results are the

21   same with those earlier years.

22       Q.    So --

23       A.    My opinions are the same.

24       Q.    So your answer is, I had it available, because it

25   was the same I just thought I shouldn't use it.

1          A.    No.  I did use it.  I simply presented the earlier

2     years -- or excuse me -- the later years.

3          Q.    Right.  Now, you've testified today that in your

4     opinion the Jonssons have suffered no damages whatsoever

5     relating to the mink that died in 2010; right?

6          A.    No.  What I've said is based on all the financial

7     information that I have seen, I don't find any damages,

8     period.  Not the same as your question.

9          Q.    Were you present on the Jonssons' ranch in 2010?

10         A.    Of course not.

11         Q.    You acknowledge that a mink has value; right?

12         A.    Yes.

13         Q.    The animal itself?

14         A.    Yes.

15         Q.    You can sell a pelt for money; correct?

16         A.    Yes.

17         Q.    And you can sell a breeder for money; right?

18         A.    Yes.

19         Q.    And a breeder actually has more value because you

20    can keep it around and you can breed it for about three years

21    and get all of the offspring from it; right?

22         A.    Yes.

23         Q.    And you agree that if one has to go out and acquire

24    a new mink you have to pay for it; right?

25         A.    Yes.

1    Q.   So if the Jonssons lost almost 6,000 mink in 2010,

2    they suffered a loss, didn't they?

3    A.   The loss does not show up in the financial

4    information.  As far as how many death they actually had and

5    as far as if they had excess deaths, sure there is a loss.

6    But it doesn't show up in the financials.

7    Q.   And you have no reason to dispute the data

8    available to you that the Jonssons in the two years following

9    the crumlet incident went outside their ranch and purchased

10   almost 2,000 breeders from external sources; right?

11   A.   No.  The number that I've seen is like 1200.  Hang

12   on a second.

13   Q.   Are you sure it's not 1904?

14   A.   I'm sorry.  Yeah, it's 1904.

15   Q.   And the data that you've reviewed, sir, for this

16   case shows that prior to 2010 for the data available the

17   Jonssons had never before turned to outside sources to

18   purchase breeders; isn't that correct?

19   A.   No, it's not.  They have breeder purchases on their

20   tax return expenses, and they have capitalized breeder sales.

21   So, no, there's breeders purchased there before in the earlier

22   years.

23   Q.   In the really early years.

24   A.   No.  I think we can look at '09 and '10 as far as

25   expenses.  Do you want me to do that?

1          Q.    Yes.

2          A.    All right.  That's going to take a couple minutes.

3                (Time lapse.)

4                THE WITNESS:  If you have a tax return for me for

5      '09 and '10 that would help he me.

6                THE COURT:  Let me give you an early break, folks.

7      10 minutes.  Remember what I told you.

8                (Whereupon, the jury left the court proceedings.)

9                THE COURT:  Give you a chance to round up your

10     documents.

11               MR. MITCHELL:  Your Honor, before we break, before

12     we break, there are a couple of pages from the -- from

13     Exhibit 26 that the parties had previously withdrawn by

14     agreement that we would like to have put back into the record.

15               THE COURT:  Yeah.  Once we get all the evidence in,

16     I'll give you a chance to walk through your exhibits and make

17     sure that those that you need to offer you may offer.

18               MR. MITCHELL:  I need to -- I need these pages for

19     redirect with Mr. Karraker.

20               THE COURT:  Well, you can have him identify it and

21     offer it at that point.  Apparently there's no objection.

22               MR. HANCEY:  Well, I don't know what they are, but

23     I can talk to counsel about that.

24               THE COURT:  Okay.

25               (Recess.)

1          THE COURT:  Did you get your documents okay?

2          MR. MITCHELL:  Yeah.  Are you okay with this?

3          MR. HANCEY:  Yeah.  Your Honor, what I'm going to

4   do when the jury gets come back in, I'm going to withdraw the

5   question and sit down.  So I don't need any documents.

6          THE COURT:  Tell me what you've got.

7          MR. MITCHELL:  What I've got, Your Honor, was

8   originally part of Exhibit 26.  It is document numbers

9   P0 001799 and PO 001800.

10          THE COURT:  Where did it come from?

11          MR. MITCHELL:  It came from Michael Jonsson.  It's

12   a letter from Michael Jonsson to Dr. Roberts.  It came from

13   the documents that Dr. Roberts relied upon in forming his

14   opinions.

15          THE COURT:  Are you fellows stipulating this in?

16          MR. MITCHELL:  It was previously stipulated in, and

17   then as we culled the exhibits, it was withdrawn with the

18   caveat that if somebody needed it, for some reason the need

19   came up for trial then it would be offered again.

20          MR. HANCEY:  That's true, Your Honor.  No

21   objection.

22          THE COURT:  All right.  And let's get it marked.

23          MR. MITCHELL:  The only --

24          MR. MINNOCK:  Hans, I'm going to get one from the

25   old version.

1          MR. MITCHELL:  Okay.

2          MR. HANCEY:  Are we doing the handwritten pages or

3    the backs?

4          THE COURT:  Is it the next exhibit in order?

5    Defendant's Exhibit?

6          MR. MITCHELL:  The next exhibit number, Your Honor,

7    would be Exhibit 50.

8          THE COURT:  50?

9          MR. MITCHELL:  Yes.

10         THE COURT:  Okay.  Why don't we have the clerk mark

11   it.

12         MR. MINNOCK:  I've got to find a single-sided

13   version first.

14         THE COURT:  I'm sorry?

15         MR. MITCHELL:  We are looking for a single-sided

16   version, Your Honor.  The versions that we have were

17   double-sided of the exhibits to keep the bulk down.  So we're

18   looking just for the single-sided versions.

19         THE COURT:  Okay.  But we can do that down the road

20   since you're stipulating it in.  You're not going to ask

21   anything about it.

22         MR. MITCHELL:  No.  I'm actually going to ask him

23   about the document.

24         THE COURT:  Let's get your version, then.  I'm

25   happy to have the clerk go take a photostat of it, too.

1      MR. MINNOCK:  Actually that would be easier, Your

2   Honor, because we're having a hard time finding a copy.

3      THE COURT:  That's because you had so many to begin

4   with.

5      (Time lapse.)

6      THE COURT:  Yesterday counsel had volunteered to

7   modify by extracting, if I remember correctly, your package of

8   suggested instructions.

9      MR. MINNOCK:  Yes.  And that's still our intent.

10   This is the last witness, as I understand it.  Right?

11      MR. MITCHELL:  Correct.

12      MR. MINNOCK:  So after this witness, we're done.

13   And we thought after that the counsel would get together and

14   go through and pick the ones we still want.

15      THE COURT:  Well, before you do that, I think we're

16   in a position to where you need to consult with the Judge in

17   the process, as well.

18      MR. MINNOCK:  Yes, absolutely.  When would you like

19   to do that?

20      THE COURT:  Immediately following my excusing the

21   jury.

22      MR. MINNOCK:  Okay.  Perfect.

23      THE COURT:  I may give you a chance to do that and

24   have you come back a few minutes later.

25      I take it there's just no rebuttal?

1          MR. MERCER:  That will depend on this new document

2     coming in.

3          MR. HANCEY:  But it will be very brief.

4          THE COURT:  Okay.

5          MR. HANCEY:  Your Honor, can I ask the Court's

6     inclination as to timing of closing arguments?

7          THE COURT:  Yeah.  Next week.

8          MR. HANCEY:  Okay.  Great.

9          THE COURT:  Not this afternoon.

10          MR. HANCEY:  We could go today, but it would be a

11     little bit of winging it, and that would be helpful.

12          THE COURT:  No.  Everybody, I'm sure, on the jury

13     has been thinking about their long weekend.

14          MR. MINNOCK:  Us, too.

15          MR. HANCEY:  I think you're right.

16          THE COURT:  I think you want more of a leisure

17     deliberation than any kind of a pressure.

18          And is this something your witness has seen?

19          MR. MITCHELL:  Yes, Your Honor.

20          THE COURT:  Okay.  I don't see your number.

21          THE CLERK:  I marked it on here.  Do you want a

22     marked copy for you?

23          THE COURT:  No, that's fine.  Why don't you bring

24     them in.

25          (Whereupon, the jury returned to the court

1          proceedings.)

2               THE COURT:  Go ahead and sit down, folks, and

3     relax.

4               We'll note for the record that the jury is present,

5     and counsel and the parties.  You may proceed.

6               MR. HANCEY:  I withdraw the last question, and have

7     no further questions.

8               THE COURT:  Okay.

9                         REDIRECT EXAMINATION

10    BY MR. MITCHELL:

11         Q.   Mr. Karraker, you indicated previously that you had

12    been able to determine that the Jonssons had, in fact,

13    purchased at least some animals in the years -- from outside

14    sources in years before 2010.  Were you able to find those

15    documents?

16         A.   Yes.

17         Q.   And what are those documents?

18         A.   Do you want the document numbers or what they are?

19         Q.   Were you able to find them in Exhibit Number 6?

20              THE COURT:  Why don't you show him your proposed

21    exhibit, Counselor, and get that from the clerk.

22              MR. MITCHELL:  We're not to that one yet, Judge.

23              THE COURT:  Oh.

24              THE WITNESS:  Yes.  There are five different

25    documents for the years 2009 through 2012.

1    Q.   BY MR. MITCHELL:  And what exhibit did you find

2    those documents in?  Was it Exhibit 6?

3    A.   6, yes.

4    Q.   Okay.  And would you, please, identify the title of

5    each of the documents that you are referring to?

6    A.   All right.  Capital gains and losses and built-in

7    gains.

8    Q.   For what years?

9    A.   '09, '10, '11 and '12.  And then also Statement 5,

10   other expenses for 2009.

11   Q.   Okay.  And what information on those documents

12   indicates to you that the Jonssons were purchasing breeders

13   from outside sources prior to the incident in this case?

14   A.   Well, 2009 has a small amount of mink purchases,

15   meaning they were expensing it.  And then in the years 2009

16   through 2012 there are long-term capital gains and losses,

17   which means they were capitalizing it.  And so when you

18   purchase a breeder mink for, let's say, $100, you keep it for

19   three years and then you sell it later, it shows up on these

20   capital gains.  And they have that in all years '09 through

21   '12.  So in other words, when they purchase something in '09

22   they don't sell it until '11.

23        So these five documents say they were purchasing

24   breeder mink earlier.  It doesn't tell me how many, how much.

25   Q.   Okay.

1              Where is proposed Exhibit 50?

2              THE CLERK:  Right here.

3         Q.   BY MR. MITCHELL:  Mr. Karraker, I've handed you

4    what has been marked as Exhibit 50 for identification

5    purposes.  And earlier you referenced that you had seen a

6    memorandum that indicated that the plaintiffs were, in fact,

7    shifting from a black, a black herd or a black dominated herd

8    to a mahogany, more of a mahogany composition within their

9    herd.  Is that the document to which you were referring?

10        A.   Yes.

11        Q.   And I'll refer you to the page that is numbered

12   PO 001800 and ask you to read item Number 5 from that

13   document.

14             MR. HANCEY:  I'm going to object to foundation.

15   There's no evidence that this witness knows what this document

16   is.

17             MR. MITCHELL:  Your Honor, this exhibit has been

18   stipulated to.

19             MR. HANCEY:  Its admissibility, Your Honor, but not

20   his personal knowledge of it.

21             THE COURT:  Well --

22             MR. HANCEY:  It is not clear.

23             THE COURT:  We're interested to have him indicate

24   when and where he saw it.

25             MR. MITCHELL:  Sorry?

1           THE COURT:  When and where did he see the document?

2           MR. MITCHELL:  Okay.

3      Q.   BY MR. MITCHELL:  Mr. Karraker, have you seen this

4    document before?

5      A.   Yes.

6      Q.   And where did you see it?

7      A.   In documents that came to me in connection with

8    Dr. Roberts' report.

9      Q.   And what is your understanding of the nature of

10   this document?

11          MR. HANCEY:  Objection; foundation.

12          THE COURT:  Well, if you know.

13          THE WITNESS:  Well, it has Michael Jonsson on it,

14   and it is a quote that speaks for itself.

15     Q.   BY MR. MITCHELL:  And would you go ahead and read

16   item Number 5, please.

17          MR. HANCEY:  Same objection.  Request a voir dire.

18          THE COURT:  Overruled.

19          THE WITNESS:  After the sale in the spring of 2010,

20   the market for black mink and mahoganies were comparable, so

21   we decided to something after black females since we had extra

22   females, anyways.  And by doing this, we decreased in blacks

23   and showed an increase in mahogany.

24     Q.   BY MR. MITCHELL:  Thank you.  Okay.  You were also

25   asked about whether one would expect an increase in profits

1   for a mahogany -- a mink rancher if the prices for mink pelts

2   were also increasing during a given time period.  Do you

3   recall that?

4        A.   Well, that wasn't quite the question.  But, sure,

5   prices were going up.

6        Q.   The gist of it is what I'm getting at.

7        A.   Okay.

8        Q.   Have your analyses taken into account price

9   fluctuations for purposes of determining whether the

10  plaintiffs actually suffered a loss or not?

11       A.   Sure.

12       Q.   And how did your analyses take that into account?

13       A.   That's why we look not just to prices, but we also

14  have to look at the total amounts and particularly the total

15  amounts per breeder.  So if the total amounts per breeder,

16  which they are are up afterward, price isn't an issue.  You're

17  doing better after in terms of producing mink, and then you

18  also enjoy that higher price.

19            So the key issue here is, how are they doing in

20  terms of the actual unit sales, either in the pelt to market

21  or the live sales?

22       Q.   Thank you.

23            In case it needs to be done, Your Honor, we would

24  go ahead and offer Exhibit 50.

25            MR. HANCEY:  No objection.

1          THE COURT:  And offered and received.

2          (Whereupon, Defendant's Exhibit 50 was received.)

3          MR. HANCEY:  No objection.

4          MR. MITCHELL:  And I have no further questions for

5     this witness.

6          THE COURT:  Thank you, sir.  I appreciate your

7     help.  You may be excused absent objection.

8          THE WITNESS:  Thank you, sir.

9          MR. MINNOCK:  Your Honor, with the conclusion of

10    that witness, National Feeds rests.

11         MR. MITCHELL:  And so does Rangen.

12         THE COURT:  Any rebuttal?

13         MR. MERCER:  One minute, please, Your Honor.

14         (Discussion with counsel.)

15         MR. HANCEY:  No rebuttal, Your Honor.

16         THE COURT:  Okay.  Okay.  The Court and counsel,

17    ladies and gentlemen, have a number of questions that need to

18    be resolved that will not require your presence for a while.

19    And rather than have you just stick around and wonder what

20    we're doing, I'm going to let you go home a little bit early.

21    Or if you want to go shopping or go to a movie, I won't tell

22    anybody.

23         But what I'd like you to do, if you would, please,

24    is remember now that we've heard all of the evidence that you

25    remember not to talk to anybody about the evidence.  The next

1    step in this process is for the attorneys to have the

2    opportunity of arguing their respective cases to you.  I

3    anticipate that the Court and counsel will have some questions

4    that will require some time, so I'm going to let you go home

5    early.  I'd like you to come on back on Tuesday.  For some

6    people, most people there's a holiday on Monday.  And I want

7    you to go home and forget about the case.  The attorneys will

8    remind you what you heard when we have you come back.  I think

9    probably it makes sense to have you come back at about

10   10 minutes to 1:00 on Tuesday, and we'll get started right at

11   1 o'clock.  The chances are that after hearing from counsel

12   and the Court that you may desire to work later than usual or

13   you may not.  So those that you care about or who care about

14   you, alert them to the fact that on Tuesday afternoon you may

15   work a little longer than usual, or longer if you so desire.

16           It's important that you not talk to anybody about

17   the case, read anything about it.  Skip the Tweeting, skip the

18   Facebook, skip all of those electronic things.  We've heard

19   what we've heard.  And you'll have a chance to make your

20   decision after argument and instruction with the Court.

21           It looks look a pretty day out there.  And I'd kind

22   of like to go home early, too, but I don't know whether I can

23   or not.  But at any rate, at this point you'll be excused, and

24   we'll see you back here not on Monday.  Enjoy the long

25   weekend.  Tuesday, 10 minutes to 1:00.  Anybody in doubt on

1    that?  Stay well.  Stay well.  We need all of you.  So come on

2    in.  And you may be excused.

3                 (Whereupon, the jury left the court proceedings.)

4                 THE COURT:  I think it might be worthwhile at this

5    point if there are exhibits, and there were some that were

6    identified as disputed, to make sure that all of your exhibits

7    are appropriately offered and received.  We sustained the

8    objection as to Exhibit 14, if I remember correctly.

9                 MR. HANCEY:  Yes, Your Honor.

10                THE COURT:  Are there others that have yet to be

11   offered or received?

12                MR. HANCEY:  What was the number of this new one?

13   50?

14                THE COURT:  50 has been received by agreement.

15                MR. MITCHELL:  Yes.  He was just wondering what the

16   number was.

17                THE COURT:  Yeah.  50.

18                MR. MINNOCK:  Well, some of these like 22, 23,

19   there was concept about admitting them, if necessary.

20                MR. HANCEY:  Yeah.  Those are out.  Yeah.  The lab

21   reports are in.  We don't need those.

22                MR. MINNOCK:  So 22 and 23 can come out.  Other

23   than that, I believe everything has been --

24                THE COURT:  You're withdrawing those?

25                MR. MINNOCK:  Yeah.  The parties are jointly

1    withdrawing those.  I believe as I look through here all the

2    remaining exhibits have been either admitted, excluded or

3    withdrawn.  Is that what you understand?

4            MR. HANCEY:  The only thing I would add to that is

5    we need to offer Exhibit 19.

6            MR. MINNOCK:  19.  19.  19.  Oh, yeah.  I mean --

7            MR. MITCHELL:  I think that one needs to come out,

8    then.

9            MR. MINNOCK:  So 19.  And we'll remove these from

10   the books.  But 19, 22 and 23 have not been dealt with, but

11   are now withdrawn.

12           THE COURT:  Everything else is in?

13           MR. MINNOCK:  Everything else is in.

14           THE COURT:  By agreement with the exception of 14?

15           MR. MINNOCK:  Right.

16           MR. MERCER:  Correct.  And, Your Honor, is there a

17   method by which Exhibit 14 remains part of the record as an

18   unreceived?

19           THE COURT:  It's part of my record.

20           MR. MERCER:  Okay.

21           THE COURT:  It won't be made available to anybody

22   else.

23           MR. MERCER:  Exactly.  Thank you.

24           MR. MITCHELL:  Your Honor, at this time Rangen has

25   a motion for partial directed verdict that we would like to

1    submit to the Court.

2              THE COURT:  Why don't you just tell me what it is.

3              MR. MITCHELL:  The gist of it is, Your Honor, that

4    Dr. Hall is the only causation witness that plaintiffs have

5    offered, and Dr. Hall has testified that he could offer no

6    opinion regarding causation with regard to the feed for any

7    period beyond whelping to weaning in 2010, and we believe that

8    the jury -- we are entitled to judgment as a matter of law

9    with regard to damages beyond the end of the weaning period in

10   2010.  And the jury should be so instructed.

11             MR. MINNOCK:  And National Feeds would join that

12   motion, Your Honor.

13             THE COURT:  Does counsel wish to talk about that?

14             MR. HANCEY:  Yes, Your Honor.  We disagree with

15   that characterization of Dr. Hall's testimony.  Dr. Hall said

16   that his focus was on the 2010 damages.  But he also discussed

17   studies where reproductive effects were shown by nitrosamines

18   in first and second generations of animals.  He talked about

19   the 4,000 mink.  He talked about the 1500 mink.  He talked

20   about the 400 breeders that died.  And Dr. Roberts has tied in

21   damages in other years back to 2010.  In other words, you

22   can't -- you can't draw a line in the sand and say that the

23   breeder-related damages that relate to breeders that died in

24   2010 and carried over in other years aren't something that the

25   jury can consider.  I mean, those flow --

1          THE COURT:  That's part of the your whole theory,

2     isn't it?

3          MR. HANCEY:  Absolutely.

4          THE COURT:  You're talking about not just the

5     breeder, but what, the breeders' progeny.

6          MR. HANCEY:  Absolutely.  And the financial

7     implications on the Jonssons.

8          THE COURT:  Sure.

9          MR. HANCEY:  Having to go out and buy other mink

10    that they wouldn't have to buy if not for 2010.  It all ties

11    together nicely.

12         THE COURT:  Okay.  Were you going to file that?

13         MR. MITCHELL:  Yes, Your Honor.  And I think

14    Mr. Minnock has some comments, and I have some comments, as

15    well.

16         MR. MINNOCK:  Well, the Court will recall that he

17    was specifically asked the question actually by Mr. Hancey:

18         What about the loss of production in 2010?

19         He said:  I believe that the neonatal losses are

20    attributable to the crumlets from weaning -- or whelping to

21    weaning so May and June.

22         And Mr. Hancey followed up and said:  Well, they

23    talked about 1500 additional mink that died later in the year.

24         He said:  I cannot state that those died due to

25    eating the lactation crumlets.  The same thing.  And so he

1    said it had to be during the exposure period.

2              Now, what Dr. Roberts has is he has production

3    losses in future years, which as Dr. Hall indicated he does

4    not believe were caused by this.  He will not render that

5    opinion.

6              THE COURT:  Well, how about the loss to those that

7    died during the period that you talked about and the potential

8    they had for creating babies down the road, and they in turn

9    had a potential for creating babies down the road?

10             MR. MINNOCK:  Well, I guess maybe the motion is

11   perhaps, and I'll let Mr. Mitchell speak to this, I don't

12   think it was narrowly down -- his motion relates narrowly to

13   those kits.  I do think if there was a breeder that died, then

14   that's one thing.  But going to future years and saying, well,

15   there were breeders that died in 2011 or 2012 or 2013 where in

16   2011 they had a decline in production or 2012 or 2013, that's

17   where Dr. Hall said, I cannot sign off on that.  So it's got

18   to be an animal that actually was alive during May and June

19   and either died or died sometime that year.

20             THE COURT:  Yeah.  I as an animal die during that

21   period, my progeny die with me.

22             MR. MINNOCK:  Right.  But the way that Dr. Roberts

23   has calculated damages, he's done it in three discrete years.

24   And that's the problems we have.  Go ahead.

25             MR. MITCHELL:  I was just going to say, I think I

1    understand the point that Your Honor is trying to make.  And

2    the motion is not quite so restrictive as that might suggest.

3    The motion itself does not contemplate instructing the jury

4    how to calculate damages.  It simply limits the jury's

5    consideration to the period in which those damages might have

6    accrued.

7            So, for example, if the jury were to conclude that

8    a breeder, in fact, died during that time period and if they

9    found that its value included the production that one might

10   realize in future years, that loss would have occurred within

11   that period, and I think that would be within the discretion

12   of the jury.  But that is for the jury to decide and the jury

13   to consider.  And based upon what Dr. Hall has --

14           THE COURT:  Do you have the transcript?

15           MR. MITCHELL:  We have ordered it.  It hasn't

16   been -- it's not quite ready yet.  At least they haven't

17   indicated it's ready yet.  I think we were -- Tuesday was what

18   we were looking at, but it has been ordered.  And you might

19   recall Dr. Hall actually said it twice.  And he said it in

20   direct, and he indicated that it was the neonatal period.  And

21   when he was brought back the second day, and on redirect,

22   Dr. Hall clarified that with regard to the 1500 animals that

23   died throughout the year, he couldn't opine that any animals

24   that died beyond the whelping period were, their deaths

25   related to the crumlets.  But if a portion of those 1500 died

1    in that period, he would attribute that to his crumlets.  That

2    was his testimony.

3              THE COURT:  I'll reserve on your motion.  I'll read

4    the transcript.

5              MR. MITCHELL:  Thank you, Your Honor.

6              MR. MINNOCK:  Your Honor, at this time I on behalf

7    of National Feeds would make a motion to dismiss any claim for

8    punitive damages.

9              THE COURT:  It's already been dismissed.

10             MR. MINNOCK:  Oh, thank you.

11             THE COURT:  On the Court's own motion.  I struck

12   it.

13             MR. MINNOCK:  Okay.  Thank you.  I wasn't sure on

14   that.  Thank you.

15             MR. MERCER:  Your Honor, I don't recall the Court

16   officially striking punitive damages.

17             THE COURT:  Well, I commented that somebody in

18   their suggestions for instructions asked about punitive

19   damages, and I indicated this wasn't a punitive damages case.

20             MR. MERCER:  May I address that, Your Honor?

21             THE COURT:  No.  The motion is granted.  No

22   punitive damages, period.  Let's move on.  It's not a punitive

23   damages case.

24             MR. MERCER:  If I can take two minutes on punitive

25   damages.  The reason it's a punitive damages case is because

1    Ken Griffeth contacts manufacturer and supplier in August and

2    says, I think you have some poison feed.  I've got dead mink

3    on three ranches.  Both National Feed and Rangen at that point

4    had samples of that very batch.  Neither National Feed nor

5    Rangen took any steps to test that batch, instead said --

6    instead embarked on this defense campaign deny, deny, deny.

7           The evidence is that damage was incurred from June

8    to November.  It was said over and over.  The information was

9    given in August.  Damages incurred from August to November,

10   were incurred because these defendants knowingly, they had the

11   information that their feed was poison.  They had samples of

12   the feed, both of them had them.  And the Court yesterday said

13   it was exquisitely interesting why neither of those parties

14   conducted any test.  Had they conducted their tests, what

15   would have happened?  They would have said, you're right.  We

16   don't want any more mink to die.  We have figured out the

17   problem, and we are going to resolve the problem and here's

18   what we suggest you do.  Instead the campaign was deny, deny,

19   deny.

20          If these were human deaths, if someone called Tyson

21   Chicken and said, we've got deaths at three restaurants,

22   people have died at three restaurants and we tied it to your

23   chicken, and Tyson instead of recalling every single chicken

24   says, we don't think it was us, and takes no action, we would

25   be outraged.

1           THE COURT:  Tell me in the record that you've made

2    here in court, particularly as to the testimony that was

3    offered by your witnesses, where that discussion occurred,

4    where someone related that they had called that to the

5    attention more than once over a period of time, I'm happy to

6    look at that.  But my memory is that there was, well, some

7    colloquy with counsel and some indication that no tests were

8    given.  No tests were made.  I don't recall the rest of it.

9           MR. MERCER:  Okay.  Let's talk about that.  It's

10   clear that there is -- there is no evidence that no tests were

11   made.  So either tests were made and not disclosed, or tests

12   were not made.  Both equally reckless.

13          THE COURT:  I think that that's a very interesting

14   observation in dealing with the question raised by our

15   traveling consultant as to the quantity of it adulterous

16   material being sufficient to reach a particular threshold,

17   so-called.  I think it's telling.  It is telling that no tests

18   have been made on the part of those who controlled the tests.

19   And I think that's a very persuasive kind of commentary on

20   whether or not the food for mink was adulterated.  If you're

21   in a position to say, hey, I ran the test, this is what we do

22   for control, this is how we make sure our mixers mix correctly

23   and provide material that bears our label, I think that that

24   can be very persuasive in reference to the existence of a

25   defective product.

1              But I'm stuck with the record at this point as you

2    are.  This is not a punitive damage case based on the record

3    that I've seen.  So the motion I thought had heretofore been

4    taken care of.  But if it wasn't clear then, it is now.

5    Motion denied.

6              MR. MERCER:  Thank you, Your Honor.

7              THE COURT:  The motion is denied.

8              MR. MINNOCK:  You mean motion granted.

9              THE COURT:  Is affirmed as granted.  There are no

10   punitives there.

11             MR. HANCEY:  Well, Your Honor, we want to make

12   another motion for directed verdict on a couple of issues that

13   I think will clarify the jury instructions that are going to

14   be presented to the jury and what can be argued in closing

15   argument, if I can take just a few minutes.

16             THE COURT:  Sure.

17             MR. HANCEY:  The first one I guess one of the

18   instructions that the defendants wanted in there, I guess

19   there's two of them that are sort of related, is that the

20   Jonssons had, whether or not the Jonssons had some comparative

21   fault.

22             THE COURT:  We're not dealing with comparative

23   fault.  There's no evidence on comparative fault.

24             MR. HANCEY:  And nor is there any evidence that the

25   Jonssons failed to mitigate damages.  So we would ask the

```
 1    Court to --
 2              THE COURT:  No.  We're not going to give
 3    mitigation.  We are not going to give comparative fault.
 4              MR. HANCEY:  The other thing that I would ask the
 5    Court to strike is any argument to the jury concerning the
 6    label that was on the bag that was never brought up in
 7    evidence except for the fact that the Jonssons never saw it.
 8    That's the label that has the warranty disclaimer and the
 9    limitation of liability.
10              THE COURT:  That really is a curious kind of thing
11    because of the flyers, the touting of the efficacy of the
12    product.
13              MR. HANCEY:  Right.
14              THE COURT:  You can't say on the one hand, this is
15    great, folks, and on the other hand say, but don't believe us.
16              MR. HANCEY:  That's correct.  And it has to be the
17    basis for the party's bargain, and there's no evidence that
18    the Jonssons even knew about those provisions let alone
19    understood them.  So I think that has to come out and can't be
20    argued.
21              MR. MINNOCK:  Well, I'd like to be heard on that
22    issue.
23              MR. HANCEY:  Let me finish my motion.
24              Let's see.  The other one, Your Honor, has to do
25    with our warranty claims.  We've got clearly an express
```

1   warranty claim against National because of the advertisements

2   the Court just referenced, and we have implied warranty

3   claims, too, against National.  The issue with those warranty

4   claims as to Rangen is a little bit different because under

5   the UCC the Jonssons can be a third-party beneficiary to any

6   warranties made by Rangen to National such as the ones that

7   were brought up in the evidence in their own contract.

8            THE COURT:  Yeah.  Let's defer on that for a few

9   moments --

10           MR. HANCEY:  Okay.

11           THE COURT:  -- or a few hours or a few days.

12           MR. HANCEY:  Okay.

13           THE COURT:  And I'd like to chat for a minute as to

14  your legal propositions.  You say defect.  Well, what's the

15  defect?

16           MR. HANCEY:  Well, before this trial counsel got

17  together and we agreed this is not a design defect case.

18           THE COURT:  Well, that's fine.

19           MR. HANCEY:  We think it's a manufacturing defect

20  case.

21           THE COURT:  Well, whatever it is.  It's a defect.

22           MR. HANCEY:  Correct.

23           THE COURT:  It's a defect in a product.

24           MR. HANCEY:  Absolutely, yes.

25           THE COURT:  It's a product that is put in commerce.

1           MR. HANCEY:  Yes.

2           THE COURT:  And you say, well, how was the product

3    manufactured?  Well, the product was jointly made by National

4    and by Rangen.  They both had input.

5           MR. HANCEY:  Yes.

6           THE COURT:  The product was a product of the effort

7    on the part of both of them.

8           MR. HANCEY:  Yes.

9           THE COURT:  It's a product.  It's allegedly defect,

10   within an alleged defect, I should say, which under your

11   theory is dangerous to mink.  It's placed in commerce.  That's

12   a strict liability concept.  There's no negligence involved in

13   that concept at that point.

14          MR. HANCEY:  Right.  They're separate.

15          THE COURT:  And at that point in time, you say, oh,

16   by the way, now you said it was good stuff, your so-called

17   express warranty.

18          MR. HANCEY:  Right.

19          THE COURT:  But they said what they said.  It's

20   good stuff.  You say defective.  Well, okay.  Good stuff.

21   That's really the other side of the coin.  If it's a product

22   and if it's defective, and if it's failed and if there's a

23   consequence, if there's causation and damage of any kind,

24   however you measure it, why worry about merchantability?  Why

25   worry about warranty?  Why worry about negligence?

1          MR. HANCEY:  I agree.  That there are lots of

2     different causes of action that can attach here, but they all

3     sort of evolve around the same concepts that the Court has

4     just mentioned.  I mean, it was a product.  We allege it was

5     defective.  It caused damages.  It was in the stream of

6     commerce.  They both sold it.  They both participated in the

7     manufacturing process.  They made claims about it.  Mink died.

8     That's our case.

9          THE COURT:  Well, why do you have to tell them five

10    times?  Why don't you just tell them once?

11         MR. HANCEY:  Well, Your Honor, our proposed special

12    verdict form is as simple as they come.

13         THE COURT:  I've looked at your form, but I'm

14    looking at your pleadings and I'm looking at the pretrial

15    order.

16         MR. HANCEY:  Yeah.

17         THE COURT:  And I'm looking at all of that stuff.

18         MR. HANCEY:  Probably being overly cautious.  But

19    you're correct, there's some overlap there.  And that's just

20    how this particular area of the tort law works.  But, I mean,

21    well, it all comes down to liability or not.

22         THE COURT:  Let's start out.  The product was a

23    joint product, wasn't it?

24         MR. MINNOCK:  Well, it's our formula and their

25    ingredients, and they mix it.

1          THE COURT:  Sure.  And they were happy enough to

2     label it for you and bag it and ship it off into commerce.

3          MR. MINNOCK:  Yeah.

4          THE COURT:  And tell you who to bill.

5          MR. MINNOCK:  Right.

6          THE COURT:  And your happy salesman up in Seattle

7     touted the formula that was wonderful and would grow superior

8     fur and help people raise big babies.

9          MR. MINNOCK:  Right.

10         THE COURT:  Okay.  Joint product.

11         MR. MINNOCK:  Well, it's joint in the sense that,

12    yeah, it's our product.  It's National Feed's product.

13         THE COURT:  It's their product, too.

14         MR. MINNOCK:  Well, Rangen manufactures it.

15         THE COURT:  You bet.  So when it comes to the

16    question of defective product, you see, you're both on the

17    hook.

18         MR. MINNOCK:  Well, I think that's an accurate

19    statement of the law under strict liability is that -- is that

20    anybody in the stream of commerce is going to be held strictly

21    liability.  I don't know that there's a dispute about that.

22         THE COURT:  Okay.

23         MR. MINNOCK:  I think you're probably right.  This

24    is a question of whether or not there is strict liability, and

25    all other causes of action are superfluous.

1          THE COURT:  Maybe people ought to think about that.

2  Well, you've got arguments from various witnesses that confuse

3  mortality to bank with balance sheets or income statements.

4          MR. MITCHELL:  I'm sorry?  I couldn't hear that,

5  Judge.  What was your last comment?

6          THE COURT:  Well, I don't often ask this question,

7  but I'll ask it just for the heck of it.  Have you ever

8  thought about resolving this case?

9          MR. MITCHELL:  We have -- we've undertaken

10  significant effort in that regard, Your Honor.

11          THE COURT:  Just a how much case?

12          MR. MINNOCK:  Well, I don't think it's just a how

13  much case.  I mean, I think, you know, based on the documents

14  that we've seen and our experts have indicated we don't see

15  that they've suffered a loss.

16          THE COURT:  No babies died.

17          MR. MINNOCK:  Well, I'm not saying -- you know, the

18  history of this case is that, you know, you've seen it in the

19  documents.

20          THE COURT:  No babies died?

21          MR. MINNOCK:  Michael Jonsson sent a letter and

22  said, 4,000 babies weren't born.

23          THE COURT:  No.  No.  My question is, did any

24  babies die?

25          MR. MINNOCK:  I don't -- well, according to their

1    records, no.

2              THE COURT:  Okay.  No babies died.

3              MR. MINNOCK:  Not according to the documents

4    provided.

5              THE COURT:  No feed was deleterious.

6              MR. MITCHELL:  Correct.

7              THE COURT:  No.  It's perfectly good feed.  That's

8    why we've tested it.

9              MR. MITCHELL:  Your Honor, we have 17 different

10   tests of this feed both by National and the plaintiffs.

11   National has tested the retained samples and produced those

12   documents.

13             THE COURT:  You produced -- you tested the --

14             MR. MINNOCK:  Wait.  Wait.  There's two samples

15   here.  When it gets done, one sample is taken and divided in

16   half.

17             THE COURT:  I understand.

18             MR. MINNOCK:  Half is kept by Rangen, and half is

19   kept by National.  The statement that Mr. Mercer made is

20   absolutely incorrect.  When Mr. Griffeth indicated he thought

21   that there was a problem with the feed and described what he

22   thought was the problem with the feed, National immediately

23   took its sample out and had it tested and, in fact, consumed

24   the entire sample doing the test that Mr. Griffeth wanted

25   done.

1          The reason we don't have tests on nitrosamine is

2     because we don't have a sample anymore because Mr. Griffeth

3     said, I want you to do these tests all the way down the road.

4               THE COURT:  But your partner has a sample.

5               MR. MINNOCK:  That's true.

6               THE COURT:  And did you test that for nitrites?

7               MR. MITCHELL:  No, Your Honor.  By the time

8     nitrites became an issue and nitrosamines in this case --

9               THE COURT:  Have you ever thought of taking that

10    sample right now and have it tested?

11              MR. MITCHELL:  We have -- the thought -- we

12    actually offered --

13              THE COURT:  No.  I'm not interested in offers.

14    Right now.  Have it tested.

15              MR. MITCHELL:  No.  I mean, we're at the end of the

16    trial.

17              THE COURT:  Well, we could always reopen.

18              MR. MINNOCK:  Well, I think it's -- I think part of

19    the reason that the whole testing issue is really a nonissue

20    is there is not a dispute in this case that nitrosamines were

21    found in the feed.

22              THE COURT:  Yeah.  And you've acknowledged that

23    before.

24              MR. MITCHELL:  Correct.

25              MR. MINNOCK:  So there's no reason to test Rangen's

1    sample to say, is there, in fact, nitrosamines?

2            THE COURT:  Well, you acknowledge nitrosamine.  And

3    then the question becomes quantity.

4            MR. MINNOCK:  The question becomes quantity.

5            THE COURT:  Sure.

6            MR. MITCHELL:  And we've had multiple tests of the

7    feed.

8            THE COURT:  And there's no question that

9    nitrosamine can have an adverse affect upon the health of

10   mink.

11           MR. MITCHELL:  No.  When the levels get to the

12   right, when it gets to the right levels, no, there is no

13   question about that.

14           THE COURT:  Okay.

15           MR. MITCHELL:  Your Honor, I would like to comment

16   on the issue regarding -- a couple of issues that have been

17   brought up which I haven't had an opportunity to talk about

18   yet.  One is the issue of mitigation, and there is ample

19   evidence in this case of plaintiff's failure to mitigate.

20           THE COURT:  What should they have done that they

21   didn't do that you put on the witness stand?

22           MR. MITCHELL:  They should have called a

23   veterinarian to come out and look at their animals.  They

24   should have replaced the breeders sooner than they did.  They

25   should have retained the breeders that they did sell to

1    replace any that, in fact, died.  They should have had

2    necropsies performed.  They should have performed feed

3    analyses much sooner than was done.  What else can I think of.

4           THE COURT:  And I guess you should have tested the

5    stuff.

6           MR. MITCHELL:  I'm sorry?

7           THE COURT:  I said, I guess you should have tested

8    the stuff.

9           MR. MITCHELL:  It's been tested ad nauseam.  There

10   are no tests that we can do that are going to add anything to

11   this collective mix.

12          THE COURT:  Well, they would certainly indicate

13   concentration.  They would certainly indicate sufficient,

14   sufficiency as far as causation goes.

15          MR. MITCHELL:  We already have those tests.  The

16   plaintiffs already performed those tests.

17          THE COURT:  Well, it's kind of fuzzy and

18   interesting.

19          MR. MITCHELL:  And then the other issue was under

20   Utah law fault has to be apportioned among the parties.  So we

21   would ask that that apportionment occur on the verdict form,

22   as well.

23          THE COURT:  Well, there's been no evidence of fault

24   on their part as far as I can see in the record.  It's a

25   strict liability case with redundancies.  But I'm perfectly

1    capable of telling the jury five times what we ought to tell

2    them once.  But that's something counsel can be of help on.

3              MR. MINNOCK:  Your Honor, I think that you're

4    probably right on comparative fault.  I think that the issues

5    we've raised relate more to mitigation that should be

6    presented to the jury.  But I agree they probably don't need

7    to be on the special verdict for in terms of -- there's no

8    showing of their fault in terms of putting the --

9              THE COURT:  And you should have called a vet, you

10   know.

11             MR. HANCEY:  Well, Your Honor, the undisputed

12   evidence is that they did call a vet.

13             THE COURT:  Well, and he's kind of busy.

14             MR. HANCEY:  In May of 2010.

15             MR. MITCHELL:  Funny a vet has not testified to

16   that.

17             MR. HANCEY:  The vet is dead.

18             MR. MITCHELL:  I didn't know he has passed.

19             MR. HANCEY:  Yeah.  The vet is dead.

20             THE COURT:  Well, there are all kinds of

21   interesting things there.  I think I'll let you go to lunch.

22   Why don't you come back and see me maybe at 1:15, if that's

23   convenient.  Play with your requests.  Extract those that you

24   think don't pertain, and we'll then chat some more.  I'm

25   interested in properly instructing the jury, and obviously

1    it's a contentious case.  It's a fascinating case.  It's one

2    that has I think great interest in the intersection between

3    law and science and statistics, matters of that kind.  I think

4    we should all make great effort to make it as simple as

5    possible for the fact finders.

6         When we chat again, I'll be asking plaintiffs as to

7    what specific proposition of law that you're referring to in

8    reference to those events, parties where you're trying to

9    stick one or the other of the defendants on a separate legal

10   proposition.

11        MR. HANCEY:  We'll do that, Your Honor.

12        THE COURT:  And you might think as well as to the

13   need for redundancies.

14        Well, let me give you a little more time.  Why

15   don't we say 1:30, and that will give you a chance to eat as

16   well as talk with one another in reference to your suggested

17   requests.  Quite often I make up instructions of my own which

18   I think meet what facts I've heard, but we have the

19   opportunity of looking at what we propose to give by way of a

20   package, and that's why I've asked the jury to come back in

21   the afternoon on Tuesday rather than the morning.

22        So let's see what you've got this afternoon, and

23   we'll see what we can be helpful on.  And maybe I'm wrong, but

24   if you've got a good customer who's been buying field from you

25   for a while and if repeat customers are worthwhile in the feed

1     business, you ought to chat about those who deal with risk and

2     see if folks can arrive at a particular sum that doesn't make

3     everybody happy but often makes everybody content with new

4     friendships or renewed friendships, let's put it that way.

5            Well, I preach too much.  1:30.  Bring me your

6     package.  Make sure that the clerk has the appropriate

7     documents.

8            (Lunch recess.)

9     THE COURT:  How are we doing on instructions?

10           MR. HANCEY:  Well, I think we made a lot of

11    progress, Your Honor.  We agreed to -- well, first of all, we

12    agreed to unclutter the verdict form by getting rid of some of

13    our claims.  And --

14           THE COURT:  Well, let's talk about instructions.

15    Which ones are you --

16           MR. HANCEY:  Okay.  I have them here.  We agreed to

17    get rid of instruction Number 1 and Number 2 and Number 3 and

18    4.  We agreed to get rid of Number 7 and Number 8.  And we

19    agreed -- well, maybe we have to have some discussion on

20    Number 18, but I think for the most part we agreed to

21    eliminate it.

22           MR. MITCHELL:  Yeah.  There's substantial

23    agreement.  There's just one fact that's coming -- that is in

24    18 right now that we're working out how to deal with it, and I

25    believe we'll be able to reach some sort of agreement.

1          MR. HANCEY:  Yeah.  So we're pretty much okay for

2     the Court not reading the stipulated facts Instruction 18.

3          THE COURT:  Well, you've previously withdrawn that

4     before.  The last time we talked about instructions on the

5     record you indicated that you would eliminate and rely upon

6     the testimony.

7          MR. HANCEY:  Right.  Yes.  And we agreed to remove

8     Number 19 and Number 21 and Number 24.  We agreed to remove

9     Number 39 and Number 40, 41.  We agreed to remove Number 44

10    and Number 45 and 46 and 47.  We agreed to remove Number 55

11    and 56 and 57.

12         What did you decide on 58, Hans?

13         MR. MITCHELL:  I think since -- we'll want to keep

14    Number 58 in.

15         MR. HANCEY:  Okay.  We agreed to remove Number 59.

16         What about 60?  That was a question mark.

17         MR. MITCHELL:  I think we'll need to keep 60 in, as

18    well.

19         MR. HANCEY:  Okay.  We agreed to remove Number 61.

20    We agreed to modify Number 63, Your Honor, to remove any

21    language indicating comparative fault on the part of the

22    plaintiffs.  But the defendants want to keep the instruction

23    in concerning comparative fault amongst themselves.

24         THE COURT:  Okay.  Your next?

25         MR. HANCEY:  We -- well, let's see.  We agreed

1    to -- well, we think the Court has already ruled on

2    instruction Number 68, mitigation of damages, but I think the

3    defendants want to argue on that one.

4              THE COURT:  And your next one?

5              MR. HANCEY:  We agreed to remove 69 and 70 per the

6    Court's order, and 71.  And that's it.

7              THE COURT:  Okay.  Tell me what substantive claims

8    remain.

9              MR. HANCEY:  The substantive claims that remain,

10   Your Honor, are negligence, strict liability and express

11   warranty.

12             THE COURT:  Okay.  And let's take a moment and talk

13   about your legal propositions in reference to each one of

14   those.

15             MR. HANCEY:  Well, okay.  So on the negligence and

16   strict liability claims, we kind of talked about it before the

17   break, our claim is that we have an adulterated product that

18   is in the stream of commerce.  We have an undisputed seller

19   and a manufacturer.  They both participated in its production.

20   And it was sold to the Jonssons, and they used it and caused

21   them damages.

22             THE COURT:  Okay.

23             MR. HANCEY:  On the --

24             THE COURT:  That's your strict liability claim or

25   negligence claim?

1          MR. HANCEY:  That's on both of them.  Those are

2     really the underlying facts.

3          THE COURT:  You can't do both because if you have

4     strict liability, negligence isn't a question.  I mean, it's

5     there, you know.

6          MR. HANCEY:  Yeah.  Well, we understand there's

7     overlap, Your Honor.  And it's true, the same facts underpin

8     both of those claims.  But we're not comfortable simply

9     getting rid of one or the other because --

10          THE COURT:  Well, is the negligence question on

11     strict liability?

12          MR. HANCEY:  Well, negligence is also a standalone

13     claim, as I understand it.

14          THE COURT:  No.  No.  That's not my question.

15          MR. HANCEY:  Oh, okay.

16          THE COURT:  Negligence isn't a question in strict

17     liability at all, is it?

18          MR. HANCEY:  No, it's not.

19          THE COURT:  So one of the elements is missing.

20     Negligence is missing.

21          MR. HANCEY:  Yeah, negligence.

22          THE COURT:  Okay.  All you've got is a defective

23     product, dangerous, commerce, consequence.

24          MR. HANCEY:  Correct.

25          THE COURT:  That's it.  There's no negligence

1     involved in that at all.

2              MR. HANCEY:  Correct.

3              THE COURT:  Okay.

4              MR. HANCEY:  The negligence claim would be similar.

5     It would be duty to manufacture a safe product.

6              THE COURT:  But that's implied right there.  It's

7     the bad product.

8              MR. HANCEY:  Right.

9              THE COURT:  As a result of the bad product.

10             MR. HANCEY:  Which is the breach, and the causation

11    are the experts and the damages are the experts.

12             THE COURT:  Tell me how you can have those two

13    concurrently.  Judge, strict liability.  Say, okay.  Lesser

14    evidence.  I don't have to show that anybody was negligent.

15    Okay.

16             MR. HANCEY:  Well, we'll talk -- and then we'll

17    talk one more time about the negligence claim.  The express

18    warranty claim has to do with the promotional literature.

19             THE COURT:  Well, I can understand that.  I can

20    understand that.  Good stuff.

21             MR. HANCEY:  Yeah.  It's good stuff.  And the

22    contract on the other side of it.  But I'm happy to, Your

23    Honor, talk with my co-counsel one more time about the

24    negligence claim and see if we can --

25             THE COURT:  I'm just talking back and forth here.

1          MR. HANCEY:  I mean, you know, we whittled down the

2     implied warranty claim.  Those are out.  We've gotten rid of

3     the failure to warn claim, and we tried to just hone in on

4     what we felt were our strongest claims.  And we realize

5     there's some overlap.

6          THE COURT:  My inquiry is, hey, if you don't need

7     the element, why bother with it?

8          MR. HANCEY:  Right.

9          THE COURT:  But that's just an inquiry.

10         MR. HANCEY:  I understand, Your Honor.  It's a good

11    point.

12         THE COURT:  Now, your warranty claim, your express

13    warranty claim.

14         MR. HANCEY:  Yes.

15         THE COURT:  Now, are you talking there about both

16    parties?

17         MR. HANCEY:  Yes.

18         THE COURT:  And tell me how and why and what.

19         MR. HANCEY:  The claim against National is that

20    National is the seller.  Jonssons were the buyer.  The seller

21    made representations about the product, and those

22    representations turned out to not be true and caused damages

23    to the plaintiffs.

24         THE COURT:  Okay.  Are those damages the same

25    damages as your strict liability damages?

1          MR. HANCEY:  They're all the same damages.

2          THE COURT:  So you can't, you can't double damages.

3          MR. HANCEY:  No.  No.  And we're not trying to

4   double dip.

5          THE COURT:  You can't be paid twice.

6          MR. HANCEY:  No.  No.  We're asking for one set of

7   damages on any or all of the claims.

8          THE COURT:  Now, when you're dealing with an

9   express warranty, is that a contract claim?

10          MR. HANCEY:  Well, it's a good question.  I mean, I

11   think that it's implied in the claim that there was a

12   contractual relationship because there was a purchase or there

13   was some kind of a transaction.  I don't know if it's a quasi

14   contract claim, you know, to be more specific.  But it

15   certainly sounds in contract because it talks about

16   representations being made and breached.  So, you know, and

17   relied on and so forth.

18          THE COURT:  Now, in dealing with contract damages,

19   are you talking about the same kind or the same quantum from

20   the strict liability damages?

21          MR. HANCEY:  Yes, Your Honor.  I don't think

22   there's any difference in the damages amongst the different

23   claims.

24          THE COURT:  No.  No.  We missed each other on that.

25          MR. HANCEY:  Okay.

1           THE COURT:  Are contract claims different than

2    strict liability claims?

3           MR. HANCEY:  Yes, they are.

4           THE COURT:  Okay.  Are damages different on strict

5    liability claims and contract claims?

6           MR. HANCEY:  They can be, yes.

7           THE COURT:  Are they different here?

8           MR. HANCEY:  I don't think the dollar amount is any

9    different.  The damages that the Jonssons sustained are what

10   they are.  And I guess there's two different paths of getting

11   there.

12          THE COURT:  Sure.

13          MR. HANCEY:  Yeah.

14          THE COURT:  You say, well, I'm justified in saying

15   you owe me money, folks, because you breached your warranty.

16   Okay.  Or you say, I want to have you pay me money, folks,

17   because you gave me a bad product --

18          MR. HANCEY:  Yes.

19          THE COURT:  -- that hurt my inventory.

20          MR. HANCEY:  That's correct.  Yeah.  It's two

21   different ways of getting to the same result, the same

22   damages.

23          THE COURT:  Okay.  Now, do you point to any

24   specific legal proposition on your warranty?

25          MR. HANCEY:  Well, the legal proposition is sort of

1    set out in the jury instruction --

2              THE COURT:  No.  No.  I'm asking you for your

3    specific legal proposition.  Say, Judge, here's my legal

4    proposition, and I trace that back either to a statutory

5    footing or to a case footing or common law, you know.

6              MR. HANCEY:  Well, the express warranty law that

7    I'm familiar with is in the UCC.

8              THE COURT:  Okay.  And it has some interesting

9    deviations and limitations.

10             MR. HANCEY:  It does.  And some of the foundational

11   things include whether a party was a seller, whether a party

12   was a merchant, although that's more with respect to implied

13   warranties.

14             THE COURT:  Okay.  Well, you think about those.

15             MR. HANCEY:  Yeah.

16             THE COURT:  Okay.  What specific express warranty

17   do you point to as the basis for your saying they were

18   breached?

19             MR. HANCEY:  In Exhibit 12 with respect to

20   National, the representations that the lactation crumlets

21   would reduce kit losses, improve lactation for better size,

22   include kit growth and minimize female losses.  As to Rangen,

23   that would be Exhibit 10.

24             THE COURT:  If you don't recover on strict

25   liability where are you?  Do you have a breach?

1          MR. HANCEY:  I'm trying to think that through.  I

2    guess it would depend on the reason for there being no strict

3    liability.

4          THE COURT:  Well, you think about that.

5          Okay.  Well, let me hear from the defendants.  Tell

6    me, to begin with, why we should differentiate between either

7    of the defendants.  Why not joint and several?

8          MR. MITCHELL:  One, because joint and several

9    liability has been abolished in Utah, Your Honor.

10         THE COURT:  I'm sorry?

11         MR. MITCHELL:  Joint and several liability has been

12   abolished in Utah, Your Honor.

13         THE COURT:  Well, as a practical matter.  But why

14   aren't you stuck, period, together?  Why should we apportion

15   it?

16         MR. MITCHELL:  I would -- because, well, I guess I

17   don't follow.  If you don't -- if you don't have joint and

18   several liability, if that's not a viable --

19         THE COURT:  No.  You produce the product together.

20         MR. MITCHELL:  Sure.

21         THE COURT:  On the strict liability question you

22   fly in the same boat.

23         MR. MITCHELL:  Well, as it -- vis-à-vis the

24   plaintiffs, I would say that I tend to agree.  Vis-à-vis each

25   other, I would say --

1           THE COURT:  Nobody's sued each other.  Nobody has

2      an action over --

3           MR. MITCHELL:  Sure.  But it would be I think --

4      and it may end up being a moot point.  I suspect it will end

5      up being a moot point at some point.  But in the event it

6      doesn't, it would be frankly significantly more efficient and

7      helpful to the defendants for the jury to provide an

8      apportionment.

9           THE COURT:  Well, it depends.  If you both produced

10     the defective product and the defective product caused damage,

11     why should we apportion at all?

12          MR. MITCHELL:  Because we each had different roles

13     in producing that product, and it would depend upon the reason

14     for that deficiency.

15          THE COURT:  You have to jointly produce the

16     product.

17          MR. MITCHELL:  But we acted -- we acted together.

18          THE COURT:  Why don't you sue each other and get

19     that determined amongst yourselves?

20          MR. MITCHELL:  You know, I don't know.  We are

21     where we are right now.  And it would -- given all of the

22     information that the jury has heard, it would seem appropriate

23     for them to provide that apportionment, if necessary.

24          THE COURT:  Well, I'm interested in why we should

25     distinguish one from the other of the defendants if both

1    participated in producing the product.

2            MR. MITCHELL:  Because each defendant's

3    participation was different from the others.  And if one

4    entity's participation has greater fault or greater cause

5    associated with producing a defective product, that ought to

6    properly be allocated to that particular defendant.

7            THE COURT:  But you both participated in producing

8    the product.

9            MR. MITCHELL:  Correct.

10           THE COURT:  Indeed not just the product, but

11   participating in putting it into the stream of commerce.

12           MR. MITCHELL:  Correct.

13           THE COURT:  And accommodated people in saying who

14   ought to be billed.

15           MR. MITCHELL:  I'm sorry?  I didn't follow that

16   last one.

17           THE COURT:  Yeah.  Different billing to different

18   recipient of product.

19           MR. MITCHELL:  Rangen billed one entity, and that

20   was National.  Rangen didn't bill any other entity.

21           THE COURT:  Oh, but National did.

22           MR. MITCHELL:  Sure.  It's National's customers.

23           THE COURT:  Sure.

24           Okay.  What else do you see here?

25           MR. MITCHELL:  From Rangen's perspective, Your

1    Honor, there are a couple of instructions that we have issue

2    with.  The first one is Number 33, violation of a safety law.

3    And this is -- I provided the Court with a memorandum.

4              THE COURT:  Violation of what now?

5              MR. MITCHELL:  Violation of a safety law as a basis

6    for a claim of negligence.  And I provided the Court with a

7    memorandum.  And there are two points with regard to Rangen

8    that would preclude giving the instructions that plaintiffs

9    have requested.  First one, this statute comes from Utah Code

10   Section 4-12-8.  And the very first sentence of that statute

11   provides that, no person in this state shall, and then a

12   laundry list of things that are prohibited.  And what has been

13   established in this case is that Rangen did nothing within the

14   state of Utah.

15             THE COURT:  Oh, they just happen to bill the

16   product and addressed it somebody --

17             MR. MITCHELL:  Nope.  Wrong.

18             THE COURT:  -- recognizing that it was going to be

19   part of that great commerce that the Supreme Court likes to

20   talk about.

21             MR. MITCHELL:  I respectfully disagree with Your

22   Honor.  Rangen manufactured the feed in the state of Idaho.

23   Rangen delivered the feed in the state of Idaho.  The feed was

24   picked up by a third party and taken from the state of Idaho

25   into Utah.  Rangen did not bill anybody in the state of Utah.

1    Rangen did nothing in the state of Utah.  Rangen did nothing

2    to violate the Utah Code 4-12-8.

3              THE COURT:  I guess Rangen is not engaged in

4    interstate commerce at all.  Doesn't sell out of state at all.

5              MR. MITCHELL:  We're not talking about whether

6    Rangen sells out of state or not.  We're talking about whether

7    Rangen performed any act in this case within the state of

8    Utah.  And the only evidence is that Rangen's activities were

9    limited to the state of Idaho in this case.  Rangen did

10   nothing in the state of Utah in this case.

11             THE COURT:  Okay.  And what's your next one?

12             MR. MITCHELL:  The other issue with this particular

13   instruction, Your Honor, is the manner in which it is being

14   proposed as a negligence per se instruction.  And the

15   authorities that we provided for within our memorandum make it

16   clear that the nature of this statute is not such that it

17   would provide a basis for a claim in negligence per se.

18             THE COURT:  Well, I asked counsel for his legal

19   proposition.  Which do you point to?

20             MR. MITCHELL:  We point to, Your Honor -- there

21   were a number of cases cited on Page 3 of our memorandum

22   beginning with Child vs. Gonda at 972 P2d 425.  Gaw, G-A-W,

23   vs. State of Utah, 798 P2d 1130.  And in those cases what we

24   find, Your Honor, is that in order for a statute to provide a

25   basis for a claim in negligence per se as this instruction is

1    drafted, the statute must provide for a bright line standard.

2            So, for example, did the person drive above 55 or

3    not?  If you're 56, you have violated a statute, and if that

4    caused damage then you are to pay.  Where, however, we're

5    talking about the reasonableness or some judgment that must be

6    made about determining whether somebody, in fact, violated a

7    statute, that statute, the nature of it does not provide a

8    basis for a claim in negligence per se.  And that is the

9    fashion in which this instruction has been drafted.

10           THE COURT:  Okay.  Well, I'll look at it.  And that

11   number is which one again?

12           MR. MITCHELL:  33, Your Honor.

13           THE COURT:  Okay.  I thought they wanted to go

14   beyond negligence per se because they already had strict

15   liability.  There's got to be something beyond that.  But

16   okay.

17           MR. MITCHELL:  At least with regard to Rangen, Your

18   Honor, what -- we do have issues with the instructions with

19   regard to a claim for express warranty.  If you look at the

20   operative complaint in this matter, no claim for express

21   warranty has been pled.  It's not at issue in the case, and it

22   has not been pled, so no instructions should properly be given

23   on those counts.

24           THE COURT:  Anything in the pretrial order?

25           MR. MITCHELL:  The plaintiffs identified a theory

1    of breach of express warranty.  Never moved on it in the

2    complaint.

3            THE COURT:  Pretrial order was initially stipulated

4    to and submitted.

5            Okay.  Well, they do suggest that the flyer that

6    they look to from Seattle said some nice things about the

7    product.

8            MR. MITCHELL:  Rangen had nothing to do with the

9    flyer.

10           THE COURT:  Oh.

11           MR. MITCHELL:  And I don't believe the plaintiffs

12   are relying upon the flyer as a basis for their express

13   warranty claim against Rangen.

14           THE COURT:  I asked them for their proposition.

15   Okay.

16           MR. MITCHELL:  I believe, Your Honor, those are the

17   primary issues of contention for us with the exception of -- I

18   believe those are the primary issues of contention, and then

19   obviously we'll have to take up some of the issues depending

20   upon how you rule upon the motions for directed verdict and

21   revisit those.

22           THE COURT:  Okay.  Anything else?

23           MR. MINNOCK:  In addition to the ones that

24   Mr. Mitchell identified, if you look at Exhibit 49, the

25   plaintiffs have asked to add an exception on that as to,

1    quote, whether or not the buyer relies on the description in

2    entering into the transaction.

3           I mention this because you talk about the flyer.

4    The flyer was not something that the plaintiffs have testified

5    that they ever saw before purchasing the product.  The only

6    information that they ever received came from Ken Griffeth.

7    The flyer was actually given to Mr. Griffeth.  And so what

8    these plaintiffs are attempting to do is to say, we did not

9    see the express warranty, but we should be allowed to rely

10   upon it.  And --

11          THE COURT:  You warrant the world, don't you?

12          MR. MINNOCK:  Well --

13          THE COURT:  You said that, we have a nice product

14   here.  It will do this and this and this.

15          MR. MINNOCK:  Well, I think that that's what the

16   Court has to decide, because the instruction says, an express

17   warranty is also created if the seller provides a description

18   of the product that is made part of the basis for the sale.

19          Well, here it wasn't part of the basis of the sale.

20          THE COURT:  What number is that?

21          MR. MINNOCK:  It's 49.

22          THE COURT:  Okay.  I'll look at that.

23          MR. MINNOCK:  All right.  Thank you.

24          THE COURT:  Anything else we need to worry about?

25          MR. MITCHELL:  I think those were the -- I think

1     those were the primary issues, Judge.

2          THE COURT:  You had a question concerning the

3     disclaimer tag today or yesterday.

4          MR. HANCEY:  Well, Your Honor, yeah.  We're asking

5     the Court to exclude any jury instructions on that issue and

6     to prohibit argument on that point.  There was no evidence

7     that the language in the label ever became part of the

8     bargain, that it was ever agreed to or acknowledged by the

9     Jonssons.  In fact, the undisputed testimony is that he didn't

10    read the tag.  It certainly wasn't negotiated for at the time

11    of the sale.  So I think the Court -- I thought the Court had

12    already ruled on that.  But in any event, we're asking the

13    Court if not, to remove that from the instructions.  And, in

14    fact, I think we agreed to that in the conference room that

15    the point not be argued.  It's going to confuse the jury when

16    there was no evidence on that point.

17         THE COURT:  Is that your agreement?

18         MR. MINNOCK:  No.  No.  No.  No.  No.  The express

19    warranty is in evidence as Exhibit Number 9.  I asked

20    Mr. Jonsson about it.  He said that he did not read the entire

21    document but that he did, in fact, see it.  And if you look at

22    the UCC, our position is is that as long as the jury

23    instruction indicates that has been proposed, that's

24    stipulated to, that if it's conspicuous it wipes out the

25    express warranties.  Now, you expressed some concern --

1          THE COURT:  You mean given with the right hand and

2    taken away with the left hand?

3          MR. MINNOCK:  And I understand that's your concern.

4    But here again, here's what we're doing now.  We're saying

5    that, I can't rely on a document that the plaintiffs did see,

6    but the plaintiffs can rely upon the document that they didn't

7    see.  In other words, the only document that they saw before

8    they opened these bags said there were no express warranties

9    at all.  And now what we're saying is, well, because there was

10   a warranty given to somebody else that can be construed as a

11   warranty that the Jonssons never saw that that overcomes the

12   exclusion of the warranty that they did see or could have

13   seen.  So that's the issue we would ask you to look at.

14         THE COURT:  It's really a public policy issue.  Can

15   you tell somebody one thing and take it away with another?

16         MR. MINNOCK:  Well --

17         THE COURT:  You know, if you're going to be honest

18   in your salesmanship, it seems to me that you have to be

19   consistent.  If you're going to say, hey, folks, great

20   product.  Great product.  And then you say, but we didn't

21   really mean it.  We really didn't mean it.  That's very

22   strange.

23         MR. MINNOCK:  Well, if you look --

24         THE COURT:  I'd like to see some legal authority

25   that suggests that you can you giveth with the right hand and

1     take it away with the left.  And I'm happy to be educated in

2     that area.

3                 MR. MINNOCK:  Well, the reason that the limited

4     warranty says what the limited warranty says is exactly what

5     it says on the label, which is:  Individual results from the

6     use of these product may vary due to management, environmental

7     or sanitation differences, and then it goes on.  And then it

8     says:  National warrants that this feed will meet the

9     guaranteed analysis set forth on the label.  And there is no

10    question it did not.  It clearly met the terms of what the

11    express warranty on the label was.

12                And our position is that's the reason that every

13    product comes with a limited warranty.

14                THE COURT:  You mean with extra nitrites, you're

15    not, you're not vulnerable --

16                MR. MINNOCK:  No.

17                THE COURT:  -- because of the so-called limited

18    warranty?

19                MR. MINNOCK:  No.  I'm suggesting to you that the

20    limitation on the express warranty is enforceable against the

21    warranty claim.  If there's a strict liability or negligence

22    claim they can bring it.

23                THE COURT:  Let's look at the language there.  Why

24    don't you read the language again.

25                MR. MINNOCK:  Individual results from the use of

889

1    this product may vary due to management, environmental and

2    sanitation differences.

3                THE COURT:  Yeah.

4                MR. MINNOCK:  And then it goes on:  National Feeds

5    warrants that this feed contained herein meets the guaranteed

6    analysis as set forth above on this label.  There are no other

7    warranties or merchantability or fitness --

8                THE COURT:  And where did we find nitrites on that?

9                MR. MINNOCK:  Well, of course nitrites aren't on

10   this.

11               THE COURT:  Sure, they're not.  Sure, they're not.

12               MR. MINNOCK:  Right.  And if there are, then

13   they've got a strict liability claim.  In other words, if we

14   made a warranty to them, hey, there's no nitrites in this

15   stuff, then they've got a warranty claim.

16               THE COURT:  If they have a limited warranty, it

17   contains only A, B and C, but it happens to contain D.  Well,

18   okay.

19               MR. MINNOCK:  The warranty simply says it meets the

20   guaranteed analysis.  That's the only warranty.

21               THE COURT:  It says what it says.

22               MR. MINNOCK:  It says what it says.

23               THE COURT:  But it doesn't say D.

24               MR. MINNOCK:  It doesn't say D.  It doesn't say

25   nitrites.  I'll admit that.

1          MR. HANCEY:  Do I need to respond to that, Your

2     Honor?

3          THE COURT:  Sure.

4          MR. HANCEY:  Here's the law as I understand it.

5     First of all, they make an express warranty to the world.

6     They're putting it out there, anybody who reads it, anybody

7     who doesn't read it, they're guaranteeing the product is going

8     to be a certain way.  And that's for the benefit of anybody

9     who buys it.

10          On the other hand, and then what has to happen is

11     we look at the actual time of contract when they purchase the

12     feed and it was shipped to them.  So an order was placed, an

13     order was received.  That was the time of the contract.

14     There's no evidence that limitation of liability was discussed

15     or any kind of a disclaimer of warranty was discussed.  That's

16     the undisputed testimony.

17          So what they're doing is they're adding terms to a

18     sale after the sale is consummated.  And the UCC expressly

19     addresses that issue.  And it says, if you're dealing with a

20     merchant on a one hand and a nonmerchant in those particular

21     goods on the other hand, you don't get to add terms in after

22     the fact unless they're expressly assented to there's no

23     evidence of expressed assent.  There's no evidence that

24     Jonsson said, you know what, we agreed to use these crumlets

25     at our own risk.  If all of our mink die that's going to be

1    our problem, and we're limited to the price of feed.  They

2    didn't agree to that.  In fact, Keith Jonsson testified

3    undisputed, we got the crumlets.  I looked at the label.  I

4    saw the protein amount, and I fed it to my mink.  And that's

5    all he looked at.

6            So that's what the law says on warranties.  Like

7    the Court has said, you don't get to give with one hand and

8    take it away over here.  They made the promises they made, and

9    the Jonssons used the product and the mink were hurt.

10           THE COURT:  Counsel suggests that there are no

11   warranties from Rangen.  How do you respond to that?

12           MR. HANCEY:  I respond to that like this.

13   Exhibit 10 is the fur production agreement, the contract

14   between National and Rangen.  In that document Rangen makes a

15   very critical expressed promise to National.  And the promise

16   is, the feed that we manufacture for you, National Feed, will

17   not be adulterated.

18           And Mr. Buschur agreed on the stand.  If, in fact,

19   Rangen produced material that was adulterated, then they

20   violated their contractual guarantee to National Feeds.  As a

21   third-party beneficiary, as an end user under the UCC and here

22   in Utah, the Jonssons are entitled to rely on and benefit from

23   any guarantees that the Rangen people made to the National

24   Feeds people in that contract.

25           THE COURT:  And give me your statutory provision

1    for that.

2             MR. HANCEY:  I should know it off the top of my

3    head, but I have it right here.

4             Utah Code 70A-2-315.

5             THE COURT:  Do you really want to go ahead on

6    negligence?

7             MR. HANCEY:  Your Honor, here's what we've decided

8    to do if the Court will allow us to.  We want to go back to

9    the office, and we want to do a little bit of research.  If we

10   come back on Tuesday morning satisfied that we can get away

11   with one and without the other, we'll go ahead and do that.

12   But we just want to do a little bit of research on that issue

13   before we concede one of those claims.

14            THE COURT:  Yeah.  One of my practical problems is

15   that I need to get my instructions finished --

16            MR. HANCEY:  I understand.

17            THE COURT:  -- hopefully if not over the weekend by

18   the time you fellows and gals arrive here Tuesday morning.

19            MR. HANCEY:  Would it be helpful if we e-mailed the

20   Court sometime during this weekend if we could just have a day

21   or two to look into the issue?  I'm happy to do it before

22   Tuesday, if that's what we're talking about.

23            THE COURT:  Well, how about if I give you an

24   opportunity to go back to the office this afternoon and have

25   you do the best you can and tell me whether you're going to

893

```
 1    move ahead on that claim or whether you're not?

 2              MR. HANCEY:  At the end of today?

 3              THE COURT:  It's as good a time as any.

 4              MR. MINNOCK:  Okay.  And what's the best way to

 5    communicate that to the Court?

 6              THE COURT:  Our court e-mail number, which

 7    Stephanie or Ashley or my secretary can give to you.

 8              MR. HANCEY:  Okay.  We'll do that, Your Honor.

 9              THE COURT:  I think that's an interesting question

10    because in the preparation of instructions, if that is not

11    there as really kind of a redundant thing, it's a lot easier

12    and a lot more simpler --

13              MR. HANCEY:  I understand, yes.

14              THE COURT:  -- to deal with the substantive

15    questions that we've got.  Bad stuff, feed, consequence.

16              MR. HANCEY:  We'll have an answer by the end of the

17    day.

18              THE COURT:  Copies to them.

19              MR. HANCEY:  Of course, yes.

20              THE COURT:  Well, I'll note the ones that you've

21    withdrawn, and I'll consider the others as requested, and

22    we'll do the best we can with what we've got.  Why don't we

23    plan on getting together to examine whatever package we come

24    up with, if you'll do that by 11:00 on Tuesday.  We'll have an

25    instruction conference at that time.  I hope to be able to
```

1    give you a package that you'll have an opportunity to examine

2    and agree with or disagree with and suggest improvements or

3    deletions or additions.

4              MR. MITCHELL:  Your Honor, would it be feasible if

5    the Court were to get its packet over the weekend to have

6    those e-mailed around to counsel so we can take a look at

7    them?

8              THE COURT:  I'll give them to you at 11 o'clock on

9    Tuesday, which is the target time I've got for me --

10             MR. MITCHELL:  Okay.

11             THE COURT:  -- with everything else I have to do.

12             MR. MITCHELL:  Understood.

13             THE COURT:  But you'll have adequate time to look.

14             MR. MITCHELL:  Okay.

15             MR. MINNOCK:  Could you answer a question that's

16   plagued us for the last week and we haven't been able to

17   figure out?  Are you planning on instructing the jury before

18   we do closings, or do we do closings and then you instruct the

19   jury?

20             THE COURT:  Yes.  You do closings, and then I

21   instruct.  I have the last word.

22             MR. MINNOCK:  Thank you.

23             MR. MERCER:  Would it be helpful to talk about the

24   schedule, then, beginning at 1 o'clock?

25             MR. HANCEY:  11 o'clock.

1          MR. MERCER:  I mean, when the jury comes.

2          THE COURT:  I'm interested in your best guess as to

3   time.

4          MR. HANCEY:  Well, are we going to do -- are we

5   going to divide the opening arguments between parties or

6   between sides?  Because I would like to save some for

7   rebuttal.

8          THE COURT:  Well, yeah.  You're entitled to save

9   something for rebuttal.

10          MR. HANCEY:  Right.

11          THE COURT:  And we really ought to divide it

12   between sides.  We've let people run on here thinking that we

13   may have two parties defendants that aren't necessarily in the

14   same tub.  But I think we ought to recognize that there may be

15   a little slippage, but generally between sides.  We'll let you

16   talk, we'll let each of them talk briefly and then we'll let

17   you talk.

18          MR. HANCEY:  Okay.  Very good.

19          MR. MERCER:  Should we talk about how long?

20          MR. HANCEY:  I don't know.  30 minutes?

21          THE COURT:  Okay.

22          MR. MINNOCK:  I would say closer to 45.  I mean,

23   we're going to have to divide.

24          MR. HANCEY:  Fair enough.  Okay.  45 minutes.  I'm

25   okay with that.

1          MR. MERCER:  45 minutes per side, and we can go 30

2    and then 15.

3          THE COURT:  However you want to divide it

4    appropriately.  I'm fairly flexible, as long as we are talking

5    about the case.

6          We'll see you at 11:00 on Tuesday.

7          MR. HANCEY:  Thank you, Judge.

8          MR. MERCER:  Thank you.

9          MR. MITCHELL:  Thank you.

10          THE COURT:  Thanks a lot.

11          (Whereupon, the court proceedings were concluded.)

12                    *   *   *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF UTAH          )

2                           ) ss.

3    COUNTY OF SALT LAKE  )

4             I, KELLY BROWN HICKEN, do hereby certify that I am

5    a certified court reporter for the State of Utah;

6             That as such reporter, I attended the hearing of

7    the foregoing matter on January 17, 2014, and thereat reported

8    in Stenotype all of the testimony and proceedings had, and

9    caused said notes to be transcribed into typewriting; and the

10   foregoing pages number from 797 through 897 constitute a full,

11   true and correct report of the same.

12            That I am not of kin to any of the parties and have

13   no interest in the outcome of the matter;

14            And hereby set my hand and seal, this _____ day of

15   _____ 2007.

16

17

18

19

20            _____

21                      KELLY BROWN HICKEN, CSR, RPR, RMR

22

23

24

25